No. 23-1059

# United States Court of Appeals for the Fourth Circuit

SOUTH CAROLINA STATE PORTS AUTHORITY,

*Petitioner,*

*and*

THE STATE OF SOUTH CAROLINA; UNITED STATES MARITIME ALLIANCE, LTD.,

*Intervenors for Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*

*and*

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL 1422; INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,

*Intervenors for Respondent.*

On Petition for Review of an Order of the National Labor Relations Board

## PETITIONER'S BRIEF

TRACEY C. GREEN
BURR & FORMAN LLP
1221 Main Street, Suite 1800
Columbia, S.C. 29201
(803) 753-3224
tgreen@burr.com

CARTER G. PHILLIPS
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for Petitioner South Carolina State Ports Authority*

*Additional counsel listed on inside cover*

<u>Counsel (continued)</u>

MICHAEL O. ECKARD
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
211 King Street, Suite 200
Charleston, S.C. 29401
(843) 720-0872
michael.eckard@ogletreedeakins.com

*Counsel for Petitioner South*
*Carolina State Ports Authority*

## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES WITH A DIRECT FINANCIAL INTEREST

The South Carolina State Ports Authority is not a publicly held entity. Thus, it does not have a parent corporation or issue stock.

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER ENTITIES WITH A DIRECT FINANCIAL INTEREST ...........................i

TABLE OF AUTHORITIES ................................................................iv

JURISDICTIONAL STATEMENT......................................................1

STATEMENT OF THE ISSUES..........................................................1

INTRODUCTION ................................................................................1

STATEMENT OF THE CASE .............................................................6

    I.    Statement Of Facts .....................................................6

    II.    Procedural History....................................................14

    III.    Rulings On Review ...................................................15

        A.    ALJ Decision ...................................................15

        B.    The Board Decision .........................................18

        C.    Board Dissent ..................................................21

SUMMARY OF ARGUMENT ...........................................................24

ARGUMENT ......................................................................................27

STANDARD OF REVIEW..................................................................27

    I.    ILA's Lawsuit Violates Sections 8(b)(4)(ii)(A) And (B) And 8(e) Of The NLRA .................................................28

        A.    ILA's Lawsuit Has An Illegal Object ...............28

        B.    The NLRB's Decision That ILA's Lawsuit Had A Lawful Work-Preservation Object Is Wrong As A Matter of Law .............................................31

            1.    The Lawsuit's Object Was Job Acquisition, Not Job Preservation. ...................................32

            2.    ILA's Coercive Conduct Was Unlawful Secondary Activity Because USMX And Its Carrier-Members Do Not Control The Lift-Equipment Work At The Leatherman Terminal ............................................42

II.    ILA And USMX And Its Carrier-Members Entered Into An Unlawful Agreement Not To Do Business With New Container-Handling Facilities Which Did Not Use ILA Members For All Container-Related Work. ............................... 50

CONCLUSION .......................................................................... 58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. President Lines, Ltd. v. ILWA, Alaska Longshore Div.,*
611 F. App'x 908 (9th Cir. 2015) ........................................... 48

*BE & K Constr. Co. v. NLRB,*
536 U.S. 516 (2002) ................................................................ 28

*Bill Johnson's Rests., Inc. v. NLRB,*
461 U.S. 731 (1983) ................................................... 3, 25, 28

*Cal. Cartage Co. v. NLRB,*
822 F.2d 1203 (D.C. Cir. 1987) ............................................ 31

*Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union,*
905 F. Supp. 2d 1198 (D. Or. 2012), *aff'd in part, vacated in part,* 544 F. App'x 657 (9th Cir. 2013) ............................ 49

*Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union,*
544 F. App'x 657 (9th Cir. 2013) .......................................... 44

*Int'l Bhd. of Elec. Workers, Loc. Union No. 501 v. NLRB,*
566 F.2d 348 (D.C. Cir. 1977) .............................................. 42

*Int'l Longshoremen's Ass'n v. NLRB,*
613 F.2d 890 (D.C. Cir. 1979) ......................................... 42, 46

*Kennedy ex rel. NLRB v. Sheet Metal Workers Int'l Ass'n Loc. 108,*
289 F. Supp. 65 (C.D. Cal. 1968) .......................................... 38

*Loc. 32B-32J Serv. Emps. Int'l Union v. NLRB,*
68 F.3d 490 (D.C. Cir. 1995) ...................................... 40, 41, 43

*Loc. 644, United Bhd. of Carpenters & Joiners of Am. v. NLRB,*
533 F.2d 1136 (D.C. Cir. 1975) ............................................ 31

*Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am.,*
147 F.3d 296 (4th Cir. 1998) ...................................... *passim*

*Nat'l Woodwork Mfrs. Ass'n v. NLRB*,
  386 U.S. 612 (1967) ..................................................... *passim*

*NLRB v. Air Contact Transp. Inc.*,
  403 F.3d 206 (4th Cir. 2005).............................................. 28

*NLRB v. Int'l Longshoremen'ts Ass'n*,
  447 U.S. 490 (1980) ..................................................... *passim*

*NLRB v. Int'l Longshoremen's Ass'n*,
  473 U.S. 61 (1985) ..............................................4, 26, 31, 38

*NLRB v. Loc. 638, Enter. Ass'n of Steam Pipefitters*,
  429 U.S. 507 (1977) ..................................................... *passim*

*Sheet Metal Workers Int'l Ass'n v. NLRB*,
  989 F.2d 515 (D.C. Cir. 1993) ............................................ 30

*Tecnocap, LLC v. NLRB*,
  1 F.4th 304 (4th Cir. 2021) ..........................................27, 28

## Statutes

29 U.S.C. § 158(b)(4)(ii) ..............................................2, 24, 29

29 U.S.C. § 158(e).........................................................5, 24

29 U.S.C. § 160(a) ............................................................ 1

29 U.S.C. § 160(f) ............................................................ 1

## Administrative Decisions

*Elevator Constructors Loc. 3 (Long Elevator & Mach. Co.)*,
  289 N.L.R.B. 1095 (1988)................................................... 52

*Gen. Teamsters Loc. 982 (J.K. Barker Trucking Co.)*,
  181 N.L.R.B. 515 (1970), *aff'd*, 450 F.3d 1322 (D.C. Cir.
  1971)...................................................................... 52

*Int'l Longshoremen's Ass'n (Dolphin Forwarding, Inc.)*,
266 N.L.R.B. 230 (1983), *enforced in relevant part*, 734
F.2d 966 (4th Cir. 1984), *aff'd*, 473 U.S. 61 (1985) ............................. 48

*Lithographers Loc. 78 (Employing Lithographers of Miami)*,
130 N.L.R.B. 968 (1961) ................................................................... 51, 57

*Longshoremen Loc. 1291 (Holt Cargo Sys.)*,
309 N.L.R.B. 1283 (1992) ...................................................................... 41

## Legislative Materials

McNair Resol. H 1636, 98th Gen. Assemb., 1st Sess., 1969
S.C. S.J. 826 (Apr. 30, 1969) ................................................................... 8

## Other Authorities

John E. Higgins, Jr., *The Developing Labor Law: The Board,
the Courts, and the National Labor Relations Act* (8th ed.
2022) ............................................................................................................ 50

vi

## JURISDICTIONAL STATEMENT

The National Labor Relations Board ("NLRB" or "Board") had jurisdiction over the unfair labor practice charges at issue under 29 U.S.C. § 160(a). The Board issued its Decision and Order on December 16, 2022; and petitioner South Carolina State Ports Authority filed its petition for review on January 17, 2023. This Court has jurisdiction to review the Board's decision under 29 U.S.C. § 160(f).

## STATEMENT OF THE ISSUES

1. Whether the International Longshoremen's Association ("ILA") violated sections 8(b)(4)(ii)(A) and (B) and 8(e) of the National Labor Relations Act by filing a lawsuit against the United States Maritime Alliance, Ltd. ("USMX") and its carrier-members, seeking to prevent them from doing business with the South Carolina State Ports Authority ("SCSPA") at the Leatherman Terminal in Charleston, South Carolina, unless and until SCSPA assigns the lift-equipment jobs there to ILA members.

2. Whether ILA and USMX have entered into an agreement not to do business with new port facilities that do not use ILA members for all container-handling jobs in violation of section 8(e) of the National Labor Relations Act.

## INTRODUCTION

For decades, the Port of Charleston, owned and operated by the South Carolina State Ports Authority ("SCSPA"), has employed roughly 270 state workers to operate the State-owned lift-equipment used to load and unload containers at the Port's terminals ("the lift-equipment work").

1

Roughly 2,000 members of the International Longshoremen's Association ("ILA") utilized by carriers who call at the Port perform all other longshoreman work there. In 2022, SCSPA opened an additional terminal at the Port, Leatherman Terminal, using that same division of labor between state employees and ILA members. ILA responded by filing a lawsuit *not against SCSPA*, but instead against the United States Maritime Alliance, Ltd. ("USMX"), a multi-employer association of carriers that deliver and pick-up containers at East and Gulf Coast ports, and two of its carrier-members. The lawsuit alleged that USMX and its carrier-members were violating their collective bargaining agreement with ILA (the "Master Contract") by calling at Leatherman Terminal, because SCSPA employed state employees for the lift-equipment work there. In the lawsuit, ILA seeks $300 million in damages along with fees and costs. It has succeeded in its goal: USMX carrier-members have ceased calling at South Carolina's Leatherman Terminal.

