NO. 23-1059

In The
# United States Court of Appeals
For The Fourth Circuit

SOUTH CAROLINA STATE PORTS AUTHORITY,

*Petitioner,*

**and**

STATE OF SOUTH CAROLINA; UNITED STATES MARITIME ALLIANCE, LTD.,

*Intervenors,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*

**and**

INTERNATIONAL LONGSHOREMEN'S ASS'N, LOCAL 1422;
INTERNATIONAL LONGSHOREMEN'S ASS'N,

*Intervenors.*

ON PETITION FOR REVIEW OF AN ORDER OF
THE NATIONAL LABOR RELATIONS BOARD

*AMICUS CURIAE* BRIEF OF GOVERNOR McMASTER
IN SUPPORT OF PETITIONER

Thomas A. Limehouse, Jr.
*Chief Legal Counsel*
Wm. Grayson Lambert
*Senior Legal Counsel*
Erica W. Shedd
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
eshedd@governor.sc.gov

*Counsel for Governor McMaster*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Governor McMaster, as the "Chief Magistrate" invested with "the supreme executive authority" of the State of South Carolina, S.C. Const. art. IV, § 1, certifies that he does not have any parent corporation or stock.

## RULE 29 COMPLIANCE STATEMENT

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, Governor McMaster submits that no party's counsel authored this brief in whole or in part and no entity or person, aside from *amicus curiae* and his counsel, made any monetary contribution toward the preparation or submission of this brief. In accordance with Rule 29(a)(2), all parties consent to the filing of this *amicus curiae* brief.

## **<u>TABLE OF CONTENTS</u>**

TABLE OF AUTHORITIES ............................................................................ ii

INTEREST OF AMICUS ............................................................................... 1

INTRODUCTION .......................................................................................... 2

ARGUMENT ................................................................................................. 4

    I.   The State has invested significant resources in the Leatherman
        Terminal ...................................................................................... 4

    II.  The Port's labor model has worked well for decades................... 8

    III. Not allowing South Carolina to unleash the Leatherman Terminal's
        potential unnecessarily threatens the State's economy .............. 11

CONCLUSION............................................................................................. 14

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2201 (2022)................1

*Blalock v. Johnston*, 180 S.C. 40, 185 S.E. 51, 53 (1936)..........................1

*Brannon v. McMaster*, 434 S.C. 386, 864 S.E.2d 548 (2021)..................................14

*Com. of Va. v. Cannon*, 228 F.2d 313, 315 (4th Cir. 1955)..............................1

*Int'l Longshoremen's Ass'n, AFL-CIO, Clc & Int'l Longshoremen's Ass'n AFL-CIO, Loc. 1422 & U.S. Mar. Ass'n, Ltd. & State of S.C. & S.C. State Ports Auth.*, 372 NLRB No. 36, 2022 WL 18232704 (NLRB Dec. 16, 2022).......................10

*Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am.*, 147 F.3d 296, 301 (4th Cir. 1998)................................................................4

**Statutes**

29 U.S.C. § 158 ..............................................................12

S.C. Code § 54-13(2) (1952)....................................................8

S.C. Code § 54-14(3) (1952)....................................................8

S.C. Code Ann. § 1-3-240(C)(1)(n) .............................................2

S.C. Code Ann. § 54-1-10 ......................................................2

S.C. Code Ann. § 54-3-130(3) ..................................................8

S.C. Code Ann. § 54-3-140(3) ..................................................8

S.C. Code Ann. § 54-3-20(A) ...................................................2

**Other Authorities**

1942 S.C. Acts No. 626 ........................................................8

2002 S.C. Acts No. 256 ........................................................4

2021 S.C. Acts No. 94.........................................................6

2022 S.C. Acts No. 239 ........................................................6

Congressional Research Service, *Supply Disruptions and the U.S. Economy* (May 13, 2022) ...................................................................11

David Wren, *Port of Charleston Sees Cargo Pullback as Economic Uncertainties Rise*, Post & Courier (Mar. 20, 2023) ...........................................2

