## 23-1059

# United States Court of Appeals
### *for the*
# Fourth Circuit

---

SOUTH CAROLINA STATE PORTS AUTHORITY,

*Petitioner,*

THE STATE OF SOUTH CAROLINA;
UNITED STATES MARITIME ALLIANCE, LTD.,

*Intervenors,*

– v. –

NATIONAL LABOR RELATIONS BOARD,

*Respondent.*

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL
1422; INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,

*Intervenors.*

---

*(For Continuation of Caption See Inside Cover)*

ON PETITION FOR REVIEW OF AN ORDER OF THE
NATIONAL LABOR RELATIONS BOARD

---

## JOINT BRIEF OF INTERVENORS
## INTERNATIONAL LONGSHOREMEN'S
## ASSOCIATION AND INTERNATIONAL
## LONGSHOREMEN'S ASSOCIATION, LOCAL 1422

---

Laurence M. Goodman
Joseph D. Richardson
WILLIG, WILLIAMS, & DAVIDSON
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
(215) 656-3655

*Counsel for the International
Longshoremen's Association, Local 1422*

JOHN P. SHERIDAN
DANIEL WOLFF
NICHOLAS M. GRAZIANO
MAZZOLA MARDON, P.C.
26 Broadway, 17th Floor
New York, New York 10004
(212) 425-3240

*Counsel for Intervenor International
Longshoremen's Association*

---

NATIONAL RIGHT TO WORK LEGAL DEFENSE
FOUNDATION; CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA; SOUTH CAROLINA CHAMBER OF
COMMERCE; NATIONAL ASSOCIATION OF
MANUFACTURERS; SOUTH CAROLINA MANUFACTURERS
ALLIANCE; GOVERNOR HENRY MCMASTER

*Amici Supporting Petitioner.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a) and Circuit Rule 26.1(a)(1), the International Longshoremen's Association certifies that it is an unincorporated labor organization that has no parent companies. No publicly held corporation owns 10 percent or more of the International Longshoremen's Association.

Dated: May 5, 2023

Respectfully submitted,

/s/ John P. Sheridan
John P. Sheridan
MAZZOLA MARDON, P.C.
26 Broadway, 17th Floor
New York, NY 10004
(212) 425-3240
dwolff@mmmpc.com

*Counsel for the International Longshoremen's Association*

## TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................................i

TABLE OF AUTHORITIES ...........................................................................iv

STATEMENT OF ISSUES ..............................................................................1

INTRODUCTION ............................................................................................1

FACTUAL BACKGROUND.............................................................................2

    A.    History of Containerization .................................................2

    B.    The Master Contract's Coast-wide Bargaining Unit.............5

    C.    Two-Tier Bargaining .............................................................5

    D.    Master Contract Provisions ..................................................6

    E.    The Coast-wide Bargaining Unit Includes Two Types of Employers...........................................................................8

    F.    Master Contract Employers Agree Not to "Contract Out" Bargaining Unit Work........................................................8

    G.    The Port of Charleston and The "Hybrid Model"................10

    H.    2012 Master Contract Negotiations......................................12

    I.    Hugh K. Leatherman Terminal ...........................................13

    J.    The Lawsuit...........................................................................15

PROCEDURAL HISTORY.............................................................................16

SUMMARY OF ARGUMENT.......................................................................16

STANDARD OF REVIEW .............................................................................17

ARGUMENT ..................................................................................................18

    I.    THE BOARD CORRECTLY HELD THAT THE ILA'S ATTEMPT TO ENFORCE A WORK-PRESERVATION AGREEMENT IN ITS COAST-WIDE MASTER CONTRACT WAS LAWFUL.................................................18

A.    The Filing of the Lawsuit Cannot Constitute Coercion Under the Act ................................................................. 18

    1.    In order to claim a violation of Section 8(b)(4)(ii) SCSPA must show a threat or coercion ............................................................... 18

    2.    The Board Correctly held that the ILA's lawsuit was protected by the First Amendment .......................... 20

    3.    Resort to the courts is not coercive in general ............... 21

    4.    The ILA's lawsuit does not have an illegal objective ........................................................................ 24

B.    The ILA's Lawsuit Has A Work-Preservation Object And Is Therefore Primary ......................................... 25

    1.    The Board rightly held that the ILA's lawsuit seeks to preserve traditional work of the ILA's coast-wide unit ................................................................ 28

        a)    The proper inquiry must focus on the work performed by the coast-wide bargaining unit ...................................................... 28

        b)    Proof of an imminent threat is not required every time a valid provision is enforced ............. 33

        c)    As in the *ILA* cases, the ILA's enforcement of the Master Contract's work preservation clause is valid, primary activity .................................................................. 37

        d)    The single employer cases cited by SCSPA are irrelevant ............................................ 38

    2.    The Board's Finding That the Carriers had the Right of Control Over the Work in Question was Based on Substantial Evidence ....................................... 40

II.    THE BOARD CORRECTLY DETERMINED THAT ARTICLE 7, SECTION 7 OF THE MASTER CONTRACT WAS NOT UNLAWFUL ................................................ 51

CONCLUSION ............................................................................. 56

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Pres. Lines v. Int'l Longshore & Warehouse Union*,
611 F. App'x 908 (9th Cir. 2015) ............................................................... 28, 41

*Am. President Lines v. Int'l Longshore & Warehouse Union*,
997 F. Supp. 2d 1037 (D. Alaska 2014), aff'd. 611 F. App'x 908
(9th Cir. 2015) ...................................................................................................45

*Am. Trucking Ass'ns, Inc. v. NLRB*,
734 F.2d 966 (4th Cir. 1984) ....................................................... *passim*

*Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n, AFL-CIO*,
192 F.3d 250 (2d Cir. 1999) .......................................................... *passim*

*Bermuda Container Line, Ltd. v. Int'l Longshoremen's Ass'n*,
No. 97 Civ. 1257 (JFK), 1997 WL 795766 (S.D.N.Y. Dec. 29, 1997) ........ 3, 4, 9

*Bill Johnson's Restaurants, Inc. v. NLRB*,
461 U.S. 731 (1983) ....................................................................... *passim*

*Brown & Root, Inc. v. La. State AFL-CIO*,
10 F.3d 316 (5th Cir. 1994) ...............................................................23

*Cal. Cartage Co. v. NLRB*,
822 F.2d 1203 (D.C. Cir. 1987) ................................................... 29, 45

*Carrier Air Condit. Co. v. NLRB*,
547 F.2d 1178 (2d Cir. 1976) .............................................................21

*Commerce Tankers Corp. v. Nat'l Maritime Union*,
553 F.2d 793 (2d Cir. 1977) ..............................................................21

*Douds v. Int'l Longshoremen's Ass'n*,
147 F. Supp. 103 (S.D.N.Y. 1956) ......................................................5

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Building Trades Council*,
485 U.S. 568 (1988) .........................................................................19

*George Koch & Sons v. NLRB*,
490 F.2d 323 (4th Cir. 1973) ........................................................ 46-47

*Gold v. Mid-Atlantic Reg'l Council of Carpenters*,
407 F. Supp. 2d 719 (D. Md. 2005) ...................................................23

iv

*Hensley v. Price*,
  876 F.3d 573 (4th Cir. 2017) ...............................................................28

*Hirsch v. Local Lodge 724, Int'l Ass'n of Machinists*,
  1992 WL 6753 (E.D. Pa. Jan. 14, 1992)..............................................24

*Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union*,
  544 F. App'x 657 (9th Cir. 2013) .......................................................41

*ILA & its Local 1291 (Holt Cargo)*,
  4-CC-2124-1, 1996 WL 625508 (N.L.R.B. Div. of Advice 1996) ....................45

*Int'l Ass'n of Heat & Frost Insulators, Local 14*,
  4-CB-4669, 1983 WL 29431 (N.L.R.B. Div. of Advice 1983)...........................24

*Int'l Longshore & Warehouse Union v. NLRB*,
  884 F.2d 1407 (D.C. Cir. 1989).........................................................23

*Int'l Longshore & Warehouse Union v. NLRB*,
  978 F.3d 625 (9th Cir. 2020) ................................................ 29, 31, 32

*Int'l Longshore & Warehouse Union*,
  371 N.L.R.B. No. 125 (Aug. 18, 2022) ...............................................37

*Int'l Longshoremen's Ass'n (Bermuda Container Line)*,
  Case No. 4-CE-107, 1996 WL 34551969 (Div. of Advice, Dec 13, 1996) ........32

*Int'l Longshoremen's Ass'n (Bermuda Container Lines)*,
  1997 WL 731472 (N.L.R.B. Div. of Advice, August 22, 1997) ........................32

*Int'l Longshoremen's Ass'n v. NLRB*,
  277 F.2d 681 (D.C. Cir. 1960)............................................................5

*Int'l Longshoremen's Ass'n (Bermuda Container Line)*, Case No. 4-CE-107,
  1996 WL 1250062 (Div. of Advice Dec 13, 1996) ...............................5, 49

*Int'l Longshoremen's Ass'n (Dolphin Forwarding, Inc.)*,
  266 N.L.R.B. 230 (1983), *enforced in part & rev'd in part sub nom. Am.
  Trucking Ass'ns v. NLRB*, 734 F.2d 966 (4th Cir. 1984), *aff'd sub nom.
  NLRB v. Int'l Longshoremen's Ass'n*, 473 U.S. 61 (1985) ("*ILA II*")............4, 42

*Int'l Longshoremen's Ass'n, Local 1242 (Rail Distribution Ctr., Inc.)*,
  No. 4-CC-1955-1, 1992 WL 396134 (N.L.R.B. Division of Advice)................45

*Int'l Longshoremen's Ass'n v. NLRB*,
  613 F.2d 890 (D.C. Cir. 1979)...........................................................43

*Kentov v. Sheet Metal Workers Int'l Ass'n, Local 15*,
    418 F.3d 1259 (11th Cir. 2005) .......................................................18

*Laborer's Local No. 89*,
    230 N.L.R.B. 638 (1977) ...............................................................22

*Local 13 (Cal. Cartage)*,
    278 N.L.R.B. 220 (1986) ...............................................................45

*Local 32B-32J, Service Employees Int'l Union v. NLRB*,
    68 F.3d 490, (D.C. Cir., 1995) ................................................ 25, 39

*Local 829, Bhd. of Painters & Allied Trades v. NLRB*,
    762 F.2d 1027 (D.C. Cir. 1985) .....................................................18

*Local Union No. 48, Sheet Metal Workers Int'l Ass'n v. Hardy Corp.*,
    332 F.2d 682 (5th Cir. 1964) ..........................................................21

*Longshoremen, ILA*,
    134 N.L.R.B. No. 125 (1961) ...........................................................6

*Marrowbone Development Co. v. Dist. 17, United Mine Workers*,
    147 F.3d  (4th Cir. 1998) ....................................................... 38, 39, 44

*Milk Drivers Local 753 (Pure Milk Ass'n)*,
    141 N.L.R.B. 1237 (1963) ..............................................................26

*N.Y. Presbyterian Hosp. v. NLRB*,
    649 F.3d 723 (D.C. Cir. 2011) ........................................................26

*N.Y. Presbyterian Hosp.*,
    354 N.L.R.B. 71 (2009) ..................................................................26

*Nat'l Woodwork Manuf. Ass'n v. NLRB*,
    386 U.S. 612 (1967)............................................................ 26, 31, 52

*New York Shipping Ass'n, Inc.*,
    107 N.L.R.B. 364 (1953) .................................................................5

*NLRB v. Enter. Ass'n of Pipefitters Local 638*,
    429 U.S. 507 (1977)............................................................... *passim*

*NLRB v. Int'l Longshoremen's Ass'n*,
    447 U.S. 490 (1980)............................................................... *passim*

*NLRB v. Int'l Longshoremen's Ass'n*,
    473 U.S. 61 (1985)................................................................ *passim*

vi

*NLRB v. Milk Wagon Drivers, Local 753*,
    335 F.2d 326 (7th Cir. 1964) ...............................................................26

