No. 23-1059

# In the United States Court of Appeals
### FOR THE FOURTH CIRCUIT

SOUTH CAROLINA STATE PORTS AUTHORITY

*Petitioner*

THE STATE OF SOUTH CAROLINA; UNITED STATES MARITIME
ALLIANCE, LTD.

*Intervenors*

v.

NATIONAL LABOR RELATIONS BOARD

*Respondent*

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL 1422;
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION

*Intervenors*

-------------------------------

NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION;
CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA;
SOUTH CAROLINA CHAMBER OF COMMERCE; NATIONAL
ASSOCIATION OF MANUFACTURERS; SOUTH CAROLINA
MANUFACTURERS ALLIANCE; GOVERNOR HENRY MCMASTER

*Amici Supporting Petitioner*

On Petition for Review of an Order of the National Labor Relations Board

**BRIEF OF INTERVENOR
UNITED STATES MARITIME ALLIANCE, LTD.**

William M. Spelman
James R. Campbell
THE LAMBOS FIRM, LLP
303 South Broadway, Suite 410
Tarrytown, New York 10591
Tel. (212) 381-9700

Jonathan C. Fritts
James D. Nelson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Tel. (202) 739-3000

*Counsel for Intervenor United States Maritime Alliance, Ltd.*

## CORPORATE DISCLOSURE STATEMENT

In accordance with FED. R. APP. P. 26.1 and 4TH CIR. R. 26.1, United States

Maritime Alliance, Ltd. makes the following disclosure:

1)      Is party/amicus a publicly held corporation or other publicly held entity?

No.

2)      Does party/amicus have any parent corporations?  If yes, identify all parent corporations, including all generations of parent corporations:

No.

3)      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  If yes, identify all such owners:

No.

4)      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  If yes, identify entity and nature of interest:

COSCO Shipping Lines (North America) Inc. is a wholly-owned subsidiary of COSCO SHIPPING Lines Co., Ltd., which is a wholly-owned subsidiary of COSCO SHIPPING Holdings Co., Ltd., which is dually listed on the Hong Kong Stock Exchange and the Shanghai Stock Exchange.

Evergreen SHIPPING Agency (America) Corp. is the North American general agent for Evergreen Marine Corp. (Taiwan) Ltd., which is a publicly traded company on the Taiwan Stock Exchange.

i

Hyundai Merchant Marine (America), Inc. is a subsidiary of HMM Co., Ltd., which is publicly traded on the Korea Exchange.

Maersk Line is a subsidiary of AP Moller - Maersk A/S, which is publicly traded on NASDAQ Copenhagen.

Ocean Network Express (North America) Inc. is a subsidiary of Ocean Network Express Pte. Ltd., which is comprised of Kawasaki Kisen Kaisha, Ltd. ("K" Line), Mitsui O.S.K. Line (MOL Line), and Nippon Yusen Line (NYK Line), which are publicly traded on the Tokyo Stock Exchange.

OOCL USA Inc. is a subsidiary of Orient Overseas Container Line Limited, which is wholly owned by Orient Overseas (International) Limited (OOIL), which is listed on the Hong Kong exchange. The majority shareholder of OOIL is COSCO SHIPPING Holdings Co. Ltd., which is traded on the Hong Kong and Shanghai exchanges.

Wallenius Wilhelmsen Logistics Americas, LLC is a subsidiary of Wallenius Wilhelmsen ASA, which is publicly traded on the Oslo, Norway stock exchange.

Yang Ming (America) Corp. is a subsidiary of Yang Ming Marine Transport Corp., which is publicly traded on the Taiwan stock exchange.

Zim American Integrated Shipping Services Company, Inc. is a subsidiary of Zim Integrated Shipping Services Ltd., which is publicly traded on the New York Stock Exchange.

5)    Is party a trade association? (amici curiae do not complete this question)?  If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

No.

6)    Does this case arise out of a bankruptcy proceeding?  If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the

parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

No.

7)   Is this a criminal case in which there was an organizational victim?  If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

No.

Dated:  May 19, 2023              *s/ Jonathan C. Fritts*
                                  Jonathan C. Fritts

                                  *Counsel for United States Maritime*
                                  *Alliance, Ltd.*

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT ...................................................... i

TABLE OF AUTHORITIES ................................................................... vi

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF ISSUES ...................................................................... 1

STATEMENT OF THE CASE ................................................................... 2

SUMMARY OF ARGUMENT ................................................................. 5

STANDARD OF REVIEW ...................................................................... 8

ARGUMENT ........................................................................................ 11

I.     The NLRB's Finding that the Carriers Have the Right of Control Ignores Undisputed Record Evidence and the ALJ's Factual Findings. ......................................................... 11

     A.     Article VII, Section 7 Reflects the Parties' Understanding That USMX Does *Not* Have the Right to Control This Work. ............................................................................. 12

     B.     There Is No Record Evidence to Support the NLRB's Right-of-Control Theory. ...................................................... 15

     C.     The Carriers Cannot Arbitrarily Bypass the Port of Charleston and Take Cargo Where It Is Not Supposed to Go. ................................................................................... 18

     D.     The Board's Finding on the Right of Control Is Contrary to Precedent and Is Diametrically Opposed to the Board's Position in Prior Cases. ...................................................... 20

II.     Article VII, Section 7(b) of the USMX-ILA Master Contract Does Not Violate Section 8(e) of the National Labor Relations Act. ...................................................................................... 26

     A.     There Is No Dispute That Article VII, Section 7(b) Is Facially Lawful. ..................................................................... 26

     B.     Substantial Evidence Supports the Board's Finding That Article VII, Section 7(b) Is Lawful. ....................................... 28

iv

## TABLE OF CONTENTS
(continued)

**Page**

1.  Article VII, Section 7(a) Supports the Board's
    Lawful Interpretation of Section 7(b). ...........................29

2.  The Bargaining History of Article VII, Section
    7(b) Supports Its Lawful Interpretation. ......................30

3.  The Disagreement Between the ILA and USMX
    Further Proves That There Was No Unlawful
    Implied Agreement. ...................................................31

4.  The Evidence Does Not Support the SCSPA's
    Allegation of an Implied Agreement to Boycott the
    Leatherman Terminal. ..................................................32

CONCLUSION ...................................................................37

CERTIFICATE OF COMPLIANCE........................................38

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allentown Mack Sales & Serv., Inc. v. NLRB*,
  522 U.S. 359 (1998)..........................................................................9

*Americare Pine Lodge Nursing & Rehab. Ctr. v. NLRB*,
  164 F.3d 867 (4th Cir. 1999) ......................................................22, 25

*Appalachian Voices v. U.S. Dep't of Interior*,
  25 F.4th 259 (4th Cir. 2022) ...........................................................22

*Bermuda Container Line, Ltd. v. Int'l Longshoremen's Ass'n*,
  192 F.3d 250 (2d Cir. 1999) ............................................................25

*Blackburn v. Martin*,
  982 F.2d 125 (4th Cir. 1992) ...........................................................10

*Bldg. Material & Const. Teamsters Union Loc. No. 216, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am. v. NLRB*,
  520 F.2d 172 (D.C. Cir. 1975)..........................................................28

*Circus Circus Casinos, Inc. v. NLRB*,
  961 F.3d 469 (D.C. Cir. 2020)..........................................................22

*Clippard v. Sec. of HHS*,
  No. 88-1733, 1989 WL 380445 (D.S.C. May 31, 1989)....................10

*Coronet Foods, Inc. v. NLRB*,
  158 F.3d 782 (4th Cir. 1998) .............................................................9

*DeAnza Delivery Sys., Inc.*
  224 NLRB 1116 (1976) ....................................................................26

