No. 23-1059

# United States Court of Appeals for the Fourth Circuit

SOUTH CAROLINA STATE PORTS AUTHORITY,

*Petitioner,*

*and*

THE STATE OF SOUTH CAROLINA; UNITED STATES MARITIME ALLIANCE, LTD.,

*Intervenors for Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*

*and*

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL 1422; INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,

*Intervenors for Respondent.*

On Petition for Review of an Order of the
National Labor Relations Board

## REPLY BRIEF

TRACEY C. GREEN
BURR & FORMAN LLP
1221 Main Street, Suite 1800
Columbia, S.C. 29201
(803) 753-3224
tgreen@burr.com

CARTER G. PHILLIPS
DANIEL J. FEITH
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for Petitioner South Carolina State Ports Authority*

*Additional counsel listed on inside cover*

## Counsel (continued)

MICHAEL O. ECKARD
OGLETREE, DEAKINS, NASH, SMOAK &
STEWART, P.C.
211 King Street, Suite 200
Charleston, S.C. 29401
(843) 720-0872
michael.eckard@ogletreedeakins.com

*Counsel for Petitioner South*
*Carolina State Ports Authority*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.........................................................................ii

INTRODUCTION ................................................................................ 1

ARGUMENT ...................................................................................... 7

    I.    ILA Coerced USMX To Cease Doing Business with SCSPA
          Because SCSPA Used the Hybrid Model at Leatherman...........7

        A.    ILA's Coercion of USMX Carriers Did Not Seek To
             Preserve Bargaining-Unit Work ........................................ 7

        B.    SCSPA – Not USMX – Controlled the Jobs At Issue.......20

    II.   ILA And USMX Unlawfully Agreed Not To Do Business With
          New Container-Handling Facilities Which Do Not Exclusively
          Use ILA Members ..................................................................26

CONCLUSION ............................................................................... 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union,*
611 F. App'x 908 (9th Cir. 2015) ........................................................ 12

*Am. Trucking Ass'ns, Inc. v. NLRB,*
734 F.2d 966 (4th Cir. 1984), *aff'd sub nom. NLRB v. Int'l
Longshoremen's Ass'n,*473 U.S. 61 (1985) ................................... 15, 16

*Bermuda Container Line Ltd. v. ILA,*
192 F.3d 250 (2d Cir. 1999) ........................................................ 16, 17

*Bill Johnson's Rests., Inc. v. NLRB,*
461 U.S. 731 (1983) ............................................................................ 1

*Butte Cnty. v. Hogen,*
613 F.3d 190 (D.C. Cir. 2010) ........................................................... 19

*Fibreboard Paper Prods. Corp. v. NLRB,*
379 U.S. 203 (1964) .......................................................................... 20

*George Koch Sons, Inc. v. NLRB,*
490 F.2d 323 (4th Cir. 1973) ............................................................. 24

*Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union,*
905 F. Supp. 2d 1198 (D. Or. 2012), *aff'd in part, vacated
in part,* 544 F. App'x 657 (9th Cir. 2013) ........................................ 25

*Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union,*
544 F. App'x 657 (9th Cir. 2013) .................................................... 4, 21

*Int'l Bhd. of Elec. Workers, Loc. Union No. 501 v. NLRB,*
566 F.2d 348 (D.C. Cir. 1977) ....................................................... 20, 24

*Int'l Longshore & Warehouse Union v. NLRB,*
705 F. App'x 1 (D.C. Cir. 2017) ..................................................... 22, 23

*Loc. 32B-32J Serv. Emps. Int'l Union v. NLRB*,
    68 F.3d 490 (D.C. Cir. 1995) ............................................................ 10

*Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am.*,
    147 F.3d 296 (4th Cir. 1998) ...................................................... 3, 9

*Nat'l Woodwork Mfrs. Ass'n v. NLRB*,
    386 U.S. 612 (1967) .................................................................... 3, 10

*NLRB v. Frigid Storage, Inc.*,
    934 F.2d 506 (4th Cir. 1991) ........................................................ 18

*NLRB v. Int'l Longshoremen's Ass'n*,
    447 U.S. 490 (1980) ...................................................... 7, 15, 16, 20

*NLRB v. Int'l Longshoremen's Ass'n*,
    473 U.S. 61 (1985) ...................................................................... 1, 16

*NLRB v. Loc. 638, Enter. Ass'n of Steam Pipefitters*,
    429 U.S. 507 (1977) ...................................................... 2, 8, 9, 20, 24

*Tecnocap, LLC v. NLRB*,
    1 F.4th 304 (4th Cir. 2021) ........................................................ 7, 14

*United Paperworkers Int'l Union v. Misco, Inc.*,
    484 U.S. 29 (1987) ........................................................................ 26

*Yanez-Marquez v. Lynch*,
    789 F.3d 434 (4th Cir. 2015) ........................................................ 20

**Statute**

29 U.S.C. § 158(b)(4)(ii)(B) ................................................................ 1

**Administrative Decisions**

*Gen. Teamsters Loc. 982 (J.K. Barker Trucking Co.)*,
    181 N.L.R.B. 515 (1970), *aff'd*, 450 F.3d 1322 (D.C. Cir.
    1971) ............................................................................................ 28

*Int'l Longshore & Warehouse Union (Kinder Morgan)*,
    371 N.L.R.B. No. 125 (2022) ........................................................ 23

*Lithographers Loc. 78 (Employing Lithographers of Miami),*
     130 N.L.R.B. 968 (1961)................................................................27, 30

## INTRODUCTION

It is an unfair labor practice for unions "to threaten, coerce, or restrain any person engaged in commerce," where "an object" of the union's coercive conduct is to force that person to "cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). ILA's dispute is with *SCSPA* and its use at Leatherman of the hybrid ILA-state employee labor model historically used at all Port of Charleston Terminals. But ILA's lawsuit coerces *USMX and its carrier-members* to cease doing business at Leatherman for that reason. The lawsuit is, therefore, an unlawful secondary boycott of SCSPA, and has an "objective that is illegal under federal law." *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 737 n.5 (1983). Indeed, "[y]ou could not ask for a more classic case of unlawful secondary pressure." Dissent 16 (JA1341).

