No. 23-1059

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

**SOUTH CAROLINA STATE PORTS AUTHORITY**
Petitioner
**and**
**THE STATE OF SOUTH CAROLINA; UNITED STATES MARITIME
ALLIANCE, LTD.**
Intervenors for Petitioner
v.
**NATIONAL LABOR RELATIONS BOARD**
Respondent
**and**
**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION; INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, LOCAL 1422**
Intervenors for Respondent

_____

## ON PETITION FOR REVIEW OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

_____

## SUPPLEMENTAL BRIEF OF THE NATIONAL LABOR RELATIONS BOARD
## IN RESPONSE TO THE INTERVENOR BRIEF OF
## UNITED STATES MARITIME ALLIANCE, LTD.

_____

**MILAKSHMI V. RAJAPAKSE**
_Supervisory Attorney_

**HEATHER S. BEARD**
_Senior Attorney_

**_National Labor Relations Board_**
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-4231**
**(202) 273-1788**

**JENNIFER A. ABRUZZO**
    _**General Counsel**_
**PETER SUNG OHR**
    _**Deputy General Counsel**_
**RUTH E. BURDICK**
    _**Deputy Associate General Counsel**_
**DAVID HABENSTREIT**
    _**Assistant General Counsel**_

**National Labor Relations Board**

# **TABLE OF CONTENTS**

**Headings**                                                                                                          **Page(s)**

Introduction ................................................................................................................2

Summary of Argument.................................................................................................3

Argument.......................................................................................................................5

      The Board reasonably found that USMX and its carrier-members are
      not neutral employers with respect to ILA's lawsuit because they
      control the work in question ................................................................................5

    A.   The work that ILA seeks to preserve through its lawsuit is the
         container-handling work of the coastwide bargaining unit, and
         USMX and its carrier-members control that work.................................6

    B.   USMX has provided no basis to disturb the Board's reasonable finding
         of carrier control over the coastwide work of the bargaining unit...........9

       1.  Article VII, section 7 of the master contract is not relevant
          to the Board's right-of-control finding because it does not
          address the coastwide work in question ...........................................10

       2.  *ICTSI* is not instructive on the right-of-control issue in
          the instant case.................................................................................12

         a.  As the Board explained in its principal brief, *ICTSI* is
            distinguishable because it involved alleged carrier control
            over disputed work at a single port ...........................................13

         b.  The more apt analogy is to the Supreme Court's decision in
            *ILA II*, affirming this court's decision in
            *American Trucking*......................................................................15

       3.  USMX's remaining contention, that the Board ignored
          allegedly relevant factual findings by the judge, is not properly
          before the court and, in any event, meritless.....................................17

i

## TABLE OF CONTENTS (cont'd)

**Headings**                                                                 **Page(s)**

Conclusion ...........................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*American Trucking Ass'n v. NLRB,*
   734 F.2d 966 (4th Cir. 1984)........................................................ 9, 19

*Bermuda Container Lines, Ltd. v. Longshoremen ILA,*
   192 F.3d 250 (2d Cir. 1999) ........................................................ 6

*Hooks ex rel. NLRB v. ILWU,*
   544 F. App'x 657 (9th Cir. 2013) ................................................ 12, 14

*ILWU v. NLRB ("ICTSI"),*
   705 F. App'x 1 (D.C. Cir. 2017), *affirming*
   363 NLRB 121 (2015) ................................................................ 12, 14

*Int'l Ladies' Garment Workers' Union v. Quality Mfg. Co.,*
   420 U.S. 276 (1975) ................................................................... 18

*Nat'l Woodwork Mfrs. Ass'n v. NLRB,*
   386 U.S. 612 (1967) ................................................................... 5

*NLRB v. Denver Bldg. & Constr. Trades Council,*
   341 U.S. 675 (1981) ................................................................... 5

*NLRB v. HQM of Bayside, LLC,*
   518 F.3d 256 (4th Cir. 2008) ....................................................... 18

*NLRB v. Int'l Longshoremen's Ass'n,*
   447 U.S. 490 (1980) ................................................................... 5, 19

*NLRB v. Int'l Longshoremen's Ass'n,*
   473 U.S. 61 (1985) ................................................................... 9, 10, 19

**Statutes**

National Labor Relations Act, as amended
 (29 U.S.C. §§ 151, et seq.)

