No. 23-1059

# United States Court of Appeals for the Fourth Circuit

SOUTH CAROLINA STATE PORTS AUTHORITY,

*Petitioner,*

*and*

THE STATE OF SOUTH CAROLINA; UNITED STATES MARITIME ALLIANCE, LTD.,

*Intervenors for Petitioner,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent,*

*and*

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL 1422; INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,

*Intervenors for Respondent.*

On Petition for Review of an Order of the
National Labor Relations Board

**SUPPLEMENTAL BRIEF OF INTERVENOR INTERNATIONAL LONGSHOREMEN'S ASSOCIATION IN RESPONSE TO BRIEF OF INTERVENOR UNITED STATES MARITIME ALLIANCE, LTD.**

John P. Sheridan
Daniel Wolff
Nicholas M. Graziano
MAZZOLA MARDON, P.C.
26 Broadway, 17th Floor
New York, NY 10004
(212) 425-3240
*Counsel for the International Longshoremen's Association*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................1

SUMMARY OF ARGUMENT ........................................................1

ARGUMENT ..................................................................................3

USMX'S CARRIER MEMBERS CONTROL THE WORK
PERFORMED ON THEIR CONTAINERS BY BRINGING THESE
CONTAINERS TO LOCATIONS OF THEIR CHOOSING ...............3

  A. The Board's Finding That the Carriers Had the Right of Control
     Over the Work in Question Was Based on Substantial Evidence ..................4

  B. Article 7, Section 7 of the Master Contract
     Shows the Carriers Control Their Containers ................................................10

  C. A Showing of a Threat is Not Required
     Before Engaging in Work Preservation .......................................................15

  D. The Sole Case Cited by USMX is Inapposite ...............................................21

  E. Prior Board and Court Decisions Discussing the
     Master Contract Bargaining Unit Have Held That
     USMX-Represented Carriers Are the Primary Employers
     Who Control The Work Performed on Their Containers .............................26

CONCLUSION ..............................................................................28

1003-547
133241

i

# TABLE OF AUTHORITIES

## Cases

*Allen v. Zurich Ins. Co.*, 667 F.2d 1162 (4th Cir. 1982) ...........................................9

*Am. President Lines*, 997 F. Supp. 2d 1037,
  *aff'd* 611 F. App'x 908 (9th Cir. 2015)...........................................................9, 25

*Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n*,
  192 F.3d 250 (2d Cir. 1999).................................................................. 13, 26, 27

*Cal. Cartage Co. v. NLRB*, 822 F.2d 1203 (D.C. Cir. 1987)..................................10

*Consolidated Aircraft Corp.*, 47 N.L.R.B. 694 (1943),
  enfd. 141 F.2d 785 (9th Cir. 1944) ......................................................................11

*Fibreboard Paper Prods Corp. v. NLRB*, 379 U.S. 203 (1964)..............................21

*Hooks v. ILWU*, 544 F. App'x 657 (9th Cir. 2013) .................................................22

*Hooks v. ILWU*, 905 F. Supp. 2d 1198, 1203 (D. Or. 2012), *aff'd in part, vacated in
  part, remanded sub nom. Hooks*, 544 F. App'x 657 (9th Cir. 2013)  .......... 22, 24

*ILWU & Port of Portland*, No. JD(SF)-36-13, 2013 WL 4587186 (Aug. 28, 2013)
  ............................................................................................................................23

*ILWU, Local 13 (Cal. Cartage)*, 278 N.L.R.B. 220 (1986) ...................................10

*Int'l Longshore Workers Union (ICTSI)*, 363 N.L.R.B. 121 (2015),
  enfd. 705 F. App'x 1 (D.C. Cir. 2017)............................................................ 22, 23

*Int'l Longshoremen's Ass'n v. NLRB*, 613 F.2d 890 (D.C. Cir. 1979) ...............8, 26

*Int'l Longshoremen's Ass'n, Local 1242 (Rail Distribution Ctr., Inc.)*,
  No. Case 4-CC-1955-1, 1992 WL 396134
  (N.L.R.B. Div. of Advice) (Nov. 9, 1992)............................................................10

*Metalcraft of Mayville, Inc.*, 367 N.L.R.B. No. 116 (2019) ............................ 11, 15

*NCR Corp.*, 271 N.L.R.B. 1212 (1984) ................................................................11

*NLRB v. Enter. Ass'n of Pipefitters Local 638*, 429 U.S. 507 (1977) ......................7

*NLRB v. Int'l Longshoremen's Ass'n*, 473 U.S. 61 (1985) ("*ILA II*")............. *passim*

*NLRB v. Int'l Longshoremen's Ass'n*, 447 U.S. 490 (1980) ("*ILA I*") ........... 4, 8, 27

*Painters & Allied Trades Dist. Council No. 51* (*Manganaro*),
    321 N.L.R.B. 158 (1996) ................................................................16

*Phelps Dodge Magnet Wire Corp.*, 346 N.L.R.B. 949 (2006) ...............................11

*Steamship Trade Ass'n of Baltimore (ILA Locals 333 & 953)*,
    1989 WL 1705876 (N.L.R.B. Div. of Advice 1989)..........................................10

*United Telephone Co. of the West*, 112 N.L.R.B. 779 (1955).................................11

**Statutes**

29 U.S.C. § 160(k) ...............................................................................................23

**Miscellaneous**

Brief for Appellees, *Bermuda Container Line Ltd. v. ILA*, No. 99-7164, 1999 WL
    33631034, at *17-18 (2d Cir. Apr. 26, 1999) .....................................................21

Brief of Respondents, *NLRB v. Int'l Longshoremen's Ass'n*, No. 79-1082, 1980
    WL 339332, at *36-40 (Apr. 5, 1980) ................................................................8

JOURNAL OF COMMERCE, *Charleston charts growth with focus on discretionary
    cargo* (Sept. 8, 2014) https://www.joc.com/article/charleston-charts-growth-
    focus-discretionary-cargo_20140908.html .........................................................18