Section 8(b)(4)(ii)(B) of the NLRA provides that it is an unfair labor practice for a union "to threaten, coerce, or restrain any person engaged in commerce," where "an object" of the union's coercive conduct is to force that person to "cease doing business with any other person." 29 U.S.C.

§ 158(b)(4)(ii)(B). Sections 8(b)(4)(ii)(A) and 8(e) make it unlawful for a union to enforce and maintain contract provisions with that same illegal object. These provisions do not prohibit "primary" activities, which directly pressure the employer with whom the union has a dispute. *See Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 643-44 (1967). They do, however, prohibit "secondary" activities, which coerce neutral employers to put indirect pressure on the primary employer with whom the union has a dispute.

ILA's lawsuit does just that: Although ILA's dispute is with SCSPA and its assignment of the lift-equipment work to state employees, ILA's lawsuit pressures USMX and its carrier-members to cease doing business at Leatherman Terminal until SCSPA agrees to use ILA members to do that work. The suit thus has an "objective that is illegal under federal law"—coercing neutral parties (USMX and its carrier-members) to pressure SCSPA to give ILA members the lift-equipment jobs. *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 737 n.5 (1983).

The NLRB, however, reversed its Administrative Law Judge's ("ALJ's") decision that ILA had violated §§ 8(b)(4)(ii)(A) and (B) and 8(e). It held that ILA's lawsuit had a lawful work-preservation purpose.

Decision and Order ("Decision") 6 (Joint Appendix ("JA") 1331). To establish a work-preservation defense, a union must show *both* that its sole objective was to preserve bargaining-unit work *and* that its actions were directed at the entity that controls the work assignment. *NLRB v. Int'l Longshoremen's Ass'n*, 473 U.S. 61, 77 (1985) ("*ILA II*"). *See also Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am.*, 147 F.3d 296, 303 (4th Cir. 1998). ILA met neither prerequisite.

Here, ILA seeks to obtain lift-equipment jobs at the Port of Charleston for its members; it is undisputed that during the 50 years the Port has operated, ILA members have *never* performed that work and SCSPA has never been party to a collective bargaining agreement with ILA. Moreover, as the Board expressly found, SCSPA—*not* USMX and its carrier-members—"indisputably controls" assignment of the lift-equipment jobs at the Port. Decision 7 (JA 1332). Thus, by its coercive actions against USMX and its carrier-members, ILA "sought to acquire work that it never had and that its employer had no power to give it." *NLRB v. Loc. 638, Enter. Ass'n of Steam Pipefitters*, 429 U.S. 507, 528 n.16 (1977) ("*Pipefitters*"). For both reasons, ILA has no work-

preservation defense. The NLRB's contrary decision violates precedent of the Supreme Court, this Court, and other courts of appeals.

The Board also erred in holding that the Master Contract does not violate section 8(e) of the NLRA. As noted, under that provision, it is an unfair labor practice for a union and employer to enter into an "express or implied" agreement to "cease doing business" with any other person. 29 U.S.C. § 158(e). The key question is whether ILA and USMX have entered into an agreement that is "tactically calculated to satisfy union objectives elsewhere," that is, ILA's well-established objectives with SCSPA. *See Nat'l Woodwork Mfrs.*, 386 U.S. at 644-45. On this record, ILA and USMX have an implied agreement that USMX carrier-members will not call at any new container-handling facility at an East or Gulf Coast port that does not use ILA members for all longshore work that ILA members perform at other ports. The Board, however, arbitrarily ignored the overwhelming evidence that the contracting parties had, as a practical matter, reached such an agreement. Its decision should be reversed.

## STATEMENT OF THE CASE

### I.   Statement Of Facts

ILA and its local unions represent longshoremen, clerks, checkers, and maintenance workers at East and Gulf Coast ports. Decision 1 (JA 1326). ILA's local union at the Port of Charleston, South Carolina is Local 1422. *Id.* at 1, 3 (JA 1326, JA 1328). During the relevant time, Harold Daggett served as ILA President, with Dennis Daggett and Kenneth Riley serving as ILA Vice-Presidents. Decision 4 (JA 1329); Dissent from Decision 10 (JA 1335).

USMX is a multi-employer association of container carriers, terminal operators and port associations. Decision 1 (JA 1326). Its members are responsible for the transportation and handling of cargo shipped to and from U.S. ports, including the Port of Charleston. *Id.* (JA 1326). It represents its carrier-members in negotiating and administering collective bargaining agreements with ILA and its local unions, including Local 1422. David Adam is the USMX Chairman and Chief Executive Officer. *Id.* at 2 (JA 1327).

ILA and USMX have long been parties to a Master Contract that covers employees at ports along the East and Gulf Coasts of the United States. The most recent Master Contract is effective from 2018 through

2024. Decision 1 (JA 1326). That Master Contract, like past Master Contracts, contains numerous provisions related to container handling. Article VII, Section 7 of the contract was first added in the 2013-2018 Master Contract. It provides:

(a) USMX and the ILA shall conduct a study to determine how the business model currently used by port authorities in the Ports of Charleston, SC, Savannah, GA, and Wilmington, NC could be altered to permit work currently performed by state employees to be performed by Master Contract-bargaining-unit employees in a more productive, efficient and competitive fashion. USMX and the ILA will use this study to meet with these port authorities in an effort to convince them to employ Master Contract-bargaining-unit employees.

(b) USMX agrees to formally notify any port authority contemplating the development of or intending to develop a new container handling facility that USMX members may be prohibited from using that new facility if the work at that facility is not performed by Master Contract-bargaining-unit employees.[1]

Decision 1 (quoting Master Contract, Art. VII, Section 7) (JA 1326).

---

[1] The Master Contract's appendix also includes a "Containerization Agreement" in which the parties "recognize the existing work jurisdiction of ILA employees covered by their agreements with the ILA over all container work which historically has been performed by longshoreman and all other ILA crafts at container waterfront facilities. Carriers, direct employers and their agents covered by such agreements agree to employ employees covered by their agreements to perform such work…." Decision 2 (quoting Containerization Agreement) (JA 1327).

SCSPA is an instrumentality of the State of South Carolina. Decision 2 (JA 1327). It has operated the Port of Charleston for roughly 50 years. SCSPA enters into contracts with numerous USMX carrier-members to provide services at the Port's waterfront container-handling facilities. Neither the State of South Carolina nor SCSPA has ever been party to a Master Contract or any other ILA agreement covering the Port. *Id.* (JA 1327). Indeed, in 1969, the South Carolina legislature passed a Concurrent Resolution stating that there is "no constitutional or statutory authority permitting the State, its subdivisions, agencies or institutions to bargain collectively with their employees." McNair Resol. H 1636, 98th Gen. Assemb., 1st Sess., 1969 S.C. S.J. 826 (Apr. 30, 1969). *See also* Decision 2. (JA 1327) ("a 1969 State law prohibits state employees from organizing and joining unions").

In operating the Port of Charleston, accordingly, SCSPA has for decades used what is known as a hybrid division of labor. *Id.* (JA 1327). SCSPA uses state employees to "operate state-owned lift equipment to load and unload container ships that call at" the Port's Terminals. *Id.* (JA 1327). "ILA-represented employees perform the remainder of the longshore work at the [P]ort." *Id.* (JA 1327). As the ALJ described:

> Specifically, the state employees operate SCSPA's ship-to-shore cranes to unload containers from incoming cargo ships and place them onto trucks, which transport the containers to a designated stack location in the Port's container yard. There, other state employees operate SCSPA's lift machines … to unload the containers and place them in a stack for pickup and delivery. The remaining work—the loading and unloading of ships, the lashing and unlashing of containers, container spotting, securing containers on the ships, etc. (referred to as stevedoring work)—is performed by Local 1422 members.

ALJ Decision 19 (JA 1344) (citations omitted). Overall, "[t]here are approximately 270 state employees and over 2,000 ILA members working on the terminals at the Port of Charleston." *Id.* (JA 1344). This same hybrid model is also used at the ports in Wilmington, North Carolina and Savannah, Georgia. *Id.* n.10 (JA 1344).

ILA has long taken the position that the purpose of Article 7, Section 7 of the Master Contract is to "contain the hybrid operating model to those existing terminals where it was used," and to forbid USMX carrier-members to "call on any new terminal where the container work was not all performed by ILA unit members, regardless of the port." ALJ Decision 20 (JA 1345). ILA Vice President Kenny Riley is quoted in a book published in 2020, as stating:

> The port can build whatever terminals it wants, and it can put in the most expensive cranes and infrastructure it wants at any terminal it wants, but if no ships call on that terminal, then it just got a brand-new terminal with nothing there…if there are any new terminals built, and if they are not in compliance with the [Master Contract], the ships will not call on those facilities."

Decision 4 & n.11 (quoting *Kenny Riley and Black Union Labor Power in the Port of Charleston*) (JA 1329).

In 2020, after years of planning, permitting, investment and construction,[2] SCSPA announced that it would open an additional terminal at the Port, the $1.5 billion Hugh K. Leatherman, Sr. Terminal. Decision 2 (JA 1327). SCSPA stated that the new Terminal would operate under the hybrid model used at the Port's other terminals. *Id.* (JA 1327).