Editorial, *Port of Charleston's Efficiency Helps it Navigate Supply Chain Woes*, Post & Courier (Nov. 4, 2021)...............................................10

Exec. Order No. 2021-40 (S.C. Nov. 23, 2021) .................................11

Gov. Henry McMaster, *South Carolina Leads the National as Top Exporter of Tires and Completed Passenger Motor Vehicles* (Feb. 16, 2023)................. 12, 13

Gov. Henry McMaster, *South Carolina releases record-breaking industry*

ii

*recruitment in 2022* (Jan. 5, 2023)..............................................................12

Lane Construction Corp., *Port Access Road, SC*......................................................5

Lazaro Gamio & Peter S. Goodman, *How the Supply Chain Crisis Unfolded*, N.Y. Times (Dec. 5, 2021) .............................................................11

Palmetto Railways, *Navy Base Intermodal Facility: Project Overview* ..................6

SCSPA, *Productivity*.........................................................................10

SCSPA, *Rail Move, Pier Container & TEU History* (last updated Mar. 8, 2023)....9

SCSPA, *SC Ports Developing Near-Dock Rail at the Port of Charleston* (Oct. 17, 2022) ...........................................................................6

SCSPA, *SC Ports Opens State-of-the-Art Hugh K. Leatherman Terminal* (Apr. 9, 2021) ............................................................... 4, 5, 7

U.S. Dep't of Transp., Bureau of Transp. Statistics, *2023 Port Performance Freight Statistics Report* 12 (Jan. 2023) ............................................................10

Walter Edgar, *South Carolina: A History* (1998) .................................................2, 3

## Constitutional Provisions

S.C. Const. art. IV, § 1 .............................................................................1

S.C. Const. art. IV, § 15 ...........................................................................1

S.C. Const. art. VI, § 5 .............................................................................1

## INTEREST OF AMICUS

Governor McMaster has multiple, important interests here. As a general matter, the Governor is the State's "supreme executive authority," S.C. Const. art. IV, § 1, and he has sworn to "preserve, protect, and defend" both the South Carolina Constitution and the United States Constitution, S.C. Const. art. VI, § 5, and to "take care that the laws be faithfully executed," *id.* art. IV, § 15. In this capacity, Governor McMaster is "invested with certain important governmental or political powers and duties belonging to the executive branch of the state government." *Blalock v. Johnston*, 180 S.C. 40, 185 S.E. 51, 53 (1936). "As to these purely executive or political functions devolving upon the chief executive officer of the state, and as to any other duties necessarily involving the exercise of official judgment and discretion," *id.*, the Governor's perspective is one "the State has deemed crucial to understanding the full range of its interests," *Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2201 (2022); *cf. Com. of Va. v. Cannon*, 228 F.2d 313, 315 (4th Cir. 1955) (noting that courts "must look to the proclamations of the Governors to determine . . . the policy of the state"). Thus, the Governor's broader interests include upholding the rule of law, defending South Carolina's sovereign authority, and advancing the State's policies and priorities.

More specifically, the Governor appoints, and has the authority to remove, all voting members of the South Carolina State Ports Authority's ("SCSPA") Board of

Directors. *See* S.C. Code Ann. § 54-3-20(A); *id.* § 1-3-240(C)(1)(n). Additionally, Governor McMaster, himself, previously served as a member of the SCSPA's Board of Directors, following his appointment by Governor Haley in 2011.

Finally, economic development has been a centerpiece of the Governor's agenda since he took office in January of 2017. In that time, over 700 economic-development projects have announced more than $32 billion in investment in South Carolina, representing nearly 80,000 new jobs in this State. The state-of-the-art Hugh K. Leatherman, Sr. Terminal in Charleston, which cost more than $1 billion to develop, is a critical part of the State's economic-development portfolio. Unfortunately, this labor dispute "has all but shut down" the Leatherman Terminal. David Wren, *Port of Charleston Sees Cargo Pullback as Economic Uncertainties Rise*, Post & Courier (Mar. 20, 2023), https://tinyurl.com/ye8uwzeb. Accordingly, the Governor has a significant interest in reversing the Board's order, ending the International Longshoremen's Association's ("ILA") secondary boycott, and allowing SCSPA to operate the Leatherman Terminal as it always intended to and in the same manner it has operated the other terminals at the Port of Charleston for decades.