*NLRB v. Visceglia*,
    498 F.2d 43 (3d Cir. 1974).....................................................................23

*Operating Eng'rs, Local Union No. 12*,
    220 N.L.R.B. 530 (1975) .......................................................................22

*Peddie Buildings*,
    203 N.L.R.B. 265 (1973) .......................................................................23

*Sheet Metal Workers Local 27 (AeroSonics, Inc.)*,
    321 N.L.R.B. 540 (1996) .......................................................................53

*Sheet Metal Workers, Local Union No. 49*,
    206 N.L.R.B. 473 (1973) .......................................................................22

*Steamship Trade Ass'n of Baltimore (ILA Locals 333 & 953)*,
    1989 WL 1705876 (N.L.R.B. Div. of Advice 1989).............................45

*Teamsters Local 982 (J.K. Barker Trucking Co.)*,
    181 N.L.R.B. 515 (1970), *enfd*., 450 F.2d 1322 (D.C. Cir. 1971) ......52

*Truck Drivers Union Local 705 v. NLRB*,
    820 F.2d 448 (D.C. Cir. 1987)..............................................................24

*Univ. Maritime Serv. Corp. v. Wright*,
    155 F.3d 311 (4th Cir. 1998) ...................................................................3

## Statutes & Other Authorities:

29 U.S.C. § 158(b)(4)............................................................. 1, 18, 21, 26

29 U.S.C. § 158(e) ...........................................................................1, 51

29 U.S.C. § 164(b) ................................................................................18

National Labor Relations Act § 14(b)....................................................18

*Charleston's Longshoremen: Organized Labor In The Anti-Union Palmetto State*,
Eli A. Poliakoff, The South Carolina Historical Magazine, Vol. 103, No. 3 (Jul.,
2002) .....................................................................................................19

Jim Newsome & Barbara Melvin, South Carolina Ports 2021,
"Priority 3: Growing Our Cargo Base and Altering Our Focus."
https://www.scstatehouse.gov/ CommitteeInfo/Ways&MeansMeetingHandouts/
EconomicDevelopment/SC%20Ports%20Authority%20FY%2021-22%20
Budget%20Request.pdf............................................................................35

## STATEMENT OF ISSUES

1.     Whether the International Longshoremen's Association (ILA) may resort to the court system to enforce its employers' promise not to contract work outside of the coast-wide Master Contract bargaining unit.  Specifically, whether the act of filing a lawsuit constitutes a threat or coercion within the meaning of Section 8(b)(4)(ii)(B) of the National Labor Relations Act (NLRA or "Act"), and whether the employers are neutral, disinterested bystanders when the lawsuit alleges that the employers failed to preserve the work of the multi-employer coast-wide bargaining unit in violation of the no-subcontracting provision of the Master Contract.

2.     Whether Article VII, Section 7, of the Master Contract between the ILA and the United States Maritime Alliance (USMX) violates Section 8(e) of the Act.

## INTRODUCTION

In April 2021, the ILA sued its employers in New Jersey state court to enforce a promise not to contract out bargaining unit work.  That promise was first made by ocean carriers—then called "steamship lines" in 1959—at the very dawn of the "container revolution"—and was given in exchange for the ILA's agreement to handle the new shipping containers.  This promise has been renewed—and enforced—in every subsequent contract since then.

Petitioner South Carolina State Ports Authority (SCSPA or "Petitioner") asked the Board to bar the ILA from making its argument to the New Jersey court,

but the Board declined.[1]  The Board noted that the Supreme Court of the United States has held that the Act cannot be used to deny a party's access to the court system except in extremely limited circumstances not present here and that the ILA's lawsuit relied on a work-preservation provision that has been repeatedly upheld as lawful to preserve bargaining unit work within the employers' control.  So the lawsuit, even if not ultimately successful, is not one that has an illegal objective.

In asking this Court to overturn the Board, SCSPA ignores a wealth of precedent from the longshore industry, instead citing inapposite cases from other industries.  Moreover, SCSPA seeks to overturn the work-preservation agreements that have provided the foundation for labor stability on the East and Gulf Coasts since 1977.  But since the Board's decision was correct and well-reasoned, the ILA should be allowed its day in court.

## FACTUAL BACKGROUND

### A.    History of Containerization

As this Court recognized in the 1980s, the advent of the shipping container revolutionized the shipping industry so that it was almost unrecognizable from what it had been two decades earlier.  *Am. Trucking Ass'ns, Inc. v. NLRB*, 734 F.2d 966,

---

[1] Citations of Petitioners Brief will be stated as "PB __."  Citations to the National Right to Work's Amicus Brief will be stated as "NRWC __."  Citations to the Chamber of Commerce's Brief will be stated as "CCB __."  Citations to Governor McMaster's Brief will be cited as "GB __."

968 (4th Cir. 1984). Prior to containerization, longshoremen transferred loose "break-bulk" cargo "piece by piece from the tailgate of the truck to the hold of the outgoing ship, checking it, sorting it, placing it on pallets, moving it by forklift to the side of the ship, and lifting it into the hold. *Id.* "Then in 1957 an event of enormous importance to the development of the shipping industry occurred: the first 'containership' took to the sea . . ." *Id.* at 969. Within decades, containerized cargo had taken over the shipping industry. *See id.* Its economic advantages "loomed large," because by eliminating the need to transfer cargo piece by piece, container ships could be "loaded or unloaded in a fraction of the time required for a conventional ship." *Id.* As a result, the period of the 1960s and 1970s was marked by much labor strife, including coast-wide strikes—the last of which was in 1977. *Id.* at 970-71.

Containerization "drastically reduced [t]he amount of work available for longshoremen." *Univ. Maritime Serv. Corp. v. Wright,* 155 F.3d 311, 316 (4th Cir. 1998). It also encouraged a race to the bottom with carriers seeking out cheaper, non-union ports for cargo. *Bermuda Container Line, Ltd. v. Int'l Longshoremen's Ass'n*, No. 97 Civ. 1257 (JFK), 1997 WL 795766, *5 (S.D.N.Y. Dec. 29, 1997). This structural realignment of container operations along the coast, and how it facilitated this race to the bottom, was aptly summarized by the Southern District of New York:

> With the advent of containerization, much of the need for longshoremen disappeared. Instead of shippers needing longshoremen to load and unload individual pallets, there was now merely a need to load and unload just a few large containers. Because containers were designed to be hooked up to tractor-trailers and driven directly to their destination, carriers were no longer bound by economic necessity to ports of call closest to their customer. Carriers could now call at ports with cheaper non-union labor, then truck the goods the extra distance, and save money. . . . In an attempt to protect jobs being lost by containerization, **the ILA recognized the need to transcend traditional port-by-port bargaining. It began to bargain on a multi-port basis.** The result of this bargaining shift was the two-step collective bargaining method described above. (**Master Contracts have become the vehicle to maintain the longshoremen's employment.**)

*See id.* (emphasis added); *see also Int'l Longshoremen's Ass'n (Dolphin Forwarding, Inc.)*, 266 N.L.R.B. 230, 235, n.23 (1983), *enforced in part & rev'd in part sub nom. Am. Trucking Ass'ns v. NLRB*, 734 F.2d 966 (4th Cir. 1984), *aff'd sub nom. NLRB v. Int'l Longshoremen's Ass'n*, 473 U.S. 61 (1985) ("*ILA II*") (the Board providing a similar description about how containerization caused the ILA to seek to "extend the framework of bargaining to a coast-wide basis.").

As a result of the dislocation caused by containerization, the ILA and its employers developed the Rules on Containers and the Containerization Agreement, both of which are still in the Master Contract, as Appendix A and Appendix B, and which were intended by the parties to preserve the bargaining unit's work.  JA0484-

0488; JA1333. Since then, these provisions and the other unique features of the Master Contract have insured labor peace and stability on the East and Gulf Coasts.

## B.  The Master Contract's Coast-wide Bargaining Unit

Before containerization, the employers and the ILA and its locals negotiated separate agreements at individual ports on the Atlantic and Gulf Coasts. *Int'l Longshoremen's Ass'n* (*Bermuda Container Line*), Case No. 4-CE-107, 1996 WL 1250062, at *1 (Div. of Advice Dec 13, 1996).  As it became clear that carriers were now able to easily transport their seaborne cargo to other ports, the bargaining unit was gradually extended to include ports coast-wide to avoid the circumvention of labor standards.[2]  *Id.*; JA0947-0948.

## C.  Two-Tier Bargaining

Collective bargaining on the East and Gulf Coasts evolved into a two-step process. *Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n, AFL-CIO*, 192

---

[2] Inter-port competition has always created downward pressure on longshore workers' wages and benefits due to the transient nature of the cargo. *See, e.g., New York Shipping Ass'n, Inc.*, 107 N.L.R.B. 364 (1953) (discussing bargaining of the parties—the ILA, terminal operators and steamship lines which moved cargo port to port—dating back to 1916).  The ILA realized it needed to curtail employers from following the cheapest labor. *See Douds v. Int'l Longshoremen's Ass'n*, 147 F. Supp. 103, 107 (S.D.N.Y. 1956), aff'd, 241 F.2d 278 (2d Cir. 1957).  Recognizing that steamship lines were able to quickly transfer their cargo to other ports, the ILA demanded that the bargaining unit include ports from Maine to Texas.  Over the course of many Board proceedings and litigation the parties ultimately reached the first document named the Master Contract in 1960. *See Int'l Longshoremen's Ass'n v. NLRB*, 277 F.2d 681, 683 (D.C. Cir. 1960) (remanding challenge to parties' expansion of the ILA unit through the Master Contract).

F.3d 250, 253 (2d Cir. 1999). The first step is when the USMX (on behalf of container carriers, marine terminal operators, and port associations) and the ILA (on behalf of its affiliated locals,) negotiate the coast-wide Master Contract. *Longshoremen, ILA*, 134 N.L.R.B. No. 125, slip. op. 8 (1961); JA0434. The second step is when local port employers (together with carriers) negotiate a supplemental local agreement to fill in remaining terms covering non-Master Contract cargo (such as breakbulk, automobiles,[3] dry bulk, and wet bulk). *See id*; *Bermuda Container Line*, 192 F.3d at 253; JA0434.

## D.     Master Contract Provisions

Article I of the Master Contract sets forth important parameters about the scope of the agreement. It explains that "management" encompasses not only the marine terminal operators, but also the terminal operators' customers—the ocean carriers.

> **Section 1.  Management**
>
> The multiemployer Management group bound to the Master Contract consists of the carriers, stevedores, marine terminal operators, and port associations that are members of USMX. . . .

JA0433.

---

[3] The amicus brief of the Governor of South Carolina states that "South Carolina leads the nation in exporting completed passenger vehicles." GB at 13. Automobile cargo is not covered by the Master Contract, and as a result is not affected by this dispute. Leatherman Terminal is currently being used for automobile cargo and other cargo and the ILA has not challenged these practices.

The longstanding historical precedent of coast-wide bargaining between ILA and USMX is codified in Article I:

> **Section 2. Recognition.**
>
> Management recognizes the ILA as the exclusive bargaining representative of longshoremen, clerks, checkers, and maintenance employees who are employed on ships and terminals in all ports on the East and Gulf Coasts of the United States, inclusive from Maine to Texas, and the ILA recognizes USMX as the exclusive employer representative in such ports **on Master Contract issues**.

JA0434 (emphasis added.)

Article I further recognizes that it is the full and complete agreement with respect to two types of cargo: container cargo and "ro-ro" cargo:

> **Section 3. Complete Labor Agreement.**
>
> This Master Contract is a full and complete agreement on all Master Contract issues relating to the employment of longshore employees on container and ro-ro vessels and container and ro-ro terminals in all ports from Maine to Texas at which ships of USMX carriers and carriers that are subscribers to this Master Contract may call. . . .