*Dorsey Trailers, Inc. v. NLRB*,
  233 F.3d 831 (4th Cir. 2000) .............................................................8

*Gen. Teamsters Local 982 (J. K. Barker Trucking Co.)*,
  181 NLRB 515 (1970) ......................................................................28

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Glenora Farms Dairy, Inc.*,
   210 NLRB 483 (1974) .........................................................................26

*Heartland Indus. Partners, LLC*,
   348 NLRB 1081 (2006) ......................................................................28

*Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union*,
   544 F. App'x 657 (9th Cir. 2013) ...............................................20, 21

*Int'l Longshore & Warehouse Union v. NLRB*,
   705 F. App'x 1 (D.C. Cir. 2017).................................................21, 25

*Int'l Longshoremen's & Warehousemen's Local 13*,
   295 NLRB 704 (1989) ........................................................................26

*Longshoremen Local 8*,
   363 NLRB 121 & 144 (2015)..............................................................20

*Mathews Readymix Inc. v. NLRB*,
   165 F.3d 74 (D.C. Cir. 1999)...............................................................10

*Media Gen. Ops., Inc. v. NLRB*,
   560 F.3d 181 (4th Cir. 2009) .........................................................8, 11

*Monroe v. NLRB*,
   460 F.2d 121 (4th Cir. 1972) ..............................................10, 18, 19

*Nat'l Woodwork Mfrs. Ass'n v. NLRB*,
   386 U.S. 612 (1967)............................................................................26

*NLRB v. Air Contact Transp. Inc.*,
   403 F.3d 206 (4th Cir. 2005) ...............................................................9

*NLRB v. Forsyth Elec. Co.*,
   69 F. App'x 164 (4th Cir. 2003) ..........................................................9

*NLRB v. Frigid Storage, Inc.*,
   934 F.2d 506 (4th Cir. 1991) ......................................................11, 15

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*NLRB v. Int'l Longshoremen's Ass'n,*
447 U.S. 490 (1980)..........................................................................24

*NLRB v. Int'l Longshoremen's Ass'n,*
473 U.S. 61 (1985)............................................................................24

*NLRB v. Pepsi Cola Bottling Co. of Fayetteville,*
258 F.3d 305 (4th Cir. 2001) .....................................................8, 9, 19

*Road Sprinkler Fitters Local 669 (Cosco Fire Prot., Inc.),*
357 NLRB 2140 (2011) ...................................................................28

*Roe v. Dep't of Def.,*
947 F.3d 207 (4th Cir. 2020) ...........................................................22

*Sam's Club, a Div. of Wal-Mart Stores, Inc. v. NLRB,*
173 F.3d 233 (4th Cir. 1999) ..................................................9, 15, 18

*Tecnocap, LLC v. NLRB,*
1 F.4th 304 (4th Cir. 2021) ...............................................................8, 9

*United Steel Workers of Am. AFL-CIO-CLC v. NLRB,*
482 F.3d 1112 (9th Cir. 2007) .........................................................10

*Universal Camera Corp. v. NLRB,*
340 U.S. 474 (1951).......................................................................10, 11

## STATUTES

National Labor Relations Act, 29 U.S.C. §§ 151-169 ............................................1
    29 U.S.C. § 151................................................................................1
    29 U.S.C. § 158(b)(4)(ii)(A) ............................................................3
    29 U.S.C. § 158(b)(4)(ii)(B) ............................................................3
    29 U.S.C. § 158(e) .....................................................................*passim*
    29 U.S.C. § 160(a) ..........................................................................1
    29 U.S.C. § 160(f)...........................................................................1

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**OTHER AUTHORITIES**

48A Am. Jur. 2d Labor and Labor Relations § 2153..............................................10

## JURISDICTIONAL STATEMENT

The National Labor Relations Board ("NLRB" or "Board") had jurisdiction over the proceeding below under National Labor Relations Act ("NLRA" or "Act") Section 10(a).  29 U.S.C. §§ 151, 160(a).  This Court has jurisdiction to review the Board's order under 29 U.S.C. § 160(f).  The petition for review was timely, and all parties to the proceeding below have intervened in this case.

## STATEMENT OF ISSUES

1.      Was the Board's dismissal of the allegation that Article VII, Section 7(b) of the Master Contract violates Section 8(e) of the NLRA rational, consistent with the Act, and supported by substantial evidence considering the record as a whole?

Proposed answer:  Yes

2.      Was the Board's finding that United States Maritime Alliance, Ltd. ("USMX") carrier-members "have the authority to bypass the Port of Charleston entirely and call on other ports where ILA-represented employees perform all loading and unloading work" rational, consistent with the Act, and supported by substantial evidence considering the record as a whole?

Proposed answer:  No

## STATEMENT OF THE CASE

USMX is a multiemployer collective-bargaining representative for its members, which consist of shipping companies or lines (also known as "carriers"), marine-terminal operators and stevedoring companies, and port associations that represent employers of longshore labor engaged in container and roll-on/roll-off operations in ports on the East and Gulf Coasts of the United States, including marine terminals in the Port of Charleston, South Carolina.

USMX, on behalf of its members, negotiates and administers with the International Longshoremen's Association ("ILA"), on behalf of its constituent locals, a collective bargaining agreement known as the Master Contract. The Master Contract establishes the key terms and conditions of employment for longshore workers that apply uniformly in all Master Contract ports on the Atlantic and Gulf Coasts of the United States, including the Port of Charleston.

In the proceedings before the Board, USMX, along with the ILA and ILA Local 1422, was a Respondent to unfair-labor-practice charges filed by the State of South Carolina and the South Carolina State Ports Authority ("SCSPA"). The SCSPA alleged that Article VII, Section 7(b) of the Master Contract constituted a "hot cargo" provision in violation of Section 8(e) of the NLRA.

USMX, along with the SCSPA, was also a Charging Party in the underlying matter arguing that a lawsuit filed in a New Jersey state court by the ILA against

2

USMX and two USMX carrier-members violated Sections 8(b)(4)(ii)(A) and (B) and 8(e) of the NLRA.

After a hearing on June 9-10, 2021, an Administrative Law Judge ("ALJ") dismissed the allegation that Article VII, Section 7(b) of the Master Contract violates Section 8(e) of the NLRA, JA1350, but found that the ILA's lawsuit had an unlawful objective under Section 8(b)(4)(ii)(A) and (B) and Section 8(e).  The ALJ found that the objective of the ILA's lawsuit was work acquisition, not work preservation. JA1354-55.

The ALJ concluded that the ILA filed the lawsuit with an unlawful objective of forcing USMX and its carrier-members to agree that the facially lawful provisions of the Master Contract prohibited them from calling at the Leatherman Terminal in the Port of Charleston unless ILA bargaining-unit employees performed all of the container-handling work, including the operation of the State-owned lift equipment at the Leatherman Terminal.  *Id.*  The ALJ also concluded that the ILA's lawsuit had an unlawful objective of forcing or requiring USMX and its carrier-members to cease doing business with the SCSPA at the Leatherman Terminal.  JA1355.

A three-Member panel of the NLRB affirmed the ALJ's dismissal of the allegation that Article VII, Section 7(b) of the Master Contract violates Section 8(e) of the NLRA, but a two-Member majority of that panel reversed the ALJ's findings with respect to the ILA's lawsuit.  The Board majority found that the ILA's lawsuit

sought to "stop the expansion of the hybrid work model" at the Leatherman Terminal, which was found to have a lawful work-preservation objective. JA1332. The Board majority also found that USMX's carrier-members had "sufficient control" over the work in dispute, which the majority defined broadly to be "the loading or unloading of containers they own or lease." *Id*.