The NLRB nonetheless claims that ILA's lawsuit had a lawful work-preservation purpose. The Board acknowledges that to invoke this defense, ILA must show that the lawsuit's sole objective was preservation of bargaining-unit work *and* the lawsuit was directed at the entity that *controls* the work assignment. *See NLRB v. Int'l Longshoremen's Ass'n*, 473 U.S. 61, 77 (1985) ("*ILA II*"). Here, the work at-issue is neither

bargaining-unit work, nor work controlled by USMX carriers. It is the lift-equipment work that has always been performed by state employees at the Port of Charleston. SCSPA is not a member of the multi-employer bargaining unit covered by the Master Contract; its employees have never been ILA members; and SCSPA controls the assignment of those jobs. Thus, ILA's lawsuit against USMX carriers "sought to acquire work that [ILA members] never had and that [USMX carriers] had no power to give it." *NLRB v. Loc. 638, Enter. Ass'n of Steam Pipefitters*, 429 U.S. 507, 528 n.16 (1977) ("*Pipefitters*"). It is unlawful secondary activity.

The Board and ILA primarily contend ILA's lawsuit sought to preserve bargaining-unit work because ILA represents a coastwide bargaining unit; its members perform lift-equipment jobs at many other East Coast locations; and therefore forcing USMX carriers to cease doing business with SCSPA somehow "preserves" bargaining-unit jobs elsewhere. Initially, as *Pipefitters* makes clear, the work at-issue here is the work at Leatherman; work at other Ports is irrelevant. Further, however the historic bargaining unit is defined, it has *never* included lift-equipment jobs at Charleston and other southeast regional Ports. A bargaining unit is not a geographical region; it is a defined set of

employers and employees, here those signatory to the Master Contract. Only jobs of signatory employers are bargaining-unit jobs. Because the signatory employers here have never had the power to assign the lift-equipment jobs in Charleston, the ILA's lawsuit would not "preserve" any such jobs.

On the Board's logic, ILA would seek to "preserve" bargaining-unit jobs *any time* it coerces an employer signatory to the Master Contract to cease doing business with any non-signatory employer on the East Coast whose employees perform jobs ILA members perform—whether or not that non-signatory employer has *ever* been covered by the ILA's Master Contract.

This is a breathtaking proposition that would gut the secondary-boycott prohibition. Unions have a work-preservation purpose only if they seek to preserve bargaining-unit jobs, not when they coerce bargaining-unit employers to stop doing business with employers *outside the bargaining unit* because they object to the labor policies of the latter. *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 630-31 (1967). *See also Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am.*, 147

F.3d 296, 303 (4th Cir. 1998) (citing *NLRB v. Int'l Longshoremen's Ass'n*, 447 U.S. 490, 507 (1980) ("*ILA I*")).

Moreover, and independently, even if the bargaining-unit work were defined as the Board proposes, the lawsuit would preserve no ILA jobs. The record shows that carriers that do not call at Leatherman call at other Charleston terminals or other regional Ports, which use the hybrid model. Not a shred of evidence suggests that coercing USMX carriers not to use Leatherman could "preserve" any bargaining-unit work.

In addition, independently, ILA's lawsuit was not lawful work preservation because SCSPA controls the job assignments at issue. The Board argues that USMX carriers control who handles their containers because they own the containers and decide which Ports to use. *E.g.*, Br. 50. Leaving aside the absence of *any* record evidence that (i) carriers can unilaterally change Ports or (ii) switching to another Charleston terminal or regional Port would preserve ILA jobs, the relevant "control" is over assignment of lift-equipment jobs at Leatherman—jobs "indisputably" controlled by SCSPA, Dec. 7 (JA1332)—not control over containers. *See Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union*, 544 F. App'x

4

657, 658 (9th Cir. 2013) ("ILWU's argument regarding the shipping
carriers' ability to bypass the Port conflates the carriers' control over
their containers with the legal question of whether they have the 'right
to control the assignment of the work' at this port") (quoting *Pipefitters*¸
429 U.S. at 537).

Again, the implications of the Board's position are stunning. On its
view, a union may coerce an employer to cease doing business with a
second employer with whom the union has a dispute, because the first
employer can always purchase goods and services elsewhere and thus
"control" who does the work. This would eliminate Congress's prohibition
of secondary boycotts and contradict *Pipefitters*, *see infra* at 24.

As the Board dissent explains: "[T]o find the ILA's lawsuit lawful
because a carrier may 'bypass' a port where, and because, the SCSPA
controls the lift-equipment work and assigns it to state employees is just
another way of saying that the lawsuit is lawful because the carrier may
cease doing business at that port." Dissent 15 (JA1340). "In effect, [the
Board] find[s] the ILA's lawsuit lawful to the extent it succeeds in
accomplishing its unlawful object!" Dissent 15 (JA1340).