Section 8(e) (29 U.S.C. § 158(e)) ..................................................... 2
Section 10(e) (29 U.S.C. § 160(e)) ................................................... 18
Section 7(b) (29 U.S.C. § 157(b)) .................................................... 11
Section 8(b)(4)(ii)(A) (29 U.S.C. § 158(b)(4)(ii)(A)) ......................... 2
Section 8(b)(4)(ii)(B) (29 U.S.C. § 158(b)(4)(ii)(B))........................... 2

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

---

### No. 23-1059

---

### SOUTH CAROLINA STATE PORTS AUTHORITY

#### Petitioner

#### and

### THE STATE OF SOUTH CAROLINA; UNITED STATES MARITIME ALLIANCE, LTD.

#### Intervenors for Petitioner

#### v.

### NATIONAL LABOR RELATIONS BOARD

#### Respondent

#### and

### INTERNATIONAL LONGSHOREMEN'S ASSOCIATION; INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL 1422

#### Intervenors for Respondent

---

### ON PETITION FOR REVIEW OF AN ORDER OF
### THE NATIONAL LABOR RELATIONS BOARD

---

### SUPPLEMENTAL BRIEF OF THE NATIONAL LABOR RELATIONS BOARD IN RESPONSE TO THE INTERVENOR BRIEF OF UNITED STATES MARITIME ALLIANCE, LTD.

---

# INTRODUCTION

This case is before the Court on the petition of the South Carolina State Ports Authority ("SCSPA") to review a December 16, 2022 Order of the National Labor Relations Board.  (JA 1326-1356.)  In its Order, the Board dismissed two unfair-labor-practice complaints:  one against the United States Maritime Alliance, Ltd. ("USMX"), the International Longshoreman's Association ("ILA"), and ILA Local 1422 ("Local 1422"), alleging that those parties violated Section 8(e) of the National Labor Relations Act, 29 U.S.C. § 158(e), by entering into a prohibited "hot cargo" agreement; and the other against ILA alone, alleging that ILA violated Section 8(e) and Section 8(b)(4)(ii)(A) and (B) of the Act, 29 U.S.C. §§ 158(e) and 158(b)(4)(ii)(A) and (B), by filing a breach-of-contract lawsuit against USMX and two of its carrier-members based on provisions of a collective-bargaining agreement between ILA and USMX ("the Master Contract").  (JA 1328-1329.) USMX has intervened in this case in *support* of the Board's finding that USMX, ILA, and Local 1422 did not violate Section 8(e), but *against* the Board's finding that ILA did not violate Section 8(e) and Section 8(b)(4)(ii)(A) and (B) by its lawsuit.

Given USMX's position as an intervenor both for and against the Board, this Court granted USMX's request to file a separate brief after the filing of all other principal and intervenor briefs.  The Court further provided that the Board and ILA

2

would have an opportunity to file responses to USMX's brief.  This supplemental brief is the Board's response to USMX's brief filed on May 19, 2023, and specifically addresses USMX's limited argument with respect to ILA's lawsuit—namely, that it constitutes unlawful secondary pressure on neutral employers (USMX and the two carrier-members), rather than lawful pressure on a primary employer, because USMX and its carrier-members do not control the work in question.[1]

## SUMMARY OF ARGUMENT

The Board reasonably found that ILA's lawsuit against USMX pursuant to the Master Contract had a lawful work-preservation objective under the two-prong work preservation test established by the Supreme Court.  Applying the first prong of that test, the Board found that the lawsuit's objective was to preserve longshore work traditionally performed by ILA-represented employees.  And applying the second prong, as particularly relevant here, the Board found that USMX and its carrier-members had the "right to control" the work in question—the loading and unloading of containers in the coastwide bargaining unit set forth in the Master

---

[1] The Board adheres to its principal brief as to all other matters, including the Section 8(e) hot-cargo-agreement issue that USMX (USMX Br. 26-26) agrees the Board correctly resolved.