JOURNAL OF COMMERCE, *Savannah doubles down on terminal expansion
    with $1.4 billion investment*, https://www.joc.com/article/savannah-
    doubles-down-terminal-expansion-14-billion-investment_20230509.html
    (May 9, 2023)......................................................................................................19

JOURNAL OF COMMERCE, *US ag exporters feel pinch of work shift cuts at West Coast terminals*, https://www.joc.com/article/us-ag-exporters-feel-pinch-work-shift-cuts-west-coast-terminals_20230328.html (Mar. 28, 2023)..............18

JOURNAL OF COMMERCE, *US SE ports prepping for more growth amid continued West Coast diversions*, https://www.joc.com/article/us-se-ports-prepping-more-growth-amid-continued-west-coast-diversions_20230306.html (Mar. 6, 2023) ..........................................................19

Post and Courier, *West Coast labor strife driving retail imports to Charleston*, https://www.postandcourier.com/business/west-coast-labor-strife-driving-retail-imports-to-charleston-other-east-coast-sites/article_7d5e80ea-509c-11ed-a124-536ae592fc56.html#newsletter-popup (Oct. 23, 2022)....................19

*SC Ports opens state-of-the-art Hugh K. Leatherman Terminal*, South Carolina Ports (Apr. 9, 2021), http://scspa.com/news/sc-ports-opens-state-of-the-art-hugh-k-leatherman-terminal/ .............................................................................18

## INTRODUCTION

For decades, United State Maritime Alliance, Ltd. (USMX) (and its predecessor organizations) and the ILA have negotiated and administered the Master Contact. After defending the Master Contract's work-preservation agreements twice before the United States Supreme Court, numerous times before various courts of appeals, and in countless administrative proceedings, USMX now flips it position by arguing that the Board erred when it ruled that USMX and its carrier members have the right of control over container cargo.

Despite what USMX says, the ILA has **never** argued that USMX controls the assignment of lift-equipment jobs at Leatherman Terminal. However, the Board affirmed the ALJ's finding—based upon record evidence—that USMX's carrier members do have control over where they bring their containers. The carriers bring their containers where they know work will be performed by the bargaining unit, and avoid the locations not staffed by the bargaining unit. That is how the Master Contract has worked for over half a century—as USMX is well aware. This Court should not entertain USMX's eleventh hour heel-turn.

## SUMMARY OF ARGUMENT

The no-subcontracting clause in the Master Contract has meant predictability in the industry. In 2021, when two USMX carrier members risked disrupting that stability by calling at a new terminal, and after USMX refused to arbitrate, the ILA

1003-547
133241

1

sued, asking the court to enforce the carriers' promise not to contract out Master Contract work.

USMX claims the Board erred because it "dodged the undisputed fact" that the SCSPA controls the assignment of lift-equipment jobs at Leatherman Terminal. USMX Br. 6. But the Board and the ALJ never found, nor did the ILA argue, that USMX has control over the assignment of jobs at Leatherman. Rather, the Board and ALJ agreed that the carriers have control over the loading and unloading of containers generally on a coastwide basis. JA1332; JA0948.

USMX now argues for the first time that Article 7, Section 7 of the Master Contract somehow changes the equation. But that section is irrelevant to the ILA's lawsuit, which relies on the no-subcontracting clause. Moreover, as the ALJ held, there is no evidence in the record that Article 7, Section 7, reflected the parties' intention to carve out Charleston from the multi-port bargaining unit. JA0948, fn 32.

Doubling down, USMX takes the fanciful position that the carriers' right to control their containers is not supported by the record in this proceeding. This argument is particularly dubious given that a number of carriers threatened to bypass Charleston altogether and SCSPA's president testified that Leatherman was built to entice USMX carriers to exercise their control to bring more cargo to Charleston.

Tellingly, USMX ignores the wealth of precedent—including a case from this Court—ruling unequivocally that the carriers control where they subcontract. USMX instead relies on an inapposite case involving another union's demand that two jobs be reassigned to its members at a specific location.

Perhaps realizing the frailty of these arguments, USMX also salts in its fallback position: that the ILA somehow waived its right to enforce the no-subcontracting clause in the Port of Charleston. But the Board correctly held that it was not the proper forum to resolve any contractual dispute between the bargaining parties. JA1333.

## ARGUMENT

### USMX'S CARRIER MEMBERS CONTROL THE WORK PERFORMED ON THEIR CONTAINERS BY BRINGING THESE CONTAINERS TO LOCATIONS OF THEIR CHOOSING

USMX's brief largely argues against the straw man that carriers cannot assign the lift-equipment job at Leatherman Terminal. But the ILA has never argued, nor did the Board find, that the carriers could. Rather, both the Board and ALJ found that the carriers do have control over the work performed on their containers coastwide. JA0948; JA1332.

Throughout this proceeding the ILA has maintained that carriers control the unloading and loading of containers by controlling where they send their

containers.  JA0510.  As the Supreme Court has explained, the relevant inquiry is whether:

> [T]he union's efforts are directed at its own employer on a topic affecting employees' wages, hours, or working conditions that the employer can control, or, instead, are directed at affecting the business relations of neutral employers and are "tactically calculated" to achieve union objectives outside the primary employer-employee relationship.

*NLRB v. Int'l Longshoremen's Ass'n*, 73 U.S. 61, 81 (1985) ("*ILA II*").  The carriers do have control over where they send their vessels.  The ILA's lawsuit requires the carriers to abide by their promise made in the Master Contract's no-subcontracting clause.

## A.    The Board's Finding That the Carriers Had the Right of Control Over the Work in Question Was Based on Substantial Evidence

Perplexingly, USMX argues that the Board's conclusion about the carriers' right of control is entitled to "no deference" because it conflicts with the findings of the ALJ.  But the ALJ **reached the same conclusion**.   To determine the carriers controlled the work performed on their containers, the Board simply had to adopt the ALJ's following finding of fact:

> [W]hile SCSPA controls the lift-equipment work at the Port of Charleston Terminals, the USMX carrier-members, like the carrier-members in *ILA I* and *II*, own or lease their containers, and, therefore, determine what ports they call on, which ultimately gives the carriers the right to control who performs the lift-equipment work on their containers.