In response, USMX Chief Executive Officer David Adam wrote to SCSPA President and Chief Executive Officer James Newsome: "[P]ursuant to Article VII, Section 7(b) of the [Master Contract] … USMX employer-members may be prohibited from using the new facility being developed … at [the Port] if the work at that facility is not performed by Master Contract bargaining-unit employees." *Id.* (JA 1327) (quoting June

---

[2] *See* Transcript of NLRB Hearing ("Tr.") 42, 71, 271 (JA 52, JA 81, JA 282).

2020 Letter from D. Adam to J. Newsome). Other USMX carrier-members sent similar letters to SCSPA. *Id.* (JA 1327).

Thereafter, USMX, SCSPA, ILA and State representatives met regularly but were unable to reach agreement about the performance of work at Leatherman Terminal. *Id.* (JA 1327). In addition, throughout August and September 2020, SCSPA CEO Newsome communicated with representatives of USMX carrier-members about SCSPA's plan to operate Leatherman Terminal under the same decades-old hybrid model historically employed at the Port. "Several representatives questioned, or expressed concern over, whether ILA had agreed to the use of that operating model, and some made references to Article VII, Section 7 of the Master Contract." ALJ Decision 21 (JA 1346).

On January 6, 2021, SCSPA CEO Newsome and ILA Vice-President Riley participated in a call with South Carolina lawmakers and others to discuss Leatherman Terminal. *Id.* (JA 1346). "Riley stated [that] ILA and Local 1422 were interested in consuming all the jobs at the Leatherman Terminal." *Id.* (JA 1346). Although SCSPA "wanted the dispute resolved through arbitration, . . . neither ILA nor USMX expressed a willingness to do so." *Id.* (JA 1346).

11

On January 6 and 7, 2021, South Carolina and SCSPA filed with the NLRB unfair labor practice charges against ILA, its Local 1422, and USMX, asserting that Article 7, Section 7 of the Master Contract violated section 8(e) of the NLRA. Decision 3 (JA 1328). On March 17, the NLRB General Counsel, finding merit in the charges, issued a complaint. *Id.* (JA 1328).

Thereafter, on March 18, 2021, ILA, Local 1422, and USMX agreed in writing not to enforce Section 7(b) of the Master Contract until the resolution of the unfair labor practice charges. *Id.* n.7 (JA 1328).

On March 30, 2021, SCSPA began operations at the Leatherman Terminal using the hybrid labor model. *Id.* (JA 1328). On April 9, USMX carrier member Hapag-Lloyd called at the new Terminal. *Id.* (JA 1328).

On April 22, 2021, despite its agreement not to enforce Section 7(b) of the Master Contract during the pendency of the NLRB proceeding, ILA filed a lawsuit against USMX and Hapag-Lloyd in New Jersey State court, where ILA and USMX are incorporated. *Id.* (JA 1328). On April 21, USMX carrier member Orient Overseas Container Line Ltd. called at Leatherman Terminal, and ILA added it as a defendant to the New Jersey lawsuit. *Id.* (JA 1328).

In that lawsuit, which was subsequently removed to federal court, ILA alleged that USMX and its carrier-members breached Article I, Section 3 of the Master Contract and portions of the Containerization Agreement, and committed tortious interference with contract, tortious interference with prospective economic advantage, and civil conspiracy, by calling at a marine terminal that employs non-bargaining unit employees. *Id.* (JA 1328). As amended, the complaint seeks $300 million in damages, plus attorneys' fees, interest, and costs. *Id.* (JA 1328).

In response, the State, SCSPA, and USMX filed a second set of unfair labor practice charges with the Board, this time alleging violations of sections 8(b)(4)(ii)(A) and (B) and 8(e), on the ground that ILA had filed its lawsuit to coerce USMX and its carrier-members to cease doing business at Leatherman Terminal in order to force SCSPA to use ILA-represented employees to perform the lift-equipment work currently performed by state employees, and to enforce an illegal interpretation of the Master Contract. Decision 3 (JA 1328).

In the two weeks following the ILA lawsuit, at least five additional USMX carrier-members contacted SCSPA demanding that they be assigned to Wando Terminal, not Leatherman Terminal. *Id.* (JA 1328).

13

One of these carriers threatened to redirect its vessels to the Port of Savannah if assigned to Leatherman Terminal. *Id.* (JA 1328). Within the next month, SCSPA diverted 12 vessels of USMX carrier members to Wando Terminal, and USMX carrier members ceased calling at Leatherman Terminal. *Id.* (JA 1328).

## II.  Procedural History

As stated above, on January 6 and 7, 2021, the State and SCSPA first filed unfair labor practices against ILA, its Local 1422, and USMX alleging that Section 7 of the Master Contract violated section 8(e) of the NLRA. *Supra* at 11-12. On March 17, the NLRB General Counsel issued a complaint. *Id.*

On April 22, 2021, after Leatherman Terminal began operations and a USMX carrier member called there, ILA filed a lawsuit against USMX and the carrier in New Jersey Superior Court, alleging breach of the Master Contract (without mentioning Article 7, Section 7) and several tort claims, and seeking $300 million in damages along with attorneys' fees, interest and costs. USMX removed that case to the United States District Court for the District of New Jersey, and it was stayed for the pendency of the NLRB proceedings. ALJ Decision 22 (JA 1347).

14

On April 26, South Carolina, SCSPA, and USMX filed additional unfair labor practice charges against ILA under sections 8(b)(4)(ii)(A) and (B) and 8(e), alleging that the ILA lawsuit had the unlawful objective of forcing USMX to cease doing business at Leatherman Terminal to coerce SCSPA to use ILA-represented employees to do the lift-equipment work there, and to enforce an illegal interpretation of the Master Contract. *Supra* at 12. On May 19, the NLRB General Counsel issued a second complaint on these allegations. *Id.*

On May 21, the two sets of unfair labor practice charges were consolidated for hearing before the Board's ALJ. Decision 3 n.8 (JA 1328). The complaints were tried together from June 9-10, 2021. ALJ Decision 17 (JA 1342).

## III.  Rulings On Review

### A.    ALJ Decision

The ALJ held that the Master Contract does not violate section 8(e). He first held that Article 7, Section 7(b) "is not clearly unlawful on its face," because it "does not require USMX or its carrier-members to boycott the Leatherman Terminal or to cease doing business with SCSPA or any other employer or person." ALJ Decision 24 (JA 1349). It only requires the carrier-member to notify the port that USMX members

"'may be prohibited' from using the facility if the work there is not performed by bargaining-unit employees." *Id.* (JA 1349).

The ALJ further found that use of the word "may" did not make that agreement ambiguous; and that, even if it were ambiguous, the "extrinsic evidence d[id] not establish [that] the parties agreed to administer the provision in an unlawful manner." *Id.* at 25 (JA 1350). The ALJ also rejected the alternative argument that between June 2020 and January 2021, the parties "made statements reflecting an (implied) agreement to interpret and apply [Section 7(b)] in a manner that violated Section 8(e)." *Id.* (JA 1350). He observed that where a provision is not facially unlawful, any subsequent agreement to enforce the provision in a manner that violates section 8(e) must be "bilateral," and that USMX and ILA did not agree on its interpretation. *Id.* (JA 1350). He then found that while ILA representatives' statements "clearly show ILA and Local 1422 wanted, and claimed the right, to perform all container work at the Leatherman Terminal[,] USMX … did not agree." *Id.* (JA 1350).

With respect to the second set of unfair labor practice charges, however, the ALJ found that ILA's lawsuit against USMX and its member-carriers had an unlawful object—to use USMX and its carrier-

members to force SCSPA to give its lift-equipment jobs at Leatherman Terminal to ILA members. ALJ Decision 29 (JA 1354). *See id.* (JA 1354) (the ILA lawsuit was "a sword to achieve an unlawful secondary object," the acquisition of work, in violation of sections 8(b)(4)(ii)(A) and (B) and 8(e)).

The ALJ first observed that "a condition precedent to finding a lawful work preservation object is evidence of an actual or anticipated threat to unit jobs." *Id.* (JA 1354) (citing cases). He concluded that in this case "there is no evidence of any actual or anticipated threat to unit work, only vague speculation." *Id.* (JA 1354). The Judge explained that evidence showed "Charleston is primarily a regional port," and that there was no evidence that "work might migrate from ILA-controlled ports to Charleston." *Id.* (JA 1354).

Thereafter, the ALJ found that "[w]hat is *not* lacking is the evidence of ILA's desire to obtain all the container work at the Leatherman Terminal, as well as at any future container-handling facilities." *Id.* (JA 1354) (emphasis supplied). He cited numerous statements by ILA representatives, including those quoted above. *Id.* (JA 1354). After describing the evidence, the ALJ held that "ILA's object for its lawsuit

17

against USMX and its carrier-members was work acquisition, not work preservation," and further that "ILA filed its lawsuit with the object of forcing USMX and its carrier-members to agree that facially valid provisions [of the Master Contract and Containerization Agreement] prohibited them from calling on the Leatherman Terminal unless bargaining-unit members performed all container work, including the lift-equipment work, in violation of Section 8(b)(4)(ii)(A) and 8(e)." *Id.* (JA 1354-1355).

B.    **The Board Decision**

The Board affirmed the ALJ's decision that the Master Contract did not violate section 8(e) of the NLRA for the reasons stated by the ALJ. Decision 3 (JA 1328). However, the Board reversed the ALJ's decision that ILA filed its lawsuit against USMX and its carrier-members in violation of section 8(b)(4)(ii)(A) and (B) and section 8(e).