## **INTRODUCTION**

The Port of Charleston is "the State port of South Carolina," S.C. Code Ann. § 54-1-10, and it has been the "primary port" in South Carolina "since the

2

seventeenth century," Walter Edgar, *South Carolina: A History* 4 (1998). After King Charles II granted eight Lords Proprietors a charter in 1663 to establish a colony between Virginia and Spanish Florida, a permanent settlement in Carolina was established at Charles Town in 1670, in large part because of its natural harbor. *See id.* at 39, 48.

The size (and frequency) of the ships visiting the Charleston Harbor has changed since that settlement over 350 years ago, but the Port of Charleston remains of paramount importance to South Carolina's economy and future prosperity. Today, the Port of Charleston is the largest facility of, and operation run by, SCSPA. As of 2019, SCSPA had an annual economic impact of more than $63 billion, generated more than $1 billion in tax revenue, and supported one in ten jobs in the State across its marine and inland terminals. To account for the Port of Charleston's continued growth into the twenty-first century, the State spent more than $1.5 billion to build the Leatherman Terminal, which was intended to join the North Charleston Terminal and the Wando Welch Terminal as the principal locations for large cargo ships to call. The Charleston Harbor has also recently been deepened to 52 feet, making it the deepest harbor on the Atlantic coast and allowing the Port to handle the newest and largest ships, at any time and any tide. The Port generally and the Leatherman Terminal specifically are critical components of the State's continued economic success.

Particularly given "the disruptive effects of the altercation on the economy," *Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am.*, 147 F.3d 296, 301 (4th Cir. 1998), this Court should not sanction the ILA's indirect effort to extort new work from a third party by attempting to force the SCSPA to either convert a significant state asset into a "sunk cost" or allow the ILA to acquire lift-equipment work traditionally and consistently performed at the Port by state employees, on state property, and using state equipment. The Court should reverse the Board's order.

## ARGUMENT

### I.     The State has invested significant resources in the Leatherman Terminal.

The Leatherman Terminal was almost two decades in the making. The General Assembly directed SCSPA to begin "the permitting process to locate new terminal facilities on the west bank of the Cooper River" in 2002. 2002 S.C. Acts No. 256, § 2. Over the next 20 years, South Carolina spent more than $1 billion to bring the first phase of this project to completion, as it became the first new container terminal opened in the United States in more than a decade. *See* SCSPA, *SC Ports Opens State-of-the-Art Hugh K. Leatherman Terminal* (Apr. 9, 2021), https://tinyurl.com/4n2uu968.

Just building the Leatherman Terminal on part of the former Navy base in North Charleston was a major undertaking. The site preparation alone involved driving more than 6,300 miles of wick drains at the site (to draw out water) and

4

barging in more than 6 million yards of sand and crushed rock (to create a flat, even surface for construction). *Id.* The State constructed new roads, utilities, and buildings, along with the wharf and a 47-acre container yard. *Id.* SCSPA purchased and installed five new ship-to-shore cranes, which have a lift height of 169 feet and a reach of 227 feet. *Id.*

But it's not just the Terminal itself. The State has also dedicated significant resources to additional, related infrastructure projects. One is the Port Access Road, which connects the Leatherman Terminal directly to I-26. This aspect of the project involved modifying two existing Interstate exits and building a three-level flyover interchange. *See* Lane Construction Corp., *Port Access Road, SC* (last accessed Mar. 22, 2023), https://tinyurl.com/mr2vzkdy. This new road and interchange allows trucks to avoid (and avoid contributing to) traffic in a congested portion of the Charleston metropolitan area and proceed quickly up I-26 to their destinations. In recognition of this important function, the State of South Carolina has already invested $373 million in building the Port Access Road to connect the Leatherman Terminal to I-26. South Carolina is also in the midst of an aggressive program to expand interstate capacity along I-26 to handle the anticipated growth in container volume from the Leatherman Terminal.