JA0434. Thus, the Master Contract establishes the terms and conditions of employment for containerized and ro-ro cargo on a multiemployer, multi-port, coast-wide basis, including the Port of Charleston. JA0948, ll. 7-10.

**E.      The Coast-wide Bargaining Unit Includes Two Types of Employers**

The Master Contract recognizes two sets of employers:  the terminal operators and the ocean carriers who agree to be bound by the Contract's terms.  JA0433.  The USMX-represented carriers acknowledge that the loading and unloading work performed by the ILA bargaining unit members is performed for the benefit of both the terminal operator and the ocean carrier.  In return, those members have agreed to contribute to the various Taft-Hartley employee benefit funds established under the Master Contract.  Article IV of the Master Contract specifies that the carriers are obligated to make direct contributions to these various Taft-Hartley employee benefit funds.  JA0439-0440.  Likewise, the Master Contract assesses carriers for container royalty payments based on tonnage and capacity.  JA0462-0463.  The carrier's container royalty assessments fund the longshoremen's health and welfare fund, pension and fringe benefits, and provide financial assistance to local port funds.  *Id.*

**F.      Master Contract Employers Agree Not to "Contract Out" Bargaining Unit Work**

One of the key provisions in the Master Contract, from the very beginning, repeated and renewed in every Master Contract to date, is the employers' promise not to contract out bargaining unit work to workers outside the bargaining unit.  JA0484; JA0486.

Through this no-subcontracting agreement and other work preservation provisions, the parties reached a compromise that allowed for labor stability. *Bermuda Container Line Ltd.*, 1997 WL 795766, at *5-6 (S.D.N.Y. Dec. 29, 1997). The ILA promised that it would perform the loading and unloading work as necessary on the carriers' containers. Conversely, USMX and its members promised that they would not give those containers to a subcontractor that would not guarantee that the loading and unloading of the carriers' containers would be performed by the ILA-represented bargaining unit.[4] JA0484; JA1331-1332.

Appendix A to the Master Contract (entitled, "Containerization Agreement") contains the employers' promise not to contract out work:

> 1.  Management and the Carriers recognize the existing work jurisdiction of ILA employees covered by their agreements with the ILA over all container work which historically has been performed by longshoremen and all other ILA crafts at container waterfront facilities. Carriers, direct employers and their agents covered by such agreements agree to employ employees covered by their agreements to perform such work which includes, but which is not limited to:
>
> > (a)  the loading and discharging of containers on and off ships
> > (b)  the receipt of cargo
> > (c)  the delivery of cargo
> > (d)  the loading and discharging of cargo into and out of containers

---

[4] A similar no-subcontracting clause is contained in Appendix B, "Rules on Containers." JA0486. In this case, the ILA's lawsuit specifically cites to the clause in the Containerization Agreement.

(e)  the maintenance and repair of containers

(f)  the inspection of containers at waterfront facilities (TIR men).

2.  Management, the Carriers, the direct employers and their agents shall not contract out any work covered by this agreement. Any violations of this provision shall be considered a breach of this agreement.

· · ·

**9. Violations of Agreement:** This Agreement defines the work jurisdiction of employees and prohibits the subcontracting out of any of the work covered hereby. It is understood that the provisions of this Agreement are to be rigidly enforced in order to protect against the further reduction of the work force . . . The parties agree that the enforcement of these provisions is especially important and that any violation of such other provisions is of the essence of the Agreement. The Union shall have the right to insist that any such violations be remedied by money damages to compensate employees who have lost their work.

JA0484.

## G.    The Port of Charleston and The "Hybrid Model"

The majority of port authorities on the East and Gulf Coasts operate under what has been described as the "landlord/tenant model." JA0250-0251.  Under that model, the authority does not actually operate the marine terminals; rather, the authority **leases** the marine terminals to private terminal operators.  The port authorities that use this model include Boston, New York/New Jersey, Philadelphia, Wilmington, DE, Baltimore, Jacksonville, Port Everglades, Miami, and Mobile (among others). *Id*.  A minority of East and Gulf Coast port authorities retain some

10

role in actually **operating** the marine terminals, including Houston, Virginia, Wilmington, NC, Charleston, and Savannah. JA0251-0253; JA0554. Houston and Virginia directly employ Master Contract bargaining unit employees for all container operations, but Wilmington, Savannah, and Charleston use something referred to as the "hybrid model." JA0056-0057. In that model, some parts of the terminal's operation are hired out to a private terminal operator, but other operational activities are retained by the public entity. *Id.*

In the early days of containerization in the Port of Charleston, ILA-represented crane operators used shipboard cranes to move the containers to and from the dock, just as they still do today with breakbulk cargo. JA0269-0270. Through an accident of history, when shore-based cranes were introduced, they were operated by employees of SCSPA, not members of the bargaining unit; similarly, as other container handling machines were developed, they were also assigned to SCSPA employees. As a result, Charleston, along with Wilmington (NC) and Savannah, are the only ports on the East and Gulf Coasts in which cranes and container-lift equipment are not worked by members of the Master Contract bargaining unit. JA0947.

So when a vessel docks at the two older container terminals in Charleston, Wando Welch Terminal and North Charleston Terminal, an SCPSA employee operating the shore-based crane moves the containers from the ship to a yard truck

11

operated by an ILA-represented employee, who then drives the container to a stack location, where another state employee, operating a lift machine, places the container in the stack for future delivery. JA0933, ll. 20-25. Even though this operation clearly violates the carriers' no-subcontracting promise, the ILA had never enforced the agreement in those terminals. *Id.*, ll. 10-14. All the same, these terminals were never specifically "carved out" of the coast-wide bargaining unit. JA0948, n. 32.

## H.    2012 Master Contract Negotiations

In 2012, during Master Contract negotiations, the bargaining parties tried to negotiate language that would address the anomaly of the three ports where Master Contract work was being contracted out of the unit by the ocean carriers. As a result, the parties negotiated the language in Article VII, Sections 7(a) and (b).

At the hearing before the ALJ, ILA Executive Vice-President Dennis A. Daggett explained that Article 7, Section 7(a) was intended to "red-circle" the then current terminals in Wilmington, NC, Charleston, and Savannah. JA0297, ll. 9-16. In other words, the parties had agreed to preserve the *status quo* at the existing terminals that utilized the hybrid model. Recognizing that it had not fully enforced the Master Contract at those locations, the ILA agreed to continue to forebear from enforcing the no-subcontracting provision at those specific terminals in order to avoid disruption for all parties. *Id.*; JA0298, ll. 7-12.

The parties also agreed to the language contained in Article 7, Section 7(b).

That provision reads as follow:

> USMX agrees to formally notify any port authority contemplating the development of or intending to develop a new container handling facility that USMX members **may** be prohibited from using that new facility if the work at that facility is not performed by Master Contract bargaining-unit employees.

JA0449 (emphasis added).

The ILA understood that this subsection meant that the Master Contract's general prohibition on contracting out bargaining unit work would be enforced at any **new** terminal in the same way that it was being enforced elsewhere on the East and Gulf Coasts, because the ILA wanted to prevent any further loss of bargaining unit work.  JA0923-0924.

## I.    Hugh K. Leatherman Terminal

The Hugh K. Leatherman Terminal is a newly developed container-handling facility located in North Charleston. JA0933, ll. 2-8.  It is being built in phases with three berths planned.  This expansion of the port capacity is intended to attract new discretionary cargo from other Master Contract ports and elsewhere. JA0053, ll. 1-4.  Discretionary cargo is cargo that can move to one or more ports based upon inland economics.  JA0949, n. 34.  Like every port, Charleston has made the attraction of additional discretionary cargo a primary goal.  JA0581, ll. 16-19 (Senator Hugh K. Leatherman states on a phone call surreptitiously recorded by

SCSPA: "I've fought tooth and toenail to keep Savannah from continuing to grow, trying to attract away our carriers and trying to grow. . .")[5].

As the opening of the new terminal was looming, the ILA met with USMX to seek assurances that it would abide by the Master Contract's no subcontracting provision at all new terminals on the East and Gulf Coast—including Leatherman. When it became clear that the ILA and USMX might have a dispute, the ILA asked to arbitrate the issue but USMX refused.  JA0936, n. 18.

On March 30, 2021, the Leatherman Terminal opened for business—the first new terminal in recent memory anywhere on the East and Gulf Coasts.  JA0937, ll. 23-24.   On April 9, 2021, a Hapag-Lloyd vessel was the first ship to dock at Leatherman Terminal to deliver containerized cargo.  *Id.*, ll. 28-29.  Although this was a violation of the Master Contract's no-subcontracting clause, consistent with assurances given by the ILA, the ship was worked by ILA labor without any interruptions.  *Id.*   Nor were there any job actions in any other container terminal in the Port of Charleston.  *Id.*   On April 21, 2021, another container vessel from Orient Overseas Container Line (OOCL) berthed at Leatherman.  *Id.*, ll. 30-31.  Again, despite the fact that this was another violation, the ILA worked that ship without work stoppages.  *Id.*   Moreover, there is no allegation of any strikes,

---

[5] The recording cuts off at this point.

14

slowdowns, picketing, or job actions at any Charleston terminal—including Leatherman—to date.

## J.    The Lawsuit

On April 22, 2021, the ILA filed a lawsuit in the Superior Court of New Jersey against USMX and Hapag-Lloyd, a Master Contract employer, seeking contractual damages—but no injunctive relief— on the grounds that Hapag-Lloyd's decision to contract with non-bargaining unit labor at Leatherman Terminal violated the no-subcontracting provision of the Master Contract. JA0514.   The lawsuit did not mention Article VII, Section 7(b).   Rather, the lawsuit alleged a violation of the no-subcontracting provision found in Section 2 of the Containerization Agreement. JA1328; JA0937, ll. 30-36.   On April 26, 2021, the ILA amended its complaint to add OOCL as a defendant.   JA0938, ll. 12-16.   The lawsuit did not name SCSPA as a defendant, nor did it name the terminal operator in Charleston, Charleston Stevedoring Company ("CSC").   JA0547.   That lawsuit has since been removed to the United States District Court for the District of New Jersey and is currently stayed during the pendency of the instant dispute. JA0945, n. 27.

The ILA's lawsuit alleges that Master Contract employer carriers must abide by their contractual promise not to subcontract to marine terminals that do not hire Master Contract unit employees for all work covered by the Master Contract, or else pay damages.   JA0529.   Paragraph 26 of the complaint states as follows: "Upon

information and belief, USMX and Hapag Lloyd's recent actions presage future diversion of discretionary cargo from the Master Contract bargaining unit to workers outside the bargaining-unit specifically to avoid the cost of paying Master Contract wages and benefits." JA0510.

## PROCEDURAL HISTORY

The ILA relies on the Procedural History set forth in the Board's brief.

## SUMMARY OF ARGUMENT

Under the highly deferential standards that restrict this Court's review, the Board's findings and rulings should be upheld and the petition for review should be dismissed.

For decades, the no-subcontracting clause in the Master Contract has provided for labor peace on the East and Gulf Coasts. In 2021, when two USMX carrier members risked disrupting that stability by calling at Leatherman Terminal, the ILA sued in state court for breach of contract. The lawsuit does not seek to acquire any new work; it merely asks the court to hold USMX signatory carriers to their promise not to contract bargaining unit work outside the ILA's bargaining unit.

This lawful exercise of the ILA's First Amendment rights cannot violate the Act. As the Supreme Court has ruled, the Board generally is precluded from finding that a party's petitioning conduct constitutes an unfair labor practice. *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731 (1983). Moreover, the lawsuit cannot

16

violate the Act's proscriptions against secondary activity because it seeks to keep Master Contract work (the loading and unloading of containers) inside the ILA's coast-wide bargaining unit. It is well-settled that the Master Contract's no-subcontracting clause is a valid, work-preservation agreement that covers a single, multi-employer bargaining unit along the East and Gulf Coasts. And, consistent with Supreme Court precedent on the very same ILA Master Contract bargaining unit, the ILA's effort to enforce the no-subcontracting clause to preserve its traditional container work encompasses a run-of-the-mill "straightforward primary dispute" between the ILA and its USMX employers. *See* JA1333.