The Board majority acknowledged that SCSPA "has sole authority to decide which terminals at the Port of Charleston USMX carriers call on, as well as who performs loading and unloading work at those terminals using state-owned lift equipment." *Id.* But, the Board majority found that "USMX carriers have the authority to bypass the Port of Charleston and call on other ports where ILA-represented employees perform all loading and unloading work." *Id.* In that sense, the Board majority found that "USMX carriers have the right to control who performs loading and unloading work of their containers." *Id.*

Board Member John Ring dissented in part. Member Ring agreed that the ALJ properly dismissed the allegation that Article VII, Section 7(b) of the Master Contract violates Section 8(e) of the NLRA. JA1334 n.4. But Member Ring disagreed with the Board majority's reversal of the ALJ's finding that the ILA's lawsuit was unlawful. Member Ring found that the ILA's dispute is with the SCSPA "because the SCSPA controls the work in question, i.e., the lift-equipment work at the Leatherman Terminal." JA1339. Member Ring found that the ILA's lawsuit

had an unlawful secondary-boycott objective because "the SCSPA, not USMX or its carrier-members, has the power to give employees the work in question." JA1340.

Member Ring explained that the ILA could not obtain the lift-equipment work at the Leatherman Terminal directly from the SCSPA – the entity that "indisputably controls that work at the Leatherman Terminal" – because the ILA has no collective-bargaining relationship with the SCSPA. JA1341. So, as Member Ring found, the ILA "seeks to do so by secondary means, by filing and maintaining a lawsuit – claiming shock-and-awe damages – in order to scare USMX's carrier-members away from that terminal until the SCSPA takes the lift-equipment work away from the state employees and gives it to the ILA." *Id.*

## SUMMARY OF ARGUMENT

The Court should affirm the Board's dismissal of the allegation that Article VII, Section 7(b) of the Master Contract violates Section 8(e) of the NLRA. The Board's dismissal of that allegation was unanimous – all three Board Members agreed with the ALJ's dismissal of that allegation. Article VII, Section 7 is a facially lawful provision – a point that the SCSPA does not now dispute. Therefore, it is unnecessary for the Court to consider extrinsic evidence concerning the parties' interpretation of that provision. According to well-established precedent under Section 8(e), a facially lawful contract provision must be construed to do no more than what is allowed by law.

But even if the Court considers the extrinsic evidence, it supports the dismissal of the Section 8(e) allegation. The bargaining history concerning Article VII, Section 7 demonstrates that it was intended to be nothing more than a notice provision concerning a potential disagreement between USMX and the ILA about how this provision should be applied. That disagreement, in and of itself, disproves the SCSPA's allegation that USMX and ILA had an unstated, implicit agreement to apply Article VII, Section 7(b) in an unlawful manner.

The Court should not, however, uphold the Board majority's unsupported finding that USMX's carrier-members have the right of control. While USMX stands behind the work-preservation provisions of the Master Contract, USMX cannot promise the ILA work that is controlled by other entities – here, the SCSPA. It is undisputed that the SCSPA controls the assignment of the lift-equipment work at the Leatherman Terminal because that equipment is owned by the SCSPA and operated by State employees. The Board majority dodged that undisputed fact by concluding – without any evidentiary basis – that USMX's carrier-members have "sufficient control" over this work because they can bypass the Port of Charleston altogether.

There are several problems with the Board majority's right-of-control theory. First, it ignores the obvious premise of Article VII, Section 7 of the Master Contract, which is that USMX's carrier-members do ***not*** have the right to control work

performed by State employees in the Ports of Charleston, SC, Savannah, GA, and Wilmington, NC. If USMX's carrier-members had the right to control that work, there would have been no need for USMX and the ILA to negotiate contract language about preparing a study in an effort to convince those state port authorities to assign the ILA work that is currently performed by State employees.

Second, there is no record evidence to support the Board majority's right-of-control theory. The Board majority ignored the undisputed record evidence which confirms that nearly all of the cargo delivered to the Port of Charleston is bound for customers in South Carolina and nearby states. USMX's carrier-members cannot arbitrarily bypass the Port of Charleston and take that cargo to New York, New Jersey, or other Master Contract ports where the ILA performs all of the container-handling work. The Board majority also ignored the ALJ's finding that there was no evidence – only "vague speculation" – that cargo was being diverted from other Master Contract ports to the Leatherman Terminal in Charleston.

Third, the Board majority's right-of-control theory is contrary to precedent and the position that the Board has taken in other cases in this same industry. The Board majority failed to explain why it is reversing its position and now embracing the dubious proposition that a carrier has the right to control work assigned by a state port authority to the state's own employees using equipment owned by the state, merely by virtue of a carrier's theoretical ability to take its vessel to a different port.

7

Even if the Board could justify this 180-degree reversal of its position, the Board majority forfeited the deference it would normally receive because it failed to explain the reasons for this reversal in its decision.

## STANDARD OF REVIEW

This Court will uphold the NLRB's legal interpretations if they are "rational and consistent with the Act." *NLRB v. Pepsi Cola Bottling Co. of Fayetteville*, 258 F.3d 305, 310 (4th Cir. 2001) (citation omitted). This Court rightly may consider whether the NLRB "erred as a matter of law" in making a legal conclusion based on undisputed facts. *Media Gen. Ops., Inc. v. NLRB*, 560 F.3d 181, 187-89 (4th Cir. 2009) (reversing Board decision that looked at same evidence the ALJ did and came to different, incorrect legal conclusion); *see Tecnocap, LLC v. NLRB*, 1 F.4th 304, 320-21 (4th Cir. 2021) (holding ALJ erred in concluding there was direct dealing despite crucial evidence "missing from this record").

The Board's findings of fact must be upheld "'if they are supported by substantial evidence,' considering the record as a whole." *Tecnocap*, 1 F.4th at 312 (quoting *Dorsey Trailers, Inc. v. NLRB*, 233 F.3d 831, 838 (4th Cir. 2000)).[1] "Substantial evidence is such relevant evidence as a reasonable mind might accept

---

[1] The ALJ's evidentiary findings should be sustained unless there is a clear preponderance of evidence that shows that those findings are incorrect. JA1326 n.2.

as adequate to support a conclusion." *Id.* (quoting *NLRB v. Air Contact Transp. Inc.*, 403 F.3d 206, 210 (4th Cir. 2005)).

In reviewing factual findings and mixed questions of law and fact, this Court is "obligated to scrutinize the whole record," including "evidence that detracts from as well as supports the NLRB's findings," and decide whether the NLRB's findings are supported by substantial evidence. *Pepsi Cola Bottling*, 258 F.3d at 310 (quoting *Coronet Foods, Inc. v. NLRB*, 158 F.3d 782, 789 (4th Cir. 1998) & citing *Sam's Club, a Div. of Wal-Mart Stores, Inc. v. NLRB*, 173 F.3d 233, 239 (4th Cir. 1999)).

"Reviewing courts must 'ensure that the [NLRB's] findings are not based on speculation or suspicion, as these register no weight on the substantial evidence scale.'" *Id.* (alteration in original) (quoting *Coronet Foods*, 158 F.3d at 788). "The NLRB must also adequately explain the basis of its decision, and a failure to do so necessitates a vacatur of the NLRB's decision and order." *NLRB v. Forsyth Elec. Co.*, 69 F. App'x 164, 167 (4th Cir. 2003).