Finally, the Board claims it reasonably decided that ILA and USMX did not agree to interpret the Master Contract to forbid USMX members to call at new Port facilities that do not employ ILA members for all longshore jobs. The Board ignores the historical context and USMX's acquiescence to this interpretation, including its carriers' refusal to call at Leatherman. Instead, the Board relies on USMX's failure openly to admit it made an unlawful deal. But NLRA section 8(e) forbids either express or "implied" agreements to cease doing business. It was unreasonable for the Board to put its head in the sand.

The hybrid labor model used at the Port of Charleston for 50 years permits the employment of as many ILA longshoremen as possible while complying with South Carolina's policy decision to exclude state workers from collective-bargaining agreements. Using the hybrid model, any growth would result in a far greater increase in jobs for ILA members than for state employees. The other terminals and regional Ports to which carriers might divert also use the hybrid model. In no legal or practical sense does ILA's lawsuit "preserve" any ILA jobs or address work controlled by USMX carriers. The Board's decision should be vacated.

## ARGUMENT

This Court accepts the NLRB's "legal interpretations" only if they "are rational and consistent with the Act" and "not inconsistent with Supreme Court case law." *Tecnocap, LLC v. NLRB*, 1 F.4th 304, 313, 324 (4th Cir. 2021). The Board's statutory interpretation here cannot be reconciled with precedent of the Supreme Court, this Court, or the Board. It also would nullify the statutory prohibition. It is not entitled to deference.

## I.     ILA Coerced USMX To Cease Doing Business with SCSPA Because SCSPA Used the Hybrid Model at Leatherman

ILA's lawsuit did not have a work-preservation purpose. Nor was it directed at employers who control assignment of the work at issue. On each independent ground, the Board decision should be vacated.

### A.     ILA's Coercion of USMX Carriers Did Not Seek To Preserve Bargaining-Unit Work

1. SCSPA, not USMX, indisputably controls the lift-equipment jobs at Leatherman that gave rise to this dispute. *See* Dec. 7 (JA1332). The parties agree that, if ILA's objective in suing USMX is to obtain those jobs—that is, if those jobs constitute the work at-issue—the lawsuit is an unlawful secondary boycott because *that* work was not "traditionally performed by employees represented by the union." *ILA I*, 447 U.S. at

7

504.

The Board and ILA seek to avoid this conclusion by defining the work at-issue, not as the lift-equipment jobs at Leatherman, but as "the loading and unloading generally at East and Gulf Coast ports." Dec. 7 (JA1332). The Board observes that the Master Contract establishes a coastwide, multi-port bargaining unit, Bd. Br. 40, arguing that although ILA-represented employees have never done lift-equipment work at Charleston, they have done it "across the coastwide unit," Br. 46. Put differently, the Board defines the work at-issue based not on traditional bargaining-unit work at the site at issue, but on such work elsewhere.

This approach to defining the work at-issue, however, is irreconcilable with, and thus foreclosed by, *Pipefitters*. There, although it was undisputed that union members "[t]raditionally" performed the cutting-and-threading work that was the subject of the union's boycott, 429 U.S. at 512, the Court did not define the work at-issue at that level of generality. Instead, it focused on the cutting-and-threading work *at the specific worksite giving rise to the dispute*. The Court found the union's boycott unlawful because it was "uncontrovertible that the [cutting and threading] work *at this site* could not be secured by pressure on [the

signatory employer] alone and that the union's work objectives could not be obtained without exerting pressure on [the secondary employer] as well." *Id.* at 530 (emphasis added).

*Pipefitters* teaches that the work at-issue must be defined in terms of the specific work, at the specific site, giving rise to the dispute. Here, under that framework, the work at-issue is the lift-equipment jobs at the Port, which ILA-represented employees have never performed and thus cannot seek to preserve.

Significantly, and consistent with *Pipefitters*, this Court has explained that a union cannot rely on the work-preservation doctrine to justify coercive actions aimed at acquiring work performed at one worksite based on the union's representation of employees who perform similar work "at other . . . sites." *Marrowbone*, 147 F.3d at 299. The Board attempts to distinguish *Marrowbone* by arguing that it involves the creation of a new bargaining unit, Br. 42–43, while here SCSPA employees are not in *any* bargaining unit. That distinction is irrelevant: In each case, the union's coercion was directed at jobs outside the union's

9

bargaining unit, and that is not work preservation.[1] *See Nat'l Woodwork Mfrs.*, 386 U.S. at 630–31 (union may not "reach out *to monopolize jobs or acquire new job tasks* when their own jobs are not threatened" by the employer being coerced) (emphasis added).