Contract.  Therefore, the carriers had the power to give that work to the bargaining-unit employees, effectively making them primary employers.

In its brief, USMX largely confines its arguments to the issue of carrier control.  However, most of USMX's arguments are infected by its misunderstanding and mischaracterization of the work in question as limited to the lift work at the Port of Charleston, or at the newly constructed Leatherman Terminal.  Thus, USMX's (incorrect) assertion that the Board ignored Article VII, Section 7, which does not concern the actual coastwide work in question, is irrelevant.  Likewise, USMX's assertion that the Board's analysis in the instant case is inconsistent with the *ICTSI* and *Hooks* decisions, and the Board's analysis in those cases, is fatally flawed given that those decisions turned on the work in question at a single port rather than coastwide work as here.

Finally, the Court is jurisdictionally barred from addressing USMX's belated factual arguments based on the judge's decision, which, in any event, are without merit.  It is undisputed that the carriers own or lease their containers, and their actions threatening to bypass the Port of Charleston established their power to change ports to perform the unloading and loading work on their containers.  Consistent with the Supreme Court's and this Court's precedent, the Board found that these facts establish the requisite right of control.

4

## ARGUMENT

**THE BOARD REASONABLY FOUND THAT USMX AND ITS CARRIER-MEMBERS ARE NOT NEUTRAL EMPLOYERS WITH RESPECT TO ILA'S LAWSUIT BECAUSE THEY CONTROL THE WORK IN QUESTION**

As shown in the Board's principal brief (Bd. Br. 23-55), the Board rationally determined in the Decision and Order on review that ILA's lawsuit did not run afoul of the Act's prohibitions of so-called "secondary" activity—that is, activity "directed tactically toward a neutral employer in a labor dispute not his own." *Nat'l Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 623 (1967). Specifically, the Board's principal brief demonstrated that ILA's lawsuit had a valid, primary objective to preserve work for the ILA bargaining unit under the two-prong test articulated by the Supreme Court in *NLRB v. International Longshoremen's Association*, 447 U.S. 490, 504 (1980) ("*ILA I*"). Applying that test, the Board reasonably concluded that (1) "[t]he lawsuit's objective was the preservation of work traditionally performed by employees represented by ILA," and (2) "USMX and its carrier members had the power to give the employees the work in question, and therefore are primary employers." (JA 1331.) And on appellate review "in this field . . . the Board's interpretation of the Act and . . . application of it in doubtful situations are entitled to great weight." *NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 691-692 (1981).

5

USMX's challenge to the Board's decision largely focuses on the Board's conclusion under the second prong of the work-preservation test, that USMX's carrier-members have sufficient control over the work in question to make them primary (and not secondary or "neutral") employers with respect to ILA's lawsuit.[2] Contrary to USMX's claims, and as shown below, the Board's conclusion as to carrier control over the work in question is reasonable and amply supported by the record.

A.  **The Work that ILA Seeks To Preserve Through Its Lawsuit Is the Container-Handling Work of the Coastwide Bargaining Unit, and USMX and Its Carrier-Members Control that Work**

Consistent with Supreme Court precedent, the Board began its analysis of the lawfulness of ILA's lawsuit by identifying the work that the lawsuit seeks to

---

[2] USMX briefly (USMX Br. 25) engages with the first prong of the work-preservation test (whether ILA sought to preserve work traditionally performed by bargaining-unit employees), by claiming that the Board misplaced reliance on *Bermuda Container Lines, Ltd. v. Longshoremen ILA*, 192 F.3d 250 (2d Cir. 1999), in its principal brief.  The Board cited that case (Bd. Br. 41) simply to establish that the Containerization Agreement here—which was the same as in *Bermuda*—"was designed to preserve the work of ILA employees in the coast-wide bargaining unit." 192 F.3d at 257.  USMX is correct that the court in *Bermuda* also found that ILA had suffered a "demonstrable loss of work" at the specific port at issue in that case, whereas the Board here made no similar finding.  But that minor incongruity does not undermine the Board's reliance on *Bermuda* for the proposition that the Containerization Agreement has a clear work-preservation purpose.  Nor does *Bermuda* set forth an absolute requirement that actual job loss is necessary to establish work preservation.  Here, of course, the Board found (JA 1333, discussed at Bd. Br. 48) that, to the extent a showing of loss is necessary, the well-recognized loss of jobs from containerization satisfied any such requirement.