JA0948.

Despite what USMX says, the ALJ specifically stated that his conclusion was "evidenced by those carrier-members that demanded SCSPA redirect their scheduled calls from the Leatherman Terminal to the Wando Terminal, as well as those carriers that threatened to bypass the Port of Charleston altogether if they were not redirected away from the Leatherman Terminal." JA0947; *see also* JA0611-12; JA0635-36. As the ALJ observed:

> Within two weeks of the ILA filing its lawsuit, five USMX carrier-members contacted SCSPA and demanded to change their scheduled calls from the Leatherman Terminal to the Wando Terminal, because they did not want to get enmeshed in the above lawsuit. SCSPA controls on what terminal the ships are assigned to call. Some of those carriers threatened to have their ships bypass the Port of Charleston altogether in favor of the Port of Savannah if they were not allowed to change terminals. SCSPA eventually granted their requests to change terminals and call on the Wando Terminal.

JA0938.

The record evidence likewise clearly demonstrated the carriers' control over which port they chose to call at within the ILA's coastwide unit, *e.g*., with carriers threatening not to call at Charleston if forced to berth at Leatherman. *E.g.*, JA0611-12 (COSCO Shipping Lines writes "[f]or the reasons set forth below, we request your confirmation. . . that the Vessel will be permitted to berth at the Wando Welch terminal, failing which COSCO will redirect the Vessel to call at the Port of

Savannah, Georgia and there discharge its cargo previously slated for Charleston.");

JA0123:8-17 (SCSPA president James Newsome testifying that CMA's CEO told

him that he "would rather spend a million dollar -- he would -- he would omit the

Port of Charleston and only call Savannah if we forced him to go to the Leatherman

Terminal . . . In other words, they would omit the Port of Charleston and spend $1

million to -- to move the cargo from Charle -- intended for Charleston from

Savannah if we forced them to come to the terminal.").

Further, USMX CEO Dave Adam testified that there were circumstances that

could require carriers to exercise their control by not calling at a facility:

> What it had to do was the potential of [] a third party
> coming in or the port expanding their [] workforce
> jurisdiction, displacing the ILA and [ ] and displacing the
> [] components of the bargaining unit. **And that may
> create a circumstance where a carrier could not call --
> one of our member companies -- carriers could not call
> that facility.** If [] a private equity company invested in the
> facility and [] automated the back land and was not a
> member of the USMX-ILA master contract, then **that may
> have triggered the language that talks about carriers
> not being able to call there**.

JA0201-02.   Likewise, USMX's former counsel Donato Caruso testified that the

Containerization Agreement could require the carriers to exercise their right of

control over the containers and refuse to call on specific terminals.  JA0314, ll. 19-

23 (Caruso acknowledging that the Containerization Agreement could be used by

the ILA to "prohibit the carriers from calling at a terminal that was not completely

manned by ILA Labor.").  And Newsome further testified that it was well understood that carriers **chose** to call on Charleston over other ports because of the port's competitive business model.  JA0076, ll. 14-18 ("And then I told him I was very sure that--that knowing them or any ocean carrier with my ocean carrier background, that I was sure that they wouldn't use a terminal where they had to pay more if the cost structure was higher and it cost them more to do that.").

As explained in the principal ILA's brief, the point of the "right-to-control" test is whether the targeted employers have the power to accede to the union's demands.  *NLRB v. Enter. Ass'n of Pipefitters Local 638*, 429 U.S. 507, 521 (1977) ("*Pipefitters*") (the issue is whether the employer "did have the power to settle the dispute with the union").  USMX cannot seriously argue that its carriers are unable to accede to the ILA's demand here because the carriers **have** acceded by not calling at Leatherman Terminal.  *E.g.*, JA0611-12; JA0635-36.

In *ILA I*, the D.C. Circuit explained exactly why the carriers control the work:

> [The] shippers[,] the employers of the boycotting ILA members in these cases and the coerced employers under *Pipefitters*[,] controlled the disposition of all the containers at issue . . . Thus when the relevant Container Committees found the shippers in violation of the Rules and fined them, the shippers, after unsuccessfully seeking indemnification from the truckers and consolidators, simply refused to supply their containers to the truckers and consolidators . . . It is difficult to imagine a more forceful demonstration of control.

*Int'l Longshoremen's Ass'n v. NLRB*, 613 F.2d 890, 912–13 (D.C. Cir. 1979). The carriers have discretion with whom they subcontract, they can dictate specifications to the subcontractors, and if the subcontractors cannot or will not agree, the carriers can look elsewhere to bring their cargo.

In *ILA I*, on appeal to the Supreme Court, USMX's predecessor Council of North Atlantic Shipping Associations (CONASA) argued as follows:

> In all of the Board decisions addressing the Rules, there is not the slightest trace of a doubt that the right of control resided in the longshoremen's employers. The court below simply underscored expressly what the Board had found implicitly. The Board now seeks to rewrite its decisions in this case by retrospectively inserting a right of control analysis. The Board's analysis, however, is fundamentally faulty. It is premised upon the astonishing contention that "[c]ontrol over the disposition of containers is not tantamount to control over the work in controversy."
> . . .
>
> The carriers have the obligation to accept cargo for transport. However, they also have the right to control the use of their property and the performance of their services "in a manner and to the extent compatible with their labor agreements and with both the carriers' and the union's rights and duties under federal labor law." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 177 (1962) (concurring opinion).

Brief of Respondents, *NLRB v. Int'l Longshoremen's Ass'n*, No. 79-1082, 1980 WL 339332, at *36-40 (Apr. 5, 1980).[1]

---

[1] USMX's legal argument in this situation is so completely contrary to its prior position – or the position of its direct predecessor – that this Court should consider

Likewise, in *Am. Trucking*, as affirmed by the Supreme Court, this Court observed:

> Up until the Court decided *ILA*, no one seriously contended that the Rules violated the Act for failure to meet the 'right of control' test of *Pipefitters* . . . the argument that the shipping lines do not have the right to control the container work sought by the longshoremen lacks any semblance of merit . . . In sum, the Board had little difficulty finding that the shipping lines retain the right to control the allocation of the work sought by the ILA under the Rules. Substantial evidence exists to support this finding.