The Board first noted that a lawsuit constitutes an unfair labor practice only when it is either "objectively baseless and retaliatory" or when it "has an objective that is illegal under federal law." Decision 4-5 (quoting *Bill Johnson's Rests., Inc.*, 461 U.S. at 737 n.5) (JA 1329-1330). The Board found that the lawsuit did not seek to acquire work at the

Port, but instead had a "lawful work preservation" objective. Decision 5 (JA 1330). The Board quoted the Supreme Court's test for determining whether conduct is lawful work preservation or unlawful secondary activity to acquire non-bargaining unit work:

> The touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer *vis-à-vis* his own employees. Under this approach, a lawful work preservation agreement must pass two tests: First, it must have as it objective the preservation of work traditionally performed by employees represented by the union. Second, the contracting employer must have the power to give the employees the work in question—the so-called 'right of control test'. … The rationale of the second test is that if the contracting employer has no power to assign the work, it is reasonable to infer that the agreement has a secondary objective, that is, to influence whoever does have such power over the work.

Decision 6 (quoting *NLRB v. ILA*, 447 U.S. 490, 504-05 (1980)) (JA 1331).

The Board first disagreed with the ALJ's determination that the ILA's objective in filing the lawsuit was to acquire work it had not traditionally performed—the lift-equipment jobs at the Port that state employees had filled for almost 50 years. The Board found that the collective bargaining agreement covered a coast-wide unit, and that ILA was "seeking to preserve the traditional work and the jobs of unit

19

employees in the face of the technological advances affecting the coastal units, including such changes as the new Leatherman Terminal." Decision 7 (JA 1332).

The Board also found that USMX and its carrier-members "have sufficient control over the work in question—the loading or unloading of containers they own or lease"—for ILA to invoke the work-preservation doctrine. *Id.* (JA 1332). The Board acknowledged that "SCSPA has sole authority to decide which terminals at the Port of Charleston USMX carriers call on, as well as who performs loading and unloading work at those terminals using state-owned lift equipment." *Id.* (JA 1332). But the Board nonetheless believed that because USMX carrier-members "have the authority to bypass the Port of Charleston and call on other ports where ILA-represented employees perform all loading and unloading work," that ability gives USMX and its carrier-members "the right to control who performs loading and unloading work of their containers." *Id.* (JA 1332).

Finally, the Board rejected what it called the ALJ's "apparent finding that a valid work preservation object requires a showing that ILA would lose jobs at the port or that the hybrid union-to-nonunion employee

ratio would widen if business at the port expanded." Decision 8 (JA 1333). The Board stated that "[t]o the extent that a showing of job loss or threat thereof is required, it has been satisfied by the history of containerization and its effect on the number of longshoremen." *Id.* (JA 1333). Further, the Board stated, "[t]o the extent that the judge believed that a showing of job loss at the Port of Charleston was required, we have found instead that a coast-wide examination is appropriate." *Id.* (alterations omitted) (JA 1333).

## C.    Board Dissent

Member Ring dissented from the Board's reversal of the ALJ's decision that the ILA lawsuit had an unlawful objective. He first noted that "SCSPA is not, and never has been, a party to the Master Contract (or any other labor agreement) with the ILA. And despite the ILA's contractual claim to all container work along the East and Gulf Coasts, for nearly 50 years the SCSPA, with the ILA's acquiescence has used a 'hybrid' operating model at the Port's North Charleston and Wando Welch Terminals." Dissent 8-9 (JA 1333-1334). He thus concluded that "even assuming arguendo that the ILA's lawsuit has as its objective the preservation of work traditionally performed by the ILA …, the work in

question is the operation of the lift-equipment work at the Leatherman

Terminal, and USMX and its carrier-members do not have the power to

give that work to ILA-represented employees." Dissent 9 (JA 1334). As

Member Ring explained,

> [It is] SCSPA [that] has that power, and therefore ILA's dispute is with the SCSPA. USMX and its carrier-members are secondary or neutral employers in the dispute, and ILA filed and is maintaining its lawsuit against USMX and the carrier-members for an unlawful secondary objective of forcing USMX and its carrier-members to cease doing business with the SCSPA at the Leatherman Terminal in order to pressure the SCSPA to assign the lift-equipment work there to ILA-represented employees.

Dissent 9 (JA 1334). *See id.* at 14 ("The State owns the lift equipment at

the Leatherman Terminal, and the State, through the SCSPA, has the

exclusive power to assign the operation of that equipment.") (JA 1339).

The dissent rejected the Board's conclusion that USMX carriers had

control over the work because they could have chosen to call at other

ports, rather than at Charleston, stating:

> to find the ILA's lawsuit lawful because a carrier may "bypass" a port where, and because, the SCSPA controls the lift-equipment work and assigns it to state employees is just another way of saying that the lawsuit is lawful because the carrier may cease doing business at that port. But

> the gravamen of the 8(b)(4)(ii)(B) allegation at issue here is precisely that the ILA, in bringing its lawsuit, has that very object—*i.e.*, an object of foreign carriers to cease doing business with the SCSPA. In effect, my colleagues find the ILA's lawsuit lawful to the extent it succeeds in accomplishing its unlawful object!

Dissent 15 (JA 1340).

Further, Member Ring explained that the Board's decision was at odds with the Supreme Court's decision in *Pipefitters*. The subcontractor in that case could have simply declined the job at issue there and worked only on projects where the general contractor did not require it to install pre-cut and pre-threaded pipe, and instead used union-represented employees to cut and thread the pipe. But "the subcontractor in *Pipefitters* was found *not* to have the right to control the work in question," and thus the union's pressure on the subcontractor was secondary and unlawful because the union's real or primary dispute was with the contractor. *Id.* (JA 1340). The dissent concluded that this precisely mirrors the situation here.

Finally, Member Ring rejected the Board's conclusion that the ILA was seeking "to preserve the traditional work of its members 'in the face of technological advances.'" Dissent 16 (JA 1341). Here, there was no

technological advance that requires "a creative definition of the work in question in order to preserve a union's traditional work." *Id.* (JA 1341). Instead, he explained:

> [This is] a simple case of the ILA seeking to acquire *more* lift-equipment work. It cannot do so directly, as it has no relationship with the entity that indisputably controls that work at the Leatherman Terminal. So it seeks to do so by secondary means, by filing and maintaining a lawsuit–claiming shock-and-awe damages—in order to scare USMX's carrier-members away from that terminal until the SCSPA takes that lift-equipment work away from the state employees and gives it to the ILA.

*Id.* (JA 1341). As Member Ring concluded, "You could not ask for a more classic case of unlawful secondary pressure. *Id.* (JA 1341).

## SUMMARY OF ARGUMENT

Under section 8(b)(4)(ii)(B) of the NLRA, it is an unfair labor practice for a union "to threaten, coerce, or restrain any person engaged in commerce," where "an object" of the union's coercive conduct is to force that person to "cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). It is also unlawful for a union to enforce and maintain contract provisions with that same illegal object. *Id.* §§ 158(b)(4)(ii)(A) and 8(e). Thus, a union may directly pressure the employer with whom

24

the union has a dispute, *see Nat'l Woodwork Mfrs. Ass'n*, 386 U.S. at 643-44; but may not coerce neutral employers to put indirect pressure on that primary employer. Doing so constitutes unlawful secondary activity.

In 2022, SCSPA opened an additional terminal at the Port of Charleston, Leatherman Terminal. As it had done for decades, and as was its practice at all Port terminals, SCSPA used state employees to operate the State-owned lift equipment at Leatherman Terminal. ILA responded by filing a lawsuit seeking $300 million in damages, *not against SCSPA*, but instead against USMX and two of its carrier-members. The lawsuit alleged that USMX and its carrier-members were violating the Master Contract between ILA and USMX by calling at Leatherman Terminal, because SCSPA used state employees for the lift-equipment work there. The objective of the lawsuit was achieved: USMX carrier-members stopped calling at Leatherman Terminal.

ILA's lawsuit thus has an "objective that is illegal under federal law." *Bill Johnson's Rests.*, 461 U.S. at 737 n.5. The union's dispute is with SCSPA, but the lawsuit pressures *USMX and its carrier-members* to cease doing business at Leatherman Terminal unless and until ILA

members are assigned to perform the lift-equipment work. This is classic unlawful secondary activity that violates the NLRA. *See* Part I.A.

The NLRB, however, held that ILA's lawsuit had a lawful work-preservation purpose. Decision 6 (JA 1331). But to establish a work-preservation defense, a union must show *both* that its objective was to preserve bargaining-unit work *and* that its coercion was directed at the person controlling the work assignment. *ILA II*, 473 U.S. at 77; *Marrowbone Dev. Co.*, 147 F.3d at 303. In Part I.B, SCSPA demonstrates that ILA failed to satisfy either requirement.

Specifically, it is undisputed that during the five decades the Port has operated, ILA members have *never* performed the lift-equipment work and SCSPA has never been party to the Master Contract or any collective bargaining agreement with ILA. Thus, ILA's lawsuit sought to obtain work that the bargaining unit members had *never* performed. *See* Part I.B.1. Moreover, the lawsuit against USMX and its carrier-members was filed to obtain jobs—the lift-equipment jobs at Leatherman—that SCSPA controlled. *See* Decision 7 (JA 1332) (SCSPA "indisputably controls" assignment of the Port's lift-equipment jobs). *See* Part I.B.2. For each of these independent reasons, under established precedent of this

26

Court and the U.S. Supreme Court, ILA has no work-preservation defense.