And there is the Navy Base Intermodal Facility. This "critical project" was specifically designed to "resolve[] the last remaining competitive disadvantage" for

the Port of Charleston by providing near-dock rail for the Leatherman Terminal and connecting to Class I railroads operated by CSX Transportation and Norfolk Southern. SCSPA, *SC Ports Developing Near-Dock Rail at the Port of Charleston* (Oct. 17, 2022), https://tinyurl.com/3kyww678. Located about a mile from the Leatherman Terminal, the Navy Base Intermodal Facility will use nearly 80,000 feet of track to move containers from the Terminal to the railyard on a dedicated rail line and, once at the facility, to load them on trains by rail-mounted gantry cranes. *Id.* One intermodal train will be able to carry as much cargo as 280 trucks, thereby further reducing traffic in the Charleston area and more efficiently moving cargo. *See* Palmetto Railways, *Navy Base Intermodal Facility: Project Overview* (last visited Mar. 22, 2023), https://tinyurl.com/2n3263tv. Since 2021, the General Assembly has appropriated over $500 million for this component of the project and related operations. *See* 2021 S.C. Acts No. 94, Part 1B, § 118.18(B)(2) (appropriating $200 million to SCSPA for this project and an inner-harbor barge operation); 2022 S.C. Acts No. 239, Part 1B, § 118.18(B)(68) (appropriating an additional $350 million for these projects).

This investment in the Leatherman Terminal and related projects was essential for South Carolina for at least two reasons. First, it expands the capacity of the Port of Charleston. The Leatherman Terminal adds 700,000 twenty-foot-equivalent units ("TEUs") of throughput capacity to the Port. *See* SCSPA, *SC Ports Opens State-of-*

6

*the-Art Hugh K. Leatherman Terminal*. Given the Port's continued growth, *see infra* Part II, increasing the Port's capacity (and utilizing it) is important for SCSPA and the State to maintain existing economic activity and sustain continued growth.

Second, the Port's success presents not only economic opportunities but also logistical challenges for the Charleston metropolitan area, its infrastructure, and the over 800,000 South Carolinians who call region home. For instance, the Wando Welch Terminal, which currently handles the vast majority of the Port's container traffic, is located along the Wando River in Mount Pleasant (the State's fourth most populous municipality) and accessible by a single road, with no rail connection. When ships call at the Wando Welch Terminal, the trucks that carry the containers on the next leg of their journey are required to use Long Point Road in Mount Pleasant to access I-526, the Terminal's main interstate connection. Yet, I-526 is already over-capacity, handling approximately 7,600 truck trips daily along an often-congested route for commercial and commuter traffic that includes the Wando River Bridge and the Don H. Holt Bridge and requires traversing portions of the State's largest and third-largest municipalities by population.

But for the ILA's secondary boycott of the Leatherman Terminal, many of these trips to and from the Wando Welch Terminal could originate in North Charleston, where infrastructure is already in place to mitigate these impacts. Unlike the Wando Welch Terminal, the Leatherman Terminal is a multi-modal facility with

direct access to I-26 via the Port Access Road, as well as to the Navy Base
Intermodal Facility, which will serve both CSX and Norfolk Southern. As compared
to Long Point Road in Mount Pleasant, the Port Access Road is an elevated roadway
that was designed to mitigate community impacts by separating truck traffic from
the streets and neighborhoods adjoining the Leatherman Terminal.

Full utilization of the Leatherman Terminal will provide both short- and long-
term benefits for South Carolina's transportation system, as well as much needed
relief to the Wando Welch Terminal and associated infrastructure. Unfortunately,
the ILA's coercive tactics have needlessly exacerbated these problems and delayed
utilization of the infrastructure intended and constructed to address them.