Substantial evidence also supports the Board's finding that Section 7(b) did not constitute an agreement to cease doing business with SCSPA.

## STANDARD OF REVIEW

The ILA relies on the Standard of Review set forth in the Board's brief.

# ARGUMENT

## I.

## THE BOARD CORRECTLY HELD THAT THE ILA'S ATTEMPT TO ENFORCE A WORK-PRESERVATION AGREEMENT IN ITS COAST-WIDE MASTER CONTRACT WAS LAWFUL

**A.    The Filing of the Lawsuit Cannot Constitute Coercion Under the Act**

**1.    In order to claim a violation of Section 8(b)(4)(ii) SCSPA must show a threat or coercion**

To prove a violation of Section 8(b)(4)(ii), two separate independent elements must be shown.  First, the union must be shown to have engaged in prohibited conduct: "threaten, coerce, or restrain."  Second, the union must also have engaged in that conduct for one of the statutorily enunciated prohibited ("secondary") objects. 29 U.S.C. 158(b)(4); *Kentov v. Sheet Metal Workers Int'l Ass'n, Local 15*, 418 F.3d 1259, 1263 (11th Cir. 2005).  If one of these prongs is not met, a claim under Section 8(b)(4)(ii)(A) or (B) fails.  *See Local 829, Bhd. of Painters & Allied Trades v. NLRB*, 762 F.2d 1027, 1032 (D.C. Cir. 1985). [6]

---

[6] One statutory provision that is undisputedly **not** implicated in this case is Section 14(b) of the Act, which allows individual states to enact so-called "right to work" laws. It is curious, therefore, that National Right to Work Committee (NRWC) took it upon itself to write an amicus brief.  NRWC's argument seems mainly to be based upon the mistaken belief that the ILA's enforcement of the Master Contract will somehow cause state workers to lose their jobs, but this fear is baseless given that the ILA has agreed to leave the existing terminals undisturbed. Unfortunately, NRWC finishes its argument by attempting to impugn the integrity of ILA members in Charleston.  NRWC does this by citing cases involving long-dead people who spent their lives and careers far from Charleston, and by describing a case of

The Supreme Court has explained that the words "threaten, coerce or restrain" "are 'nonspecific, indeed vague,' and should be interpreted with 'caution' and not given a 'broad sweep.'" *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Building Trades Council*, 485 U.S. 568, 578 (1988). In reviewing the legislative history, the Supreme Court found that the only activity that clearly was meant to be included in those words was "ambulatory picketing." *Id.* at 587. In this case, the only act that SCSPA alleges was coercive is the ILA's lawsuit. If the lawsuit is not coercive under the Act, then SCSPA's claim fails altogether.

But SCSPA ignores all this precedent when it argues: "ILA's lawsuit plainly had an unlawful object: coercing USMX and its carriers-members to cease doing business with SCSPA at Leatherman terminal . . ." PB at 28-29. First, SCSPA's argument makes no distinction between primary and secondary conduct: it is by no

---

**employer** fraud in Tampa as if it was the fault of the union. NRWC's characterization of the ILA in Charleston is unjust. The ILA has a long and proud history of advocating for both labor rights and civil rights in South Carolina, and as a result, has the well earned respect of the Charleston community. *See Charleston's Longshoremen: Organized Labor In The Anti-Union Palmetto State*, Eli A. Poliakoff, THE SOUTH CAROLINA HISTORICAL MAGAZINE, Vol. 103, No. 3 (Jul., 2002), pp. 247-264 (South Carolina's "political and business leaders have consistently worked to prevent the development of a strong labor presence . . . Yet since 1869 organized Charleston longshoremen have overcome South Carolina's racial dynamic and anti-union sentiment to maintain economic, political and social influence unsurpassed in the state's labor community. From its earliest days this predominately African American union has enjoyed significant links with local political and business elites . . . Charleston longshoremen used solidarity forged by racial prejudice to disarm anti-union pressures.").

means unlawful for a union to take steps to coerce **its own employers** to abide by their contractual promises.  But SCSPA also fails to explain how merely filing a lawsuit is "coercive," either as that term is used in the Act, or in light of the First Amendment concerns explicated by the Supreme Court.  Thus, even though SCSPA does not appeal the Board's ruling that the no-subcontracting clause is a lawful work preservation agreement, SCSPA seeks to nullify it by making it impossible to enforce.  Work preservation clauses only **need** to be enforced when workers from outside the bargaining unit are doing (or threatening to do) bargaining unit work; thus, they always cause cessation of business.

### 2. The Board Correctly held that the ILA's lawsuit was protected by the First Amendment

Here the Board correctly held that the ILA's lawsuit was protected by the First Amendment pursuant to the Supreme Court's decision in *Bill Johnson's Restaurants*, 461 U.S. 731.  Specifically, the Board observed as follows:

> To protect the fundamental First Amendment right to petition the government for redress of grievances, the Supreme Court has placed limits on the Board's authority to find that a lawsuit constitutes an unfair labor practice. The Board may not make such a finding unless the lawsuit is both objectively baseless and retaliatory or the lawsuit "has an objective that is illegal under federal law."

JA1329-1330, quoting *Bill Johnson's*, 461 U.S. at 737 fn. 5.  The Board went on to examine whether the ILA's lawsuit was "illegal under federal law", and concluded

that the lawsuit did not have an illegal objective, and therefore, was not an unfair labor practice.  JA1330.

### 3.     Resort to the courts is not coercive in general

As a preliminary matter, even before the Supreme Court performed its First Amendment analysis in *Bill Johnson's*, 461 U.S. 731, both the Board and the courts had recognized that a lawsuit is fundamentally different from the conduct that Congress intended to be considered coercive under Section 8(b)(4)(ii).  For example, in the construction industry, where hot-cargo agreements are legal, such agreements still may **not** be enforced in a way that violates Section 8(b)(4)(ii).  Nevertheless, courts and the Board routinely held that such agreements **may** be enforced by resort to the courts, because legal action is not "coercion" as that term is used by Section 8(b)(4)(ii).  The same reasoning is applied to lawful work preservation agreements—such as this one—in industries other than construction.  *Commerce Tankers Corp. v. Nat'l Maritime Union*, 553 F.2d 793, 802 (2d Cir. 1977) ("With respect to the claim under § 303, we agree with the judge's determination that 'resort to the courts' is not a threat, coercion or restraint under § 8(b)(4)(ii)."); *Carrier Air Condit. Co. v. NLRB*, 547 F.2d 1178, 1191 (2d Cir. 1976) (resort to courts "does not constitute the sort of coercion that Congress intended to make unlawful");  *Local Union No. 48, Sheet Metal Workers Int'l Ass'n v. Hardy Corp.*, 332 F.2d 682, 686 (5th Cir. 1964) ("We believe that the Congress used 'coerce' in the section under consideration as a word

of art, and that it means no more than non-judicial acts of a compelling or restraining nature, applied by way of concerted self-help consisting of a strike, picketing or other economic retaliation or pressure in a background of a labor dispute."); *Operating Eng'rs, Local Union No. 12,* 220 N.L.R.B. 530 (1975) ("a lawsuit for punitive damages does not amount to impermissible restraint or coercion within the meaning of Section 8(b)(4)(ii) because Section 8(b)(4)(ii) was not intended to be applied to the use by a union of a lawsuit to enforce a hot cargo agreement."); *Laborer's Local No. 89*, 230 N.L.R.B. 638, 639 (1977) (in a lawsuit to enforce a collective-bargaining agreement that was arguably contrary to Section 8(e) "[t]he lawsuit, irrespective of motivation for its filing, is simply not coercive within the meaning of Section 8(b)(4)(ii)."); *Sheet Metal Workers, Local Union No. 49*, 206 N.L.R.B. 473 (1973) ("attempted establishment of an unlawful interpretation to a subcontracting agreement [is] 'not sufficient to taint [a] lawsuit with illegality. . .'").

Therefore, the Supreme Court's decision in *Bill Johnson's*, 461 U.S. 731 (1983), was wholly consistent with the Board's and the courts' prior decisions. In *Bill Johnson's*, the Board had ruled that an employer violated Section 8(a)(1) of the Act—which prohibits employers from retaliating against employees for exercising their statutory rights—by filing a state-court lawsuit **intended** to retaliate against employees for their protected conduct. 461 U.S. at 737-41. However, the Supreme Court reversed the Board's ruling based on the "weighty countervailing

considerations" of the First Amendment and the constitutional right to petition. *Id.* at 741-43. The Court stated:

> We should be sensitive to these First Amendment values in construing the NLRA in the present context. As the Board itself has recognized, "going to a judicial body for redress of alleged wrongs . . . stands apart from other forms of action directed at the alleged wrongdoer. The right of access to a court is too important to be called an unfair labor practice solely on the ground that what is sought in court is to enjoin employees from exercising a protected right."

*Id.* at 742 (quoting *Peddie Buildings*, 203 N.L.R.B. 265, 272 (1973), enf. denied on other grounds, *NLRB v. Visceglia*, 498 F.2d 43 (3d Cir. 1974)).

After *Bill Johnson's*, courts and the Board concluded that lawsuits do not constitute coercion under 8(b)(4)(ii) except in the very narrow circumstances where a lawsuit has an "objective that is illegal under federal law." *See, e.g.*, *Brown & Root, Inc. v. La. State AFL-CIO,* 10 F.3d 316, 320 (5th Cir. 1994) (coercion means "nonjudicial acts"); *Int'l Longshore & Warehouse Union v. NLRB*, 884 F.2d 1407, 1413-14 (D.C. Cir. 1989) ("under section 8(b)(4)(B) a union bringing a lawsuit to enforce contractual rights does not engage in 'coercion' . . . [unless the lawsuit] present[s] an irreconcilable conflict between a Board order and contractual remedies."); *Gold v. Mid-Atlantic Reg'l Council of Carpenters*, 407 F. Supp. 2d 719, 725 (D. Md. 2005) ("The NLRB has defined this 'coercion' element as 'nonjudicial acts of a compelling or restraining nature, applied by way of concerted

23

self-help consisting of a strike, picketing, or other economic retaliation and pressure in the background of a labor dispute.'"); *Int'l Ass'n of Heat & Frost Insulators, Local 14¸ 4-CB-4669*, 1983 WL 29431 (N.L.R.B. Div. of Advice 1983) (under *Operating Engineers Local 12*, and after *Bill Johnson's*, union's lawsuit for punitive damages was not a threat or coercive act).

It bears repeating that in this case, SCSPA has not alleged, nor does the record show, any "non-judicial" acts. This appeal springs from the ILA's attempt to enforce the Master Contract by means of a lawsuit. Petitioner and its *amici* cite to cases involving work stoppages, walkouts, and picketing, but none of those job actions are present in this case.

### 4.    The ILA's lawsuit does not have an illegal objective

The D.C. Circuit has explained that under *Bill Johnson's,* a union's lawsuit cannot have an "illegal objective" if the lawsuit seeks to enforce a legal provision of a contract. *Truck Drivers Union Local 705 v. NLRB*, 820 F.2d 448, 452 (D.C. Cir. 1987) ("It is irrelevant under *Bill Johnson's* whether Local 705's motive in filing the grievance was to impose secondary pressure on Emery. If the grievance had an unlawful objective, the contract provision sought to be enforced must *itself* have been illegal."); *see also Hirsch v. Local Lodge 724, Int'l Ass'n of Machinists*, 1992 WL 6753 (E.D. Pa. Jan. 14, 1992) (when interpreting the Master Contract, the court held: "in order for a labor lawsuit or grievance to have an illegal objective under federal law, the specific contract provision sought to be enforced in the action must

be one that constitutes an unfair labor practice under Section 8(b)(4)(ii)(A) of the Act, *i.e.*, the contract provision must itself be illegal").[7]

In other words, a union cannot be foreclosed from petitioning the courts to enforce a lawful contractual provision, before any discovery is obtained, and before a court has had the chance to consider the merits. *See Bill Johnson's,* 461 U.S. at 745-46. ("If there is a genuine issue of material fact that turns on the credibility of witnesses or on the proper inferences to be drawn from undisputed facts, it cannot, in our view, be concluded that the suit should be enjoined.").