"When the Board purports to be engaged in simple factfinding, it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Sam's Club*, 173 F.3d at 239-40 (ellipses omitted) (quoting *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 378 (1998)); *id.* at 244 (holding factual conclusions not supported by substantial evidence because ALJ and Board "disregarded a compelling inference to

be drawn from th[e] evidence"); *cf. Clippard v. Sec. of HHS*, No. 88-1733, 1989 WL 380445, at *1 (D.S.C. May 31, 1989) (holding under substantial-evidence standard that placing reliance on "one portion of the record to the disregard of overwhelming evidence to the contrary" requires reversal).

When the NLRB disagrees with the ALJ's factual findings, courts scrutinize the NLRB's factual findings "more critically" as part of the substantial-evidence review. *Blackburn v. Martin*, 982 F.2d 125, 128 (4th Cir. 1992); *see also United Steel Workers of Am. AFL-CIO-CLC v. NLRB*, 482 F.3d 1112, 1117 (9th Cir. 2007) ("when the Board disagrees with an ALJ's findings or conclusions, we conduct a more searching review"); *Mathews Readymix Inc. v. NLRB*, 165 F.3d 74, 77 (D.C. Cir. 1999) ("when the Board reverses an ALJ 'it must make clear the basis of its disagreement'" (citation omitted)).

More critical review is warranted when the Board reverses or disregards an ALJ's factual findings because "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's." *Blackburn*, 982 F.2d at 128 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951)); *Monroe v. NLRB*, 460 F.2d 121, 124 (4th Cir. 1972) (applying this rule to reverse Board's factual findings); 48A Am. Jur. 2d Labor and Labor Relations

§ 2153 ("ALJ's conclusions are one factor to be considered in determining whether" substantial-evidence "standard has been satisfied.").

To the extent the ALJ's factual findings are based on credibility determinations, the Board typically should defer to the ALJ, "having heard the evidence and seen the witnesses." *Universal Camera Corp.*, 340 U.S. at 496; *see NLRB v. Frigid Storage, Inc.*, 934 F.2d 506, 509 (4th Cir. 1991) (implying special scrutiny would apply if the Board reversed "an ALJ's findings as to credibility of witnesses"); *Media Gen. Ops.*, 560 F.3d at 185-86 (similar).

## ARGUMENT

I. **The NLRB's Finding that the Carriers Have the Right of Control Ignores Undisputed Record Evidence and the ALJ's Factual Findings.**

The Board majority acknowledged that "SCSPA has ***sole authority*** to decide which terminals at the Port of Charleston USMX carriers call on, as well as who performs loading and unloading work at those terminals using state-owned lift equipment." JA1332 (emphasis added). Despite this dispositive finding, the Board majority concluded that USMX's carrier-members have the right of control over the work in dispute (the operation of the SCSPA's lift equipment at the Leatherman Terminal) because "USMX carriers have the authority to bypass the Port of Charleston and call on other ports where ILA-represented employees perform all loading and unloading work." *Id.*

11

The Court should reject the Board's finding on the right of control because (a) it ignores the parties' specific agreement in Article VII, Section 7 of the Master Contract, which reflects the parties' clear understanding that the carriers do ***not*** have the right to control this work; (b) there is no record evidence to support the Board's right-of-control finding; (c) the Board's finding ignores the undisputed record evidence which shows that the carriers cannot arbitrarily bypass the Port of Charleston when the cargo is supposed to be delivered to customers in South Carolina and nearby states; and (d) the Board's finding is contrary to precedent and the positions it has taken in prior cases.

### A.    Article VII, Section 7 Reflects the Parties' Understanding That USMX Does *Not* Have the Right to Control This Work.

The NLRB's finding on the carriers' right of control ignores the specific agreement that USMX and the ILA made in Article VII, Section 7 of the Master Contract.  Article VII, Section 7 reflects the parties' understanding that USMX's carrier-members do ***not*** have the right to control the assignment of work performed by state employees on state-equipment in the Ports of Charleston, SC, Savannah, GA, and Wilmington, NC.  That is why USMX and the ILA agreed to conduct a study in order to "convince" those Ports to employ Master Contract bargaining-unit employees to perform that work.  JA0449.

Donato Caruso, former principal counsel for USMX who was deeply involved in the 2012-2013 negotiations that resulted in Article VII, Section 7, testified that

12

Section 7(a) was an attempt by the parties to try to convince port authorities like those in Charleston, Savannah, and Wilmington to adopt an operating model similar to the one adopted by the port authority in Houston, which solely uses members of the ILA, through the preparation of a study that would compare productivity in Houston to productivity in Charleston and Savannah. JA0312, JA0313-14, JA0325-26 (Caruso). David Adam, who is the Chairman and CEO of USMX, also testified that Section 7(a) concerns a comparison between port models, namely a comparison between the Houston model and the Charleston/Savannah/Wilmington model. JA0188, JA0200 (Adam).

If USMX's carrier-members had the right to control the work assignments in those Ports, there would have been no need for a study or for meetings to "convince" those Ports to change their historical work assignments. Because the carriers do not control the assignment of work that the ILA has not historically or traditionally performed in those Ports, USMX only agreed that the carriers "*may* be prohibited" from using a new facility in those Ports. JA0449 (emphasis added).

According to Mr. Caruso, the term "may" was used because USMX did not want to give the impression that USMX agreed with the ILA's position that the Master Contract prohibits carriers from calling at a terminal that is not completely manned by ILA labor. JA0314-16, JA0321-26 (Caruso). Mr. Caruso anticipated that the ILA might argue that ***other provisions*** of the Master Contract (*i.e.,* the

13

jurisdictional provisions, including the no-subcontracting provision) prohibit carriers from calling at a terminal that does not utilize ILA labor.  But USMX did *not* agree with such an interpretation of the Master Contract.  As Mr. Caruso testified:

> USMX has never – has never agreed in any manner with the ILA that if – that its members did not have the right to call at the new terminal in – in Charleston. That's never been the position.

JA0321 (Caruso).  He testified that USMX's consistent position was that the parties would run afoul of Section 8(e) of the NLRA if they were to apply the jurisdiction and containerization provisions of the Master Contract to port authorities that control the assignment of work.  JA0315-16 (Caruso).

The Board credited Mr. Caruso's testimony.  JA1327 n.3 ("Former USMX counsel Donato Caruso credibly testified that he drafted the language, and specifically the notice requirement, as a compromise to ILA's insistence on a provision requiring that unit employees perform all longshore work by 2014 because he feared that ILA's recommended language could be interpreted as violating Sec. 8(e).").

Mr. Caruso's testimony was corroborated by that of USMX's Chairman and CEO, David Adam.  Mr. Adam testified that the primary objective of Section 7(b) was work preservation. According to Mr. Adam, Section 7(b) does not prohibit any USMX carrier-member from calling at the Leatherman Terminal because ILA

workers are performing the same jobs at the Leatherman Terminal as they have historically performed at the other terminals in the Port of Charleston. JA0223-24. Mr. Adam testified that USMX always believed that it could ***not*** provide work to the ILA that is controlled by an entity that is not a member of USMX. JA0191, JA0197-98, JA0201, JA0215-16, JA0217-18, JA0225-26, JA0227.

All of this demonstrates that, while USMX agreed to support the ILA's efforts to attempt to persuade the Port to assign the ILA additional work on the Port's lift equipment, the parties understood that USMX's carrier-members do not have the right to control the assignment of that work. Therefore, Article VII, Section 7 does not reflect any promise to give the ILA work that historically and traditionally has been performed by the Port with its own employees. Because the Board majority's finding ignores this record evidence concerning the parties' negotiated agreement and the ALJ's credibility determination concerning the meaning of that agreement, it deserves no deference. *See Sam's Club*, 173 F.3d at 239-40, 244 (noting Board may not ignore evidence or "disregard[] a compelling inference to be drawn from th[e] evidence"); *Frigid Storage*, 934 F.2d at 509 (Court should not defer to Board's findings that reverse "an ALJ's findings as to credibility of witnesses").