Likewise, in *Local 32B-32J Service Employees International Union v. NLRB*, 68 F.3d 490 (D.C. Cir. 1995), the court rejected the union's attempt to "illegally extend the contract to reach outside the contractual bargaining unit," saying "the [union's] efforts to enforce its interpretation of the contract were intended not to preserve work (that it had never done), but to pressure Golden to change its labor policies." *Id.* at 495. The Board purports to distinguish *Local 32B-32J* because it did not involve "containerization or any similar technological change." Br. 46 n.8. This is a non-sequitur. Whether a job has been transformed by technology or not, a union does not seek to preserve work when it coerces one employer to cease doing business with an employer outside the bargaining unit

---

[1] Revealing concern about *Marrowbone*, the Board argues that the Court should not follow it unless it "leaves no room for agency discretion." Br. 45. *Marrowbone* follows U.S. Supreme Court decisions, *see* Op. Br. 33-35, and the Board's extension of work preservation to coercion focused on jobs outside the bargaining-unit is wholly inconsistent with that precedent.

because that second employer does not assign work to union members.[2]

Relatedly, while the Board recognizes that a union's actions are only considered primary and lawful when "aimed at influencing an employer's labor relationship with its own employees," it asserts without citation that ILA's lawsuit is "addressed to the labor relations of USMX—the contracting employer—*vis-à-vis* the longshoremen it directly or indirectly employs along the East Coast." Bd. Br. 34, 44. This claim is frivolous; the lawsuit seeks to coerce USMX carriers not to call at Leatherman by punishing them for doing so. *See, e.g.*, GC Exhibit 4 ¶¶20–26 (JA524–525); GC Exhibit 4 ¶34 (JA526) (claiming USMX carrier committed tortious interference with contract by bringing its "container vessels to the Leatherman Terminal in April 2021, as workers not covered by the Master Contract were hired to perform crane and terminal work … from [the member's ship]"); GC Exhibit 4 ¶44 (JA528) (same for civil conspiracy); GC Exhibit 4 ¶49 (JA528–529) (same for Master

---

[2] The Board also incorrectly claims ILA's acquiescence to the hybrid model at the Port and its sister regional Ports is irrelevant to whether ILA sought to preserve work at Charleston, Br. 47. That established, decades-old acquiescence shows the historic bargaining-unit has never included lift-equipment jobs at Ports using the hybrid model, including Charleston—a fact clearly relevant to whether ILA seeks to preserve bargaining-unit jobs.

Contract breach). The complaint alleges no claims against USMX carriers based on their relationships with their own employees.[3]

In addition to ignoring the logic of *Pipefitters* and *Marrowbone*, the Board also fails to do business with the logic of its position. If under the banner of "work preservation," ILA can coerce employers signatory to the Master Contract to cease doing business with any non-signatory employer on the East Coast whose employees do jobs ILA members perform at some other locations, the prohibition on secondary pressure would be "eviscerated." *See Amicus* Br. of Chamber of Commerce 11 (if "work preservation can be established by looking to the type of work performed by union members in completely different parts of the country, the Board [gives] a green light for unions to use pressure tactics to take away jobs from non-union members in places where they have long worked").[4]

_____

[3] The Board and ILA argue, in essence, that ILA's lawsuit does not seek to coerce USMX carriers to cease doing business with SCSPA, but instead to require the carriers to do business with other Ports. This argument is inconsistent with both the complaint's allegations and with logic: *Forcing carriers to do business with others coerces them to cease doing business with SCSPA.*

[4] The Board cites *American President Lines, Ltd. v. International Longshore & Warehouse Union*, 611 F. App'x 908, 911 (9th Cir. 2015), for the proposition that "the bargaining unit is comprised of multiple

2. Even if the Board's identification of the work at-issue as "the loading and unloading generally at East and Gulf Coast ports" were correct, there is no factual basis (let alone substantial evidence) for the Board's assertion that the objective of ILA's lawsuit is to "stop expansion of the hybrid work' at the new Leatherman Terminal so as not to lose more of its work loading and unloading containers" at other Ports. Bd. Br. 46; *see* Dec. 7 (JA1332). Although ILA's brief revives its argument that ships would divert to Charleston from other Ports if Leatherman uses the hybrid model, *see* ILA Br. 34, the ALJ rejected that argument, and the Board did not adopt it. *See* ALJ Dec. 29 (JA1354) (characterizing ILA argument of diversion as "vague speculation," "without any evidentiary support"). The record shows that ships that did not use Leatherman instead called at *other Charleston Terminals* using the hybrid model. Dec. 3 (JA1328). No record evidence even suggests that ships bound for New York or Baltimore would travel to Charleston

---

employers who are signatory to the operative collective-bargaining agreements, at all covered ports." Bd. Br. 41. That case involved a *signatory* carrier whose ILWU-represented employees had "historically performed stevedoring work" in Seward, Alaska. *Id.* SCSPA is not signatory to the Master Contract; and ILA members have never performed its lift-equipment work. *American President Lines*, accordingly, sheds no light here.

13

because it uses the hybrid model. *See* ALJ Dec. 29 (JA1354) (finding no evidence that "work might migrate from ILA-controlled ports to Charleston"). Indeed, the record shows that Charleston is a regional port, *see* ALJ Dec. 29 (JA1354); customers use it because of the inland destination of cargo. Tr. 143, 134 (JA153, JA144). Thus, coercing USMX vessels to divert from Leatherman to Wilmington or Savannah would not "preserve" any bargaining-unit work. It would simply expand the volume of work performed under the hybrid model elsewhere. *See* Dec. 2 n.5 (JA1327) (identifying other regional ports as using the hybrid labor model); ALJ Dec. 19 (JA1344). The Board did not reverse these ALJ findings, to which it owed deference. *See* n.6 *infra*.