preserve for the represented bargaining unit.  (D&O 2-3, 7; Bd. Br. 40.)  By its

terms, the lawsuit seeks to enforce Article I, Section 3 of the Master Contract, and

Sections 1, 2, and 9 of the Master Contract's Containerization Agreement.  (JA 6,

JA 1347.)  The referenced provisions, in turn, reflect the parties' understandings

with regard to the broad scope of the bargaining unit, the work that belongs to that

unit, and the prohibition on dissipating unit work by diverting it to non-unit

employees.  (JA 1347.)

Specifically, Article I, Section 3 establishes that the bargaining unit is

coastwide in scope, covering longshoremen "in all ports from Maine to Texas at

which ships of USMX carriers and carriers that are subscribers to this Master

Contract may call."  (JA 1326.)  Section 1 of the Containerization Agreement

recognizes that the work jurisdiction of the bargaining unit encompasses "all

container work which historically has been performed by longshoremen and all

other crafts at container waterfront facilities," including "the loading and

discharging of containers on and off ships."  (JA 1327.)  And Sections 2 and 9

prohibit USMX and its carrier-members from contracting out or subcontracting

"any of the work" within the bargaining unit's jurisdiction, with Section 9

additionally providing that the provisions of the Containerization Agreement are to

be "rigidly enforced," and that ILA can seek liquidated damages for any breach.

(JA 1327.)

7

By focusing its lawsuit on these specific provisions, ILA has placed in issue the contracting employers' (that is, USMX's and its carrier-members') compliance with the work-jurisdiction provisions of the Master Contract, which are coastwide in scope. The Board accordingly found (JA 1332), with ample basis in the record, that the work in question in the lawsuit is the coastwide container-handling work that USMX and its carrier-members deliberately contracted to protect in the Master Contract. (*See* USMX Br. at 6 (noting that USMX "stands behind the work-preservation provisions of the Master Contract").)

There is no question, and the Board readily found (JA 1332), that USMX and its carrier-members control the subject coastwide work. The carriers "own and lease their own containers," and they determine which ports to use for the loading and unloading of those containers. (JA 1328, JA 1332.) Thus, although SCSPA may determine which specific terminals the carriers may use at the Port of Charleston, and "who performs loading and unloading work at those terminals using state-owned lift equipment, USMX carriers have the authority to bypass the Port of Charleston and call on other ports where ILA-represented employees perform all loading and unloading work." (JA 1332.)

Put simply, by virtue of their significant power over the destination of their containers, USMX's carriers also have the power to control the flow of loading and unloading work to the coastwide bargaining unit—precisely as anticipated by the

parties' Master Contract.  (JA 1332 & n.20.)  *See NLRB v. Int'l Longshoremen's Ass'n*, 473 U.S. 61,74 n.12 (1985) ("*ILA II*") (observing that the employers had the "right to control" container loading and unloading work by virtue of their ownership or leasing of the shipping containers), *affirming American Trucking Ass'n v. NLRB*, 734 F.2d 966, 978 (4th Cir. 1984) (holding that the "argument that the shipping lines do not have the right to control the container work sought by the longshoremen lacks any semblance of merit").  Indeed, USMX would not, and arguably could not, have contracted in the first place to preserve container-handling work for employees in the coastwide bargaining unit if its carrier-members did not meaningfully control that work and possess the power to direct it to bargaining-unit employees.

### B.    USMX Has Provided No Basis To Disturb the Board's Reasonable Finding of Carrier Control Over the Coastwide Work of the Bargaining Unit

USMX's attempts to undermine the Board's right-of-control finding are unavailing.  As shown below, the Board's analysis does not conflict with Article VII, Section 7 of the Master Contract or the *ICTSI* decision, and its remaining claim about an unrelated finding by the administrative law judge is jurisdictionally barred and, in any event, meritless.