734 F.2d at 978.

And in *ILA II*, on the petition for certiorari consolidating *Am. Trucking* and a number of other Circuit Court decisions, the Supreme Court again found that the carriers have the right to control the containers that they lease or own:

> In this case, the ALJ, Board, and Court of Appeals have unanimously concluded that the longshoremen's employers, marine shipping companies, have the "right to control" container loading and unloading work by virtue of their ownership or leasing control of the containers.

*ILA II*, 473 U.S. at 74, n. 12.[2]

---

invoking judicial estoppel. *See Allen v. Zurich Ins. Co.*, 667 F.2d 1162 (4th Cir. 1982) (party who asserts position that is inconsistent with position taken in prior proceeding may be estopped from arguing that position).

[2] See the argument spelled out more fully in the ILA's principal brief. ILA br. p. 45-46; citing *Am. President Lines Ltd. v. Int'l Longshore & Warehouse Union*, 997 F. Supp. 2d 1037, 1046-47 (D. Alaska 2014), *aff'd* 611 F. App'x 908 (9th Cir. 2015) (Carriers "control[] where [the carriers'] containers go, when they go, where they

Similarly, USMX's attempts to mischaracterize the work in dispute as the crane work in Charleston, USMX Br. 16, ignores this line of cases that USMX or its predecessor was a party to, and which clearly recognize that in the longshore industry, containers (and other sorts of cargo) **are** the work. This is why the ILA cannot be seeking "the work" at Leatherman Terminal, because "work" at any one marine terminal is contingent on cargo being brought there.

**B.    Article 7, Section 7 of the Master Contract Shows the Carriers Control Their Containers**

Perhaps realizing that the record before the Board **does** support its finding that the carriers can control where their containers go, USMX pivots to a contractual interpretation argument concerning Article 7, Section 7, of the Master Contract.

Neither the ALJ nor the Board attempted to resolve any contractual dispute between the parties—while acknowledging that such a dispute did exist.   JA0943 (unequivocally holding that the record established disagreement over the meaning

---

go, when they get there, and who takes them."); *ILWU, Local 13 (Cal. Cartage)*, 278 N.L.R.B. 220, 223 (1986) ("The containers are owned or leased by the steamship companies. Those companies control the use of the containers."), *enf'd in part*, 822 F.2d 1203 (D.C. Cir. 1987); *Int'l Longshoremen's Ass'n, Local 1242 (Rail Distribution Ctr., Inc.)*, No. Case 4-CC-1955-1, 1992 WL 396134, at *3 (N.L.R.B. Div. of Advice) (Nov. 9, 1992) (carriers' ownership or long-term lease of containers suggests that carriers have the authority to designate the routing and direction of their containers); *Steamship Trade Ass'n of Baltimore (ILA Locals 333 & 953)*, 1989 WL 1705876 (N.L.R.B. Div. of Advice 1989) (same).

of the provisions); JA1328.[3]  This makes sense, because "[w]here . . . the dispute is solely one of contract interpretation . . ., [the Board] will not seek to determine which of two equally plausible contract interpretations is correct." *Phelps Dodge Magnet Wire Corp.*, 346 N.L.R.B. 949, 951 (2006) (quotation omitted); *NCR Corp.*, 271 N.L.R.B. 1212, 1213 (1984).  Rather, "[a]s the Board has held for many years, with the approval of the courts: '. . . it will not effectuate the statutory policy . . . for the Board to assume the role of policing collective contracts between employers and labor organizations by attempting to decide whether disputes as to the meaning and administration of such contracts constitute unfair labor practices under the Act.'" *United Telephone Co. of the West,* 112 N.L.R.B. 779, 781 (1955) (quoting *Consolidated Aircraft Corp.*, 47 N.L.R.B. 694, 706 (1943), *enfd.* 141 F.2d 785 (9th Cir. 1944)).  Instead, "the parties' recourse is to attempt to settle the question by negotiation and, if there is no settlement, by seeking **judicial enforcement** of their interpretation of the contract." *Metalcraft of Mayville, Inc.*, 367 N.L.R.B. No. 116, slip. op. at *4 (2019) (emphasis added).  Thus, contractual interpretation is not before this court.  JA1332, n. 17 ("We do not purport to interpret the contract or to

---

[3] It is also curious that USMX would read additional purpose into Article 7, Section 7 of the Master Contract regarding carrier control when USMX's brief acknowledges that there is **no** agreement between the parties on what Article 7, Section 7 means.  USMX Br. 31.

decide or predict the outcome of ILA's lawsuit.  A judge or jury will have to do that.").

Besides, the ILA's lawsuit does not once reference Article 7, Section 7, instead it relies on the valid no-contracting clause in the Containerization Agreement. Moreover, USMX's argument that Article 7, Section 7 reflects the parties' understanding that USMX and its carriers could not control the work performed in the Port of Charleston is pure obfuscation.  To follow the argument, this Court would first have to supplant the loading and unloading work performed on the carriers' cargo with the lift equipment work at Leatherman.  USMX Br. 12-13.  This Court would then have to ignore USMX's former counsel Donato Caruso's testimony, which explicitly acknowledges that Article 7, Section 7 has nothing to do with carrier control over their containers:

> Q: . . . [If] the ILA were to attempt to apply article 7, section 7 to prohibit carriers from calling [at Leatherman Terminal], that your concern is that that would be an 8(e) violation?
>
> A: It would -- it would not be second -- section 7 because that -- section 7 really doesn't have any of the provisions that relate to jurisdiction. They -- **they really are containing in other provisions of the contract**. So if there were to be an attempt by the Union, the Union would probably rely on those other provisions.

JA0321, ll. 1-10.

> Q: Understood, and section 7(b) of article 7 is the provision in the master contract that contemplates the

potential application, at least from the ILA's point of view, of claiming jurisdiction over work that has historically been -- been performed by state ports authorities; is that correct?