In Part II, SCSPA shows that the Board incorrectly held that the Master Contract does not violate section 8(e) of the NLRA. In entering into the Master Contract, ILA and USMX made an agreement that was "tactically calculated to satisfy union objectives elsewhere," specifically, ILA's oft-expressed objective to obtain the lift-equipment work at new terminals at Charleston. *See Nat'l Woodwork Mfrs.*, 386 U.S. at 644-45. The overwhelming record evidence reflects the ILA's and USMX's implied agreement that USMX carrier-members will not call at new container-handling facilities unless they use ILA members for all work that ILA members perform at other ports.

## ARGUMENT

## STANDARD OF REVIEW

This Court will uphold the NLRB's "legal interpretations" only if they "are rational and consistent with the Act." *Tecnocap, LLC v. NLRB*, 1 F.4th 304, 313 (4th Cir. 2021) (quoting *Media Gen. Operations, Inc. v. NLRB*, 394 F.3d 207, 211 (4th Cir. 2005)). This Court has held that "courts decide and review de novo" the question whether a "collective-

27

bargaining agreement violates § 8(e)." *Marrowbone Dev. Co.*, 147 F.3d at 300.

This Court will uphold the NLRB's findings of fact "'if they are supported by substantial evidence,' considering the record as a whole. *Tecnocap*, 1 F.4th at 312 (citing *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 838 (4th Cir. 2000)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206, 210 (4th Cir. 2005). Although the Board may "draw reasonable inferences from the evidence," it "may not base its inference on pure speculation." *Tecnocap*, 1 F.4th at 313 (quoting *Owens-Corning Fiberglas Corp. v. NLRB*, 407 F.2d 1357, 1362 (4th Cir. 1969)).

## I.   ILA's Lawsuit Violates Sections 8(b)(4)(ii)(A) And (B) And 8(e) Of The NLRA

### A.   ILA's Lawsuit Has An Illegal Object

Where, as here, a union files a lawsuit that "has an objective that is illegal under" the NLRA, that action constitutes an unfair labor practice. *Bill Johnson's Rests.*, 461 U.S. at 737 n.5. *See also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 526 (2002). ILA's lawsuit plainly had an unlawful object: coercing USMX and its carrier-members to cease

28

doing business with SCSPA at Leatherman Terminal and to enforce an agreement with USMX and its carrier-members requiring them to cease doing business with SCSPA.

Specifically, section 8(b)(4)(ii) of the NLRA provides that it is an unfair labor practice for a union "to threaten, coerce, or restrain any person engaged in commerce," where "an object" of the union's coercive conduct is to force a person "to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii). That provision does not prohibit "primary" activity, which is activity that directly pressures the employer with whom the union has a dispute. *Nat'l Woodwork Mfrs.*, 386 U.S. at 643-44. Instead, it prohibits "secondary activity," which is any coercive activity directed at a neutral employer in order to put indirect pressure on a different entity. *Id.. See also Pipefitters*, 429 U.S. at 511. As numerous courts have recognized, sections 8(b)(4)(ii)(A) and (B) and 8(e)'s prohibitions on secondary activity serve "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures and controversies not

their own." *Sheet Metal Workers' Int'l Ass'n v. NLRB*, 989 F.2d 515, 519 (D.C. Cir. 1993).

Though ILA has no bargaining relationship with SCSPA, it has a dispute with SCSPA; it seeks the lift-equipment jobs SCSPA assigns to state employees at Leatherman Terminal for ILA members. To achieve that objective, ILA filed a lawsuit, *not* against SCSPA, but against USMX and its carrier-members, coercing them to cease calling at Leatherman Terminal until SCSPA assigns the lift-equipment jobs to its members. Thus, ILA is coercing a secondary employer—one neutral in its dispute with SCSPA—to cease doing business with SCSPA, the primary employer with which ILA has a dispute. This is a clear violation of section 8(b)(4)(ii)(B). ILA also seeks to enforce an unlawful interpretation of the Master Contract, violating sections 8(b)(ii)(A) and 8(e).

ILA contends, however, and the Board found, that its lawsuit against USMX and its carrier-members was protected by the work-preservation defense. As a matter of law, however, ILA failed to meet the requirements for application of that defense.

30

**B.    The NLRB's Decision That ILA's Lawsuit Had A Lawful Work-Preservation Object Is Wrong As A Matter of Law**

To be shielded by the work-preservation defense, a union's coercive activity must satisfy two conditions: (1) its activity must be "conducted for the sole purpose of preserving traditional unit work," *Loc. 644, United Bhd. of Carpenters & Joiners of Am. v. NLRB*, 533 F.2d 1136, 1147 (D.C. Cir. 1975); and (2) the "contracting employer must have the power to give the employees the work in question—the so-called 'right of control' test," *NLRB v. Int'l Longshoremen's Ass'n*, 447 U.S. 490, 504 (1980) ("*ILA I*"). Put differently, a union violates section 8(b)(4)(B) when its goal is "to acquire completely new jobs or to benefit [non-bargaining unit] employees." *Cal. Cartage Co. v. NLRB*, 822 F.2d 1203, 1207 (D.C. Cir. 1987) (citations omitted). *See also Loc. 644, United Bhd. of Carpenters*, 533 F.2d at 1147 (expansion of bargaining unit membership is an unlawful secondary objective). And even union activity undertaken to preserve traditional work violates section 8(b)(4)(B) if it is directed at a party without control over the assignment of that work. *ILA II*, 473 U.S.

at 77. ILA's lawsuit satisfies neither prerequisite for the work-preservation defense.

### 1. The Lawsuit's Object Was Job Acquisition, Not Job Preservation

On the undisputed facts in this record, ILA did not seek to preserve work its members traditionally had performed. In fact, ILA seeks to acquire new work—specifically, the lift-equipment jobs at the Port's Leatherman Terminal that are and have been performed by state employees for decades.

Under the work-preservation rule, a labor organization may use coercive activities as a "shield to preserve the jobs" of employees in the bargaining unit, but it may not engage in such activities as a sword wielded "to reach out *to monopolize jobs or acquire new job tasks* when their own jobs are not threatened" by the employer being coerced. *Nat'l Woodwork Mfrs.*, 386 U.S. at 630-31 (emphasis supplied). *See also ILA I*, 447 U.S. at 507 ("to determine whether an agreement seeks no more than to preserve the work of bargaining-unit members, *the Board must focus on the work on the bargaining unit employees*, not on the work of other employees who may be doing the same or similar work") (emphasis supplied).

32

It is undisputed that ILA-represented employees have never performed the lift-equipment work at any terminal of the Port of Charleston. For almost 50 years, that work has been performed by state employees. *See supra* at 7-9. SCSPA is not a member of USMX; it has *never* had a collective bargaining agreement with ILA and its employees have never been represented by ILA or an ILA local. Indeed, ILA accepted SCSPA's assignment of the lift-equipment work to state employees throughout this period. This consistent history at the Port of Charleston shows that ILA did not have a legitimate work-preservation purpose here, but instead sought to acquire new jobs by coercing neutral employers (USMX and its carrier-members) to refuse to do business with SCSPA until SCSPA somehow replaces state employees with ILA-represented employees.

This Court considered a closely analogous argument in *Marrowbone Development Co.*, 147 F.3d at 297. There, the union raised a work-preservation defense to a violation of section 8(e), and this Court held that application of the union's national collective-bargaining agreement to a new bargaining unit violated that provision, because the work at

33

issue *had not historically been performed in the local bargaining unit*. As

the Court explained:

> To determine whether the agreement before us
> preserves or acquires work for the bargaining
> unit—that is, whether the work at issue was
> traditionally done by the employees before the
> agreement—we must determine which group of
> employees is the relevant group for comparison.
> …. Specifically, in the case of a newly formed local
> union, we must decide whether to compare the
> contract's work jurisdiction with the jobs
> historically done by the employees who are now
> members of the local, or with the jobs generally
> done by the union's other employees throughout
> all of its locals.

147 F.3d at 302.

This Court held that the "appropriate group for comparison is the

group of employees constituting Local 93, not the members of the

[union's] other locals." *Id.* It explained that "the basic premise [of section

8(e)] is to keep labor disputes within the bounds of the employer-

employee relationship," and that section 8(e) "evinces a preference for

comparing only the jobs of the particular employer's employees directly

affected by the dispute, and not all job descriptions represented in all of

a union's various locals." *Id.* at 302-03. *See also id.* at 303 (citing *Nat'l

Woodwork Mfrs.*, 386 U.S. at 635 (inquiry is "to determine whether an

34

agreement seeks no more than to preserve the work of bargaining-unit members")).

Here, in finding that the lawsuit's object was work preservation, the Board relied on the fact that the lift-equipment work at issue is the sort of work ILA members perform at *other* East and Gulf Coast container terminals. Decision 7 (JA 1332). From this, the Board concluded that the work-preservation provisions of the Master Contract are lawful *and* may lawfully be enforced against *all* employers. This is contrary to the law of this Circuit. The fact that ILA members have done lift-equipment work for some employers in their multi-employer bargaining unit does not license ILA to engage in coercive actions to obtain the lift-equipment work from *any* employer *anywhere*, including employers like SCSPA who are not members of the multi-employer bargaining unit and whose employees are not represented by ILA. *See Marrowbone*, 147 F.3d at 303.