## II.    The Port's labor model has worked well for decades.

SCSPA was created in 1942 to "acquire, construct, equip, maintain, develop,
and improve" South Carolina's "harbors or seaports and of their port facilities" and
to "foster and stimulate the shipment of freight and commerce through" these ports.
1942 S.C. Acts No. 626, § 2 (codified at S.C. Code § 54-13(2) (1952)). The General
Assembly gave SCSPA broad authority to accomplish these goals, including
building and operating "wharves, docks, . . . piers, . . . other structures." *Id.* § 3
(codified at S.C. Code § 54-14(3) (1952)). SCSPA continues to enjoy a similar
mission and powers today. *See* S.C. Code Ann. §§ 54-3-130(3); 54-3-140(3).

When it comes to operating these facilities at the Port of Charleston, even the Board acknowledged that "[f]or nearly 50 years, SCSPA has operated the Port of Charleston using a hybrid division of labor in which nonunionized state employees operate state-owned lift equipment to load and unload container ships that call at the port's two terminals" and that "[s]tate employees also lift the containers from trucks and stack them in the port's holding area to await pickup." *Int'l Longshoremen's Ass'n, AFL-CIO, Clc & Int'l Longshoremen's Ass'n AFL-CIO, Loc. 1422 & U.S. Mar. Ass'n, Ltd. & State of S.C. & S.C. State Ports Auth.*, 372 NLRB No. 36, 2022 WL 18232704, at *3 (NLRB Dec. 16, 2022). Shipping carriers then directly utilize ILA members to perform all other longshoreman work at the Port. Everyone— including the ILA and the United States Maritime Alliance—knew this, both long before and after SCSPA opened the Leatherman Terminal based on plans to use the same division of labor between state employees and carrier-contracted ILA members. *See id.* at *2 (quoting the Master Contract discussing the "business model currently used by" SCSPA).

This labor model has been successful for the Port as it has grown over the decades. For example, the Port of Charleston handled more the double the number of TEUs in January 2023 than it did 25 years earlier in January 1998. *See* SCSPA, *Rail Move, Pier Container & TEU History* (last updated Mar. 8, 2023), https://tinyurl.com/2p8km9kr. The Port is now the eighth busiest port (by TEUs) in

9

the country. *See* U.S. Dep't of Transp., Bureau of Transp. Statistics, *2023 Port Performance Freight Statistics Report* 12 (Jan. 2023), https://tinyurl.com/2p8889j6.

The efficiency of the Port's hybrid model is also reflected in other types of data. When a ship arrives at the Port, each (state-owned and state-employee-operated) crane unloading that ship's cargo averages 36 moves per hour. *See* SCSPA, *Productivity* (last visited Mar. 21, 2023), https://tinyurl.com/253n8t33. Each truck that enters the Port to pick up cargo spends a mere 23 minutes there, averaging just nine minutes outside the interchange gates. *See id.* These statistics illustrate why multiple sources have rated the Port of Charleston as one of the most efficient in the nation. *See* Editorial, *Port of Charleston's Efficiency Helps it Navigate Supply Chain Woes*, Post & Courier (Nov. 4, 2021), https://tinyurl.com/49m72yuf (discussing reports from the World Bank and the Journal of Commerce).

Whether viewed from a wide-angle lens of the Port's annual performance in comparison to other ports or from a zoomed-in perspective of how the Port operates when a particular ship calls, the Port of Charleston has traditionally, consistently, and efficiently utilized its labor model to move import and export cargo. Against this historic backdrop, and based on these settled expectations, SCSPA therefore had every reason to plan to continue using this division of labor at the Leatherman Terminal. Notwithstanding their third-party pressure and coercive claims to the

10

contrary, the ILA had no reason to expect to acquire new lift-equipment work from SCSPA that the ILA's members have never performed at the Port.

### III. Not allowing South Carolina to unleash the Leatherman Terminal's potential unnecessarily threatens the State's economy.