## B.     The ILA's Lawsuit Has A Work-Preservation Object And Is Therefore Primary

When examining the Rules on Containers[8] in the Master Contract, the Supreme Court enunciated the test for a lawful work preservation agreement:

---

[7] SCSPA confuses two concepts: on the one hand, the "objective that is illegal under federal law," defined by the Supreme Court in *Bill Johnson's*, and on the other hand, the secondary "object" that is set forth in the Act.  The two concepts are not the same.  A secondary object is only illegal under that statute when it is accompanied by some prohibited **conduct**—such as coercion, but lawsuits are not coercive unless they have an "objective that is illegal under federal law." *Bill Johnson's*, 461 U.S. at 737 n.5. A secondary object, however, is **not** an intrinsically illegal object; it is only illegal if accompanied by prohibited conduct.  Thus, the lawsuit must have something on its face that marks it as illegal from the start in order to be an unfair labor practice. *See Local 32B-32J, Service Employees Int'l Union v. NLRB*, 68 F.3d 490, 496, (D.C. Cir., 1995) (distinguishing lawsuits seeking a contractual interpretation that would not "**necessarily** result in an illegal hot cargo agreement" from "suits that were unlawful from the start" (emphasis added)).

[8] The Rules on Containers are incorporated by reference within the Containerization Agreement.

> [A] lawful work preservation agreement must pass two tests: First, it must have as its objective the preservation of work traditionally performed by employees represented by the union. Second, the contracting employer must have the power to give the employees the work in question—the so-called "right of control" test of *Pipefitters*, *supra*. The rationale of the second test is that if the contracting employer has no power to assign the work, it is reasonable to infer that the agreement has a secondary objective, that is, to influence whoever does have such power over the work. "Were the latter the case [the contracting employer] would be a neutral bystander, and the agreement or boycott would, within the intent of Congress, become secondary."

*NLRB v. Int'l Longshoremen's Ass'n*, 447 U.S. 490, 504–505 (1980) ("*ILA I*"), (quoting *Nat'l Woodwork Manuf. Ass'n v. NLRB*, 386 U.S. 612, 644–645 (1967).

An agreement requiring the contracting employer to preserve the work of its bargaining unit employees by a no-subcontracting clause has long been recognized as one type of primary activity. *ILA I,* 447 U.S. at 507; *Nat'l Woodwork,* 386 U.S. at 645 ("[U]nions and employers are entitled to negotiate contracts that 'preserve' unit work by way of no-subcontracting or similar clauses, *even if the enforcement of such agreements may cause the contracting employer to cease doing business with someone else*") (emphasis in original); *see Milk Drivers Local 753 (Pure Milk Ass'n)*, 141 N.L.R.B. 1237, 1240 (1963), *enf'd*, *NLRB v. Milk Wagon Drivers, Local 753*, 335 F.2d 326 (7th Cir. 1964); *see N.Y. Presbyterian Hosp.*, 354 N.L.R.B. 71, 77 (2009), *aff'd on other grounds*, *N.Y. Presbyterian Hosp. v. NLRB*, 649 F.3d 723 (D.C. Cir. 2011) (citing *Nat'l Woodwork Manuf. Ass'n*, 386 U.S. 612).   Such a

dispute is clearly primary because it is between the union and its members' own employer affecting the labor relations of the contracting unit. Even though the agreement results in the employer's cessation of business with a third party, this effect does not alter the basic primary nature of the agreement. *ILA I,* 447 U.S. at 507 n.22.

Applying the test from *ILA I,* the Board found here that the ILA's lawsuit to enforce its no-subcontracting clause was lawful:

> Here, as in the *ILA* cases, ILA is seeking to preserve the traditional work and the jobs of unit employees in the face of the technological advances affecting the coastal units, including such changes as at the new Leatherman Terminal. That ILA seeks to stop expansion of the hybrid work model is merely one facet of preserving work for the employees it represents. ILA, USMX, and USMX carrier members are parties to the contract and any one of them may seek to enforce it to reap the benefit of that party's perceived bargain.

JA1332.

The Board's decision is supported by substantial evidence. In fact, the Board could hardly have concluded otherwise. As shown below, (1) SCSPA does not dispute that the ILA's coast-wide bargaining unit currently performs the lift equipment work the lawsuit seeks to preserve within the unit; and (2) this Court has already ruled that "the argument that the shipping lines do not have the right to control the container work sought by the longshoremen lacks any semblance of merit." *Am Trucking Ass'n, Inc.*, 734 F.2d at 968.

27

Nevertheless, SCSPA tries to make an argument that even Member Ring demurred from making:  namely, that the ILA's lawsuit does **not** seek to preserve the unit's traditional work, but rather "seeks to acquire new work . . . at the Port's Leatherman Terminal."  PB at 32.  But that quotation shows the false premise on which SCSPA bases its argument.  There is no work at Leatherman unless the **carriers** choose to bring their containers there, and the carriers have already promised those containers to the bargaining unit.

1.    **The Board rightly held that the ILA's lawsuit seeks to preserve traditional work of the ILA's coast-wide unit**

a)    **The proper inquiry must focus on the work performed by the coast-wide bargaining unit**

SCSPA does not dispute the cases that find that Master Contract's no-subcontracting provision is a lawful work preservation clause.[9]  Moreover, SCSPA **admits** that the Master Contract embraces a multiemployer, coast-wide bargaining unit.  PB at 35.[10]

---

[9]    In its opening brief, SCSPA does not dispute either (1) that the ILA's no-subcontracting clause in the Master Contract is a valid work preservation clause; or (2) that the Master Contract covers a single, multi-employer bargaining unit across the East and Gulf Coasts.  Thus, any contentions to the contrary are waived. *See Hensley v. Price*, 876 F.3d 573, 581 n.5 (4th Cir. 2017) (Under the Rules of Appellate Procedure, waiver is analyzed based on the content of the opening brief; again, '[a brief's argument section] must contain . . . [the] appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.'").

[10] The longshore bargaining units on both coasts are multi-port, multiemployer, and coast-wide. *E.g., Am. Pres. Lines v. Int'l Longshore & Warehouse Union*, 611 F. App'x 908, 911 (9th Cir. 2015) ("[W]e evaluate whether the [longshore] union's objective is the preservation of work traditionally performed by 'bargaining unit'

Also, although SCSPA argues that the objective of the ILA's lawsuit is work acquisition, SCSPA cannot point to a single allegation from the lawsuit's papers. The lawsuit does not name either CSC or SCSPA as defendants and thus seeks no relief from them. The lawsuit does not seek the assignment of jobs at Leatherman or anywhere else.   Indeed, the lawsuit seeks no injunctive relief at all—only damages from those carriers who violated their contract.   The text of the ILA's complaint describes the work in the same terms as the Board:  loading and unloading containers coast-wide.  JA0507-0508.

Undaunted by this lack of evidence, SCPSA argues that the lawsuit is not work-preservative because the ILA-represented employees never did the lift-equipment work "at any terminal in the Port of Charleston." PB at 33.   SCSPA further argues that "the fact that ILA members have done lift-equipment work for some employers in **their multi-employer bargaining unit**" is essentially irrelevant.   *Id.* (emphasis added).[11]   The Board explicitly rejected all these arguments:

---

employees. . . [which] [i]n the shipping industry. . . is comprised of the multiple employers who are signatory to the [CBA]."); *Bermuda Container Lines, Ltd.*, 192 F.3d at 257; *Cal. Cartage Co. v. NLRB*, 822 F.2d 1203, 1206 (D.C. Cir. 1987) (starting work preservation analysis with consideration of the "unusual" features of the multi-employer, multi-port, West Coast longshore unit); *Int'l Longshore & Warehouse Union v. NLRB*, 978 F.3d 625, 630-631 (9th Cir. 2020) (same).

[11] Moreover, SCSPA erroneously focuses its argument on the work performed by state employees in Charleston "for decades."   Any extra-unit effect on the employment opportunities of the state employees is entirely irrelevant here.

> As in the *ILA* cases, the collective-bargaining agreements
> in issue cover coast-wide units. The Master Contract
> provides that it is the full complete agreement on "issues
> relating to the employment of longshore employees on
> container and ro-ro vessels and container and ro-ro
> terminals in all ports from Maine to Texas at which ships
> of USMX carriers and carriers that are subscribers to this
> Master Contract may call." The Master Contract
> incorporates the Containerization Agreement, which is
> substantially the same as the Rules and which provides
> that: Management and the Carriers recognize the existing
> work jurisdiction of ILA employees covered by their
> agreements with the ILA over all container work which
> historically has been performed by longshoremen and all
> other ILA crafts at container waterfront facilities. Carriers,
> direct employers and their agents covered by such
> agreements agree to employ employees covered by their
> agreements . . . .

JA1331.

Consistent with the Supreme Court's mandate to focus on the **bargaining unit** work, the Board correctly defined the work that the ILA seeks to preserve as the "loading and unloading of containers generally at East and Gulf Coast ports," JA1332, mirroring the work definitions found in the *ILA* cases. *ILA I*, 460 U.S. at 507-08 (remanding to the Board with instructions to "focus on the work of the bargaining unit employees" of the coast-wide unit); *ILA II*, 473 U.S. at 77, n.17.

---

*NLRB v. Int'l Longshoremen's Ass'n,* 473 U.S. 61, 77-78 (1985) ("*ILA II*") ("[T]he effect of work preservation agreements on the employment opportunities of employees not represented by the union, no matter how severe, is of course irrelevant. . . so long as the union had no forbidden secondary purpose.").

(endorsing the Board's definition, that the work being preserved was simply "the work of loading and unloading containers" in the coast-wide bargaining unit.).

Analysis of the work preservation doctrine "must be carefully focused: to determine whether an agreement seeks no more than to preserve the work of **bargaining unit** members, the Board must focus on the work of the **bargaining unit** employees, not on the work of other employees who may be doing the same or similar work." *ILA I*, 447 U.S. 490, 507 (emphasis added); *Nat'l Woodworkers Mfrs. Ass'n*, 386 U.S. at 646 (affirming Board's finding that "the objective of the [challenged clause] was preservation of work traditionally performed by the jobsite carpenters."). The proper inquiry focuses on whether the union's conduct is "addressed to the **labor relations of the contracting employers vis-a-vis their own employees**, or tactically calculated to achieve union objectives elsewhere." 386 U.S. at 644; *see also ILA II*, 473 U.S. at 81.

In this case, the ILA's lawsuit was directed solely at its own contracting employers in order to protect the work of those employers' employees in the coast-wide bargaining unit. As the Board correctly observed, "*ILA I and II* demonstrate that the Board must look beyond the locus of a dispute" and to the work performed by the ILA's coast-wide unit. JA1332 (emphasis supplied). "[T]he place where work is to be done often lies at the heart of the controversy, and is seldom relevant to the definition of the work itself." *ILA II*, 473 U.S. at 77; *see also Int'l Longshore*

31

*& Warehouse Union v. NLRB*, 978 F.3d 625, 639 (9th Cir. 2020) (the analysis must be "focused on bargaining unit workers rather than non-unit workers currently doing the same or similar work; **unconcerned with the work's precise location** and accommodative toward change (or even the threat of change), including the elimination of traditional work." (emphasis added)).