## B. There Is No Record Evidence to Support the NLRB's Right-of-Control Theory.

There is absolutely no record evidence to support the Board majority's conclusion that USMX's carrier-members have the right of control over the

assignment of the work in dispute because the carriers can – in theory – bypass the Port of Charleston, and deliver the cargo to a different port.  Quite to the contrary, bypassing the Port of Charleston would be counter-productive to the goal of preserving work opportunities for ILA bargaining-unit employees in the Port of Charleston.  If a carrier were to bypass the Port, that would result in a loss of work for the many ILA bargaining-unit employees who perform the vast majority of the work associated with vessels that call at the Port.

Oblivious to this reality, the Board majority focused on the theory that USMX's carrier-members "have the authority to bypass the Port of Charleston *entirely* and call on other ports where ILA-represented employees perform all loading and unloading work."  JA1332 (emphasis added).  In doing so, the Board overlooked the fact that the ILA has not taken the position that the carriers should bypass the Port of Charleston entirely; there is no dispute about the lift-equipment work at the other terminals in the Port of Charleston.[2]  There is also no dispute that the SCSPA has the right of control over the assignment of work on the State-owned lift equipment.  JA1332 ("SCSPA has sole authority to decide which terminals at the

---

[2]  As the ALJ noted, the ILA did not object to the carriers calling at the Wando Terminal in the Port of Charleston; they only filed suit against carriers that called at the Leatherman Terminal.  JA1354 n.33 (noting that the ILA was "enforcing the Master Contract and the Containerization Agreement as it relates to the Leatherman Terminal, and not the Wando and North Charleston Terminals"); *see also* ILA Brief at 11-13.

Port of Charleston USMX carriers call on, as well as who performs loading and unloading work at those terminals using state-owned lift equipment").

The Board majority, in reversing the ALJ and concluding that the carriers have the right of control, relied on the fact that the Master Contract "is coast-wide in scope and not limited to any specific port." *Id.* While it is true that the Master Contract applies to ports from Maine to Texas, the Board majority disregarded the significant differences in the scope of work that has historically and traditionally been performed by the ILA in some of those ports. Article VII, Section 7 recognizes that state port authorities perform and control certain longshore work in Charleston, SC, Savannah, GA, and Wilmington, NC. Similarly, Article VIII, Section 2(b) of the Master Contract provides that "clerical work currently performed by state port authorities or government agencies, if discontinued, will fall under the ILA's jurisdiction." JA0452.

The Board majority's right-of-control theory rests on the assumption that USMX's carrier-members have the right or obligation to bypass these Ports and call at a different port. JA1332 ("USMX carriers have the authority to bypass the Port of Charleston and call on other ports where ILA-represented employees perform all loading and unloading work."). But the Master Contract creates no such right or obligation for work that has historically and traditionally been performed and controlled by state port authorities. The Board cannot ignore the plain meaning of

17

the Master Contract provisions which recognize that USMX cannot promise the ILA work which historically and traditionally has been performed by state port authorities.

To the extent the Board majority's decision is based on the assumption that work is being diverted from other Master Contract ports to the Port of Charleston, there is no record evidence to support that assumption. The ALJ found no evidence – "only supposition" – to support the ILA's contention that work ***might*** be diverted to Charleston from other Master Contract ports. JA1354. "[T]here is no evidence of any actual or anticipated threat to unit work, only vague speculation." *Id.*

The Board majority's decision on the right-of-control issue, therefore, deserves no deference because it is not supported by any evidence, let alone substantial evidence, and is contrary to the ALJ's factual findings. *See Sam's Club*, 173 F.3d at 244 (Board may not ignore evidence or "disregard[] a compelling inference to be drawn from th[e] evidence"); *Monroe*, 460 F.2d at 124 (Board may not disregard "the findings of the Trial Examiner" or ALJ).

## C.    The Carriers Cannot Arbitrarily Bypass the Port of Charleston and Take Cargo Where It Is Not Supposed to Go.

The Board majority also ignored the evidence that almost all of the cargo on vessels that call at the Port of Charleston is destined for customers in South Carolina and nearby states. As the ALJ found, approximately 30% of the cargo "is consumed within the Charleston area" and the "great preponderance" of the rest of the cargo

18

"is consumed in upstate South Carolina, in the Greenville and Spartanburg areas, where BMW, Michelin, and other major customers are located."  JA1354; JA153. The ALJ found that "20-25 percent of the cargo that goes outside of South Carolina goes to North Carolina, Tennessee, and Alabama" and only a "minimal amount of the cargo ends up in the Midwest, and none in the Northeast."  *Id.*

The Board majority's finding on the carriers' right of control ignores this evidence, which the ILA did not refute.  The ILA suggested that some cargo may be "discretionary" – *i.e.*, it could be delivered to another port if it is economically feasible to then transport the cargo inland.  JA0152.  But the record reflects that, even if some of the cargo is "discretionary," it would typically be delivered to the nearby Port of Savannah (which also uses the hybrid model).  *Id.*  That is why the ALJ rejected as "supposition" the ILA's contention that work might be diverted to Charleston from New York/New Jersey or other "ILA-controlled ports."  JA1354.

The Board majority completely disregarded the ALJ's findings on this point, which were based on undisputed record evidence.  Therefore, the Board majority's finding to the contrary – that the carriers have the right of control based on their theoretical ability to "bypass" the Port of Charleston altogether – deserves no deference.  *See Pepsi Cola Bottling*, 258 F.3d at 310 (substantial evidence review requires scrutinizing evidence that detracts from the NLRB's findings); *Monroe*, 460 F.2d at 124 (Board may not disregard "the findings of the Trial Examiner" or ALJ).

19

**D.** **The Board's Finding on the Right of Control Is Contrary to Precedent and Is Diametrically Opposed to the Board's Position in Prior Cases.**

The Board majority failed to explain why it is now adopting the same right-of-control theory that it rejected in another case in this industry. *Hooks ex rel. National Labor Relations Board v. International Longshore & Warehouse Union*, 544 F. App'x 657 (9th Cir. 2013), involved a dispute over work performed by employees of the Port of Portland. The Board sought and obtained an injunction against the International Longshore and Warehouse Union ("ILWU") for, *inter alia*, pursuing claims for damages against carriers that called at the Port of Portland. The ILWU argued that the carriers had the right to control the assignment of the disputed work because they could bypass the Port. Agreeing with the Board's position to the contrary in that case, the Ninth Circuit rejected this right-of-control theory:

> ILWU's argument regarding the shipping carriers ability to bypass the Port conflates the carriers' control over their containers with the legal question of whether they have the "'right to control' the assignment of the work" at this port.

*Id.* at 658 (citations omitted).

Following the Ninth Circuit's affirmance of that preliminary injunction, the Board held in a ruling on the merits that the ILWU engaged in an unlawful secondary boycott because the Port of Portland maintained the right of control over the assignment of the disputed work to the Port's own employees. *Longshoremen Local 8*, 363 NLRB 121 n.3 & 144 (2015).

20

Then, when the ILWU sought review of the Board's decision in the D.C. Circuit, the Board argued forcefully against the very same right-of-control theory that it is espousing in this case. Quoting the Ninth Circuit's decision in *Hooks*, the Board denounced the argument that carriers have the right of control because they can bypass the Port and take their containers to a different port. Brief of NLRB at 40, *Int'l Longshore & Warehouse Union v. NLRB*, 705 F. App'x 1 (D.C. Cir. 2017) (Nos. 15-1344, 15-1428), 2016 WL 6248401. The Board warned that this argument "would strip the Act's secondary boycott protections from every customer with physical custody or ownership of property that is the subject of work sought by a union." *Id.* To illustrate this point, the Board offered the following analogy:

> ILWU's argument is akin to claiming that a vehicle owner is the primary employer of mechanics who service his car merely because he can bypass a particular auto-shop or refuse to "release" his car to it.