Implicitly acknowledging the absence of any evidence that Leatherman will cause ILA "to lose more of its work," Bd. Br. 46, the Board argues that a new terminal such as Leatherman *must* have "incorporate[d] upgrades and/or innovative technology" because it would "defy common sense" to build a new terminal without such improvements, *id.* at 49 (quoting Dec. 7 (JA1332 n.19)). This argument is doubly flawed. First, the Board cites no evidence of any technological changes at Leatherman, so its statement is "pure speculation." *Tecnocap*,

1 F.4th at 313. Second, even if such evidence existed, to rely on it, the Board would have had to examine the changes and determine whether they displaced jobs held by ILA members. *See ILA I*, 447 U.S. at 507. The Board's decision cites no such evidence or analysis, and there is none.

The absence of evidence of any threat to ILA-member jobs also demonstrates why the containerization cases the Board and ILA principally rely upon are inapposite. Those cases arose in circumstances where "employees' traditional work is displaced, or threatened with displacement, by technological innovation." *ILA I*, 447 U.S. at 505; *accord Am. Trucking Ass'ns, Inc. v. NLRB*, 734 F.2d 966, 979 (4th Cir. 1984) (the work-preservation doctrine requires that there shall be no "diminution of [bargaining unit] work flowing from changes in technology"). In such cases, "[i]dentification of the work at issue . . . requires a careful analysis of the traditional work patterns that the parties are allegedly seeking to preserve, and of how the agreement seeks to accomplish that result under the changed circumstances created by the technological advance," to ensure that the work-preservation agreement "seeks no more than to preserve the work of bargaining unit members." *ILA I*, 447 U.S. at 507.

Thus, in *American Trucking* and *ILA*, this Court and the Supreme

Court concluded that the union was engaged in work preservation where it sought jobs that functionally replaced jobs its members had performed before containerization. *Id.*; *see Am. Trucking*, 734 F.2d at 968. Here, by contrast, there is no evidence of technological displacement—or displacement for any other reason.[5] However significant the "history of containerization" has been in the shipping industry, the Board's repeated incantations of that phrase (Bd. Br. 48 (quoting Dec. 8 (JA1333))) are not "talismanic[,] nor can they substitute for analysis." *ILA II*, 473 U.S. at 81.

Bermuda Container Line Ltd. v. ILA*, 192 F.3d 250 (2d Cir. 1999) is

---

[5] Because the Board ignores the context of the containerization cases, it misunderstands the statement in *ILA II* that "the place where work is to be done ... is seldom relevant to the definition of the work itself." 473 U.S. at 77. The Board reads this statement to endorse defining the work at issue in a dispute according to "traditional work patterns" in general, rather than at the "locus of the dispute." Bd. Br. 45-46. But that is not what the Court meant. Referring back to *ILA I*, the Court was making the point that because technology may shift the location certain work is performed—*e.g.*, moving the loading and unloading of ships from on-pier to off-pier—one cannot define the work at issue only by its location *after* the displacement has occurred. *See ILA II*, 473 U.S. at 77. Rather, identifying the "traditional work patterns" that may be preserved requires considering "all the surrounding circumstances, including the nature of the work both *before* and after the innovation." *ILA I*, 447 U.S. at 507 (emphasis added) (internal quotation marks and citation omitted). Neither *ILA I* nor *ILA II*, however, suggests that "traditional work patterns" at one site may be used to define the work at-issue at another.

inapplicable for similar reasons. There, bargaining-unit members had performed the work in question for an employer in the multi-employer bargaining unit for years; that signatory employer sought to evade compliance with the governing agreement by *moving* the work. *See id.* at 257. As the Court emphasized, the "proposed move to Salem would deplete the number of longshore jobs available to ILA workers in the port of New York and divert them to non-union labor in Salem," which "would directly hurt existing members of the bargaining unit." *Id.* The contrast with this case is clear: No similar findings or evidence suggest that ILA's lawsuit seeks to preserve any bargaining-unit jobs.

The Board next argues that it is "irrelevant" that ILA-represented employees have never performed the lift-equipment work at Charleston, because a union is "preserving work" when it seeks to obtain the new jobs created as a result of technological change that eliminates old jobs. Bd. Br. 45–46. But even the Board's preferred historic bargaining unit has always omitted Ports using the hybrid model, including Charleston. While ILA may seek to preserve jobs *bargaining-unit members lost* through containerization by asserting its members' rights to the transformed jobs of employers in the bargaining unit, ILA's lawsuit does

17

not seek to preserve bargaining-unit work in the face of technological change. Before or after any technological change, the lift-equipment work at the Port of Charleston has *never* been bargaining-unit work.

Ultimately, this complete absence of any factual basis for a work-preservation defense lays bare the true objective of ILA's lawsuit: to obtain jobs at Leatherman. Clearly recognizing that such an objective would be unlawful, both the Board and ILA protest that ILA's lawsuit "does not seek any work at the Leatherman Terminal." Bd. Br. 50 n.10; *see* ILA Br. 29. But as the ALJ found, there is abundant evidence of "ILA's desire to obtain all the container work at the Leatherman Terminal," including repeated statements by senior ILA officials spelling out their demand for that work.[6] ALJ Dec. 29 (JA1354).

The Board altogether failed to address this evidence in its decision; its brief merely asserts that such statements, from "months and years

---

[6] Notably, the Administrative Law Judge ("ALJ") found that the ILA lawsuit had an unlawful secondary purpose based in part on his assessment of witness evidence, ALJ Dec. 29 (JA1354) (ILA "denies" that it sought "to obtain all the container work at the Leatherman Terminal," but "the evidence tells another story") (citing testimony from ILA Vice President Daggett and ILA Delegate Riley, ALJ Dec. 29 (JA1354 n.35)), an assessment to which the Board owed, but failed to give, deference, *NLRB v. Frigid Storage, Inc.*, 934 F.2d 506, 509 (4th Cir. 1991).