9

**1.  Article VII, Section 7 of the Master Contract is not relevant to the Board's right-of-control finding because it does not address the coastwide work in question**

USMX purports to counter the Board's control finding by asserting (USMX Br. 12) that Article VII, Section 7 of the Master Contract (discussed at Bd. Br. 9-10, 23-31) "reflects the parties' understanding that carrier-members do not have the right to control" work performed at hybrid ports.  Thus begins USMX's strawman:  that the Board incorrectly found that USMX controls the loading and unloading of containers (including lift work) *at the Port of Charleston*.  But the Board made no such finding.

Instead, as shown in the Board's principal brief, the Board followed the Supreme Court's instruction to "look beyond the locus of the dispute and consider traditional work patterns and industrial practices when analyzing [the union's] work preservation defense."  (Bd. Br. 45-46, JA 1332, JA 1332 n.18 (citing *ILA II*, 473 U.S. 61, 77 (1985)).  And the Board further heeded the Court's admonition that although "the place where work is to be done often lies at the heart of the controversy," it "is seldom relevant to the definition of the work itself."  *Id.* at 77.  Taking that approach, the Board concluded that "the work in question is loading and unloading generally at East and Gulf Coast ports," and that ILA-represented employees have traditionally done that work—including lift work—across the coastwide unit, even if they have not done so at the Port of Charleston.  (JA 1332.)

10

Accordingly, any language in Article VII, Section 7 discussing the work at the Port of Charleston or other individual ports is utterly irrelevant.[3]

There is likewise no merit to USMX's related assertion (USMX Br. 15) that the Board "ignored" evidence regarding Article VII, Section 7. As the very first page of the Board's Decision and Order (JA 1326) shows, the Board was keenly aware of Article VII, Section 7, and it carried forward that awareness in its analysis of the lawsuit. Thus, the Board specifically noted that the lawsuit "neither mentions Section 7(b) nor seeks to enjoin unrepresented state employees from performing the work or to have bargaining unit employees assigned the work in issue." (JA 1328.) In short, because Article VII, Section 7 is not implicated in the lawsuit, the Board rightly did not parse that provision in analyzing whether USMX's carrier-members control the coastwide loading and unloading work at issue in that lawsuit.

Nor was the Board obliged to infer that the carriers lack control over the coastwide loading and unloading work, as USMX suggests (Br. 16-18), based on the omission of any language in Article VII, Section 7 regarding the carriers' ability to bypass ports that use non-union longshore workers. To be sure, as

---

[3] In any event, USMX's assertion (USMX Br. 12, 15) that it has an "understanding" with ILA about the meaning of Article VII, Section 7 flies in the face of its argument elsewhere (USMX Br. 28), and the Board's amply supported finding (JA 1328, Bd. Br. 27-31), that USMX and ILA *disagreed* about the meaning of that provision.

11

USMX points out, Article VII, Section 7 does not indicate that the carriers can or should bypass the three named ports (including the Port of Charleston) that use a "hybrid" labor model involving such workers. But no negative inference can be drawn from that omission, given that ample other evidence, discussed below at p. 18-19, affirmatively establishes the carriers' power to determine which ports they call at, and to bypass individual ports in their discretion.

Finally, to the extent that USMX obliquely suggests (USMX Br. 13, 17) that Article VII, Section 7 somehow reflects an exception to the Master Contract's coastwide scope, it should be disregarded. As the Board found, there is no indication in the language of Article VII, Section 7 limiting the parties' intention "for a single, multi-port bargaining unit." (JA 1353, 1353 n.32).

### 2. *ICTSI* is not instructive on the right-of-control issue in the instant case

Picking up where SCSPA left off in its brief (SCSPA Br. 45-45, 49), USMX also insists that this case involves "the very same right-of-control theory" (USMX Br. 21-22) as in a work-jurisdiction dispute arising at a single port on the west coast. *See ILWU v. NLRB ("ICTSI")*, 705 F. App'x 1, 3 (D.C. Cir. 2017), *affirming* 363 NLRB 121 (2015); *Hooks ex rel. NLRB v. ILWU*, 544 F. App'x 657, 658 (9th Cir. 2013) (preliminary-injunction phase of *ICTSI*). However, as the Board argued in its principal brief (Bd. Br. 54-55), any attempted analogy to that port-specific dispute rests on a misunderstanding of the work in question in this

12

case.  As shown, the work in question here is coastwide, rather than port-specific as in *ICTSI* and *Hooks*, and therefore the case for carrier control is significantly different, and stronger, here.  Accordingly, the Board was not obliged, as USMX suggests, to analyze the issue of control exactly as in those earlier, distinguishable cases.  Moreover, as further shown below, if comparison to any case is helpful, the Supreme Court's analysis of carrier control in *ILA II* is far more apt than any analysis in *ICTSI* and *Hooks*.