A: I'm not sure it's -- I -- I think 7 -- in my opinion, 7(b) was just a provision that allowed USMX to go forth to the state authorities and at least inform them of the -- of the possibility that the Union might raise a -- you know, an issue **with respect to the contract, not with respect the 7(b), but with respect to the provisions in the containerization agreement and the jurisdiction provisions that were utilized**, as I said, in one case, that is *Bermuda Container Line*, to prohibit a carrier member of -- of USMX from going to port that did not have ILA labor operating in that port.

JA0322-23 (emphasis).

Thus, while completely undermining USMX's argument on the provision's meaning in terms of carrier control, Caruso also expressly acknowledged that the ILA **could** rely on the no-subcontracting clause of the Containerization Agreement, as it had in *Bermuda Container Line Ltd v. Int'l Longshoremen's Ass'n*, to demand that a carrier cease contracting the ILA's work from its bargaining unit. 192 F.3d 250, 256-57 (2d Cir. 1999). Again, it is worth repeating that the ILA's position was **supported** by management in *Bermuda Container*. And since that case, signatory carriers have exercised their control by refraining from calling at the Port of Salem, New Jersey, as well as various other non-bargaining-unit terminals coastwide.

USMX's reliance on Article 7, Section 7(b), is undermined further by the language included in that provision of the Master Contract:

1003-547
133241                                              13

> USMX agrees to formally notify any port authority
> contemplating the development of or intending to develop
> a new container handling facility that USMX members
> **may be prohibited** from using that new facility if the
> work at that facility is not performed by Master Contract
> bargaining-unit employees.

JA0449.

Article 7, Section 7(b), is virtually an acknowledgement that the carriers **do**
control the work performed on their containers through the phrase "may be
prohibited." *Id.* If USMX's carriers cannot control the ports that their carriers travel
to, how could the carriers ever be prohibited from using a newly opened facility as
contemplated by Section 7(b)? Indeed, if the carriers have no control over where
they subcontract the unloading of their containers, then why did they ever agree to
the no-subcontracting clause in the first place?

Grasping at straws, USMX argues that the testimony of USMX CEO Adam
shows that the ILA has waived its jurisdiction in the Port of Charleston. USMX Br.
14-15. This argument, raised by SCSPA below, was squarely rejected by the ALJ:

> [T]he Containerization Agreement requires that covered
> carriers and their agents employ ILA-bargaining unit
> members to perform all container work when they call on
> ports on the East and Gulf Coast, and it prohibits them
> from contracting out that work to non-ILA unit employees.
> However, for nearly 50 years, these provisions have not
> been applied or enforced against covered carriers that call
> on the Port of Charleston, where the container work is
> divided between ILA unit and non-ILA unit employees. .
> . . As stated, the origin and rationale for this it is not clear
> from the record, but there is no indication the parties

> intended to carve out, individually or collectively, these
> three South Atlantic ports from the multi-port bargaining
> unit."

JA0948 n. 32.

Despite allowing some violations of the no-subcontracting provision at older terminals in the South Atlantic and then agreeing to "red-circle" those terminals, the ILA never waived its right to enforce the no-contracting provision when carriers demonstrated their intent to begin subcontracting bargaining-unit work at a completely **new** location.

The new facility in Charleston forced the ILA to draw a line in the sand to make clear that it would not acquiesce to any further encroachments on Master Contract bargaining-unit work.  Thus, the ILA filed its lawsuit with the lawful primary object of enforcing its contract against the carriers who promised not to subcontract bargaining-unit work to entities that did not employ members of the Master Contract's coastwide unit.  *Metalcraft of Mayville, Inc.*, 367 N.L.R.B. slip. op. at *4  (judicial enforcement of contract clause is proper when negotiations fail).

## C.    A Showing of a Threat is Not Required Before Engaging in Work Preservation

Continuing on its voyage to confuse this Court, USMX spends much of its brief arguing that it has no obligation[4] to bypass the Port of Charleston because

---

[4] The "obligation" to bypass Charleston altogether is completely hypothetical.  The ILA has never maintained that the carriers must bypass the older terminals in

neither the ILA nor the Board have demonstrated an actual threat to bargaining unit

work through the opening of Leatherman Terminal.  USMX Br. 18-19.

This argument has **nothing** to do with whether USMX has control over its

containers, and besides, it was considered and rejected by the Board.[5]  As the Board

explained:

> Here, as in the ILA cases, ILA is seeking to preserve the
> traditional work and the jobs of unit employees in the face
> of the technological advances affecting the coastal units,
> including such changes as at the new Leatherman
> Terminal. That ILA seeks to stop expansion of the hybrid
> work model is merely one facet of preserving work for the
> employees it represents. ILA, USMX, and USMX carrier
> members are parties to the contract and any one of them
> may seek to enforce it to reap the benefit of that party's
> perceived bargain.

---

Charleston—as USMX acknowledges in its brief.  USMX Br. 3, fn 3.  Nor does this
hypothetical have any bearing on whether the carriers **could** bypass a port, which
Dave Adam acknowledges the ILA could if its bargaining unit work is being
displaced.  JA0201-02.

[5] The ALJ had relied on *Painters & Allied Trades Dist. Council No. 51* (*Manganaro*),
321 N.L.R.B. 158 (1996) to improperly place the burden on the ILA to make an
evidentiary showing of a specific looming threat before it can lawfully enforce a
work-preservation clause.  JA0948.  *Manganaro* does not hold that a threat to unit
jobs is a "condition precedent."  Rather, in *Manganaro* the Board held that "the
evidence fails to demonstrate that [the employer's] operations posed a threat to
preservation of bargaining unit work," but regardless the union had a lawful primary
objective because, "viewed from the standpoint of the Union's intent in the context
of the multiemployer bargaining unit, . . .  the Union had reason to believe that
double-breasted operations by other signatory employers caused or threatened loss
of unit work." *Id.* at 166.  Thus, the Board did not require a specific evidentiary
showing that the threat was looming or imminent. *Id.*  Rather, the mere possibility
of a threat of lost work was sufficient. *Id.*

JA1332.