The Board also asserted that ILA had a work-preservation object because it was "seeking to preserve the traditional work of unit employees in the face of the technological advances affecting the coastal units, including work at the new Leatherman Terminal." Decision 7 (JA 1332). As the Board Dissent points out, however, the lift-equipment work

35

at Leatherman Terminal does not involve any technological change; it is the same work that state employees have performed at the Port for 50 years. Dissent 16 ("It's a simple case of the ILA seeking to acquire *more* lift-equipment work.") (JA 1341).

The *ILA* work-preservation cases cited by the Board arise in circumstances "when employees' traditional work is displaced, or threatened with displacement, by technological innovation." *ILA I*, 447 U.S. at 505. In such cases, "[i]dentification of the work at issue . . . requires a careful analysis of the traditional work patterns that the parties are allegedly seeking to preserve, and of how the agreement seeks to accomplish that result under the changed circumstances created by the technological advance," to ensure that the work-preservation agreement "seeks no more than to preserve the work of bargaining unit members." *Id.* at 507. The Board's opinion is devoid of any such careful analysis. Moreover, the Supreme Court has recognized that, where the "method of doing the work" has not changed, "the process of identifying the work at issue will require no subtle analysis" and the issue of work-preservation intent will be determined by whether the union members "had always done" the work at issue. *Id.* at 505.

36

This case is a clear example of the latter variety. No technological advance has occurred that has transformed one job into another. The lift-equipment work at the Port of Charleston has not changed materially for decades and has always been performed by SCSPA's state employees. Thus, there is no new work involved that is the "functional equivalent" of work that ILA members may have traditionally performed at the Port of Charleston.

Nor does this case involve a situation where the ILA workforce is *genuinely* threatened by "the banned . . . services," here SCSPA's continued use of state employees to perform the lift-equipment work. *Nat'l Woodwork Mfrs.*, 386 U.S. at 644 n.38. The *ILA*'s cases involved a "massive technological change," the advent of containerization, which "drastically reduced" work opportunities for longshoremen. *ILA I*, 447 U.S. at 495, 509. In contrast, here the Port of Charleston would simply continue to use state employees in an additional Terminal in the same proportion and for the same jobs in which it uses state employees in two existing Terminals. As noted, the current number of ILA and state employees at the Port of Charleston is over 2000 and roughly 270, respectively. Thus, ILA-represented employees will continue to hold the

vast majority of the jobs—and all jobs traditionally occupied by ILA-represented employees—at the Port. The complete absence in this case of a genuine threat resulting from the new Terminal's use of the existing hybrid model underlines that ILA has not acted with a legitimate work preservation motive. *See, e.g.*, *Kennedy ex rel. NLRB v. Sheet Metal Workers Int'l Union*, 289 F. Supp. 65, 81 (C.D. Cal. 1968) (where union failed to show decrease in members' employment, threat of displacement was remote and work preservation intent was lacking).[3]

The Board also asserts that in assessing work preservation, it focuses on the full East and Gulf Coast bargaining unit. Decision 8. As shown above, that focus is contrary to Supreme Court decisions and this Court's decision in *Marrowbone*. SCSPA is not a member of the multi-

---

[3] The Board suggests that the impact of work-preservation agreements on third parties such as the Port and its employees is "immaterial," Decision 7 (citing *ILA II*, 473 U.S. at 79) (JA 1332). Significantly, however, the Supreme Court qualified this point: "The effect of work preservation agreements on the employment opportunities of employees not represented by the union . . . is of course irrelevant to the validity of the agreement *so long as the union had no forbidden secondary purpose to affect the employment relations of the neutral employer*." *ILA I*, 447 U.S. at 507 n.22 (citing *Pipefitters*, 429 U.S. at 510, 526 (emphasis supplied)). Where, as here, there is "proof of an attempt 'not to preserve, but to aggrandize'" bargaining-unit jobs, an otherwise valid work-preservation agreement has an "unlawful secondary objective." *ILA II*, 473 U.S. at 79 (citing numerous cases).

38

employer bargaining unit and its employees are not in that unit. Thus, ILA's lawsuit against USMX and its carrier-members seeks to acquire jobs outside of the bargaining unit traditionally performed by state employees; it cannot have a work preservation object.

Moreover, even focusing on the East and Gulf Coasts as a whole (rather than solely on the Port of Charleston), ILA did not have a valid work-preservation purpose with regard to the lift-equipment work at the Leatherman Terminal. For decades while the Master Contract has been in effect on the Coasts, ILA has acquiesced in the Port of Charleston's use of state employees to perform the lift-equipment work. And the Board did not accept ILA's argument that if the hybrid model extends to Leatherman, USMX carriers will divert ships from ports in New York or New Jersey to Charleston. The Port of Charleston is "regional": 30% of its cargo is consumed in the Charleston area, while the "great preponderance of [the remaining portion] is consumed in what we call the Upstate of South Carolina, which is the Greenville[-]Spartanburg area; that's where the manufacturing facilities for BMW, Michelin, and other major accounts are." Tr. 143 (JA 153). Only 20-25% of the cargo goes outside of South Carolina, and it generally arrives in nearby states such

as North Carolina, Tennessee, and Alabama.[4] *See* Decision 29 (characterizing ILA argument of diversion as "vague speculation," "without evidentiary support") (JA 1347). Thus, history and practice under the Master Agreement—allowing the hybrid model at the Port of Charleston—itself refutes any suggestion that ILA's lawsuit was intended to "preserve" lift-equipment work ILA members traditionally performed.

The circumstances here are similar to those presented in *Local 32B-32J Service Employees International Union v. NLRB*, 68 F.3d 490, 492-93 (D.C. Cir. 1995). In that case, a union sought to apply a putative work-preservation agreement with a signatory employer outside of the bargaining unit. The union represented a superintendent and porter employed by a contractor (Nevins) in a building; Nevins subcontracted *the cleaning work* at the building to another entity, Golden, with which the union had a dispute. The union objected to Nevins' subcontracting of

---

[4] *See* Tr. 143 (JA 153); *id.* at 134 (JA 144) (it is "extremely unlikely [that ships would divert to Charleston]," "because cargo moves based on the origins and destinations of cargo, which is largely governed by inland [costs]").

the work to Golden and pressured Nevins to cease, claiming that its members were entitled to the cleaning work. *Id.* at 493.

The court rejected that argument. It first observed that "Nevins' employees had never meaningfully done the cleaning work" at issue because Nevins had "always used outside, independent contractors for that task." *Id.* at 494. The court also held that "the facial validity of the subcontracting clause does not excuse the [union's] conduct where its application, as in this instance, would illegally extend the contract to reach outside the contractual bargaining unit" to Golden's employees. *Id.* at 495 (citing *Pipefitters*, 429 U.S. at 517-18). "In sum," the court concluded, "the [union's] efforts to enforce its interpretation of the contract were intended *not* to preserve work (*that it had never done*), but to pressure Golden to change its labor policies." *Id.* (emphases supplied).

The parallels are evident. ILA members have "never meaningfully done" the lift-equipment work at Charleston, including at Leatherman Terminal. Thus, the union's work-preservation provision "does not excuse the [union's] conduct where its application . . . would illegally extend the contract to reach outside the contractual bargaining unit." *Id. See also Longshoremen Loc. 1291 (Holt Cargo Sys.)*, 309 N.L.R.B. 1283, 1286

41

(1992) (rejecting ILA work-preservation argument because ILA-represented employees had never performed the disputed work at the terminal at issue).

In sum, the ILA's lawsuit does not seek work preservation but work acquisition. Its conduct therefore had an unlawful "cease doing business objective" under the NLRA.

>### 2. ILA's Coercive Conduct Was Unlawful Secondary Activity Because USMX And Its Carrier-Members Do Not Control The Lift-Equipment Work At The Leatherman Terminal

Independently, a union's coercive action against an employer has an "improper secondary objective" if the "work sought by the union [is] not under the control of the immediate employer." *Pipefitters*, 429 U.S. at 521-22 (citing *Nat'l Woodwork Mfrs.*, 386 U.S. at 616-17). "If a union pressures an employer, even one with which it has a valid collective bargaining agreement, to obtain work over which the employer has no 'right of control,' there is at least 'strong evidence,' that the union's actions are not 'addressed to the labor relations of the contracting employer *vis-à-vis* his own employees,' but are instead 'tactically calculated to satisfy union objectives elsewhere,' and are thus prohibited secondary activity." *Int'l Bhd. of Elec. Workers, Loc. Union No. 501 v.*

42

*NLRB*, 566 F.2d 348, 352 (D.C. Cir. 1977) (citations omitted) (quoting *Nat'l Woodwork Mfrs.*, 386 U.S. at 644-45). *See also Local 32B-32J SEIU*, 68 F.3d at 495 n.5 ("If one union pressures an employer who has no power over the . . . work, then that union's conduct presumptively is directed toward another (secondary) employer who does have that power.") (citing *ILA I*, 447 U.S. at 504-05; *Pipefitters*, 429 U.S. at 521-28). Thus, even if the union acts with the intent to preserve historical work, it engages in unlawful secondary activity if the coerced entity does not control the work being demanded. That is what happened here.