The COVID-19 pandemic strained the country's supply chain, to put it mildly. *See, e.g.*, Congressional Research Service, *Supply Disruptions and the U.S. Economy* (May 13, 2022), https://tinyurl.com/2p99h2bu; Lazaro Gamio & Peter S. Goodman, *How the Supply Chain Crisis Unfolded*, N.Y. Times (Dec. 5, 2021), https://tinyurl.com/3xfpvtzz. Thankfully, the Port of Charleston has weathered that challenge better than most facilities. So has South Carolina generally, as the Governor prioritized mitigating supply-chain disruptions and facilitating favorable economic conditions. *See, e.g.*, Exec. Order No. 2021-40 (S.C. Nov. 23, 2021) (authorizing transportation waivers and directing various state agencies to provide relief from regulations that would alleviate strains in the supply chain); *Brannon v. McMaster*, 434 S.C. 386, 388, 864 S.E.2d 548, 549 (2021) (affirming the Governor's authority "to end South Carolina's participation in federal unemployment insurance programs" under the CARES Act).

But the fact that South Carolina's economy successfully weathered COVID-19 is no reason not to be concerned about the actual and potential impacts of the ILA's secondary "cancel campaign" on the State's future prosperity. Just the opposite. Particularly as South Carolina continues to experience significant

economic activity and has recently announced historic investments, the ILA should not be allowed to use third-party pressure to throttle economic growth, which in turn forecloses job opportunities for all South Carolinians, including the ILA's members. *Cf.* 29 U.S.C. § 158.

From January to December 2022, the State announced a total capital investment of $10.27 billion, the single largest in any year in South Carolina's history, which represented 120 projects and the creation of 14,083 new jobs. Industry recruitment soared in multiple categories in 2022. Gov. Henry McMaster, *South Carolina releases record-breaking industry recruitment in 2022* (Jan. 5, 2023), https://tinyurl.com/5n7uvmw4. The record-breaking capital investment of $10.27 billion was almost two-and-a-half times as much as 2021 and reflected a 118% increase over 2017. *Id.* While domestic-based companies represented the majority of announced investments, overall foreign direct investment in 2022 increased 371% over 2021. *Id.* In fact, the record for the largest capital investment project was broken twice in the same year.

In addition to new projects, established businesses in South Carolina continue to expand and thrive. As a result, exports grew 6% in 2022 over those in 2021, with those goods and products destined for 196 countries on six continents. *See* Gov. Henry McMaster, *South Carolina Leads the National as Top Exporter of Tires and Completed Passenger Motor Vehicles* (Feb. 16, 2023),

https://tinyurl.com/5cc792n4. As just one illustration of the State's export strength, the South Carolina leads the nation in exporting completed passenger vehicles and tires. *Id.* The Port is therefore the State's "gateway to the world." *Id.* (quoting SCSPA CEO Barbara Melvin). The Court should not allow the ILA (and the Board) to close this gateway by upending the longstanding labor model that SCSPA has successfully used for decades and relied upon in planning and developing the Leatherman Terminal.

South Carolina is leading at a transformational time in business and cultivating an increasingly diverse and technologically advanced economy, which, absent interruption, will continue to create opportunities for future generations. But the story statistics cannot fully convey is the critical role of the Port not only in sustaining economic activity but also in attracting and competing for economic development. The Court should not allow the ILA (and the Board) to put South Carolina at a competitive disadvantage in economic development by not allowing the State to realize the benefits of its investments in, and unleash the full potential of, the Leatherman Terminal and the Port of Charleston.

## **CONCLUSION**

For the foregoing reasons, the Court should reverse the Board's order.

13

Respectfully submitted,

s/Thomas A. Limehouse, Jr.
Thomas A. Limehouse, Jr.
*Chief Legal Counsel*
Wm. Grayson Lambert
*Senior Legal Counsel*
Erica W. Shedd
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
eshedd@governor.sc.gov

*Counsel for Governor McMaster*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

    This brief contains *3,027* words.

2.  This brief complies with the typeface and type style requirements because:

    This brief has been prepared in a proportionally spaced typeface using *Microsoft Word* in *14 pt Times New Roman*.


 Dated: <u>April 7, 2023</u>              <u>s/Thomas A. Limehouse, Jr.</u>
                                          *Counsel for Governor McMaster*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of April, 2023, I caused this *Amicus Curiae Brief of Governor McMaster* to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all counsel of record.

s/Thomas A. Limehouse, Jr.
*Counsel for Governor McMaster*