During the *Bermuda Container Line* dispute, the Board's Division of Advice was given **two** occasions to evaluate the exact no-subcontracting clause on which the ILA's lawsuit was based in this case. First, the Division opined that the Master Contract's no-subcontracting clause was crafted to limit "the ILA's work preservation objective to subcontracting within the coast-wide bargaining unit," which is a "single, coast-wide bargaining unit up and down the Atlantic and Gulf Coasts. . .." *Int'l Longshoremen's Ass'n* (*Bermuda Container Line*), Case No. 4-CE-107, 1996 WL 34551969 (Div. of Advice, Dec 13, 1996). The following year, the Division explained further:

> [A] contract clause restricting subcontracting has a valid work preservation object, or is "primary," if a majority of the work in question has traditionally been performed by employees in the bargaining unit **even if it is a multiemployer unit and the employees of a particular employer member of that unit have never performed that work.**

*Int'l Longshoremen's Ass'n* (*Bermuda Container Lines*), 1997 WL 731472, at *2 (N.L.R.B. Div. of Advice, August 22, 1997) (emphasis added); *see also Bermuda*

*Container Line Ltd.*, 192 F.3d at 257 (holding that the Master Contract "was designed to preserve the work of ILA employees in the coast-wide bargaining unit").

> **b)    Proof of an imminent threat is not required every time a valid provision is enforced**

SCSPA maintains that there is no "genuine threat resulting from the new terminal's use of the existing hybrid model."  PB at 38.  The Board rejected this argument: "To the extent that a showing of job loss or threat thereof is required, it has been satisfied by the history of containerization and its effect on the number of longshoremen."  JA1333.  The no-subcontracting provision was negotiated in circumstances "when employees' traditional work [was] displaced, or threatened with displacement, by technological innovation," namely containerization.  *ILA I*, 447 U.S. at 505.  The no-subcontracting provision was the parties' negotiated response to those circumstances.  The provision does not simply expire because it has been used and enforced—or even not enforced—for a period of time.  The ILA is still entitled to the benefit of its bargain today.[12]  Moreover, the very nature of a

---

[12] SCSPA echoes Member Ring's dissent again, when he argues that the no-subcontracting clause can no longer be enforced because we are no longer "back in 1960s or 1970s." JA0134.  Of course the provision **has** been enforced many times since then.  Regardless, if he is correct that the Board can simply release the carriers from their contractual promise not to subcontract after a certain amount of years, how does the ILA get the benefit of its bargain? Does that mean that the bargaining unit will be released from its corresponding promise to handle shipping containers?

work-preservation clause is to act proactively to preserve work before it escapes the unit, a union does not have to wait until the work is actually lost before it can enforce its contract.

Regardless, the threat posed by the unfettered expansion of the hybrid model **is** real. SCSPA argues that the ILA is seeking to "acquire . . . the lift equipment jobs at Leatherman Terminal that are and have been performed by state employees for decades." PB at 32. But that is a false premise; Leatherman is a new terminal and no one has worked there at all—let alone for decades—and there will be no jobs there unless SCSPA acquires additional business to fill its additional capacity. This underscores the reality that if Leatherman Terminal represents "work acquisition" for any party, it is SCSPA. Indeed, the reason Leatherman was built was to acquire additional business.[13] JA0581. Leatherman represents **new**, **additional** capacity for containers; it is not intended to replace any terminals. Where will this additional cargo come from? Obviously, SCSPA hopes it will come either at the expense of its competitors on the East and Gulf Coasts by siphoning off discretionary cargo currently being brought to other ports, or by capturing a larger share of new discretionary cargo—for example, cargo that is being attracted from the West

---

[13] If this was not already self-evident, the Governor of South Carolina concedes this point, stating: "South Carolina is also in the midst of an aggressive program to expand interstate capacity along I-26 to handle the anticipated growth in container volume from the Leatherman Terminal." GB 5.

Coast.[14]  It is not difficult to see that whatever happens at Leatherman will set a precedent for all new terminals, not just in the Southeast, but everywhere on the East and Gulf Coasts.

Thus, SCSPA seems to presume that it has a legal right to **compel** ocean carriers to bring their containers to Charleston in increasing amounts to fill whatever capacity SCSPA intends to build.  SCSPA's testimony at the hearing was consistent with this entitled attitude: "I can say with certainty that we invest a billion dollar in new facilities to assimilate growth . . . yes, we're growth oriented, and we open new terminals to—to assimilate growth.  And that's international cargo; we don't do domestic cargo here."  JA0154; *see also* JA0053 (the Ports Authority is "owned by

---

[14] The SCSPA's 2021 presentation before the South Carolina Ways and Means Committee repeatedly emphasized the importance of **growing** its discretionary cargo base (*e.g.*, retail and e-commerce consumer goods), noting that "an overall shortage of space/capability in US creates opportunity" for doing so. *See* Jim Newsome & Barbara Melvin, South Carolina Ports 2021, pp. 14-17, "Priority 3: Growing Our Cargo Base and Altering Our Focus." https://www.scstatehouse.gov/ CommitteeInfo/Ways&MeansMeetingHandouts/ EconomicDevelopment/SC%20Ports%20Authority%20FY%2021-22%20Budget% 20Request.pdf.  This report also described the SCSPA's ambition to increase its share of discretionary cargo bound for inland destinations, stating that its investments in its intermodal rail capacity will "expand[] rail reach **beyond traditional Southeast**." *Id.* at p. 20 (emphasis added).  It further states that "a new cargo base focus is required to sustain above market growth" such that "a significant pivot is required into retail distribution." *Id.* at 15.

State of South Carolina, and is given a statutory mission to foster the growth of waterborne commerce in South [Carolina].”); JA0072, JA0074, JA0581.[15]

However, a carrier's contractual commitment to any one marine terminal lasts only as long as it takes to unload and load the vessel.  This fact is borne out by the evidence here where carriers told SCSPA that if SCSPA could not accommodate the carriers' request, the carriers would “skip” Charleston altogether.  JA0137-0139; JA0611-0612; JA0938.  On the other hand, signatory carriers **do** have an **ongoing** contractual commitment to the bargaining unit.  And to the extent that containerized cargo is being carried by the ILA's employers, destined for the East or Gulf Coast, **all** those containers have already been contractually earmarked for the bargaining unit.

SCSPA admitted that the hybrid model is attractive for carriers precisely because of the lower labor costs.  SCSPA testified that paying bargaining unit wages and benefits is “more expensive”: “[W]e have the hybrid operating model in the South Atlantic ports. . . A deviation from that would put us at a competitive disadvantage, you know, relative to any new terminal or any facility that had to operate a more expensive model.”  JA0092; JA0084.  SCSPA's statements in public

---

[15] The amicus brief of the Chamber of Commerce discusses at length about how carriers have recently been bringing more discretionary cargo to the East Coast instead of the West Coast as they used to do.  CCB 21-22.

records also belie its claims that there is not a threat to bargaining unit work in other ports, s*ee e.g., supra* fn 14.

> **c)** **As in the *ILA* cases, the ILA's enforcement of the Master Contract's work preservation clause is valid, primary activity**

SCSPA maintains further that any work preservation objective requires a "massive technological change." But work-preservation does not require technological displacement. *ILWU*, 978 F.3d at 639. ("Neither [*ILA*] case suggests its work preservation framework should be reserved only for particularly complex cases of technological displacement."). *ILA I* specifically contemplates its application to the "'simple case' and the 'more complex cases [of technological displacement]' . . . and that in either situation the inquiry remains the same." *Int'l Longshore & Warehouse Union*, 371 N.L.R.B. No. 125, slip. op. 4 (Aug. 18, 2022) (quoting *ILA I*, 447 U.S. at 507). The *ILA* cases merely expand on general work preservation law where, as here, a union tries to react to changed circumstances of **any** sort, instead of simply "respond[ing] to change with intransigence." *ILA I*, 447 U.S. at 506 (quotations omitted).

Here, the Board rejected SCSPA's argument:

> [I]n characterizing the ILA cases as inapposite, the dissent chooses to overlook the fact that the Court there found that ILA's attempt to enforce the Rules on Containers was lawful work preservation notwithstanding that the work in question—the stuffing and stripping of containers— was not historically longshore work. Here, as in the ILA cases, the ILA is merely seeking to enforce the Master Contract and the Containerization Agreement (which is

> substantially the same as the "Rules on Containers") in order to prevent the erosion of unit jobs in the coast-wide unit.

JA1332-1333.

In other words, it is **easier** to see the work preservation object here than in *ILA I* and *II*. Stuffing and stripping containers was new work that the bargaining unit had never done before, but the Master Contract claimed it because it was the functional equivalent of loading ships. The reviewing tribunals had to stretch their imagination to see the connection. But using cranes to take cargo off ships and store it on the docks has been done since the Age of Sail. Operating shore-based cranes and container-lift equipment is the actual, **current** work of the bargaining unit. The contractual provision that the ILA seeks to enforce here is not something that describes a specific new task, rather the provision is just a generic no-subcontracting clause protecting **current** work.

### d) The single employer cases cited by SCSPA are irrelevant

Ignoring the surfeit of multi-employer cases from the longshore industry that are exactly on point—including one case from this Court—SCSPA instead fixates on *Marrowbone Development Co. v. Dist. 17, United Mine Workers*, 147 F.3d 297 (4th Cir. 1998), which is about the coal mining industry. But far from undermining the ILA's position, *Marrowbone* is completely consistent with it. Indeed, that becomes clear even by the way SCSPA describes the case in its brief. SCSPA

argues that the "work at issue" must have been traditionally performed in the bargaining unit. PB 33-34. Given that SCSPA has **admitted** that the Master Contract bargaining unit is a multi-employer bargaining unit, the logical inference from those quotations is that the enforcement of the no-subcontracting clause does **not** violate the Act when it requires the employers—such as Hapag Lloyd and OOCL—to preserve the containerized cargo for their ILA-represented employees.

The key distinction in *Marrowbone* is that there was a **single**-employer bargaining unit. 147 F.3d at 302. After formation, the workers in the bargaining unit had demanded that the employer accept provisions in a national agreement that the employer had no role in negotiating. *Id.* at 299-300. As a result, the fact that other bargaining units had done the work in question was irrelevant, when it had never been done in the *Marrowbone* unit. *Id.* at 303. SCSPA tries to analogize *Marrowbone* by asking this Court to look at the "Charleston bargaining unit," but there is no such bargaining unit for the Master Contract. JA0434; JA1119-1120.

SCSPA next cites a case from the D.C. Circuit—**not** one of the D.C. Circuit cases that analyze that Master Contract or the longshore industry—but rather a case involving a real estate company in Brooklyn. *Local 32B-32J Service Emps. Int'l Union v. NLRB*, 68 F.3d 490 (D.C. Cir. 1995). *Local 32B-32J* also involves a single-employer unit—consisting of two people. The form contract that the employer had signed was facially legal. However, it listed cleaning staff in the

bargaining unit, even though this bargaining unit (a porter and a superintendent) had **never** included cleaning staff. Based upon this error, the union demanded that the employers subcontract to an entity that hired local members to do the cleaning, but the court said this was "work acquisition" because the bargaining unit "had never meaningfully done the cleaning work." *Id.* at 495. The court found that using erroneous information and the employer's carelessness to force the employer to bring new work into the unit was a clear violation of Section 8(e). Thus, the key factor again was an analysis of the **reality** of the bargaining unit.

In this case, the language of the Master Contract unit has been carefully negotiated and crafted over the past six decades in coast-wide, multiemployer bargaining. The scope of the multiemployer coast-wide bargaining unit is clear. The description of work jurisdiction is clear. The no-subcontracting clause is also clear, and has been assented to by all the unit employers repeatedly; and it is undisputed that the ILA-represented coast-wide bargaining unit performs the lift-equipment work at ports all across the East and Gulf Coasts.