*Id.* at 40 n.8. The D.C. Circuit affirmed the NLRB's decision, likewise rejecting the argument that the carriers calling in Portland had the "ultimate right of control" by virtue of their ownership of the containers. *Int'l Longshore & Warehouse Union v. NLRB*, 705 F. App'x 1, 2 (D.C. Cir. 2017) (per curiam).[3]

---

[3] By referring to the Portland litigation, USMX is not comparing the ILA's conduct in this case to the ILWU's conduct in the Portland case. As noted previously, and as the ALJ found, the ILA has never taken the position that USMX's carrier-members should bypass the Port of Charleston entirely. JA1354 n.33. Instead, both USMX and the ILA agree that their current dispute as to the meaning of Article VII, Section 7(b) as it relates to the Leatherman Terminal is a dispute that should be resolved in arbitration. While this dispute is being resolved, USMX's carrier-

21

In its decision in this case, the Board majority did not even attempt to explain why it is now embracing the very same right-of-control theory that it so thoroughly and consistently rejected in the Portland litigation, with the approval of both the Ninth Circuit and D.C. Circuit. The Board's unexplained reversal of its strongly held position deserves no deference. *See, e.g.*, *Americare Pine Lodge Nursing & Rehab. Ctr. v. NLRB*, 164 F.3d 867, 876 (4th Cir. 1999) ("[I]t is well settled that this Court will not accept the Board's departure from its standing interpretation of the Act without a reasonable explanation."); *Circus Circus Casinos, Inc. v. NLRB*, 961 F.3d 469, 476 (D.C. Cir. 2020) (explaining that Board orders "must be consistent with precedent" and the Board must apply its rules "consistently" and "may not depart from [its] precedent without explaining why").

The Board's lawyers cannot offer *post hoc* rationalizations for the Board majority's inconsistent position in this case. *See, e.g.*, *Roe v. Dep't of Def.*, 947 F.3d 207, 220 (4th Cir. 2020), *as amended* (Jan. 14, 2020) ("We consider the record made before the agency at the time the agency acted, so post-hoc rationalizations have traditionally been found to be an inadequate basis for review.") (citation, ellipsis, and internal quotation marks omitted); *Appalachian Voices v. U.S. Dep't of Interior*,

---

members continue to call at the Wando and North Charleston Terminals where the hybrid model has historically been used and where the ILA performs the vast majority of the work associated with vessels that call there.

25 F.4th 259, 279 (4th Cir. 2022) (refusing to rely on agency's "*post hoc* rationalization").

Even if the Board had included its *post hoc* explanations in its decision, they do not hold up under scrutiny. First, the Board cannot distinguish this case on the grounds that the Portland case involved "specific reefer work at that port" (which was performed by the port's own employees). NLRB Br. at 54. Likewise here, the dispute involves work performed by State employees at the Leatherman Terminal.

Second, the Board's assertion that the ILA "does not, through its lawsuit, seek to acquire the work at any specific port" (NLRB Br. at 55) ignores the ample record evidence concerning the ILA's desire to obtain the work performed by State employees at the Leatherman Terminal. JA1354 ("What is not lacking is the evidence of ILA's desire to obtain all the container work at the Leatherman Terminal . . . .").[4]

---

[4] The Board's finding that the ILA "is merely seeking to enforce the Master Contract and the Containerization Agreement . . . in order to prevent the erosion of unit jobs in the coastwide unit" is not supported by the record evidence. There is very little testimony in the record concerning the Containerization Agreement because the focus of this case was Article VII, Section 7(b) of the Master Contract and its application at the Leatherman Terminal. *See* JA0322-23. Indeed, during their testimony before the ALJ, neither representative of the ILA identified any provision of the Master Contract other than Article VII, Section 7 that applied to the opening of Leatherman Terminal. *See* JA0277. To the extent the ILA had a dispute with USMX about the Containerization Agreement or other provisions of the Master Contract, the forum for resolving such a dispute is arbitration under the Master Contract – not a lawsuit in New Jersey state court.

The Board majority also relied on a different interpretation of the Supreme Court's decisions in the *ILA* cases,[5] which provide important guidance in this industry. The right-of-control issue in the *ILA* cases involved the work of stuffing (loading) and stripping (unloading) of cargo in containers that the carriers owned or leased. *See ILA II*, 473 U.S. at 74 n.12. The Board majority's interpretation of the carriers' right of control, as articulated by the Supreme Court in a footnote in *ILA II,* is much more expansive than the fact-bound interpretation the Board has previously espoused.

In its brief to the D.C. Circuit in the Portland case, the Board argued that this very same footnote in *ILA II* "refers to factual conclusions involving a different type of work based upon a specific evidentiary record in the case before it." NLRB D.C. Circuit Br. at 36. In particular, the Board explained that the carriers had sometimes used their own employees to perform the stuffing and stripping work in *ILA II*. *Id.* at 37. For this and other reasons, the Board took the position that "*ILA II* addresses a very different factual scenario involving a different job function and carriers that possessed significant direct control over assigning the work, unlike the carriers here." *Id.* The D.C. Circuit agreed with the Board's interpretation of the *ILA* cases, finding that "the Board's conclusion applied the proper legal standard and its factual

---

[5] *NLRB v. Int'l Longshoremen's Ass'n*, 447 U.S. 490 (1980) ("*ILA I*"), and *NLRB v. Int'l Longshoremen's Ass'n*, 473 U.S. 61 (1985) ("*ILA II*").

findings regarding the Port's right of control over the reefer work are supported by substantial evidence." *Int'l Longshore & Warehouse Union*, 705 F. App'x at 3.

If the Board is now going to reinterpret longstanding Supreme Court precedent, the Board at the very least must explain why it is doing so and why it believes its prior interpretation was incorrect. The Court should not accept the Board's unexplained about-face on this issue. *Americare Pine Lodge Nursing*, 164 F.3d at 876 ("[I]t is well settled that this Court will not accept the Board's departure from its standing interpretation of the Act without a reasonable explanation.").

The Board majority failed to contend with the ALJ's analysis of the Second Circuit's decision in the *Bermuda Container Line, Ltd. v. Int'l Longshoremen's Ass'n*, 192 F.3d 250 (2d Cir. 1999), a case which the Board and the ILA rely upon in their briefs to this Court. *Bermuda Container Line* involved a carrier's relocation of work from an ILA port (New York/New Jersey) to a non-ILA port (Salem, New Jersey). *Id.* at 253. Thus, there was a demonstrable loss of work that had been performed by the ILA. That is not the situation here, as the ALJ found: "there is no evidence of any actual or anticipated threat to unit work, only vague speculation." JA1354. The Board majority did not discuss the ALJ's analysis; it is yet another unexplained mystery of its decision.

The Court should reject the Board majority's arbitrary and unjustified departure from precedent and the position the Board has taken in prior cases.

## II.    Article VII, Section 7(b) of the USMX-ILA Master Contract Does Not Violate Section 8(e) of the National Labor Relations Act.

While the Board reversed the ALJ on the secondary-boycott charges, the Board affirmed the ALJ's determination that Article VII, Section 7(b) of the Master Contract does not violate Section 8(e) of the NLRA.  Because this holding is supported by substantial evidence and the ALJ's findings, it should be upheld by this Court.