18

before the April 2022 lawsuit," "do not alter the lawful, primary character of the lawsuit." Bd. Br. 50 n.10. Respectfully, this is nonsense. Repeated statements by senior ILA officials in the run-up to the lawsuit are probative of the lawsuit's objective. Tellingly, the Board offers no reason to think otherwise. *See Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action ….").

Instead, the Board and ILA base their characterization of the lawsuit's objective entirely on the fact that the lawsuit does not name SCSPA or seek injunctive relief assigning ILA the Leatherman jobs. *See* Bd. Br. 50 n.10; ILA Br. 29. This ignores, however, that the gravamen of the lawsuit is that two USMX members called at Leatherman and that the lawsuit seeks over *$300 million* for just those two visits. Dec. 3 (JA1328). The *in terrorem* effect of such claims is more than sufficient to fulfill ILA Vice President Riley's threat that "if there are any new terminals built, and *if they are not in compliance with the [Master Contract]*, the ships will not call on those facilities." ALJ Dec. 29 (JA1354) (emphasis added). The Board and ILA's argument, in essence, is that unless ILA effectively confesses its unlawful objective, no unlawful

19

objective may be inferred. But ILA cannot, through artful pleading, escape the fact that the clear objective of its lawsuit is work acquisition, not work preservation. *See ILA I*, 447 U.S. at 504.[7]

In sum, ILA's lawsuit would not "preserve" work that ILA bargaining-unit members have ever performed.

## B.    SCSPA—Not USMX—Controlled the Jobs At Issue.

Independently, ILA's coercive lawsuit had an "improper secondary objective" because the "work sought by the union [is] not under the control of [USMX carrier-members]." *Pipefitters*, 429 U.S. at 521–22 (citing *Nat'l Woodwork Mfrs.*, 386 U.S. at 616–17). ILA's lawsuit was instead "tactically calculated to satisfy [its] objectives elsewhere." *Int'l Bhd. of Elec. Workers, Loc. Union No. 501 v. NLRB*, 566 F.2d 348, 352 (D.C. Cir. 1977) (quoting *Nat'l Woodwork Mfrs.*, 386 U.S. at 644).

---

[7] ILA argues that its lawsuit seeks to preserve work by enforcing the Master Contract's prohibition against subcontracting. *E.g.*, ILA Br. 26–27. The Board did not rely on that ground, and it cannot support affirmance. *See Yanez-Marquez v. Lynch*, 789 F.3d 434, 461 n.14 (4th Cir. 2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80 (1943)).  In any event, an employer engages in subcontracting when it contracts out "work previously performed by employees in the bargaining unit." *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 210 (1964). USMX carriers' employees have *never* performed the lift-equipment jobs at the Port, so USMX carriers are not "contracting out" jobs at the Port, let alone contracting out jobs performed by ILA members to non-ILA labor.

As the Board itself found, SCSPA "indisputably" controls assignment of the work at issue. Dec. 7 (JA1332). The Board's response is that USMX carriers decide which Ports to utilize and thus "control" the assignment of the work at issue. Dec. 7 (JA1332).

Initially, this argument confuses an employer's decision to do business with a second business and an employer's ability to control the work assignments of that second business's employees. The relevant control here is the latter—whether USMX carriers control the assignment of work at Leatherman. They do not. Indeed, as noted above, the Ninth Circuit rejected a similar argument, saying, "ILWU's argument regarding the shipping carriers' ability to bypass the Port conflates the carriers' control over their containers with the legal question of whether they have the 'right to control the assignment of the work' at this port." *Hooks*, 544 F. App'x at 658 (quoting *Pipefitters*, 429 U.S. at 537) (internal quotation marks omitted).

In any event, the Board's view—that because USMX carriers can submit to ILA's coercion and cease doing business with Leatherman, the carriers "control" who performs the work at issue—would have absurd consequences. Businesses can always decide from whom to purchase

21

goods and services. On the Board's view, therefore, a union can always coerce an employer to cease doing business with a second employer that supplies goods and services, because the first employer is always free to take its business elsewhere. Again, that view would "eviscerate[]" the NLRA's prohibition of secondary boycotts. *See Amicus* Br. of Chamber of Commerce 11.

The Board purports to distinguish *Hooks* and a related case, *Int'l Longshore & Warehouse Union v. NLRB*, 705 F. App'x 1, 3 (D.C. Cir. 2017) (per curiam), saying that in those cases "the work in question was found to be the specific reefer work at that port," while here the work is "the coastwide loading and unloading of containers." Bd. Br. 54–55. There is no difference. There, ILWU, like ILA here, argued that its master contract was a coastwide agreement and that its members performed reefer work at other West Coast ports. The courts and the Board rejected those arguments, recognizing that (i) the relevant question was who controlled the reefer work at Portland, not on the coast generally; (ii) the Port of Portland controlled that work; (iii) the carriers' ability to call at a different port was irrelevant; and therefore (iv) ILWU's coercion of carriers to cease doing business with the port operator (ICTSI) to force

the Port to use ILWU members for reefer work was unlawful secondary activity. *E.g.*, *ILWU*, 705 F. App'x at 3 (enforcing Board decision that "labor practices targeted against … the shipping carriers … to pressure the Port to re-assign the dockside reefer work [to ILWU members] were unlawful secondary boycotts targeting an employer [the carriers] that did not have the right to control the work"). With a change in administration, the Board changed its view. Its prior view correctly followed judicial and Board precedent.[8]