> **a.     As the Board explained in its principal brief, *ICTSI* is distinguishable because it involved alleged carrier control over disputed work at a single port**

USMX is wrong (USMX Br. 20-25) that the Board's right-of-control finding in the instant case is inconsistent with the Board and D.C. Circuit decisions in *ICTSI*, and with the Ninth Circuit's decision in the related *Hooks* preliminary-injunction case.  As explained in the Board's principal brief (Bd. Br. 54-55), the work in question in those cases was plugging reefers (refrigerated containers) *at a single port* in Portland, Oregon.  Given the much narrower limits of the work in question in those cases, the Board and courts understandably did not consider the carriers' control over their containers and the destination of those containers suggestive of control over the specific reefer work performed at the Port of Portland.  And further distinguishing the situation in *ICTSI* and *Hooks* from the situation here, one of the unions (ILWU) fighting over the work there explicitly

13

sought, through grievances and other actions, to claim the reefer work at the Port of Portland.  In contrast, ILA's lawsuit does not seek to claim the lift work at the Leatherman Terminal for the bargaining-unit employees, but only to preserve the bargaining unit's existing work as outlined in the Master Contract.

Tellingly, USMX admits (Br. 23 n.3) that it "is not comparing the ILA's conduct in this case to the ILWU's conduct in the Portland case [*ICTSI* and *Hooks*]."  Nor could it make that comparison.  In *ICTSI* (and *Hooks*), port operator ICTSI controlled the actual reefer work at the Port of Portland, and the carriers' ability to bypass that port with their owned or leased containers, by itself, did not carry the day to establish the right of control over the work at the port.  *ICTSI*, 705 F. App'x at 3; *Hooks*, 544 F. App'x at 659.  By contrast, here, the USMX carriers' ability to bypass one port in favor of another is indicative of their broader right of control over the work in question, which—unlike in *ICTSI* and *Hooks*—spans all of the ports at which the carriers may call.  This case is therefore not inconsistent with *ICTSI* or *Hooks*; it simply involves different, and broader, work over which the carriers much more clearly have control as compared to individual port operators.[4]

---

[4] In light of USMX's admission that ILA has not engaged in conduct comparable to that of ILWU in *ICTSI*, USMX's assertion (USMX Br. 23) that the Board "ignored" evidence that ILA was trying to claim work at the Leatherman Terminal rings hollow.  In any event, as shown in the Board's principal brief (Bd. Br. 49-50

14

Moreover, given the obvious differences between the control issue in *ICTSI* and the control issue here, there is no merit to USMX's accusation (USMX Br. 21-25), that the Board and its counsel have been inconsistent (or have done an "about face," USMX Br. 25) in analyzing carrier control over port-specific work. There is no port-specific work in question here, and therefore no analogy to be drawn to *ICTSI*.[5]

### b. The more apt analogy is to the Supreme Court's decision in *ILA II*, affirming this Court's decision in *American Trucking*

Contrary to USMX's additional claim (USMX Br. 24-25), the Board's appellate brief in *ICTSI* belies, rather than supports, the proposition that the Board has inconsistently applied the Supreme Court's *ILA II* decision. As the Board's

---

n.10), the Board properly focused on the language of the lawsuit itself, not on comments made years and months before by union officials, in finding that ILA did not seek to acquire the lift work at the Leatherman Terminal through its lawsuit. USMX's related claim (USMX Br. 23 n.4) that the evidence does not support the Board's finding that the purpose of ILA's lawsuit is to enforce the Containerization Agreement simply ignores the language of both the lawsuit and the Containerization Agreement, which is the source of ILA's authority to seek damages in court. (JA 484 (Containerization Agreement), JA 272-273 (testimony discussing the Containerization Agreement.))