Both the ALJ and the USMX state that the ILA can only point to a "supposition" that cargo will be diverted to the new terminal, but the record shows that this supposition was a prudent conclusion based on evidence. JA0053, ll. 1-4; JA0072, ll. 17-19; JA0073, ll. 12-17; JA0074, ll. 8-9; JA0092, ll. 17-25; JA0093, ll. 1-2 (James Newsome, III testifying that increased amounts of discretionary cargo will be handled by non-unit employees since using bargaining-unit employees is "more expensive" than hiring non-bargaining-unit employees); JA0084, ll. 14-25; JA0153-54 (Newsome testifying that the Port handles cargo that is destined for out-of-state locations); JA0581. USMX also conveniently ignores Newsome's testimony that Charleston was trying to capture new discretionary cargo:

> I -- I can say with certainty that we invest a billion dollar in new facilities to assimilate growth. We have the good fortune of being the fastest growing port in percentage terms since 2010 -- about twice the U.S. port market, so yes, we're growth oriented, and we open new terminals to -- to assimilate growth. And that's international cargo; we don't do domestic cargo here, so.

JA0154, ll. 17-23; *see also* JA0053, ll. 1-3 (Newsome testifying that SCSPA "is given a statutory mission to foster the growth of waterborne commerce in South [Carolina]"); JA0072, ll. 17-25 (Newsome testifying that COSCO shipping lines felt Leatherman could support its "growth aspirations"); JA0074, ll. 6-9 (Newsome testifying that carriers recognized the significant investments in infrastructure made

by SCSPA); JA0084, ll. 19-25; JA0581, ll. 16-19 (Senator Hugh K. Leatherman stating "I've fought tooth and toenail to keep Savannah from continuing to grow, trying to attract away our carriers and trying to grow. . ."). Indeed, as Newsome has also said publicly, "**Discretionary cargo — that's where the growth is.**" JOURNAL OF COMMERCE, *Charleston charts growth with focus on discretionary cargo* (Sept. 8, 2014) https://www.joc.com/article/charleston-charts-growth-focus-discretionary-cargo_20140908.html (emphasis added).

The public record is also replete with evidence that discretionary cargo from Asia is being attracted to the East and Gulf Coast from the West Coast.[6] JOURNAL OF COMMERCE, *US ag exporters feel pinch of work shift cuts at West Coast terminals*, https://www.joc.com/article/us-ag-exporters-feel-pinch-work-shift-cuts-west-coast-terminals_20230328.html (Mar. 28, 2023) ("[R]etailers, concerned about the lack of progress in contract negotiations between the ILWU and the Pacific Maritime Association (PMA), shifted a large volume of their discretionary cargo to ports along the East and Gulf coasts."); JOURNAL OF COMMERCE, *US SE*

---

[6] The public record also has ample evidence that SCSPA intends to capitalize on this opportunity. *E.g.*, *SC Ports opens state-of-the-art Hugh K. Leatherman Terminal*, South Carolina Ports (Apr. 9, 2021), http://scspa.com/news/sc-ports-opens-state-of-the-art-hugh-k-leatherman-terminal/ ("We have invested in the right infrastructure at the right time to handle growing cargo volumes and bigger ships, ensuring SC Ports remains a top 10 U.S. container port. The Leatherman Terminal adds a berth and more capacity to the Port of Charleston when it is most needed on the East Coast," says James Newsome, CEO and President of the Ports Authority.).

*ports prepping for more growth amid continued West Coast diversions*,
https://www.joc.com/article/us-se-ports-prepping-more-growth-amid-continued-
west-coast-diversions_20230306.html (Mar. 6, 2023) (SCSPA's Chief Financial
Officer crediting Port of Charleston as key role player in handling discretionary
cargo from Asia and the West Coast); POST AND COURIER, *West Coast labor strife
driving          retail          imports          to          Charleston*,
https://www.postandcourier.com/business/west-coast-labor-strife-driving-retail-
imports-to-charleston-other-east-coast-sites/article_7d5e80ea-509c-11ed-a124-
536ae592fc56.html#newsletter-popup (Oct. 23, 2022) ("Retailers are getting weary
of repeated labor problems at West Coast ports, and the protracted contract
negotiations there is triggering a cargo move to the Port of Charleston and other
East Coast locations, executives said at last week's S.C. International Trade
Conference."). The Chamber of Commerce also noted in its amicus brief that labor
unrest has driven carriers to divert cargo from the West Coast to the East Coast.[7]
CCB Br. 21. If discretionary cargo can be attracted from one coast of the United
States to the other, it can be attracted from one port to another on the East Coast.[8]

---

[7] This also proves the reality of the carriers' right of control over container-handling
work—that the carriers have chosen to divert cargo from the West Coast due to labor
unrest demonstrates their control over the ports on which they call.

[8] The public record also shows that the other ports operating the hybrid model are
eager to follow Charleston's lead in expanding the hybrid model. Journal of
Commerce, *Savannah doubles down on terminal expansion with $1.4 billion*

USMX also makes the confounding claim that the Board failed to contend with the ALJ's analysis of *Bermuda Container* on the carriers' right of control, calling it "yet another unexplained mystery of its decision." But this is just yet **another** false premise. The ALJ found that the carriers' **have** the right of control over the work performed on their containers. In fact, nothing in the ALJ's decision resembles anything close to saying that *Bermuda Container* undermines the carriers' right of control over the work performed on their containers. Instead, the ALJ relied on "the contractual similarities with *Bermuda Container*" to find that within the ILA's coastwide unit, the USMX carrier-members "determine what ports they call on, which ultimately gives the carriers the right to control who performs the lift-equipment work on their containers." JA0948.

USMX's position is even more astonishing given that one of its members, the New York Shipping Association, Inc. (NYSA) once argued as follows in a joint amicus brief with the ILA:

> BCL's denial of its status as an employer of the longshore workers servicing its vessels runs afoul of the prevailing labor law rule that in the longshore industry carriers by virtue of their membership in multiemployer associations that determine the terms and conditions of longshore employment are the employers of the longshore workers who service their vessels. This principle recognizes that it is the carriers' ships which provide the work and

---

*investment*, https://www.joc.com/article/savannah-doubles-down-terminal-expansion-14-billion-investment_20230509.html (May 9, 2023) (discussing Savannah's plans to expand capacity).