     As the Board itself found, SCSPA "indisputably" controls the lift-equipment work at the Port of Charleston, including at the Leatherman Terminal. Decision 7 (JA 1332). Indeed, SCSPA's control of the lift-equipment jobs is recognized in the Master Contract Article 7, Section 7, which requires ILA and USMX to conduct a study "to meet with … port authorities in an effort *to convince them to employ*" ILA members. *Supra* at 7 (emphasis supplied).

     The Board, however, concluded that USMX carrier-members have the right to control work performed on their own containers, because the carriers decide which ports to utilize. Decision 7 (JA 1332). The Board's

main rationale for its decision appears to be that USMX carrier-members can "bypass" the Port of Charleston and thus ensure that ILA members perform the lift-equipment work elsewhere. *Id.* (JA 1332). In the Board's view, ILA engages in work-preservation activities whenever it coerces *any carrier* in order to get an East Coast port to assign container-related work (here the lift-equipment work) to ILA, because a carrier can always decide to use a different port where ILA-represented members do the work.

Of course, carriers could respond to ILA pressure by boycotting the Port of Charleston unless SCSPA relinquishes the lift-equipment work to ILA members. But that is not evidence of carrier *control* of the relevant work assignment. It is instead the consequence of ILA's tactical pressure on carriers to obtain results from a second employer—*i.e.*, the result of the coercion of a neutral party that the NLRA forbids. As the Ninth Circuit stated in a similar case, "ILWU's argument regarding the shipping carriers' ability to bypass the Port conflates the carriers' control over their containers with the legal question of whether they have the 'right to control the assignment of the work' at this port." *Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union*, 544 F. App'x 657, 658 (9th

Cir. 2013) (quoting *Pipefitters*, 429 U.S. at 537) (internal quotation marks omitted).[5]

Indeed, ILA's theory of "control" directly contravenes *Pipefitters* and *IBEW, No. 501*. In *Pipefitters*, a general contractor (Austin) had a contract with a subcontractor (Hudik) for heating, ventilation and air-conditioning work on a building project. Under the contract, Austin purchased climate-control units to be delivered with internal piping cut, threaded, and installed. 429 U.S. at 511-12. The union representing Hudik's employees had a collective bargaining agreement requiring pipe threading and cutting to occur on the jobsite; union members refused to install the pre-cut and threaded pipe. *Id.* at 512. The Board held that the union's action violated section 8(b)(4)(B), and the Supreme Court agreed, explaining:

> It is uncontrovertible that the work at this site could not be secured by pressure on Hudik alone and that the union's work objectives could not be obtained without exerting pressure on Austin as

---

[5] *International Longshoremen's Association v. NLRB*, 613 F.2d 890, 912-13 (D.C. Cir. 1979), does not support the Board's Decision. As in the cases discussed in text, the factual context regarding stuffing and unstuffing of containers in that case is entirely distinct from the facts here. And, on review, the Supreme Court did not adopt the "right to control" analysis used in that decision, instead remanding the case for additional evidence on that point. *ILA I*, 447 U.S. at 511-12.

> well. . . . It was not error for the Board to conclude
> that the union's objectives were not confined to the
> employment relationship with Hudik but included
> the object of influencing Austin in a manner
> prohibited by § 8(b)(4)(B).

*Id.* at 530-31. *See also IBEW No. 501*, 566 F.2d at 351-52 (holding that

union violated section 8(b)(4)(ii)(B) by engaging in work stoppages and

other actions against neutral subcontractors to pressure general

contractor to turn over operation of temporary power at construction sites

to union-represented employees).

In both *Pipefitters* and *IBEW No. 501*, the subcontractors could

have refused to contract with the general contractor unless their own

union-represented employees performed the disputed work. But in both

cases, the general contractor provided otherwise in contracts with

subcontractors, and the courts found that the general contractor

"controlled" the work assignments. Like the general contractors in those

cases, SCSPA indisputably had control of the relevant work assignment.

Like the subcontractors in those cases, USMX and its carrier-members

could have decided not to contract with SCSPA, rather than accept this

division of labor. But that possibility is irrelevant to the legal question

here—it "conflates" the question of control over containers with control

46

over the relevant work assignment. SCSPA controls the assignment of the lift-equipment work, and ILA's coercion of USMX and its carrier-members to cease doing business with SCSPA to obtain the lift-equipment work for ILA-represented employees is secondary and unlawful.

The Board rejected the import of *Pipefitters*, arguing that USMX carrier-members here are akin to the general contractor in that case, not the subcontractor. Decision 7 (JA 1332). This makes no sense; it is simply a bald assertion that the carriers—not SCSPA—control assignment of the lift-equipment work at the Port of Charleston. The USMX carrier-members here (like the *subcontractors* in *Pipefitters*) may be parties to an agreement with ILA that contains a work-preservation provision, but ILA is not coercing *the carriers* to change *their* work assignments. Instead, ILA unlawfully seeks to make SCSPA change its work-assignment decisions. *See Pipefitters*, 429 U.S. at 512 (the coerced subcontractor knew the contract it was bidding on would violate its contract (by allowing use of pre-cut, pre-threaded pipe), yet the Supreme Court agreed that the employer was neutral and unoffending).

47

ILA's reliance on the *ILA* cases to support its argument is also misplaced. The *ILA* decisions were based on an evidentiary record demonstrating that ocean carriers had themselves developed the technology that led to containerization and sometimes used *their own employees* to perform the work of stuffing and unstuffing containers with goods. Thus, carriers decided the assignment of the work at issue—sometimes using their own employees to stuff and unstuff containers and other times releasing their containers for other employees to perform that work. *See Int'l Longshoremen's Ass'n (Dolphin Forwarding, Inc.)*, 266 N.L.R.B. 230, 232 (1983), *enforced in relevant part*, 734 F.2d 966 (4th Cir. 1984), *aff'd*, 473 U.S. 61 (1985). Based on that record, the Board concluded that *carriers* controlled the assignment of the stuffing and unstuffing work on their containers, and the Supreme Court agreed. *Id.* at 261-62.[6]

---

[6] The Board relies on the Ninth Circuit's unpublished decision in *American President Lines, Ltd. v. ILWA, Alaska Longshore Div.*, 611 F. App'x 908 (9th Cir. 2015), but it is inapposite. In that case, ILWA had "historically performed stevedoring work" in Seward, Alaska, giving it a work-preservation object; and on the right-to-control issue, the signatory carrier had an unfettered "choice in deciding whether or not to employ a connecting carrier who refuses to hire ILWU labor in Seward." *Id.* at 911-12.

Here, the carriers have never performed the lift-equipment work with their own employees; nor did they develop or implement any technology that displaced ILA workers from bargaining-unit jobs, as the carriers did in the *ILA* cases. Thus, neither USMX nor its carrier-members control the assignment of that lift-equipment work. As a result, ILA's lawsuit to prevent USMX and its members to cease calling at Leatherman Terminal constitutes secondary pressure to coerce SCSPA to fire its state employees and have them replaced with ILA-represented employees (or to cease operating the Terminal). *Cf., e.g.*, *Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union*, 905 F. Supp. 2d 1198, 1212 (D. Or. 2012) ("because the Carriers have no power to assign the [work at issue] to ILWU members, [ILWU's] grievances are tactically calculated to pressure the Carriers to cease doing business with the Port"), *aff'd in part, vacated in part*, 544 F. App'x 657 (9th Cir. 2013). Indeed, if ILA's contrary argument were accepted, any purchaser of goods or services would be deemed vested with control over the work assignments of the seller, an absurd result that would cripple the doctrine forbidding secondary coercion.

In sum, ILA's lawsuit had the unlawful object of coercing USMX and its carrier-members to cease doing business with SCSPA to force SCSPA to use ILA members in its lift-equipment jobs.

## II. ILA And USMX And Its Carrier-Members Entered Into An Unlawful Agreement Not To Do Business With New Container-Handling Facilities Which Did Not Use ILA Members For All Container-Related Work

The ALJ found, and the Board affirmed, that ILA and USMX had "reached no agreement" about whether that language in the Master Contract prohibited USMX carriers from calling on new facilities that did not use ILA-represented employees to perform all container work, and therefore that they did not violate section 8(e). Decision 3, 25 (JA 1328, JA 1350). *See* Decision 25 (the evidence "does not establish the parties agreed to administer the provision in an unlawful manner") (JA 1350). This decision was arbitrary and unreasonable.

In determining whether a union and employer have made an "express or implied" agreement to cease doing business with a third party, "[t]he touchstone is whether the agreement or its maintenance is addressed to the labor relations of the contracting employer vis-à-vis [its] own employees." *Nat'l Woodwork Mfrs.*, 386 U.S. at 645. *See also* John E. Higgins, Jr., *The Developing Labor Law: The Board, the Courts, and the*

*National Labor Relations Act*, § 23.II.A (8th ed. 2022) (*National Woodwork* "teaches that if the object of a suspect clause is to benefit union members generally, as distinguished from employees within the bargaining unit, the clause violates Section 8(e)"). Here, considered as a whole, undisputed record evidence shows that the Master Contract constitutes an implied agreement that USMX carrier-members would not do business with East and Gulf Coast employers that developed new container-handling facilities and used non-ILA members in jobs that ILA members fill at other ports.