### 2. The Board's Finding That the Carriers had the Right of Control Over the Work in Question was Based on Substantial Evidence

SCSPA argues that the carriers here lack the right of control over the "work sought by the union." PB at 42. But SCSPA is entirely alone in this view. In this case, both the ALJ and the Board found that carriers have the right to control with

whom they choose to contract for loading and unloading their cargo.  There was

substantial evidence for the Board to find as follows:

> USMX and its carrier members have sufficient control
> over the work in question—the loading or unloading of
> containers they own or lease. . . USMX carriers have the
> authority to bypass the Port of Charleston and call on other
> ports where ILA-represented employees perform all
> loading and unloading work. Therefore, USMX carriers
> have the right to control who performs loading and
> unloading work of their containers.

JA1332. Indeed, it would be difficult for the Board to have found otherwise

in this case, because, in addition to the evidence in this record, all the legal

precedent supports the Board's finding.[16]

---

[16] SCSPA cites only to one decision from the Ninth Circuit to support its argument that the carriers lack the right of control over which terminals they choose to contract with for the purpose of stevedoring their cargo:  *Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union*, 544 F. App'x 657, 658 (9th Cir. 2013).  However, the *Hooks* case was very different because there the union was demanding that the terminal operator ICTSI assign specific jobs to the union at ICTSI's terminal— something the Board had already held ICTSI had no control over.  Here, the ILA is not suing the terminal operator CSC, nor is it asking CSC to reassign any jobs anywhere.  The ILA is only seeking to enforce what the carriers have already agreed to: control where they send their containers to.  In a case decided after *Hooks*, the Ninth Circuit unequivocally agreed that carriers control where their containers go. *American President Lines v. ILWU*, 611 F. App'x 908, 911 (9th Cir. 2015) (holding no issue of fact as to whether carriers control work performed on their containers).  Thus, if it is true in *Hooks* that the union "conflated" the carriers' right to control their containers with the right to assign specific jobs at a specific terminal, then here SPSCA is conflating things in the opposite way, arguing that since the carriers do not have the right to assign jobs at a specific location, then they do not have the right to refrain from contracting with that terminal in the first place.

Taking its cue from Member Ring's dissent, SCSPA rests its argument almost entirely on one case that SCSPA did not even bother to cite in its briefs in front of the Board. In *Pipefitters*, the Supreme Court gave its formal approval to the "'Board's control' test, under which the union commits an unfair labor practice under § 8(b)(4)(B) when it coerces an employer in order to obtain work that the employer has no power to assign." *NLRB v. Enter. Ass'n of Pipefitters Local 638*, 429 U.S. 507, 521 (1977) ("*Pipefitters*"). But *Pipefitters* is hardly a recent decision, and given that it was decided before both *ILA I* and *II*, all the courts who have considered the Master Contract's work-preservation provisions to date were well aware of *Pipefitters* and indeed ruled that the Master Contract's work preservation provisions passed the "*Pipefitters* test." *E.g.*, *ILA I*, 447 U.S. at 504–05 ("the contracting employer must have the power to give the employees the work in question—the so-called 'right of control' test of *Pipefitters* . . . In *Pipefitters* the object of the strike was to obtain work controlled not by the subcontractor, with whom the steamfitters had agreed to the lawful work preservation clause, but by the main contractor."); *ILA II*, 473 U.S. 61, 74 n. 12 (1985) ("In this case, the ALJ, Board, and Court of Appeals have unanimously concluded that the longshoremen's employers, marine shipping companies, have the 'right to control' container loading and unloading work by virtue of their ownership or leasing control of the containers.

*See* 734 F.2d, at 978; 266 N.L.R.B., at 234, 260-267. Thus the *Pipefitters* test is satisfied here.").

In *ILA I*, the Supreme Court distinguished *Pipefitters* by noting that carriers in the longshore industry were more like the general contractor in that case as opposed to the subcontractor. 447 U.S. at 504–05. SCSPA disagrees with the Supreme Court. PB at 46. Like a general contractor, the carriers control the work and select another entity to perform the loading and unloading work on the carriers' cargo to their specifications. Likewise, the carriers have a wide selection of "subcontractors" who compete with each other for the carriers' business.

In *ILA I*, the D.C. Circuit explained exactly why the carriers (referring to them as "the shippers") are the general contractor—they control the work:

> [The] shippers[,] the employers of the boycotting ILA members in these cases, and the coerced employers under *Pipefitters*[,] controlled the disposition of all the containers at issue . . . Thus when the relevant Container Committees found the shippers in violation of the Rules and fined them, the shippers, after unsuccessfully seeking indemnification from the truckers and consolidators, simply refused to supply their containers to the truckers and consolidators . . . It is difficult to imagine a more forceful demonstration of control.

*Int'l Longshoremen's Ass'n v. NLRB*, 613 F.2d 890, 912–13 (D.C. Cir. 1979). The carriers have discretion with whom they subcontract, they can dictate specifications to the subcontractors, and if the subcontractors cannot or will not agree, the carriers can look elsewhere.

In the longshore industry, containers (and other sorts of cargo) **are** the work. This is why the ILA cannot be seeking "the work" at Leatherman Terminal, because "work" at any one marine terminal is contingent on cargo being brought there. Longshore job assignments are only theoretical until cargo arrives. If there is no cargo, longshore workers are not hired. And unlike other industries, where work is fixed to a location, cargo is mobile, and waterborne cargo especially so.

It is unlike coal mining work, which is tethered to the coal mine. *See Marrowbone*, 147 F.3d 297. In the coal industry, whoever controls the mine site controls the work, but in the longshore industry, whoever controls the cargo controls the work. Containerized cargo **can** be relocated very quickly, and that happens frequently. For example, the amicus brief of the Chambers of Commerce cites to news articles reporting that "[p]otential for labor-driven disruption as a result of the ongoing International Longshoremen and Warehouse Union labor negotiations on the West Coast has already driven shippers to divert traffic to ports on the East Coast." CCB at 21-22.

Likewise, in *Am. Trucking*, as affirmed by the Supreme Court, this Court observed:

> Up until the Court decided *ILA*, no one seriously contended that the Rules violated the Act for failure to meet the 'right of control' test of *Pipefitters* . . . the argument that the shipping lines do not have the right to control the container work sought by the longshoremen lacks any semblance of merit . . . In sum, the Board had

44

little difficulty finding that the shipping lines retain the right to control the allocation of the work sought by the ILA under the Rules. Substantial evidence exists to support this finding.

734 F.2d at 978; *see also Am. President Lines v. Int'l Longshore & Warehouse Union*, 997 F. Supp. 2d 1037, 1046-47 (D. Alaska 2014), aff'd. 611 F. App'x 908 (9th Cir. 2015) (Carriers "control[] where [the carriers'] containers go, when they go, where they go, when they get there, and who takes them."); *ILWU, Local 13 (Cal. Cartage),* 278 N.L.R.B. 220, 223 (1986) (["Carriers] control the use of the containers."), enf. in part, *Cal. Cartage Co. v. NLRB*, 822 F.2d 1203 (D.C. Cir. 1987); *ILA & its Local 1291 (Holt Cargo)*, 4-CC-2124-1, 1996 WL 625508 (N.L.R.B. Div. of Advice 1996) ("[C]arriers . . . generally have the right to control the assignment of work since, by virtue of their ownership and/or long-term leasehold interest in the containers, they have the authority to prescribe the conditions of the containers' release to subcontractors."); *ILA v. NLRB*, 613 F.2d at 912-13; *Int'l Longshoremen's Ass'n, Local 1242 (Rail Distribution Ctr., Inc.),* No. 4-CC-1955-1, 1992 WL 396134, at *3 (N.L.R.B. Division of Advice) (Nov. 9, 1992) (carriers' ownership or long-term lease of containers suggests that carriers have the authority to designate the routing and direction); *Steamship Trade Ass'n of Baltimore (ILA Locals 333 & 953)*, 1989 WL 1705876 (N.L.R.B. Div. of Advice 1989) (same); *see also ILA II*, 473 U.S. at 74, n. 12.

The issue in *Pipefitters* was **not** whether the provision was unlawful.  *See ILA I*, 447 U.S. at 509.  Rather, the unfair labor practice in *Pipefitters* resulted from the way in which the union **enforced** the provision.  429 U.S. at 514.  SCSPA concedes that the union could have legally enforced the agreement when it argues, "[i]n both *Pipefitters* and *IBEW No. 501*, the subcontractors **could have** refused to contract with the general contractors unless their own union-represented employees performed the disputed work." PB at 46 (emphasis added).  What *Pipefitters* says is that the union was not entitled to threaten its employer **after** the employer had entered into a contract with a general contractor at the site.[17]  Indeed, SCSPA seems to concede this as well: "Like the subcontractors in those cases, USMX and its carrier-members could have decided not to contract with SCSPA, rather than accept this division of labor."  PB at 46. That **is** precisely what the Master Contract requires:  not to contract with entities who do not give the contractual work to the bargaining unit.  Moreover, nothing in *Pipefitters* says that the union is prohibited from suing for damages.  429 U.S. 507.

The point of the "right-to-control" test is whether the targeted employers have the power to accede to the union's demands.  *Id.* at 521-22 (the issue is whether the employer "did have the power to settle the dispute with the union"); *George Koch*

---

[17] Conversely, there **are** also situations where the employer is at fault for deliberately contracting away its right of control in order to avoid its contractual obligations to the union, but that is not what the ILA is arguing here.

*& Sons v. NLRB*, 490 F.2d 323, 326 (4th Cir. 1973) (if the employer is "not legally empowered to meet his employees' demand, then they cannot lawfully strike him for his failure to accede."). Here, the carriers **are** able to accede to the ILA's demand because the carriers have many other available terminals on the East and Gulf Coast (including the other terminals in Charleston and Savannah where the ILA has agreed to maintain the *status quo.*) And the carriers **have** acceded by not calling on Leatherman Terminal. JA0608-0612; JA0635.

That is the fallacy in SCSPA's argument—that the carriers are "neutrals" with whom the ILA has no dispute. But the carriers are the **primary** employers under the Master Contract. *Bermuda Container Line*, 192 F. 3d 250, 257 (2d Cir. 1999) The record is replete with testimony explaining the dispute between the bargaining parties about the proper interpretation of the no-subcontracting clause in the Master Contract with respect to Leatherman. USMX and carrier representatives repeatedly told SCSPA that there was a disagreement with the ILA that would likely need to be arbitrated. JA0184 ll: 7-10; 0207 ll: 12-25; 0210. USMX's counsel Donato Caruso explicitly testified the same: "[T]hat would require a determination to be made whether the language that the Union was relying on, which was in the contract for many years, particularly the containerization provisions of the contract, and the jurisdiction provisions, that there would be a need to have that issue resolved,

47

possibly through arbitration." JA0315. This shows a straightforward contractual dispute between a union and its primary employers.

SCSPA's brief begrudgingly acknowledges, as it must, that carriers do control with whom they subcontract. But SCSPA then argues against a straw man, arguing that ocean carriers have no right to control the assignment of **jobs** at Leatherman. As already discussed, nothing in the ILA's lawsuit says that the ILA is demanding reassignment of jobs at Leatherman (or anywhere else), but SCSPA argues that the only reason that the ILA would want to enforce the no-subcontracting language would be to force the reassignment of jobs at Leatherman. That argument deliberately misunderstands the nature of work preservation in the coast-wide bargaining unit.

Perhaps because everyone likes to think that they are the main character in the movie, SCSPA argues as though the 60-year old Master Contract is directed entirely at SCSPA. But SCSPA is barely a bit player here.[18] The goal of the no-

---

[18] The amicus briefs of the Chambers of Commerce and the Governor of South Carolina discuss the alleged economic harm caused by the ILA's lawsuit. Yet, even though Leatherman has been under dispute since the spring of 2021, last year (2022) was "the most successful fiscal year in our port's history," according to SCSPA's **own** annual report. https://scspa.com/about-the-port/publications/annual-report. The reports of economic harm seem exaggerated. Regardless, the Supreme Court is explicit that these alleged effects are irrelevant: "So long as the union had no forbidden secondary purpose' to disrupt the business relations of a neutral employer, . . . such effects are 'incidental to primary activity.'" *ILA II*, 473 U.S. at 79. Consistent with this precedent, the Board explained that a secondary *effect* on the State and SCSPA is different from a union's secondary *purpose*; "the former, no matter how consequential, is incidental to a lawful primary purpose.'" JA1332. (emphasis in original).