In order to find a violation of Section 8(e), there must be a "contract or agreement . . . whereby such employer ceases or refrains or agrees to cease . . . doing business with any other person." 29 U.S.C. § 158(e); *see DeAnza Delivery Sys., Inc.* 224 NLRB 1116, 1124 (1976); *Glenora Farms Dairy, Inc.*, 210 NLRB 483, 490 (1974); *see also Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 645-46 (1967); *Int'l Longshoremen's & Warehousemen's Local 13*, 295 NLRB 704, 705 (1989).

### A.    There Is No Dispute That Article VII, Section 7(b) Is Facially Lawful.

The Board affirmed the ALJ's ruling that Article VII, Section 7(b) is facially lawful:

> [The ALJ] reasoned that the language of Section 7(b) of the Master Contract was facially valid because it did not require USMX and its carrier members to cease doing business with SCSPA, but only to "formally notify" SCSPA that they "*may* [if an arbitrator ruled in favor of ILA] be prohibited" from calling at new facilities where ILA unit employees did not perform all the loading and unloading work, including the use of lift equipment.

26

JA1328 (emphasis in original).

There is no language in Section 7(b) that requires USMX's carrier-members to boycott the Leatherman Terminal or to cease doing business with the SCSPA or with any other port.  Section 7(b) only states that USMX members "may" be prohibited from using a new terminal facility "if the work at that facility is not performed by Master Contract-bargaining unit employees."  JA0449.  The term "may" does not require any boycott or cessation of business.  Even the SCSPA understands and admits that the language of Section 7(b) is "permissive, not prescriptive."  JA0085 (Newsome).

If a port authority cannot be persuaded to change its hybrid business model, Section 7(b) does *not* state that USMX' s carrier-members would be prohibited from calling at such a facility.  Instead, Section 7(b) is merely a notice provision designed to advise a port authority of a *potential* issue under the Master Contract.  JA0276-77 (Riley): JA0314-15, JA0323, JA0326 (Caruso).

The SCSPA does not contest the Board's conclusion that Article VII, Section 7(b) is facially lawful.  Indeed, the SCSPA admits that "[i]t could not be clearer that USMX declined to enter into a written agreement not to do business with non-compliant ports to avoid a facial violation of section 8(e)[.]"  Petitioner's Br. at 57.

This admission is fatal to the SCSPA's argument.  When a challenged contract provision is not "*clearly* unlawful on its face," it should be construed "to require no

more than what is allowed by law." *Heartland Industrial Partners, LLC*, 348 NLRB 1081, 1084 (2006) (quoting *Gen. Teamsters Local 982 (J. K. Barker Trucking Co.)*, 181 NLRB 515, 517 (1970), *aff'd*, 450 F.2d 1322 (D.C. Cir. 1971)); *see also Bldg. Material & Const. Teamsters Union Loc. No. 216, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am. v. NLRB*, 520 F.2d 172, 178 (D.C. Cir. 1975) (same).

Because it is undisputed that Article VII, Section 7(b) is not "clearly unlawful on its face," it must be construed to comply with Section 8(e). *Road Sprinkler Fitters Local 669 (Cosco Fire Prot., Inc.)*, 357 NLRB 2140, 2142 (2011); *see also Teamsters Local 216*, 520 F.2d at 177-78 (noting in Section 8(e) case that "Board was correct in following its policy that 'where the clause is not clearly unlawful on its face, the Board will interpret it to require no more than what is allowed by law'"). Therefore, there is no need to review extrinsic evidence concerning Article VII, Section 7.

## B. Substantial Evidence Supports the Board's Finding That Article VII, Section 7(b) Is Lawful.

Even if the Court considers evidence outside the plain language of Article VII, Section 7(b), it supports the Board's finding that there is no violation of Section 8(e) of the NLRA. The Board adopted the ALJ's finding that "the General Counsel [] failed to establish ILA, USMX and Local 1422 entered into, or reaffirmed, an agreement, express or implied, that violates Section 8(e)." JA1350.

The SCSPA takes issue with that determination and boldly asserts that there is "overwhelming record evidence" that USMX and the ILA had an implied agreement that USMX's carrier-members would not call at the Leatherman Terminal unless the State employees' jobs were turned over to the ILA. *See* Petitioner's Br. at 27, 51. The Court should reject the SCSPA's overblown argument. There is more than substantial evidence to support the Board's findings.

### 1.    Article VII, Section 7(a) Supports the Board's Lawful Interpretation of Section 7(b).

First, the SCSPA refers to the language in Article VII, Section 7(a), JA0449, concerning the parties' agreement to conduct a study in an effort to convince port authorities, such as the SCSPA, of the benefits of changing their hybrid business model. *See* Petitioner's Br. at 52. The SCSPA emphasizes the undisputed fact that this study was never conducted. *Id.* The SCSPA goes on to surmise that Article VII, Section 7(b) "directly ties [the] putative study [from Section 7(a)] to a requirement that USMX member-carriers notify any Port developing 'a new container handling facility' that member-carriers '***may*** be prohibited' from calling at facilities using such models[]" and serves as a "threat" that USMX carrier-members will not call at "facilities that do not bring their new facilities under the Master Contract." *Id.* (emphasis added).

But the SCSPA misses the critical point of the Section 7(a) language: it reflects a mutual understanding that USMX and the ILA would not and could not

obtain this work through an unlawful boycott. Instead, they would need to persuade the ports that it would be "more productive, efficient, and competitive" to use ILA Master Contract bargaining-unit employees instead of State employees to perform the lift-equipment work.

### 2. The Bargaining History of Article VII, Section 7(b) Supports Its Lawful Interpretation.

The bargaining history of Article VII, Section 7(b), as discussed above, supports the Board's lawful interpretation. Mr. Caruso testified that the purpose of Section 7(b) was to give notice to a port authority that develops a new terminal that there is a possibility that USMX carrier-members may be prohibited from calling at the new terminal if it is not manned completely with ILA labor. JA0314-15. Mr. Caruso further testified that such a situation would arise if the ILA were able to convince an arbitrator that the jurisdiction and containerization provisions of the Master Contract require the use of ILA labor in all port functions. JA0322-26.

The Board's findings on this point deserve deference because they are consistent with the credibility determination made by the ALJ who heard the testimony. JA1345 n.16 (crediting Mr. Caruso "because Caruso's recollection and testimony were more logical and consistent with the other evidence").

### 3. The Disagreement Between the ILA and USMX Further Proves That There Was No Unlawful Implied Agreement.

The Board's finding is further supported by "the fact that ILA, Local 1422, and USMX interpreted Section 7(b) differently" and, in the absence of a mutual understanding, "the provision did not constitute an agreement to cease handling the products of, or cease doing business with, SCSPA." JA1328. The ALJ found that the "evidence establishes disagreement, rather than agreement" concerning the interpretation of Article VII, Section 7(b). JA1350. Specifically, the ALJ found that "ILA and Local 1422 wanted, and claimed the right, to perform all container work at the Leatherman Terminal. USMX, however, did not agree." *Id*.

USMX recognized that the ILA could seek to arbitrate such a claim under the Master Contract. Mr. Adam expected that the ILA would file a grievance once the Leatherman Terminal opened. JA1346 n.18. USMX intended to oppose any claim by the ILA that carriers are prohibited from calling at a new terminal. JA0322 (Caruso). Even if an arbitrator were to construe the Master Contract in a way that would violate Section 8(e), USMX would seek to vacate it in federal court. JA0323-25 (Caruso).