The Board's efforts to distinguish *Pipefitters* are also unavailing. As explained above, there a subcontractor and its union had agreed that the subcontractor's employees would cut and thread pipe on the jobsite; but the general contractor purchased pre-cut, pre-threaded pipe. The union sought to coerce the subcontractor to cease doing business with the general contractor, but the Supreme Court found the union's coercion unlawful because the subcontractor had "no right to control" the pipe's

---

[8] *Amicus* AFL-CIO cites *Int'l Longshore & Warehouse Union (Kinder Morgan)*, 371 N.L.R.B. No. 125 (2022), which is wrong for the same reasons the decision below is wrong. It is also distinguishable because there the employer (Kinder Morgan) was a member of the Pacific Maritime Association, the multi-employer bargaining unit. SCSPA is not a member of USMX.

cutting and threading. 429 U.S. at 524–28. As the Board Dissent highlighted, *see* Dissent 15 (JA1340), the subcontractor could have chosen not to work for the contractor; but the Supreme Court nonetheless found the union's pressure unlawful.

The Board says *Pipefitters* is not relevant because "the work in question is not similarly confined to a single jobsite controlled by an employer at that jobsite." Br. 52. But at single jobsites or multiple jobsites, if a union coerces an employer to cease doing business with a second employer outside the bargaining unit because it objects to the latter's work assignments, that is an unlawful secondary boycott. *See also George Koch Sons, Inc. v. NLRB*, 490 F.2d 323, 328 (4th Cir. 1973) (prophetically embracing the analysis and outcome in *Pipefitters*); *IBEW, No. 501*, 566 F.2d at 351–52 (union violated section 8(b)(4)(ii)(B) by coercing neutral subcontractors to pressure general contractor to assign jobs to union-represented employees).

Finally, the Board relies heavily on the Supreme Court's *ILA* decisions, but ignores relevant factual differences. Those cases arose in settings where carriers used *their own employees* to stuff and unstuff containers, and thus carriers decided the assignment of that work—

24

sometimes using their own employees and other times releasing containers for others' employees to perform that work. *See* Op. Br. 36, 48–49. Here, USMX carriers have *never* performed lift-equipment work at Charleston with their own employees and do not control assignment of that work.[9]

As the Board acknowledges, its arguments that USMX carrier-members "control" the work at issue depend on defining the work as "coastwide loading and unloading of containers," including for employers who are *not* members of the bargaining unit. *E.g.*, Br. 55. Defining "work" as the Board does would allow unions to claim that employers "control" the work assignments at other companies they do business with,

---

[9] ILA quotes *American Trucking*'s statement that shipping lines control their containers, ILA Br. 27; but carriers do not "control" all work assignments of all employers with respect to containers. As explained in text, the containerization cases were based on evidentiary records demonstrating that ocean carriers developed the technology and used their own employees to stuff and unstuff containers. *See Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union*, 905 F. Supp. 2d 1198, 1211 n.7 (D. Or. 2012) ("[a]t least one key difference" between the case before the court and *ILA II* was that, in *ILA II*, the carriers *employed* the longshoremen), *aff'd in part, vacated in part,* 544 F. App'x 657 (9th Cir. 2013). That record provided the basis for the courts' findings of carrier control of the stuffing and unstuffing work. Here, USMX carriers have never performed lift-equipment work at Charleston with their own employees. *See id.* at 1212 ("Carriers have no power to assign the … work to ILWU members").

25

including those outside the bargaining unit. Again, accepting that argument would gut the NLRA's prohibition of secondary boycotts.

## II. ILA And USMX Unlawfully Agreed Not To Do Business With New Container-Handling Facilities Which Do Not Exclusively Use ILA Members

The Board decided that ILA and USMX had "reached no agreement" about whether Section 7 of the Master Contract prohibited USMX carriers from calling on new facilities that did not use ILA-represented employees to perform all container work, and therefore did not violate section 8(e). Dec. 3 (JA1328); ALJ Dec. 25 (JA1350). This decision was arbitrary and unreasonable.[10]

Section 8(e) of the NLRA prohibits a union and an employer from making an "express or implied" agreement to cease doing business with a third party for an unlawful objective. By including "implied" agreements in the prohibition, "Congress meant to reach every device which, fairly considered, is tantamount to an agreement that the

---

[10] The Board argues that *Marrowbone*'s statement that courts review "de novo" whether a collective bargaining agreement violates Section 8(e) is irrelevant here because *Marrowbone* involved an arbitrator's decision. Bd. Br. 22 n.4. If anything, judicial review of arbitral awards is *more* deferential than judicial review of NLRB decisions. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987).

contracting employer will … cease doing business with another person."
*Lithographers Loc. 78 (Employing Lithographers of Miami)*, 130 N.L.R.B.
968, 976 (1961). The Board decided that Section 7 was not an agreement
to cease doing business with Ports that continued to use the hybrid model
at new terminals only by isolating the contract language from the parties'
conduct and ignoring the undisputed historical context of the ILA-USMX
bargaining relationship and the practical reality underlying USMX
carriers' statements to SCSPA.