[5] Contrary to USMX's suggestion (USMX Br. 20-24), Board counsel is under no obligation to adhere to the position taken in an earlier Board brief involving significantly different operative facts. Nor did Board counsel engage in "post-hoc rationalization" (USMX Br. 22-23) by explaining, in response to SCSPA's mistaken reliance on *ICTSI* and *Hooks*, why those cases are distinguishable.

brief in *ICTSI* acknowledged (2016 WL 6248401, at *36), the Supreme Court in

*ILA II*, affirming this Court's decision in *American Trucking*, found that the

shipping carriers had the right to control container loading and unloading work by

virtue of their ownership or leasing of the shipping containers.  Here, as in *ILA II*,

the disputed work on the carriers' containers is at the heart of the compromise that

ILA made under the same coastwide Rules on Containers that were before the

Court in *ILA II*.  And as in *ILA II*, ILA-represented employees that used to work

directly for USMX prior to containerization also performed the work in question in

the coastwide bargaining unit after containerization.  (Bd. Br. 48-49, citing JA 269-

272.)

Accordingly, this case is far more analogous to *ILA II* than to *ICTSI*, which

involved the disputed work of "plugging and unplugging [] reefers on a dock" at a

single port, with no evidence that the union seeking the work had done such work

in the past.  *See* NLRB *ICTSI* Brief, 2016 WL 6248401, at *36-37.  Thus, the

bargain struck between USMX and its carriers in this case is akin to that struck in

*ILA II*, and the Board's treatment of the right-of-control issue in *ICTSI*, under

different facts, is not inconsistent.

16

**3.    USMX's remaining contention, that the Board ignored allegedly relevant factual findings by the judge, is not properly before the Court and, in any event, meritless**

USMX acknowledges in its brief (USMX Br. 15-16, 18-19) that carriers can "in theory" bypass the Port of Charleston.  Likewise, before the Board, USMX accepted as a "fact" (JA 1261) that "USMX's carrier-members have the ability to determine if they call or bypass the Port of Charleston."  However, USMX now belatedly argues (USMX Br. 18-19), without any case support, that this "theoretical" (USMX Br. 19) authority is insufficient to establish the right of control because, as a practical matter, the evidence does not show they actually do, or would, exercise their power to divert cargo to other ports from the Port of Charleston.  For this argument, USMX makes novel use of the judge's (inverse) finding (JA 1354) under the first prong of the work-preservation analysis, that ILA failed to establish that the opening of the Leatherman Terminal would result in diversion of cargo *from* ILA-controlled ports *to* the Port of Charleston.  USMX also claims (USMX Br. 19) that the Board "ignored" this purportedly relevant finding by the judge when assessing the issue of control under the second prong of the work-preservation analysis.

As an initial matter, USMX's new argument comes too late to be considered by this Court.  USMX excepted to the judge's finding that the carriers have the right to control who performs "the lift work" on their containers.  But in discussing

17

that argument in its exceptions brief, USMX did not make the specific argument it is making now: that the Board should infer from the judge's evidentiary findings about cargo diverted *to* the Port of Charleston that the carriers could not, or would not, divert cargo *from* the Port of Charleston to other ports. USMX's failure to make this specific argument before the Board precludes this Court from considering it now. *See* Section 10(e) of the Act, 29 U.S.C. § 160(e) ("([n]o objection that has not been urged before the Board. . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances"); *NLRB v. HQM of Bayside, LLC*, 518 F.3d 256, 262 (4th Cir. 2008) (generalized exception does not satisfy Section 10(e) because it fails to provide the Board with adequate notice of the argument the party seeks to advance on review). At the very least, if USMX believed that the Board's decision overlooked relevant findings in the judge's decision, it should have filed a motion for reconsideration to bring that issue to the Board's attention. *See Int'l Ladies' Garment Workers' Union v. Quality Mfg. Co.*, 420 U.S. 276, 281 n.3 (1975) (issue that could not have been raised on exceptions but could have been raised in a motion for reconsideration, barred). USMX has shown no "extraordinary circumstances" to excuse these failures.