> workplace for longshoremen, that it is the carriers who bear the cost of longshore labor and pay directly the longshoremen's compensation, including fringe benefit contributions and a portion of their direct remuneration, and that it is the carriers who have control over the assignment and preservation of longshore work. It is on the strength of this principle that carrier members of NYSA and other multiemployer associations in the longshore industry are certified by the NLRB as longshore employers.

Brief for Appellees, *Bermuda Container Line Ltd. v. ILA*, No. 99-7164, 1999 WL 33631034, at *17-18 (2d Cir. Apr. 26, 1999).

NYSA further argued:

> Moreover, the carriers--to the exclusion of all other entities in the industry--control the use of vessels and containers. They thus have absolute control over the assignment and preservation of longshore work--an essential "term or condition of employment." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203 (1964).

*Id.* at *26.

## D.    The Sole Case Cited by USMX is Inapposite

Like SCSPA, USMX ignores altogether this Court's decision in *Am. Trucking Ass'n v. NLRB*. 734 F.2d 966 (1984).  In *Am. Trucking*, affirmed in pertinent part by *ILA II*, this Court harshly criticized any challenge to the carriers' "right-to-control" as "lack[ing] any semblance of merit" due to the carriers' container ownership.  *Id.* at 978.

Turning a blind eye to binding precedent in which USMX or its corporate predecessors frequently helped develop—USMX instead fixates on the Board's distinguishable decision in the *ICTSI* case. *See Int'l Longshore Workers Union (ICTSI)*, 363 N.L.R.B. 121 (2015), *enf'd.* 705 F. App'x 1 (D.C. Cir. 2017); and *Hooks v. ILWU*, 544 F. App'x 657 (9th Cir. 2013). But *ICTSI* has no bearing here because it did not concern the carriers' right to decide where their containers should go, but rather whether the carriers had the right to assign the jobs at a specific terminal.[9]

In *ICTSI*, a dispute arose concerning two jobs which involved the plugging, unplugging, and monitoring of refrigerated shipping containers, known as reefer work, at Terminal 6 in the Port of Portland. *Hooks v. ILWU*, 905 F. Supp. 2d 1198, 1203 (D. Or. 2012), *aff'd in part, vacated in part, remanded sub nom. Hooks*, 544 F. App'x 657 (9th Cir. 2013). The reefer work had been performed at Terminal 6 by IBEW-represented electricians pursuant to an agreement between the IBEW and the Port of Portland, which was incorporated in a lease agreement between ICTSI and the Port of Portland allowing ICTSI to operate Terminal 6. *Id.* After ICTSI

---

[9] USMX quotes an analogy from the Board's brief implying that carriers are not the bargaining unit's employers, but rather analogous to customers of an auto-shop. USMX Br. 21. That USMX would espouse such an analogy is offensive and ludicrous given that the carriers have been acting as the longshoremen's employers, and bargaining with their employees' representative, for over a century.

took over operations at the terminal, the ILWU took numerous steps, including filing grievances and engaging in work stoppages and slowdowns, in order to pressure ICTSI to reassign the reefer jobs at Terminal 6 to ILWU-represented employees.[10]   The Board concluded that these actions constituted unfair labor practices because the Port of Portland retained the right of control over the reefer work in dispute as the lease between the Port of Portland and ICTSI stated a contractual obligation to assign the work to the IBEW electricians.  *Int'l Longshore & Warehouse Union (ICTSI, Inc.)*, 363 N.L.R.B. No. 12 (2015).

At each stage in the *ICTSI* case, the work in dispute was appropriately defined narrowly to only include the site-specific reefer work at Terminal 6.  *E.g.*, *ILWU & Port of Portland*, No. JD(SF)-36-13, 2013 WL 4587186 (Aug. 28, 2013) (NLRB Regional Director defining the work is dispute in his 10(k) hearing notice as the "plugging, unplugging, and monitoring of refrigerated cargo containers for ICTSI, Inc., at Terminal 6 of the Port of Portland, Portland, Oregon").  Thus, in *ICTSI*, as

---

[10]  Unlike *ICTSI*, there have been no slowdowns by the ILA at any terminal in Charleston—including Leatherman.  And the ILA's lawsuit does not demand that USMX or its carrier-members reassign jobs that the carrier-members have no control over.  Conversely, in *ICTSI* the ILWU was not asking that the carriers refrain from calling at ICTSI's terminal but demanding reassignment of the reefer work.  The ILA's lawsuit is targeted at USMX-member carriers who have the right to control where their containers go, asking only that USMX and its carrier members keep their no-subcontracting promise.  Even USMX concedes that it cannot compar[e] the ILA's conduct in this case to the ILWU's conduct in the Portland case."  USMX Br 21, fn 3.

here, the carriers do not have control over job assignments once the container is on the terminal. But that does not mean they do not control the vessels that brought the containers to the terminal in the first place.[11]

The carriers in *ICTSI* also understood the nature of the ILWU's demand to be reassignment of the reefer jobs, as the carriers sent numerous emails to the Port and ICTSI demanding that they use ILWU members to perform the reefer work at Terminal 6. *Hooks*, 905 F. Supp. 2d at 1212. The ILWU's demand was clear to the carriers and the carriers reacted to the pressure they felt from the ILWU to seek the jobs at Terminal 6 on the ILWU's behalf. *See id.*

In contrast, in response the ILA's lawsuit, the USMX carrier members never made any demand that the ILA-represented employees perform the lift-equipment work at Leatherman (or elsewhere in Charleston). Rather, the carriers demanded that the Port reassign their vessels to Wando Welch Terminal and away from Leatherman. JA0611-12. And in doing so, the carriers demonstrated their right of