As the Board has previously explained:

> Congress was intent upon outlawing 'hot-cargo' clauses no matter how disguised. Probably no language can be explicit enough to reach in advance every possible subterfuge of resourceful parties. Nevertheless, we believe that in using the term "implied" in Section 8(e) Congress meant to reach every device which, fairly considered, is tantamount to an agreement that the contracting employer will not handle the products of another employer or cease doing business with another person.

*Lithographers Loc. 78 (Employing Lithographers of Miami)*, 130 N.L.R.B. 968, 976 (1961). In addition, where, as here, a clause "is ambiguous, the Board will not presume unlawfulness, but will consider extrinsic

51

evidence to determine whether the clause was intended to be administered in a lawful or unlawful manner." *Gen. Teamsters Loc. 982 (J.K. Barker Trucking Co.)*, 181 N.L.R.B. 515, 517 (1970), *aff'd*, 450 F.3d 1322 (D.C. Cir. 1971); *Elevator Constructors Loc. 3 (Long Elevator & Mach. Co.),* 289 N.L.R.B. 1095, 1095 n.2 (1988).

Initially, the text of Article 7, Section 7(a) reflects ILA's intent to change the business model of ports using the hybrid model by requiring a study that would be used to persuade ports using the hybrid model to change. It is undisputed that *no study was ever done*. Decision 2-3 n.3 (JA 1326-1327). Section 7(b) then directly ties that putative study to a requirement that USMX member-carriers notify any Port developing "a new container handling facility" that member-carriers "may be prohibited" from calling at facilities using such models. *Supra* at 7. This language is, at least, a threat; respectfully, its intent is clear—to avoid facial invalidity under Section 8(e) while conveying that USMX carrier-members will not be permitted to call at facilities that do not bring their new facilities under the Master Contract. At the very least, the clause is ambiguous about the parties' intentions. The ALJ and the Board erred in concluding otherwise.

52

Examining the extrinsic evidence here reveals the parties' intentions. As to the union's intent, ILA President Daggett testified that this interpretation was discussed and agreed upon in contract negotiations. *See* Tr. 284 ("any new terminal that comes online, if it's not 100[%] ILA then the carriers cannot go there") (JA 295); Tr. 252 ("any new terminal coming online, those jobs would be bargaining unit workers covered by the ILA, covered by the master contract, or else those lines would be prohibited from coming into those terminals") (JA 263). A September 2017 article in a prominent trade publication quoting ILA Vice-President Riley as stating: "This is my No. 1 issue. Anything else in the contract would be secondary to me. I think about it in the morning. I think about it at night. We want the jobs that our colleagues in other ports have." General Counsel ("GC") Exhibit 9 at 2 (JA 585). *See also supra* at 9-10; Tr. 264 ("ILA's position [is] that article 7, section 7 prohibits USMX member carriers from sending ships to the Leatherman Terminal … [u]nder that [hybrid] model.") (JA 275). In a January 6, 2021 call among SCSPA and ILA representatives, and the late South Carolina State Senator Leatherman and others, Riley stated that carriers could not call on Leatherman Terminal unless ILA members performed all

work there. *See supra* at 11 (ILA is "interested in consuming all the jobs").

After ILA filed its lawsuit to enforce the Master Contract and prevent USMX carrier-members from calling at Leatherman Terminal, the statements and conduct of USMX representatives reveal their practical interpretation of the Master Contract as an implied agreement not to call at non-compliant ports.

As the opening date for Leatherman Terminal approached in 2020, USMX Chairman and CEO Adams provided SCSPA with the Section 7(b) notice that "USMX members may be prohibited from using the new facility ….if the work at that facility is not performed by Master contract bargaining-unit employees." *See supra* at 10. And USMX refused to submit the meaning of Section 7(b) to an arbitrator for a definitive determination of its meaning. *Supra* at 11. Moreover, when SCSPA reached out to USMX carrier-members to arrange for them to use Leatherman Terminal, it received responses indicating that USMX members would not use the Terminal unless SCSPA agreed to ILA's position on the manning of that Terminal. Specifically, SCSPA received the following communications:

54

- An August 3, 2020 email from USMX carrier-member[7] Ocean Network Express ('[o]f course, our primary concern would be the risk involved if an agreement with the ILA has not been finalized"). Tr. 55 (JA 65); GC Exhibit 18 at 2 (JA 651).

- An August 5, 2020 email from carrier-member COSCO (expressing concern about calling at Leatherman due to "some perceived unique challenges relative to the USMX-ILA agreement(s);" stating that the carrier "[m]ust defer to USMX regarding Leatherman;" and seeking clarification of how SCSPA intended to operate the Terminal). GC Exhibit 7 (JA 538-542); Tr. 58-60 (JA 68-70).

- An August 6, 2020 telephone call from USMX Board member and COSCO Executive Vice President (explaining that COSCO would be "exposed" if it used the terminal without a resolution with ILA, and expressing willingness to use it "if the USMX and the ILA would work something out"). Tr. 60-64 (JA 70-74).

- An August 12, 2020 telephone call from USMX Board member and carrier ONE Vice President (explaining that ONE "would have an issue until the USMX and the ILA could find a resolution to article 7, section 7 and how it applied to the Leatherman Terminal"). Tr. 64-65 (JA 74-75).

- An August 26, 2020, telephone call from USMX Board member and carrier Maersk's head of labor (noting that Article VII, Section 7 was added to the Master Contract in specific anticipation of the Leatherman Terminal). Tr. 69-72 (JA 79-82).

- An August 26, 2020 telephone conversation from USMX Board member and carrier MSC Executive Vice President ("ma[king] it very clear at the outset that MSC would not put

---

[7] GC Exhibit 17 is a link to the list of USMX member companies. (JA 646-648).

a ship at the Leatherman Terminal absent resolution of the USMX-ILA consideration of the application of article 7, section 7"). Tr. 72-73 (JA 82-83).

- An August 27, 2020 telephone call from USMX Board member and carrier Evergreen Vice Chairman who "made it very clear to [SCSPA CEO] that Evergreen would not deploy a ship to the Leatherman Terminal absent resolution of that issue"). Tr. 74 (JA 84).

- A September 3, 2021 telephone call from USMX Board member and NY Shipping Association President (discussing attempt to enforce Article VII, Section 7 as a potential "secondary boycott"). Tr. 76 (JA 86).

- A March 31, 2021 call from carrier MCA CGM Chief Operating Officer (declining to call at the Leatherman Termination "due to the uncertainty of application of article 7, section 7."). Tr. 106-107 (JA 116-117).

- An April 25, 2021 communication from MCA, stating that ILA had told him that it would amend its lawsuit to include CMA CGM, that he would "rather spend a million dollar[s] [and] he would omit the Port of Charleston and only call Savannah if we forced him to go to the Leatherman Terminal"). Tr. 112-113 (JA 122-123).

- An April 27, 2021 telephone call from COSCO demanding that COSCO be permitted to call at a different terminal and indicating that the carrier would bypass Charleston if SCSPA did not agree. Tr. 115-117 (JA 125-127).

Even more tellingly, following the filing of the ILA lawsuit on April 22, 2021, *to enforce the Master Contract*, numerous ships originally scheduled to call at Leatherman Terminal refused to do so, and USMX carrier-

members "ceased calling at the Leatherman Terminal." Decision 3 (JA 1328).

In light of the undisputed communications quoted above and the uniform response by USMX carrier-members to a lawsuit alleging that calling at the Leatherman Terminal violated the Master Contract, it was arbitrary and unreasonable for the Board not to find that ILA and USMX had an implied agreement not to do business with new container-handling terminals that did not exclusively employ ILA members. It could not be clearer that USMX declined to enter into a written agreement not to do business with non-compliant ports to avoid a facial violation of section 8(e), but that both parties understood and agreed that, as a practical matter, USMX carrier-members would not call at such terminals. At the very least, Article 7, Section 7 constitutes a "device which, fairly considered, is tantamount to an agreement that the contracting employer will not handle the products of another employer or cease doing business with another person." *Lithographers Loc. 78*, 130 N.L.R.B. at 976.

## CONCLUSION

The Decision and Order of the Board should be reversed.

Respectfully submitted,

TRACEY C. GREEN
BURR & FORMAN LLP
1221 Main Street, Suite 1800
Columbia, S.C. 29201
(803) 753-3224
tgreen@burr.com

CARTER G. PHILLIPS
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
cphillips@sidley.com

MICHAEL O. ECKARD
OGLETREE, DEAKINS, NASH, SMOAK
& STEWART, P.C.
211 King Street, Suite 200
Charleston, S.C. 29401
(843) 720-0872
michael.eckard@ogletreedeakins.com

*Counsel for Petitioner South Carolina State Ports Authority*

## CERTIFICATE OF COMPLIANCE

Under Federal Rule of Appellate Procedure 32(a)(7), I certify that:

This brief complies with Rule 32(a)(7)'s type-volume limitation and this Court's order of March 17, 2023, because it contains 11,736 words, as determined by the Microsoft Word 2016 word-processing system used to prepare the brief, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using the 2016 version of Microsoft Word in 14-point Century Schoolbook font.

/s/ Carter G. Phillips
CARTER G. PHILLIPS

## CERTIFICATE OF SERVICE

I certify that I caused this document to be electronically filed with the Clerk of the Court using the appellate CM/ECF system on March 31st, 2023. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Carter G. Phillips
CARTER G. PHILLIPS