48

subcontracting clause is to preserve cargo by keeping it **within** the bargaining unit. Thus, if a ship stops calling in New Jersey, and starts calling at Baltimore, the Master Contract has not been violated—even though the individual workers in New Jersey have lost hours—because the work has been preserved for the whole unit. Within the confines of the bargaining unit, carriers are free to seek out the most favorable deal; a signatory carrier is "free to subcontract unit work at any time so long as it agrees to 'use employees covered by the Master Contract' to stevedore its vessels within the single, coast-wide bargaining unit up and down the Atlantic and Gulf Coasts . . .". *Bermuda Container Line*, 1996 WL 1250062, at *7.

SCSPA makes two curious arguments that betray a mischaracterization of the primary employer relationship. SCSPA first attempts to distinguish the *ILA* cases by explaining that container stuffing was sometimes done by the carriers' ILA-represented employees, whereas in other cases they "contracted out" the stuffing. PB at 48. The situation is the exact same here: in most East Coast ports, lift equipment is operated by the carriers' ILA-represented employees, whereas in the Port of Charleston they are contracting out that work. Then, SCSPA says the lawsuit is not intended to coerce "*the carriers* to change *their* work assignments." PB at 47 (emphasis in original), but that is exactly what the lawsuit seeks.

Most tellingly, SCSPA's brief ignores the *Bermuda Container* case entirely, even though both the ALJ and the Board relied upon it. Just as here, in *Bermuda*

*Container*, the carrier BCL argued that the ILA's "real" dispute was with the marine

terminal operator in Salem, New Jersey, and that BCL was a disinterested neutral.

The ILA argued as follows to the Second Circuit:

> The defect in BCL's scenario is that there is no dispute
> between the ILA and the Salem stevedore and BCL is not
> an innocent bystander. The facts show that ILA's dispute
> is with BCL to get BCL to comply with the contractual
> commitment it made in the Master Contract to use
> bargaining unit employees for its operations. Pressuring a
> party to a labor contract to assign work to the employees
> covered by that agreement is classic primary activity.

*Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n*, 99-7164, Appellee's

Br., p. 25 n. 7 (2d Cir. Apr. 26, 1999).  The Second Circuit had no difficulty rejecting

the employer's argument in that case, *see Bermuda Container Line Ltd.*, 192 F.3d

250, 257 (2d Cir. 1999) (finding that the "Container Agreement by prohibiting

BCL's proposed move preserves work within the primary employment

relationship"), and SCSPA fares no better here.  Decades after the Second Circuit

decision in *Bermuda Container*, there are still zero ILA-represented workers in the

Port of Salem, because acquiring the jobs in Salem was never the goal of the no-

subcontracting clause.

Just as the ILA did not have to acquiesce when Bermuda Container took its

cargo away from members of the bargaining unit, the ILA does not have to sit idly

by while a limited carve-out of the unit's jurisdiction at the existing terminals in

only three ports may now be increased exponentially by the expansion of one of

those ports (and create the precedent for future new terminals in other ports).

JA0043, ll. 1-4; JA0072:17-25; JA0073:12-17; JA0153:22-25-0154:1; JA0154:16-23; 0263:7-22.

## II.

### THE BOARD CORRECTLY DETERMINED THAT ARTICLE 7, SECTION 7 OF THE MASTER CONTRACT WAS NOT UNLAWFUL

SCSPA also challenges the Board's unanimous determination that Article VII, Section 7 of the Master Contract[19] is not an unlawful "hot cargo" agreement under Section 8(e) of the Act. Section 8(e) prohibits an employer and a labor organization from entering into any contract or agreement, express or implied, whereby the employer agrees "to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or cease doing business with any other person." 29 U.S.C. § 158(e).

The Board's test for evaluating the lawfulness of a contract provision under Section 8(e) has remained the same for over fifty years:

> [I]f the meaning of the clause is clear, the Board will determine forthwith its validity under 8(e); where the clause is not clearly unlawful on its face, the Board will interpret it to require no more than what is allowed by law. On the other hand, if the clause is ambiguous, the Board

---

[19] SCSPA takes a broad view asserting that the Board held that "the *Master Contract* does not violate Section 8(e)." PB at 5 (emphasis supplied). The issue raised in the Complaint was far narrower: Whether the ILA, Local 1422, and USMX violated Section 8(e) by entering into or re-affirming the provisions in Article VII, Section 7 of the Master Contract, not the agreement as a whole. JA0409–0410.

> will not presume unlawfulness, but will consider extrinsic
> evidence to determine whether the clause was intended to
> be administered in a lawful or unlawful manner. In the
> absence of such evidence, the Board will refuse to pass on
> the validity of the clause.

*Teamsters Local 982 (J.K. Barker Trucking Co.)*, 181 N.L.R.B. 515, 517 (1970),

*enfd*. 450 F.2d 1322 (D.C. Cir. 1971).

Applying longstanding precedent to a common-sense reading of Article VII,

Section 7, the Board found the clause a facially valid one that lawfully requires

USMX to give notice to ports authorities that its members may be prohibited from

calling under certain circumstances, but does not require any employer to cease

doing business with any entity.[20]  JA1328.

SCSPA abandons the claim it made before the Board—that Article VII,

Section 7 is facially unlawful—instead arguing that "extrinsic evidence here reveals

the parties' intentions," and, "[i]t could not be clearer that . . . both parties

understood and agreed that, as a practical matter, USMX carrier-members would

not call at such terminals."  PB at 53, 56.  This claim is squarely at odds with the

---

[20] Section 8(e) agreements are subject to the same work-preservation analysis the
Board conducted with respect to the ILA's lawsuit against USMX and its member
carriers.  *See National Woodwork*, 386 U.S. 612.  The Board did not reach the
question of whether Article VII, Section 7 had a proper work-preservation purpose.
In the event that the Court finds that Article VII, Section 7 is an agreement subject
to Section 8(e), the case should be remanded back to the Board to address the work-
preservation defense.

52

record: both the ALJ and Board found that there was no such agreement with respect to Article VII, Section 7.  JA0936; JA0942-0943.

As Member Ring succinctly put it in his separate opinion concurring in the dismissal of the relevant charges:

> [USMX's former counsel, Donato Caruso] testified that USMX's understanding of Sec. 7(b) was that it did not prohibit the hybrid model from being applied at new terminals. In USMX's view, the word 'may' in Sec. 7(b) was meant to signify that the ILA might be able to persuade an arbitrator that the Master Contract prohibited carriers from calling at any terminal that is not exclusively manned by ILA labor. Crediting Caruso's testimony, the judge dismissed the General Counsel's allegation that Sec. 7(b), on its face, violates Sec. 8(e) of the Act. As stated, I join my colleagues in adopting the judge's dismissal of this allegation.

JA1335, n.6; 1334, n.4.

Although SCSPA argued to the Board that Article VII, Section 7 is facially unlawful, JA1058, it apparently concedes the Board's subsequent decision on this point, asserting instead to the Court that the clause is "ambiguous," and arguing that extrinsic evidence demonstrates the parties' unlawful intent.  PB at 51-52.  But such evidence must show a bilateral, or mutual, agreement to such an unlawful interpretation.  *E.g.*, *Sheet Metal Workers Local 27 (AeroSonics, Inc.)*, 321 N.L.R.B. 540, 540 n.3 (1996) ("[A]s a matter of law, solely unilateral conduct by a union, for example, a threat of picketing or the mere filing of a grievance, to enforce an

unlawful interpretation of a facially lawful contract clause does not violate Sec. 8(e) because such conduct does not constitute an 'agreement.'") (citations omitted).

The evidence SCSPA musters demonstrates just the opposite: that USMX and the ILA had a **dispute**, not an **agreement**, about the interpretation of Article VII, Section 7.  PB at 55-56 (listing communications in which member carriers expressed concerns about the lack of "resolution" or "agreement" between the ILA and USMX).

SCSPA fails to acknowledge, much less address, the substantial evidence supporting the Board's determination that "ILA, Local 1422, and USMX interpreted Section 7(b) differently and . . . that, absent a mutual understanding, the provision did not constitute an agreement to cease handling the products of, or cease doing business with, SCSPA."  JA1328, JA1350.[21]

SCSPA also ignores the bargaining history underlying the inclusion of Article VII, Section 7.  During contract negotiations that resulted in the inclusion of Article VII, Section 7 in the agreement, the ILA attempted to obtain contract language that would have required USMX members to forgo calling at any port where any "receiving and delivery of cargo and all terminal work" was performed by non-ILA

---

[21] This includes the testimony of the Ports Authority's own President, James Newsome III, who admitted that USMX member carriers were telling him that the existence of a purported agreement was "an outstanding issue" that had "to be resolved between USMX and the ILA".  JA0172.

members.  JA1344.  But instead, the parties agreed on the language now found in Article VII, Section 7.  Subsection 7(a) provided for a study to be performed to "convince" the Port of Charleston and two other ports where the hybrid model was employed that the work performed by state employees in those ports could be performed by Master Contract bargaining unit employees "in a more productive, efficient, and competitive fashion."  JA0449.  This mutual effort to "convince" SCSPA of the superiority of employing bargaining unit labor would be unnecessary if Article VII prohibited the use of hybrid-model employees at terminals subject to an historical exception from the Master Contract's jurisdiction.  *See* JA0085, JA0145, JA0174 (Newsome describing Article VII, Section 7(b) as "permissive," not "prescriptive," because it "says 'may' instead of 'shall'.").[22]

SCSPA also contends that the fact that USMX member carriers refused to call at Leatherman Terminal is evidence that USMX tacitly interpreted Article VII, Section 7 as prohibiting its members from using the new terminal as long as it was operated by non-Master Contract bargaining unit employees.  PB at 56–57.  This is inconsistent with SCSPA's claim that the ILA's lawsuit—which does not invoke Article VII, Section 7—caused the member carriers to refuse to call at the Leatherman Terminal.  It is also inconsistent with the record before the Board and

---

[22] USMX and its member carriers have likewise repeatedly disavowed any prohibitory interpretation of Article VII, Section 7, which they view as a simple notice provision.  JA0322–0325.

other portions of SCSPA's brief, which show that USMX member-carriers refused to call at the Leatherman terminal after the ILA's lawsuit was filed. PB at 13; JA1328.

Thus, the Ports Authority has failed to demonstrate that the Board erred when it unanimously found that Article VII, Section 7 of the Master Contract is lawful under Section 8(e).

## CONCLUSION

The petition for review should be dismissed.

Dated: May 5, 2023

Respectfully submitted,

/s/ John P. Sheridan

Laurence M. Goodman
Joseph D. Richardson
WILLIG, WILLIAMS, & DAVIDSON
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103
(215) 656-3655

John P. Sheridan
Daniel Wolff
Nicholas M. Graziano
MAZZOLA MARDON, P.C.
26 Broadway, 17th Floor
New York, NY 10004
(212) 425-3240

*Counsel for the International Longshoremen's Association, Local 1422*

*Counsel for the International Longshoremen's Association*

56

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. __23-1059__    **Caption:** South Carolina State Ports Authority v. NLRB

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ____12,094____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 365_____ [*identify word processing program*] in
14 point Times New Roman_____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) John P. Sheridan_____

Party Name International Longshoremen's Ass__

Dated: 5/5/23_____

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2023, I filed the foregoing to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered counsel as CM/ECF users.

Dated: May 5, 2023

/s/ John P. Sheridan
John P. Sheridan
MAZZOLA MARDON, P.C.
26 Broadway, 17th Floor
New York, NY  10004
(212) 425-3240
jsheridan@mmmpc.com

*Counsel for the International*
*Longshoremen's Association*