This dispute over the interpretation of Article VII, Section 7(b) demonstrates that USMX and the ILA never entered into a mutual agreement to boycott any newly developed port-authority facility in order to force the port authority to give the ILA jobs historically performed by state employees.

31

**4.    The Evidence Does Not Support the SCSPA's Allegation of an Implied Agreement to Boycott the Leatherman Terminal.**

The evidence also does not support the SCSPA's contention that the responses of USMX carrier-members to the ILA's lawsuit "reveal their practical interpretation of the Master Contract as an implied agreement not to call at non-compliant ports." Petitioner's Br. at 54. The ALJ found that, within two weeks of the filing of the ILA's lawsuit, at least five USMX carrier-members contacted the SCSPA demanding to be assigned to Wando Terminal in the Port of Charleston because they did not want to become enmeshed in the ILA's lawsuit; one USMX carrier-member threatened to redirect its vessels to the Port of Savannah. JA1328, JA1347. The ALJ also found that, within a month of the lawsuit, the SCSPA had diverted 12 vessels of USMX carrier-members from Leatherman to the Wando Terminal. JA1328; *see also* JA0656.

Contrary to the SCSPA's assertion, these actions do not demonstrate the existence of an implied agreement not to call at the Leatherman Terminal. Instead, they show that, prior to the ILA's lawsuit, USMX carrier-members intended to call at the Leatherman Terminal. This is supported by Mr. Newsome's testimony that the carrier-members of USMX had planned to call at the Leatherman Terminal and had delivered export containers to Leatherman in anticipation of calling there. JA0113-15, JA0121-35, JA0175-79 (Newsome). It was only after the ILA had

commenced its $300 million lawsuit against the two carriers that had called at the Leatherman Terminal that other carriers made the perfectly rational decision to avoid being named as the next $100 million defendant in the ILA's lawsuit. *Id.*

The SCSPA claims that its discussions with representatives of USMX and its carrier-members prior to the opening of the Leatherman Terminal "indicat[ed] that USMX members would not use the Terminal unless SCSPA agreed to ILA's position on the manning of that Terminal." Petitioner's Br. at 54. But the Board made or affirmed the following findings of fact that are contrary to the SCSPA's claim:

- After Mr. Adam sent the Section 7(b) letter to SCSPA President/CEO James Newsome in June 2020, stating that "USMX employer-members may be prohibited from using" the Leatherman Terminal, USMX participated in meetings with the ILA and the State to help broker "an arrangement for the performance of work at the new terminal." JA1327.

- In conversations in late September or early October 2020, Mr. Adam told Mr. Newsome that USMX and the ILA "had different positions regarding the Leatherman Terminal." JA1346. Mr. Adam said that USMX interpreted the Master Contract to mean that carrier-members "could call on the Leatherman Terminal as long as the division of work between the state employees and the Local 1422 members remained the same as it was at the other terminals at the Port of Charleston." *Id.*

- USMX clearly stated that its interpretation of Section 7(b) was different than the ILA's. "USMX asserted that its employer members interpreted Section 7(b) as allowing the continuation of the hybrid model so long as performance of the work by state employees and ILA-represented employees was proportionally the same as at the port's two older terminals." JA1327-28.

- Mr. Newsome acknowledged that there was a dispute between the ILA and USMX about the interpretation of Section 7(b) and "asked Adam multiple times to submit the matter to arbitration for a decision, and Adam stated it would need to wait until after the Leatherman Terminal opened and began operating." JA1350.

- USMX carrier-member representatives also recognized that there was a disagreement with the ILA and asked Mr. Newsome "whether a resolution had been reached with ILA and expressed unwillingness to accept scheduled calls to that terminal without such a resolution." JA1350.

These findings of fact are substantially supported by the evidence. On June 8, 2020, Mr. Adam sent Mr. Newsome a letter in accordance with Article VII, Section 7(b). JA0531. After Mr. Newsome received that letter, he suggested to Mr. Adam that USMX and the ILA could arbitrate any dispute the parties had. JA0193-94 (Adam). However, Mr. Adam did not believe that arbitration would be

appropriate until the issues became clearer and more concrete. JA0194, JA0204, JA0210, JA0211 (Adam).

At no time did Mr. Adam tell Mr. Newsome or anyone else at the SCSPA that USMX and the ILA had an agreement to boycott the Leatherman Terminal if the ILA did not get the jobs performed by State employees. JA0194 (Adam). USMX never entered into any agreement with the ILA to boycott the Leatherman Terminal. JA0194-95 (Adam).

USMX informed its carrier-members that Article VII, Section 7 does ***not*** restrict their ability to call at the Leatherman Terminal. USMX informed its carrier-members that they are free to call at the Leatherman Terminal if they individually decide to do so. JA0195 (Adam).

Mr. Newsome's testimony did not contradict Mr. Adam's testimony. After Mr. Newsome spoke with Mr. Adam on August 12, 2020, Mr. Newsome was left with the impression that if USMX and the ILA could not resolve the dispute about Article VII, Section 7, arbitration would be used to resolve the issue. JA0079 (Newsome).

According to Mr. Newsome's testimony, some of USMX's carrier-members specifically told him that Article VII, Section 7 did ***not*** prohibit them from calling at the Leatherman Terminal, but that there would likely need to be an arbitration to resolve this issue:

- Albert Gebhardt, Head of Labor Relations for Maersk and a carrier-member of USMX's Board of Directors, told Mr. Newsome that Article VII, Section 7 gave the carriers a choice as to whether to call at the Leatherman Terminal since the language in Article VII, Section 7 is permissive because it uses "may" instead of "will." JA0081 (Newsome). According to Mr. Newsome, Mr. Gebhardt believed that the matter would be resolved through arbitration prior to the opening of the Leatherman Terminal. JA0082 (Newsome).

- Christopher Parvin, who is Executive Vice President, Marine Operations, of MSC and a carrier-member of the USMX Board of Directors, told Mr. Newsome that MSC would not advocate that the SCSPA do anything different from what the SCSPA was doing – extending the hybrid operating model that the SCSPA traditionally used to the Leatherman Terminal. JA0083 (Newsome).

- John Nardi, who is the President of New York Shipping Association, Inc., a port-association member of USMX, told Mr. Newsome that Mr. Nardi felt that the Article VII, Section 7 issue would go to arbitration. JA0087 (Newsome).

The fact that all parties – including the SCSPA – expected that there would need to be an arbitration demonstrates that there was no agreement. If USMX and

the ILA had truly entered into an agreement to boycott the Leatherman Terminal, as the SCSPA alleges, there would be no need for an arbitration.

Thus, there is more than substantial evidence to support the Board's order dismissing the Section 8(e) charge.

## CONCLUSION

The Board's Decision and Order should be reversed on the right-of-control issue, but the Board's dismissal of the Section 8(e) allegations concerning Article VII, Section 7(b) of the Master Contract should be affirmed.

Dated:  May 19, 2023

Respectfully submitted,

*s/ Jonathan C. Fritts*
Jonathan C. Fritts
James D. Nelson
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel. (202) 739-5867
jonathan.fritts@morganlewis.com
james.nelson@morganlewis.com

William M. Spelman
James R. Campbell
THE LAMBOS FIRM, LLP
303 South Broadway, Suite 410
Tarrytown, New York 10591
Tel. (212) 381-9700
wmspelman@lambosfirm.com
jrcampbell@lambosfirm.com

*Counsel for United States Maritime Alliance, Ltd.*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(B)(i) because this brief contains 8,743 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirement of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 MSO in Times New Roman, 14-point font.

Dated:  May 19, 2023                     *s/ Jonathan C. Fritts*
                                         Jonathan C. Fritts

                                         *Counsel for United States Maritime
                                         Alliance, Ltd.*