First, the Board argues that Section 7(b) of the Master Contract is
not unlawful on its face, because it requires only that USMX carrier-
members give notice that they "may" be prohibited from calling at new
facilities that use the hybrid labor model. Br. 25. The Board ignores, as
SCSPA highlighted (Op. Br. 52), that ILA and USMX never conducted
the "study" mandated by Section 7, supporting SCSPA's argument that
the parties never intended to "persuade" hybrid Ports to change their
labor practices, and that Section 7 was a thinly-veiled threat. Op. Br.
52.[11]

---

[11] The Board puzzlingly asserts that SCSPA waived its argument that
the text was ambiguous, but then cites SCSPA's argument in its opening
brief, including that the parties failed to conduct Section 7's mandated

The Board also never considers what the purpose of the required "notification" might be, other than to warn hybrid Ports that they will be boycotted if they use the hybrid model at new terminals. Only by viewing Section 7 without considering the historical setting and the parties' need for plausible deniability about their agreement's unlawfulness could one find the contract language unambiguous.

Where, as here, contract language is ambiguous, the Board "will consider extrinsic evidence to determine whether the clause was intended to be administered in a lawful or unlawful manner." *Gen. Teamsters Loc. 982 (J.K. Barker Trucking Co.)*, 181 N.L.R.B. 515, 517 (1970), *aff'd*, 450 F.3d 1322 (D.C. Cir. 1971).[12] The Board also asserts that SCSPA's extrinsic evidence does not demonstrate the parties' unlawful agreement,

---

study. The Board also cites SCSPA's assertion that, in this setting, the language was arguably a threat. Br. 27.

[12] The Board chastises SCSPA for refusing to accept its decision to credit the testimony of USMX counsel Caruso that USMX did not share ILA's view that Section 7(b) meant that UMSX members cannot go to new terminals using non-ILA labor. Br. 28. But Caruso actually testified that Section 7(b) used the word "may" to allow for the possibility that an arbitrator might agree that "certain provisions in the [Master Contract] would prohibit the carriers from calling at a terminal that was not completely manned by ILA Labor." ALJ Dec. 20 (JA1345); Tr. 314–316 (JA325–327). This testimony supports SCSPA's argument that the Master Contract was ambiguous.

but that argument likewise reflects the Board's refusal to consider the relevant context. The Board reviews the numerous statements of USMX carriers to SCSPA, including some by USMX Board members, explaining why they would not call at Leatherman, but concludes that none expressly states that the Master Agreement *required* the carrier to engage in an unlawful secondary boycott of Leatherman. Bd. Br. 30.

It is unsurprising that the Board could not find statements from USMX admitting to entering into an unlawful agreement (although ILA officials made many such admissions, *see* ALJ Dec. 20–21 (JA1345–1346); Dec. 4 & n.11 (JA1329); Tr. 284, 252, 264 (JA295, JA263, JA275)). It was unreasonable for the Board to insist that USMX officials incriminate themselves to find an implied agreement. Moreover, the Board ignores that numerous USMX carriers indisputably told SCSPA that they would not call at Leatherman and then refused to do so. The Board decided that those carriers, though USMX Board members, were not officially speaking for USMX, and declined to draw any inferences from the unbending refusal of USMX members to call without ILA permission, instead taking all at their word that they did not enter into an illegal

agreement. Bd. Br. 30–31.[13] Viewed in context and "fairly considered," Section 7 "is tantamount to an agreement" that USMX carrier-members will cease doing business with Ports building new facilities that employ non-ILA labor. *Lithographers Loc. 78*, 130 N.L.R.B. at 976.

## CONCLUSION

The Board's Decision and Order should be reversed.

Respectfully submitted,

Tracey C. Green
Burr & Forman LLP
1221 Main Street, Suite 1800
Columbia, S.C. 29201
(803) 753-3224
tgreen@burr.com

Michael O. Eckard
Ogletree, Deakins, Nash, Smoak
& Stewart, P.C.
211 King Street, Suite 200
Charleston, S.C. 29401
(843) 720-0872
michael.eckard@ogletreedeakins.com

Carter G. Phillips
Daniel J. Feith
Sidley Austin LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
cphillips@sidley.com

*Counsel for Petitioner South Carolina State Ports Authority*

---

[13] The Board states that USMX carriers' refusal to call at Leatherman should be attributed to ILA's lawsuit, not any agreement, implicitly recognizing the lawsuit had a "cease doing business" purpose. Br. 31. But that uniform conduct reflects USMX's acceptance of the practical reality that its members effectively *had to agree* to ILA's contract interpretation, despite the legal prohibition on admitting to it.

## CERTIFICATE OF COMPLIANCE

Under Federal Rule of Appellate Procedure 32(a)(7), I certify that:

This brief complies with Rule 32(a)(7)'s type-volume limitation and this Court's order of March 17, 2023, because it contains 6,410 words, as determined by the Microsoft Word 2016 word-processing system used to prepare the brief, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with Rule 32(a)(5)'s typeface requirements and Rule 32(a)(6)'s type-style requirements because it has been prepared in a proportionately spaced typeface using the 2016 version of Microsoft Word in 14-point Century Schoolbook font.

/s/ Carter G. Phillips
CARTER G. PHILLIPS

## CERTIFICATE OF SERVICE

I certify that I caused this document to be electronically filed with the Clerk of the Court using the appellate CM/ECF system on May 26, 2023. All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

/s/ Carter G. Phillips
CARTER G. PHILLIPS