In any event, the carriers indisputably own or lease their containers, and that fact alone sufficed in *ILA II* for the Supreme Court, affirming this Court, to hold

18

that they have the requisite right to control container loading and unloading work. *See* 473 U.S. at 74 n. 12; *American Trucking*, 734 F.2d at 978. USMX simply has not undermined the Board's application of these decisions to the facts here.

In addition, the Board reasonably found (JA 1332) that the carriers have "sufficient control over the work in question" by virtue of their *ability* to bypass a port. As noted above, USMX has admitted (JA 1261) that the carriers possess this ability, and as discussed in the Board's principal brief (Bd. Br. 16), two carriers specifically threatened to bypass the Port of Charleston if SCSPA President Newsome did not allow them to call at the Wando Terminal instead of the Leatherman Terminal. It is difficult to see how the carriers could have succeeded in these threats if they did not in fact have the power to change ports. *See also* ILA Int. Br. 47, citing JA 608-12, JA 635. Moreover, USMX's assertion that (Br. 15-16) the authority to bypass a port is insufficient to establish control simply cannot be squared with the Supreme Court's *ILA* decisions, which only require the power to control the work in question, and not its actual exercise. *ILA I*, 447 U.S. at 504-05; *ILA II*, 473 U.S. at 82. Accordingly, even if USMX's belated factual arguments based on the judge's decision were properly before the Court, which they are not, those arguments would fail, as the Board's findings (JA 1332) regarding control are amply supported by the record.

## CONCLUSION

The Board respectfully renews its request that this Court enter a judgment denying the petition for review.

/s/Milakshmi V. Rajapakse
MILAKSHMI V. RAJAPAKSE
   *Supervisory Attorney*

/s/Heather S. Beard
HEATHER S. BEARD
   *Senior Attorney*

National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-4231
(202) 273-1788

JENNIFER A. ABRUZZO
   *General Counsel*

PETER SUNG OHR
   *Deputy General Counsel*

RUTH E. BURDICK
   *Deputy Associate General Counsel*

DAVID HABENSTREIT
   *Assistant General Counsel*

National Labor Relations Board
May 2023

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

SOUTH CAROLINA STATE PORTS    )
AUTHORITY    )
    )
          **Petitioner**    )    **Case No. 23-1059**
    )
       **and**    )
    )
THE STATE OF SOUTH CAROLINA;    )
UNITED STATES MARITIME    )
ALLIANCE, LTD.    )
    )
    **Intervenors for Petitioner**    )
    )
    **v.**    )
    )
    )
NATIONAL LABOR RELATIONS BOARD    )
    )
         **Respondent**    )
    )
      **and**    )
    )
INTERNATIONAL LONGSHOREMEN'S    )
ASSOCIATION, INTERNATIONAL    )
LONGSHORMEN'S ASSOCIATION,    )
LOCAL 1422;    )
    )
   **Intervenors for Respondent**    )

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that its document contains 4,599 words of proportionally-spaced,

14-point type, and the word processing system used was Microsoft Word 2016.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 30th day of May 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

| | | |
|---|---|---|
| **SOUTH CAROLINA STATE PORTS AUTHORITY** | ) | |
| | ) | |
| **Petitioner** | ) | **Case No. 23-1059** |
| | ) | |
| **and** | ) | |
| | ) | |
| **THE STATE OF SOUTH CAROLINA; UNITED STATES MARITIME ALLIANCE, LTD.** | ) | |
| | ) | |
| **Intervenors for Petitioner** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **NATIONAL LABOR RELATIONS BOARD** | ) | |
| | ) | |
| **Respondent** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, INTERNATIONAL LONGSHORMEN'S ASSOCIATION, LOCAL 1422;** | ) | |
| | ) | |
| **Intervenors for Respondent** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on May 30, 2023, I electronically filed the foregoing

with the Clerk of the Court for the United States Court of Appeals for the Fourth

Circuit by using the appellate CM/ECF system.  I further certify that this document

was served on all parties or their counsel of record through the CM/ECF system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC  20570
(202) 273-2960

Dated at Washington, DC
this 30th day of May 2023