---

[11] USMX's argument that the Board's conclusion on the right of control issue is entitled to no deference because it is inconsistent with the Board's position in *ICTSI* falls apart on itself. USMX explains that the Board in *ICTSI* took a different approach than it had in *ILA II* because the Board's decision in that case "refers to factual conclusions involving a different type of work based upon a specific evidentiary record in the case before it." USMX Br. 24. The Board engaged in the very same reasoning here, and it makes sense for the Board to apply a reasoning consistent with *ILA II* in the present case because *ILA II* and this proceeding **involve the same bargaining unit**. *ICTSI* does not.

control by threatening to bypass Charleston altogether if their request for a terminal reassignment was not met. *See id.*

In its mistaken reliance on *ICTSI*, USMX highlights a crucial distinction missing here: the ILA does not seek the reassignment of the lift-equipment work at Leatherman Terminal, any more than it sought reassignment of jobs at the Port of Salem in the *Bermuda Container* case. As the Board and the ALJ both found, the work in dispute in this case has always been the lift-equipment work performed on containers generally coastwide. JA1332; JA0948. In such circumstances, Supreme Court and this Court's precedent dictate that the ILA carriers possess the right of control over the container-handling work in dispute. *ILA II*, 473 U.S. at 74; *Am. Trucking Assn.*, 734 F.2d at 966-977. Moreover, USMX also ignores subsequent decisions that find the ILWU carriers also have the right of control over container work. In *APL v. ILWU*, the Ninth Circuit applied *ILA II* to hold that a union carrier has the "right of control" over container-handling work because its ownership of the containers gives it control over their disposition and terms of their release to others. 611 F. App'x 908, 911 (9th Cir. 2015) (the carrier "control[s] where [its] containers go, when they go, how many go, where they go when they get there, and who takes them there").

**E.    Prior Board and Court Decisions Discussing the
Master Contract Bargaining Unit Have Held That
USMX-Represented Carriers Are the Primary Employers
Who Control The Work Performed on Their Containers**

USMX's argument in this proceeding that it does not control its containers is

so egregious because USMX has repeatedly argued that its carriers do control the

work performed on their containers in the past.  *See Bermuda Container Line Ltd.,*

192 F.3d at 256-57 ("The Containerization Agreement was designed to preserve the

work of ILA employees in the coast-wide bargaining unit and was directed at [the

primary employment relationship] by virtue of [the carriers] status in the multi-

employer bargaining association); *see also*, *supra*, pp. 8, 20.[12]

By nature of the USMX-ILA Master Contract, USMX and its carriers are the

primary employers of the Master Contract's coastwide bargaining unit who

---

[12] USMX's overarching argument in its brief that the Board's conclusion is
inconsistent with the Board's prior decisions is also belied by the other occasions in
which the Board considered whether USMX and its carriers have control over the
work performed by the Master Contract bargaining unit.  *Int'l Longshoremen's Ass'n
(Greenwich Terminals)*, 04-CC-123452, 42 N.L.R.B. AMR 7, at \*5 (N.L.R.B. Div.
of Advice 2014) ("[B]y virtue of owning or leasing the containers, the Carriers can
ensure that ILA-represented employees perform the disputed work because "the
contractual assignment to the ILA operates as a prior restraint upon shippers,
importers, or their agents who would choose to utilize containers owned or leased
by the steamship companies in violation of the latter's obligation to deep sea ILA
labor.") (citation omitted); *ILA & its Local 1291 (Holt Cargo)*, 4-CC-2124-1, 1996
WL 625508, at \*3 (N.L.R.B. Div. of Advice 1996) (Holding that "'[i]t is difficult to
imagine a more forceful demonstration of control'" than the control the carriers can
exercise over their containers) (quoting *Int'l Longshoremen's Ass'n v. NLRB*, 613
F.2d 890, 913 (D.C. Cir. 1979)).

promised not to contract unit work away from the unit. *Bermuda Container Line v. ILA*, 1997 WL 795766, at \*10-11 (S.D.N.Y. 1997). Just as in *Bermuda Container*, by calling at Leatherman Terminal, the carriers are breaching their no-subcontracting promise within the Master Contract.

USMX argues repeatedly against an argument that the ILA never made in its state court lawsuit or any of its briefs to the Board: that its members have a right to the lift-equipment jobs at Leatherman. USMX Br. 6, 11, 15 16. To give it face value would require this Court to ignore the record evidence of the ILA's state court complaint, which never asked for those assignments. USMX also asks this Court to ignore binding precedent. *See LRB v. Int'l Longshoremen's Ass'n*, 447 U.S. 490 (1980) ("*ILA I*"); *ILA II*, 473 U.S. 61; *Bermuda Container*, 192 F.3d at 256-57. This Court must hold USMX and its carriers to this no subcontracting promise that—until now—they have stood by for decades.

# CONCLUSION

The petition for review should be dismissed.


Dated: May 30, 2023

Respectfully submitted,

/s/ John P. Sheridan
John P. Sheridan
Daniel Wolff
Nicholas M. Graziano
MAZZOLA MARDON, P.C.
26 Broadway, 17th Floor
New York, NY  10004
(212) 425-3240

*Counsel for the International Longshoremen's Association*

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1), I certify that the International Longshoremen's Association's Response to USMX's Motion for Leave to Intervene complies with the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5,736 words, excluding the parts of the document that are exempted by Federal Rule of Appellate Procedure Rule 32(f), according to the Word Count function of Microsoft Word.  I further certify that this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface utilizing Microsoft Word 2016 in 14-point Times New Roman font.

Dated: May 30, 2023

/s/ Daniel Wolff
Daniel Wolff
MAZZOLA MARDON, P.C.
26 Broadway, 17th Floor
New York, NY  10004
(212) 425-3240
dwolff@mmmpc.com

*Counsel for the International Longshoremen's Association*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2023, I filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the CM/ECF system. I certify that the foregoing document is being served today via email upon the following counsel:

Dated: May 30, 2023

<u>/s/ Daniel Wolff</u>
Daniel Wolff
MAZZOLA MARDON, P.C.
26 Broadway, 17th Floor
New York, NY  10004
(212) 425-3240
dwolff@mmmpc.com

*Counsel for the International Longshoremen's Association*