**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 23-1059**

───────────────

SOUTH CAROLINA STATE PORTS AUTHORITY,

> Petitioner,

THE STATE OF SOUTH CAROLINA; UNITED STATES MARITIME ALLIANCE, LTD.,

> Intervenors,

> v.

NATIONAL LABOR RELATIONS BOARD,

> Respondent,

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL 1422; INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,

> Intervenors.

------------------------------

NATIONAL RIGHT TO WORK LEGAL DEFENSE FOUNDATION; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; SOUTH CAROLINA CHAMBER OF COMMERCE; NATIONAL ASSOCIATION OF MANUFACTURERS; SOUTH CAROLINA MANUFACTURERS ALLIANCE; GOVERNOR HENRY MCMASTER,

> Amici Supporting Petitioner.

MARINE ENGINEERS' BENEFICIAL ASSOCIATION, District #1-PCD; AMERICAN FEDERATION OF LABOR AND CONGRESS OF INDUSTRIAL ORGANIZATIONS; TRANSPORTATION TRADES DEPARTMENT; STATE

OF MARYLAND; INTERNATIONAL LONGSHORE AND WAREHOUSE
UNION,

                    Amici Supporting Respondent.

On Petition for Review of an Order of the National Labor Relations Board.
(10−CC−276241)

Argued:  June 6, 2023                        Decided:  July 28, 2023

Before DIAZ, Chief Judge, NIEMEYER, Circuit Judge, and MOTZ, Senior Circuit Judge.

Petition denied by published opinion.  Chief Judge Diaz wrote the opinion, in which Senior
Judge Motz joined.  Judge Niemeyer wrote a dissenting opinion.

**ARGUED:** Carter Glasgow Phillips, SIDLEY AUSTIN, LLP, Washington, D.C., for
Petitioner.  Heather Stacy Beard, NATIONAL LABOR RELATIONS BOARD.
Washington, D.C., for Respondent.  John Philip Sheridan, MAZZOLA MARDON, P.C.,
New York, New York, for Intervenors. International Longshoremen's Association and
International Longshoremen's Association, Local 1422.  William Michael Spelman, THE
LAMBOS FIRM, LLP, Tarrytown, New York, for Intervenor United States Maritime
Alliance, Ltd. **ON BRIEF:** Tracey C. Green, BURR & FORMAN LLP, Columbia, South
Carolina; Michael O. Eckard, OGLETREE, DEAKINS, NASH, SMOAK & STEWART,
P.C., Charleston, South Carolina, for Petitioner.  Jennifer A. Abruzzo, General Counsel,
Peter Sung Ohr, Deputy General Counsel, Ruth E. Burdick, Deputy Associate General
Counsel, David Habenstreit, Assistant General Counsel, Milakshmi V. Rajapakse,
Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C.,
for Respondent.  Lawrence M. Goodman, Joseph D. Richardson, WILLIG, WILLIAMS,
& DAVIDSON, Philadelphia, Pennsylvania, for Intervenor International Longshoremen's
Association, Local 1422.  Daniel Wolff, Nicholas M. Graziano, MAZZOLA MARDON,
P.C., New York, New York, for Intervenor International Longshoreman's Association.
James R. Campbell, THE LAMBOS FIRM, LLP, Tarrytown, New York; Jonathan C.
Fritts, James D. Nelson, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C., for
Intervenor United States Maritime Alliance, Ltd. Glenn M. Taubman, NATIONAL RIGHT
TO WORK LEGAL DEFENSE FOUNDATION, INC., Springfield, Virginia, for Amicus
The National Right to Work Legal Defense Foundation, Inc.  Anthony J. Dick,
Washington, D.C., Brian West Easley, Courtney L. Burks, JONES DAY, Minneapolis,
Minnesota, for Amici Chamber of Commerce of the United States of America, The South

Carolina Chamber of Commerce, The National Association of Manufacturers, and The South Carolina Manufacturers' Alliance. Stephanie A. Maloney, Tyler S. Badgley, UNITED STATES CHAMBER LITIGATION CENTER, Washington, D.C., for Amicus Chamber of Commerce of the United States of America. Erica Klenicki, Michael A. Tilghman II, NAM LEGAL CENTER, Washington, D.C., for Amicus National Association of Manufacturers. M. Dawes Cooke, Jr., John W. Fletcher, BARNWELL WHALEY PATTERSON & HELMS, LLC, Charleston, South Carolina, for Amicus South Carolina Manufacturers' Alliance. Thomas A. Limehouse, Jr., Chief Legal Counsel, Wm. Grayson Lambert, Senior Legal Counsel, Erica W. Shedd, Deputy Legal Counsel, OFFICE OF THE GOVERNOR OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus Governor McMaster. James R. Rosenberg, Brian G. Esders, Paul D. Starr, ABATO, RUBENSTEIN AND ABATO, P.A., Baltimore, Maryland, for Amicus Marine Engineers' Beneficial Association, District #1-PCD. Matthew Ginsberg, Craig Becker, Andrew Lyubarsky, AFL-CIO, Washington, D.C., for Amicus American Federal of Labor and Congress of Industrial Organizations and Transportation Trades Department. Anthony G. Brown, Attorney General, Ryan R. Dietrich, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Robert Remar, LAW OFFICE OF ROBER REMAR, San Francisco, California; Eleanor Morton, LEONARD CARDER, LLP, San Francisco, California, for Amicus International Longshore and Warehouse Union.

DIAZ, Chief Judge:

A collective-bargaining agreement between the International Longshoremen's Association (ILA) and the United States Maritime Alliance (USMX), an association of carriers and other employers, earmarks all container loading and unloading work on the East and Gulf Coasts for the union's members. So when USMX-affiliated ships docked at a new South Carolina terminal that used non-union lift operators, the union sued USMX and its carrier-members for damages. Soon enough, USMX's carrier-members stopped calling at that terminal.

We're asked to determine whether the ILA's lawsuit—and a separate provision of its contract with USMX—violate the National Labor Relations Act, 29 U.S.C. § 151 *et seq*. The National Labor Relations Board held that they don't, and the South Carolina State Ports Authority petitioned for review.

We agree with the Board and deny the petition.

I.

A.

First, some historical context. Before the "container revolution," longshore workers would transfer loose ("break-bulk") cargo piece-by-piece from pier to ship. *Am. Trucking Ass'ns v. NLRB*, 734 F.2d 966, 968 (4th Cir. 1984), *aff'd sub nom. NLRB v. Int'l Longshoremen's Ass'n (ILA II)*, 473 U.S. 61 (1985). But "[a]s might be expected, moving cargo in this break-bulk manner proved expensive and inefficient."

4

A more economical method emerged in the mid-1950s with the "containership," a vessel made to transport large containers of cargo. *Id*. at 969. Since containers didn't need to be packed and unpacked at the pier, the new ships could be "loaded or unloaded in a fraction of the time required for a conventional ship." *NLRB v. Int'l Longshoremen's Ass'n (ILA I)*, 447 U.S. 490, 494–95 (1980). And since the containerships spent less time in port and could make more frequent journeys, fewer ships were needed to carry a given volume of cargo. *Id*. at 495.

But as "containerization" streamlined the shipping industry, it also "threatened the jobs of longshoremen by dramatically increasing their productivity." *Id*. at 496. Because containers could be hooked up to trucks and driven to their destinations, shippers were no longer bound to the ports closest to their customers. They "could now call at ports with cheaper non-union labor, then truck the goods the extra distance, and save money." *Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n*, No. 97 CIV. 1257, 1997 WL 795766, at *5 (S.D.N.Y. Dec. 29, 1997). The result was "wide job loss in the longshore industry, and widespread upheaval and acrimony in the management-labor relationship in the industry." *Id*.

B.

In the face of these technological developments, the ILA has sought to maintain its members' traditional work through collective bargaining. The ILA and its constituent local units represent "longshoremen, clerks, checkers, and maintenance employees working on ships and terminals" on the East and Gulf Coasts "from Maine to Texas." J.A. 433–34.

Local 1422, an intervenor here, represents members working at the Port of Charleston, South Carolina.

The ILA has negotiated a series of collective-bargaining agreements—known as "Master Contracts"—with USMX, a multi-employer association of shipping carriers and longshore companies. The current Master Contract, effective from 2018 to 2024, contains several provisions relevant to this appeal.

First, Article I, Section 3 provides that the Master Contract is a "full and complete agreement" between the ILA and USMX on all issues

> relating to the employment of longshore employees on container and ro-ro [roll on/roll off] vessels and container and ro-ro terminals in all ports from Maine to Texas at which ships of USMX carriers and carriers that are subscribers to this Master Contract may call.

J.A. 434.

Second, Appendix A to the Master Contract (the "Containerization Agreement") recognizes the "existing work jurisdiction of ILA employees" and bars USMX from contracting out that work to non-union members. It reads, in part:

> 1. Management and the Carriers recognize the existing work jurisdiction of ILA employees covered by their agreements with the ILA over all container work which historically has been performed by longshoremen and all other ILA crafts at container waterfront facilities. Carriers, direct employers and their agents covered by such agreements agree to employ employees covered by their agreements to perform such work which includes, but which is not limited to:
>
> (a)  the loading and discharging of containers on and off ships
> (b)  the receipt of cargo
> (c)  the delivery of cargo
> (d)  the loading and discharging of cargo into and out of containers
> (e)  the maintenance and repair of containers
> (f)  the inspection of containers at waterfront facilities (TIR men).

2.  Management, the Carriers, the direct employers and their agents shall not contract out any work covered by this agreement. Any violations of this provision shall be considered a breach of this agreement.

\* \* \*

9.  Violations of Agreement: This Agreement defines the work jurisdiction of employees and prohibits the subcontracting out of any of the work covered hereby. It is understood that the provisions of this Agreement are to be rigidly enforced in order to protect against the further reduction of the work force. . . . The parties agree that the enforcement of these provisions is especially important and that any violation of such other provisions is of the essence of the Agreement.

J.A. 484–85 (cleaned up).

Finally, Article VII, Section 7 of the Master Contract deals with the anomalous "hybrid labor model" historically used by ports in Wilmington, North Carolina; Charleston, South Carolina; and Savannah, Georgia.  Under the hybrid model, non-union employees operate lift equipment to load and unload the containerships and ILA members perform the rest of the longshore work.

It's not clear from the record why the hybrid model arose at these ports.  And while the hybrid model seems to violate the no-subcontracting provision (included in all past Master Contracts), the ILA has never sought to enforce the contract's terms against those ports.

The ILA and USMX negotiated Section 7 in 2012 and 2013 to address the hybrid model and kept the provision in their current contract without further discussion.  It reads:

Section 7.  Port Authorities.

(a)  USMX and the ILA shall conduct a study to determine how the business model currently used by port authorities in the Ports of Charleston, SC, Savannah, GA, and Wilmington, NC, could be altered to permit work

7

currently performed by state employees to be performed by Master Contract-bargaining-unit employees in a more productive, efficient, and competitive fashion. USMX and the ILA will use this study to meet with these port authorities in an effort to convince them to employ Master Contract-bargaining-unit employees.

(b)  USMX agrees to formally notify any port authority contemplating the development of or intending to develop a new container handling facility that USMX members may be prohibited from using that new facility if the work at that facility is not performed by Master Contract bargaining-unit employees.

J.A. 449.

USMX and the ILA never conducted the study described in Section 7(a). And they disagree about Section 7(b)'s intended purpose and application. ILA and Local 1422 officials involved in the negotiations believed that Section 7(b) requires USMX carrier-members to refrain from doing business at any new facility where ILA members don't perform all the longshore work. But USMX's former counsel testified that the language was meant to be a compromise, acknowledging the ILA's issues with the hybrid model without binding USMX.

### C.

The South Carolina State Ports Authority operates three terminals at the Port of Charleston: the North Charleston Terminal, the Wando Welch Terminal, and the new Hugh K. Leatherman, Sr. Terminal. The North Charleston and Wando Welch Terminals use the hybrid labor model, and USMX carrier-members have long docked at those terminals. The Ports Authority isn't a party to the Master Contract.

In 2020, the Ports Authority announced that it planned to operate the Leatherman Terminal using the same hybrid model. Under the Master Contract's Section 7(b), USMX

8

notified the Ports Authority that "USMX members may be prohibited from using the new facility . . . if the work at that facility is not performed by Master Contract bargaining-unit employees." J.A. 531. Several USMX carrier-members sent similar letters to the Ports Authority. Then things fell apart.

USMX, the ILA, the Ports Authority, and the State of South Carolina met several times over the ensuing months but couldn't agree on a work arrangement for the new terminal. At one meeting, the ILA proposed that the existing hybrid terminals be "redline[d]" and allowed to keep using non-union labor, but that all longshore work at the new terminal be performed by ILA members. J.A. 549. The State and the Ports Authority responded that they weren't bound by Section 7(b) and were free to use non-union lift workers at the new terminal just as they had at the older Charleston terminals.

The State and the Ports Authority then filed an unfair labor practice charge with the National Labor Relations Board against the ILA, USMX, and Local 1422. They claimed that the ILA and USMX violated Section 8(e) of the National Labor Relations Act, *see* 29 U.S.C. § 158(e), by agreeing to a "hot cargo" provision—a provision barring an employer from doing business with another party—in Section 7(b) of the Master Contract.

Undeterred by the failed discussions, the Ports Authority began operating the Leatherman Terminal using the hybrid model. Two USMX carrier-members sent ships to the Leatherman Terminal, and the ILA promptly sued them (and USMX) in New Jersey state court.

Among other claims, the ILA alleged that USMX and the carrier-members breached Article I, Section 3 of the Master Contract and Sections 1, 2, and 9 of the Containerization

Agreement by docking at Leatherman. Its complaint didn't mention Section 7(b). And while the ILA sought $300 million in damages, the union didn't ask for injunctive relief like assigning union employees to the work. J.A. 529.

Soon after the ILA filed its lawsuit, at least five USMX carrier-members contacted the Ports Authority and demanded to be reassigned from the Leatherman Terminal to the Wando Welch Terminal. One threatened to redirect its vessels to the Port of Savannah, Georgia. The Ports Authority agreed to reassign the vessels, and USMX carrier-members eventually stopped sending ships to the Leatherman Terminal.

The State, the Ports Authority, and USMX then filed more unfair labor practice charges against the ILA and Local 1422, claiming that the ILA's lawsuit also violated the National Labor Relations Act.

## II.

### A.

The Board's General Counsel consolidated both sets of charges and an Administrative Law Judge ("ALJ") held a hearing and issued a decision.

First, the ALJ rejected the Ports Authority's argument that Section 7(b) of the Master Contract was an illegal "hot cargo" provision. The section's language was facially valid, the ALJ held, because it didn't require USMX to stop doing business with the Ports Authority—it only required USMX to notify the Ports Authority that it "may be prohibited" from using a hybrid facility. J.A. 942.

10

The ALJ acknowledged that the ILA and USMX had debated the provision's meaning and that union officials believed it to bar USMX carrier-members from calling at Leatherman. But he found that the evidence "establishe[d] disagreement, rather than agreement," so it didn't demonstrate a meeting of the minds on the issue. J.A. 943.

Next, however, the ALJ held that the ILA's lawsuit against USMX and the carrier-members violated the National Labor Relations Act. Rejecting the ILA's argument that the lawsuit had a lawful "work preservation" goal, the ALJ found that the ILA used the Master Contract "as a sword to achieve an unlawful, secondary object"—the acquisition of "all the container work at the Leatherman Terminal, as well as at any future container-handling facilities." J.A. 948–49. And the ALJ further found that the ILA intended its lawsuit to make USMX cease doing business at Leatherman Terminal, violating Section 8(b)(4)(ii)(B) of the Act.

### B.

The State, the Ports Authority, and the ILA filed exceptions to the Board's rulings. A three-member panel issued its own opinion, finding for the ILA on both issues.

The Board quickly dismissed the challenge to Section 7(b) of the Master Contract, unanimously affirming the ALJ's ruling "for the reasons stated by the judge." J.A. 1328.

But the Board disagreed that the ILA's lawsuit had an illegal work-acquisition objective. Instead, the Board found, the ILA lawfully sought to preserve its traditional work and jobs—"the loading and unloading generally at East and Gulf Coast ports"—against the technological changes wrought by containerization. J.A. 1332. While the lawsuit may have had the "secondary *effect*" of causing ships to bypass the Port of

11

Charleston, that effect was still "incidental to a lawful primary purpose." *Id*. The Board also disagreed with the ALJ's requirement that the ILA show a threat of job losses in Charleston—if such a showing was required, it was measured coastwide and "satisfied by the history of containerization and its effect on the number of longshoremen." J.A. 1333.

Board Member John F. Ring dissented on the lawsuit issue. Rejecting the majority's coastwide definition of the "work" being preserved, Ring instead posited that "the work in question is the operation of the lift-equipment work at the Leatherman Terminal, and USMX and its carrier-members do not have the power to give that work to ILA-represented employees." J.A. 1334. The ILA's real beef was with the Ports Authority, he continued, and its lawsuit had the unlawful secondary *objective* (rather than a secondary *effect*) of pressuring the Ports Authority to assign lift-equipment work at Leatherman to union members.

The Ports Authority petitioned for review of the Board's decision under 29 U.S.C. § 160(f), and the Board is the respondent before us. The State of South Carolina intervened on the Ports Authority's behalf, and the ILA and Local 1422 intervened for the Board. USMX, also an intervenor, sides with the Ports Authority on the lawsuit issue, but with the ILA on the Section 7(b) issue.

III.

The Ports Authority advances two issues on appeal. First, it argues, the ILA's lawsuit against USMX and its carrier-members had the illegal aim of obtaining the lift work at Leatherman Terminal—work that ILA members had never performed and USMX

12

was powerless to award.  Second, the Ports Authority claims that the Master Contract's Section 7(b) represents a tacit unlawful agreement that USMX's carrier-members won't call at new terminals unless ILA members perform all the longshore work there.

Because the Board's rulings for the union are supported by substantial evidence and aren't illogical or inconsistent with the National Labor Relations Act, we deny the Ports Authority's petition for review.

A.

Our review of a Board decision is "limited."  *Tecnocap, LLC v. NLRB*, 1 F.4th 304, 312 (4th Cir. 2021).  We will uphold the Board's findings of fact if they're supported by substantial evidence, "even though we might have reached a different result had we heard the evidence in the first instance."  *Id*. at 313.

Under this standard, we can't "displace the [Board's] choice between two fairly conflicting views" of the evidence.  *NLRB v. Pepsi Cola Bottling Co. of Fayetteville*, 258 F.3d 305, 310 (4th Cir. 2001).  And when factual findings "rest upon credibility determinations," we accept them absent "exceptional circumstances"—for example, when a credibility determination is unreasonable or contradictory.  *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997).

We will also uphold the Board's legal interpretations if they're "rational and consistent with the Act," even if the Board's reading isn't "the best way to read the statute." *Tecnocap*, 1 F.4th at 313.  But we don't give "special deference . . . to the Board's interpretation of collective bargaining contracts" (though we're "mindful of the Board's

13

considerable experience" in interpreting such agreements). *Bonnell/Tredegar Indus. v. NLRB*, 46 F.3d 339, 343 (4th Cir. 1995).

B.

The primary issue is whether the ILA's lawsuit against USMX and its carrier-members violates the Act. Since the First Amendment protects a union's right to access the courts, the Board may determine that a union's lawsuit constitutes an unfair labor practice only if it is baseless or "has an objective that is illegal under federal law." *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 738 n.5, 743 (1983).

No one asserts that the ILA's lawsuit is baseless. So we're left to determine whether it has an illegal objective under the Act. We conclude that it doesn't.

Section 8(b)(4)(ii)(B) of the Act makes it an unfair labor practice for a union "to threaten, coerce, or restrain any person engaged in commerce," where "an object" of the union's coercive conduct is to force that person to "cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). Section 8(e) prohibits unions and employers from agreeing to "cease doing business with any other person," and Section 8(b)(4)(ii)(A) prohibits unions from pressuring employers into such agreements. *Id*. § 158(b)(4)(ii)(A), (e).

These provisions exempt "primary" activity—that is, a "union's efforts [] directed at its own employer on a topic . . . that the employer can control." *ILA II*, 473 U.S. at 81. An activity has a "secondary" purpose, by contrast, if it is "directed at affecting the business relations of neutral employers and [is] 'tactically calculated' to achieve union objectives outside the primary employer-employee relationship." *Id*; *see also Nat'l Woodwork Mfrs.*

14

*Ass'n v. NLRB*, 386 U.S. 612, 623 (1967) (explaining that a secondary boycott is characterized by "pressure tactically directed toward a neutral employer in a labor dispute not his own.").

The Supreme Court has emphasized that secondary *purposes* are distinct from secondary *effects*: If a union has "no forbidden secondary purpose to disrupt the business relations of a neutral employer," any "extra-unit effects, no matter how severe, are irrelevant to the analysis." *ILA II*, 473 U.S. at 79 (cleaned up).

Preserving work for bargaining-unit members is a lawful, primary object.[1] *ILA I*, 447 U.S. at 504. A union's activity must pass two tests to be considered work-preserving. First, the activity "must have as its objective the preservation of work traditionally performed by employees represented by the union." *Id.* And second, the "contracting employer must have the power to give the employees the work in question" (the "right of control" test). *Id.*

The Ports Authority claims that the ILA's lawsuit violates several of the Act's prohibitions on activities with secondary purposes. In the Ports Authority's view, the union's lawsuit aims to "coerc[e] neutral parties (USMX and its carrier-members) to pressure [the Ports Authority] to give ILA members the lift-equipment jobs." Petitioner's

---

[1] Several circuits have referred to the work-preservation doctrine as a "defense" available to a union facing charges of an unfair labor practice. *See, e.g.*, *Int'l Longshore & Warehouse Union v. NLRB*, 978 F.3d 625, 637 (9th Cir. 2020); *Loc. 32B-32J, SEIU v. NLRB*, 68 F.3d 490, 494 (D.C. Cir. 1995); *Nat'l Mar. Union of Am. v. Com. Tankers Corp.*, 457 F.2d 1127, 1134 (2d Cir. 1972). At oral argument, the Board agreed that the doctrine could be characterized as a defense, giving the union the burden of proving it applies. Assuming the burden is on the union, we find—as we'll explain—that the ILA met it here.

Br. at 3. But the Board found that the lawsuit met both requirements to be considered lawful work preservation:

> (1) the lawsuit's objective was the preservation of work traditionally performed by employees represented by ILA, and (2) USMX and its carrier members had the power to give the employees the work in question, and therefore, are primary employers.

J.A. 1331. We address each finding in turn.

1.

a.

First, the parties dispute whether the ILA's lawsuit seeks to preserve the union's historic work jurisdiction or to acquire new work. To decide this question, "the first and most basic question is: What is the 'work' that the [activity] allegedly seeks to preserve?" *ILA I*, 447 U.S. at 505.

The Board looked to the Master Contract and found that the "work" was all container work historically performed by ILA members "in all ports from Maine to Texas." J.A. 1331–32. But the Ports Authority argues that the work is narrower, encompassing only "the lift-equipment jobs at the Port's Leatherman Terminal" that are performed by non-union employees. Petitioner's Br. at 32.

We're guided by a pair of 1980s Supreme Court cases that also involved the ILA. These cases were about challenges to the ILA's Rules on Containers, which gave union longshore workers the right to load and unload containers that would otherwise be packed or unpacked within fifty miles of the port. *ILA I*, 447 U.S. at 499.

16

After several shipping companies contracted with third parties who used non-ILA labor to pack and unpack cargo within the 50-mile radius, the ILA assessed damages against the shipping companies. *Id*. at 502. The shipping companies stopped working with the third parties, and the third parties filed unfair labor charges with the Board. *Id*.

The Board found the charges substantiated, defining the "work" as "the off-pier stuffing and stripping of containers" and determining that the ILA members hadn't traditionally performed that work. *Id*. at 506.

But the Court rejected that formulation of the "work" in *ILA I*. After sketching the history of containerization, the Court explained that the Board needed to perform "a careful analysis of the traditional work patterns that the parties are allegedly seeking to preserve" in the face of "technological displacement." *Id*. at 507.

The Board had "focused on the work done by the employees of the charging parties . . . after the introduction of containerization." *Id*. But it should have focused "on the work of the bargaining unit employees"—the ILA longshore workers—"not on the work of other employees who may be doing the same or similar work." *Id*. The Court remanded to the Board "to evaluate the relationship between traditional longshore work and the work which the Rules attempt to assign to ILA members." *Id*. at 509.

Five years later in *ILA II*, the Court held that the Rules on Containers—and the ILA's attempts to enforce them—were lawfully aimed at work preservation, articulating two principles relevant here.

First, the Court noted that in cases involving work displaced by innovation, "the place where work is to be done . . . is seldom relevant to the definition of the work itself."

17

*ILA II*, 473 U.S. at 77.  The Court therefore defined the work as "simply 'the work of loading and unloading containers,'" not just at the ports or within the fifty-mile range covered by the collective-bargaining agreements.  *Id*. at 77 n.17.  And second, the Court reiterated that "extra-unit effects, no matter how severe, are irrelevant to the analysis." *Id*. at 79 (cleaned up).

Finding that the Rules on Containers were "motivated entirely by the longshoremen's understandable desire to preserve jobs" in the face of dwindling longshore work, the Court concluded that harmful effects on non-union workers weren't alone sufficient to find an improper secondary objective.  *Id*.

Given the Court's directive to focus "on the work of the bargaining unit employees," *ILA I*, 447 U.S. at 507, we hold that the Board here rationally determined that the "work in question is the loading and unloading generally at East and Gulf Coast ports." J.A. 1332. The Master Contract defines the ILA's existing work jurisdiction in similarly broad strokes.[2]  And the Contract controls "in all ports from Maine to Texas," J.A. 434, reflecting that it was "designed to preserve the work of ILA employees in the coast-wide bargaining unit," *Bermuda Container Line Ltd. v. Int'l Longshoremen's Ass'n*, 192 F.3d 250, 257 (2d Cir. 1999).

---

[2] *See* J.A. 484 ("Management and the Carriers recognize the existing work jurisdiction of ILA employees covered by their agreements with the ILA over all container work which historically has been performed by longshoremen and all other ILA crafts at container waterfront facilities.").

18

The Ports Authority would prefer to define the work as only the lift-equipment work at Leatherman Terminal.  But that view ignores two takeaways from the *ILA* cases: (1) it focuses on "the place where work is to be done," which is "seldom relevant"; and (2) it focuses on "extra-unit effects," not the work of bargaining-unit employees.  *ILA II*, 473 U.S. at 77, 79.

It's true that "ILA-represented employees have never performed the lift-equipment work at any terminal of the Port of Charleston," Petitioner's Br. at 33—the Board recognized as much, *see* J.A. 1327.  But as the Board explained, the *ILA* cases instruct us to "look beyond the locus of a dispute and consider traditional work patterns" more broadly.  J.A. 1332; *see also Bermuda Container*, 192 F.3d at 257 (declining to "narrow the employment relationship to include only employees of Maher terminals"); *Int'l Longshore & Warehouse Union v. NLRB*, 978 F.3d 625, 639–40 (9th Cir. 2020) (rejecting a Board order as overly "preoccupied with the precise location of the disputed work" where it "made prior performance of electrical M&R work" at a particular facility "a talisman").  It would defang the parties' collective-bargaining agreement to hold that the union couldn't enforce it at a new location just because no one, union or otherwise, had "historically" worked there.

The Ports Authority relies on *Marrowbone Development Co. v. District 17, United Mine Workers of America*, 147 F.3d 296 (4th Cir. 1998), but that case is distinguishable.  *Marrowbone* involved a newly certified local union of mineworkers that sought work at a particular mining site.  *Id.* at 298–299.  Although members of other locals had performed

such work, we looked narrowly at the (lack of) work historically performed *by the new local* to determine that it sought to acquire, not preserve, work. *Id*. at 302.

But in *Marrowbone*, the new local—as the "exclusive bargaining representative" of the mine's employees—was the relevant "bargaining unit." *Id*. at 298, 303 (citing *ILA I*, 447 U.S. at 507); *see also* J.A. 946 n.29 (ALJ drawing same distinction). We emphasized that given the site-specific nature of the mining work, only the members of the new local would be "directly affected by the dispute"—any effects on members of other locals "would be by and large incidental." *Marrowbone*, 147 F.3d at 303.

Here, by contrast, the ILA (not Local 1422) is the relevant bargaining unit. The ILA negotiated the Master Contract and filed the lawsuit to benefit its coastwide constituents. And as we'll explain, the "work" of loading and unloading containers isn't tethered to a single location, unlike the work at the Marrowbone mine—so it's not the case that the ILA's lawsuit will have only "incidental" effects across the coastwide unit. We therefore agree with the ALJ that *Marrowbone* is inapt.

At oral argument, the Ports Authority and USMX suggested that Section 7(a) of the Master Contract effectively excludes the hybrid-model ports—Charleston, Savannah, and Wilmington—from the ILA's work jurisdiction. But while that section acknowledges the reality that non-union employees currently perform the lift work at those ports, it doesn't suggest that the union meant to forever surrender its claim to that work.[3]

---

[3] To be clear, we express no view on the merits of USMX's potential waiver defense in the New Jersey lawsuit. We only observe that a union may still claim work preservation (Continued)

As the ALJ put it, the "origin and rationale for [the hybrid model] is not clear from the record, but there is no indication the parties intended to carve out, individually or collectively, these three South Atlantic ports from the multi-port bargaining unit." J.A. 948 n.32. No party challenged this finding. So giving due deference to the agency, we decline to find that Section 7(a) represents any kind of tacit agreement to exclude the lift work at hybrid ports from the Master Contract's jurisdiction.

In all, we conclude that the Board and ALJ rationally defined "the work in question" as longshore work throughout the ILA's coastwide jurisdiction, not just the lift work at Leatherman Terminal.

b.

Next, we consider whether the challenged activity (the lawsuit) sought to preserve that work. The Board found that although this case arose some 40 years after the *ILA* cases, it follows in their lineage: The ILA is still "seeking to preserve the traditional work of unit employees in the face of the technological advances affecting the coastal units," including at Leatherman Terminal. J.A. 1332. And the union is trying to do so by enforcing its coastwide Containerization Agreement—the Rules on Containers' direct descendant, *see* J.A. 1328 n.9—against employers that breach its terms by choosing hybrid ports for their

---

when its traditional work is performed at a new location within the jurisdiction of its collective-bargaining agreement.

21

longshore work.[4]  Though its lawsuit against USMX had the effect of diverting ships away from Leatherman, the key word is *effect*—and "extra-unit effects, no matter how severe, are irrelevant to the analysis."  *ILA II*, 473 U.S. at 79 (cleaned up).

None of the Ports Authority's arguments undermine this conclusion.  First, the Ports Authority contends that the *ILA* cases are inapt because "the lift-equipment work at Leatherman Terminal does not involve any technological change."  Petitioner's Br. at 35–36; *see also* Dissent at 44 (contending that the "historic loss of work because of containerization" is "long past for this case"); J.A. 1341 (dissenting member arguing that the Board's opinion is stuck "back in the 1960s or 1970s").

But we decline to disregard history, especially where the Court has demanded a "careful analysis of the *traditional* work patterns that the parties are allegedly seeking to preserve."  *ILA I*, 447 U.S. at 507 (emphasis added).  And we see no reason why the passage of time should negate the bargain the ILA negotiated in the (aptly named) Containerization Agreement.

As the Board explains, "The lift work arose from and was enabled by containerization."  Respondent's Br. at 48.  Before containerization, cranes were mounted

---

[4] To support its view that the ILA seeks to acquire, not preserve work, the dissent cites several comments from ILA officials expressing a "desire to 'have all of the work . . . that is performed by nonbargaining workers to be brought under the ILA['s] jurisdiction."  Dissent at 49 (citing J.A. 260).  These remarks aren't smoking guns, however.  It's no secret that the ILA isn't a fan of the hybrid model—but doesn't follow that the ILA isn't entitled to sue to enforce its collective-bargaining agreement.  And more broadly, in nearly *all* work-preservation cases, a union is seeking work not currently assigned to it.  Our inquiry is whether that aim is lawful work preservation considering the union's traditional work patterns.

on ships and operated by union employees. J.A. 269–72. The rise of containers made specially designed shoreside cranes, like those operated by the state employees in Charleston, a better option. *Id*. So the ILA negotiated its containerization agreements to combat the loss of this traditional work. J.A. 272–73; *see also* J.A. 484 (defining work jurisdiction to include "the loading and discharging of containers on and off ships"). Indeed, no one disputes that at non-hybrid ports, ILA members perform all the lift work.

It's true that at terminals in the Port of Charleston, non-union employees have operated the shoreside cranes since the early days of containerization. But *ILA I* warns against "focusing on the work as performed, after the innovation took place, by the employees who allegedly have displaced the longshoremen's work." 447 U.S. at 508. Such a focus would "foreclose[]—by definition—any possibility that the longshoremen could negotiate an agreement" to keep loading or unloading cargo as the work evolved. *Id*.

The Ports Authority also argues that this isn't a situation "where the ILA workforce is genuinely threatened" by the "continued use of state-employees to perform the lift-equipment work." Petitioner's Br. at 37 (cleaned up); *see also Nat'l Woodwork*, 386 U.S. at 630–31 (suggesting that workers boycotting to "acquire new job tasks when their own jobs are not threatened" may be an unfair labor practice). But even if such a showing of genuine threat is required, it's satisfied by "the history of containerization and its effect on the number of longshoremen." J.A. 1333.

Like its predecessors, the Master Contract aims "to preserve jobs against the steadily dwindling volume of cargo work." *ILA II*, 473 U.S. at 79 (cleaned up). The Leatherman Terminal contributes to that "dwindling" by assigning to non-union workers jobs

earmarked for the union by contract.  As the ILA argues, moreover, the lower labor costs of hybrid-model ports could draw cargo away from fully union ports, threatening other bargaining-unit jobs.  *See* ILA's Br. at 13, 34–35; *cf.* J.A. 92–93 (Ports Authority president testifying that "[a] deviation from [the hybrid model] would put us at a competitive disadvantage . . . relative to any new terminal or any facility that had to operate a more expensive model"); Gov. McMaster's Amicus Br. at 10 (heralding the "efficiency of the Port's hybrid model").[5]

Finally, the Ports Authority notes that the ILA has, for decades, "acquiesced in the Port of Charleston's use of state employees to perform the lift-equipment work." Petitioner's Br. at 39; *see also* Gov. McMaster's Amicus Br. at 10 (noting "settled expectations" that Leatherman would also use the hybrid model).  But while that might serve as a defense for USMX in the New Jersey breach-of-contract lawsuit, it doesn't bear on whether the lawsuit itself has an unlawful work-acquisition object.

The Board rationally found the ILA's lawsuit against USMX to have a valid work-preservation purpose.  We therefore find that it passes *ILA I*'s first prong.

---

[5] Much of Governor McMaster's amicus brief details the potential economic impact of ruling in the ILA's favor.  The State of Maryland, in turn, argues in its amicus brief supporting the Board that "union labor provides tremendous benefits for workers" and their communities.  Md.'s Amicus Br. at 12.  While these arguments may have normative force, it's "not our function as a court of review to weigh the economic cost" of a collective bargaining agreement.  *Am. Trucking*, 734 F.2d at 979.

2.

*ILA I*'s second prong asks whether USMX has the "right to control" the relevant work's assignment.  447 U.S. at 512.  The answer largely turns on how we define the work.  *Id*. at 512 n.27.

The Board, viewing the "work" on a coastwide scale, found that USMX's carrier-members controlled the work because they could "bypass the Port of Charleston entirely and call on other [fully union] ports."  J.A. 1332.  But USMX and the Ports Authority again urge us to focus on the lift-equipment work at the port of Charleston, which the Ports Authority exclusively controls.  Because we agree with the Board's broader work definition, it follows that USMX and its carrier-members have the right to control it.

In *American Trucking*, we held that shipping companies had the "right to control the container work sought by the longshoremen" because they owned or leased the containers and controlled where they went.  734 F.2d at 978.  That holding applies here.

As the ALJ put it, "the USMX carrier-members, like the carrier-members in *ILA I* and *II*, own or lease their containers, and, therefore, determine what ports they call on, which ultimately gives the carriers the right to control who performs the lift-equipment work on their containers."  J.A. 948.  That's because "[i]n the longshore industry, containers (and other sorts of cargo) *are* the work."  ILA's Br. at 44.  If no ships dock at a terminal, there's no longshore work to be done there.  So where USMX's carrier-members choose to send their ships is the whole ballgame.

The Ports Authority and USMX rely on a West-Coast longshore case holding that the Port of Portland—not the carriers or third-party terminal operator—controlled the

25

"reefer work" of "plugging in, unplugging, and monitoring refrigerated shipping containers." *Hooks ex rel. NLRB v. Int'l Longshore & Warehouse Union*, 905 F. Supp. 2d 1198, 1201, 1211 (D. Or. 2012), *aff'd in relevant part*, 544 F. App'x 657, 658 (9th Cir. 2013) (unpublished); *accord Int'l Longshore & Warehouse Union v. NLRB*, 705 F. App'x 1, 3 (D.C. Cir. 2017) (per curiam).  But *Hooks* is distinguishable.

In that case—a jurisdictional scuffle between two unions—the Board determined that the "work in dispute" was site-specific reefer work at one terminal in Portland.  *See Int'l Bhd. of Elec. Workers, Loc. 48*, 358 N.L.R.B. 903, 904 (2012).  One union expressly sought reassignment of the reefer work, threatening to picket the terminal operator "or take other economic action if the disputed work was not assigned to its members."  *Id.* at 905.

ILA's lawsuit, by contrast, seeks damages from USMX and its carrier-members for breaching the Master Contract—not injunctive relief like work reassignment.  We accept that USMX, like the terminal operator in *Hooks*, can't control who operates the cranes (or plugs in the reefers) at a specific terminal.  But USMX and its carrier-members *can* control whether they send their containers to a terminal whose labor model doesn't comply with their contractual obligations.  And under *American Trucking*, that's what matters.

The Ports Authority also claims this case is like *NLRB v. Enterprise Association of Pipefitters*, 429 U.S. 507 (1977), which preceded *ILA I* and *II*.  There, a subcontractor entered into two conflicting agreements: one with a union, promising that pipe threading and cutting would be performed onsite; and one with a general contractor, agreeing to use units with pre-cut pipes on a construction project.  *Id*. at 511–1.  Relying on the first agreement, the union members refused to install the units at the jobsite.  *Id.* at 512–13.

26

The Court found that while the agreement was valid, the boycott wasn't. The union members were exerting pressure on a subcontractor with "no power to award the [jobsite cutting and threading work] to the union," the Court held, when their real problem was with the (neutral) general contractor. *Id*. at 513, 521–523.

Following the dissenting Board member's lead, the Ports Authority argues that USMX is analogous to the subcontractor in *Pipefitters*. Like the subcontractor, the Ports Authority contends, USMX has no power to assign the lift work at Leatherman to union members.[6] And while USMX could direct its carrier-members to avoid hybrid ports, the subcontractor likewise could have walked away from its deal with the general contractor— but the general contractor (like the Ports Authority) would still control the work.

But that analogy doesn't fit. In *Pipefitters*, the "work" was confined to cutting and threading pipes at one specific site. 429 U.S. at 529–30. The subcontractor could have walked away from the deal with the general contractor—but the union members would have gone home empty-handed too.

Here, as we've discussed, the "work" is the loading and unloading of containers along the coastwide bargaining unit. And USMX's carrier-members *can* unilaterally give that work to union members by "simply refus[ing] to supply their containers" to ports using non-ILA labor. *Int'l Longshoremen's Ass'n v. NLRB*, 613 F.2d 890, 913 (D.C. Cir. 1979), *aff'd*, *ILA I*, 447 U.S. 490 (1980); *see also id.* n.192 (finding *Pipefitters* "inapplicable to the instant cases").

---

[6] True enough, and the Board readily concedes the point.

27

In other words, USMX has all the "power to settle the dispute with the union" by avoiding terminals that would violate the Master Contract. *Pipefitters*, 429 U.S. at 522. "It is difficult to imagine a more forceful demonstration of control." *Int'l Longshoremen's Ass'n*, 613 F.2d at 913.

Since USMX and its carrier-members control where the containers go, the Board rationally concluded they also control the relevant work—the loading and unloading of containers along the East Coast. Finding that the union has satisfied *ILA I*'s right-of-control test as well, we hold that the ILA's lawsuit had a legitimate work-preservation objective.

We therefore deny the Ports Authority's petition on this issue.


IV.

The ALJ separately held (and the Board affirmed) that Section 7(b) of the Master Contract wasn't a prohibited agreement to stop doing business—known as a "hot cargo" clause—with the Ports Authority. The Ports Authority contends that the Board erred in concluding that the provision didn't violate Section 8(e) of the Act, which makes it an unfair labor practice for a union and employer to form an agreement, "express or implied, whereby such employer . . . agrees to cease . . . doing business with any other person." 29 U.S.C. § 158(e).

In the Ports Authority's view, the ILA and USMX had an "implied agreement not to do business with new container-handling terminals that did not exclusively employ ILA members"—an agreement that became reality when carriers asked not to dock at Leatherman Terminal. Petitioner's Br. at 56–57.

28

The Board responds that the provision doesn't require USMX carrier-members to boycott Leatherman; it only requires them to give notice that they "may be prohibited" from calling there.  Respondent's Br. at 25 (cleaned up).  And while the Ports Authority argues that extrinsic evidence shows the contracting parties made an unlawful agreement, the Board and the ILA say that the evidence in fact shows "a dispute, not an agreement," about the provision's meaning.  ILA's Br. at 54 (cleaned up); *see also* Petitioner's Br. at 29–30.  We agree with the Board and the ILA.

The Board evaluates whether a contractual clause violates Section 8(e) in two steps.  *See Gen. Teamsters, Loc. 982*, 181 N.L.R.B. 515, 517 (1970).  First, the Board determines whether the clause's meaning is clear.  *Id*.  If it is, the Board will determine whether it's valid under Section 8(e).  *Id.*  But if the clause is ambiguous, the Board can then "consider extrinsic evidence to determine whether the clause was intended to be administered in a lawful or unlawful manner."  *Id*.

In conducting this analysis, the ALJ first found that the meaning of Section 7(b) was clear:  It didn't "require USMX or its carrier-members to boycott the Leatherman Terminal or to cease doing business with [the Ports Authority] or any other employer or person."  J.A. 942.  The ALJ's reasoning was sound.

The plain text of Section 7(b) requires USMX to "notify" port authorities that their members "may be prohibited" from using terminals staffed by non-union workers.  J.A. 449.  As the ALJ explained, "The word 'may' is ordinarily construed to mean permissive and discretionary," while "shall" connotes a requirement.  J.A. 1350; *see also Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171–72 (2016) ("Unlike the word

29

'may,' which implies discretion, the word 'shall' usually connotes a requirement."). And elsewhere in the contract, the parties used "shall" and "may" to differentiate terms. *See* J.A. 942 (listing examples). We therefore agree that Section 7(b) doesn't bind USMX to a particular plan—so the ALJ (and Board) correctly concluded that the provision isn't "clearly unlawful on its face." *Id*.

The Ports Authority contends that the provision is at least ambiguous and that we should examine extrinsic evidence that "reveals the parties' intentions." Petitioner's Br. at 52–53. But even if we consider the extrinsic evidence, it doesn't change our view.

First, the Ports Authority notes that ILA President Harold Daggett testified that Section 7(b) was meant to stop carriers from docking at "any new terminal that comes online, if it's not 100 percent ILA." J.A. 295. But USMX's former counsel Donato Caruso testified that he negotiated for the term "may" because he "didn't want to give the impression that USMX agreed . . . with the Union's position." J.A. 314.

The ALJ credited Caruso over Daggett "because Caruso's recollection and testimony were more logical and consistent with the other evidence." J.A. 935 n.16. Giving due deference to the agency's credibility findings, *see Eldeco*, 132 F.3d at 1011, substantial evidence establishes that USMX and the ILJ didn't come to a tacit unlawful agreement when they negotiated Section 7(b).

The Ports Authority points to a series of communications from USMX carrier-members indicating that they wouldn't dock at Leatherman unless the terminal was fully union-staffed. As the ALJ noted, however, the carrier-members weren't speaking for USMX, but for the individual shipping companies. And even if the statements could be

attributed to USMX, none establish a bilateral agreement between ILA and USMX that ships couldn't call at Leatherman.  *See Loc. 27, Sheet Metal Workers Int'l Ass'n*, 321 N.L.R.B. 540, 541 n.3 (1996) ("solely unilateral" conduct by a union "to enforce an unlawful interpretation of a facially lawful contract clause does not violate Sec. 8(e) because such conduct does not constitute an 'agreement'" (cleaned up)).  To the contrary, the statements note the carriers' concerns about "risk," "challenges," and "uncertainty," J.A. 117, 540, 651—all suggesting "disagreement, rather than agreement" about what Section 7(b) meant.  J.A. 943.

We agree that USMX and the ILA haven't made an agreement that violates Section 8(e), so we deny the Ports Authority's petition on this issue too.

## V.

The Board rationally held that the ILA's lawsuit against USMX sought to preserve its coastwide jurisdiction over loading and unloading work, so it didn't violate the Act. And the Board and ALJ correctly concluded that Section 7(b) of the Master Contract didn't constitute an illegal hot-cargo provision, whether by its text or by tacit agreement.

The South Carolina State Ports Authority's petition for review is therefore

*DENIED.*

NIEMEYER, Circuit Judge, dissenting, except as to Part IV:

In its effort to coerce the South Carolina State Ports Authority to hire union workers to operate the state-owned cranes at the new Leatherman Terminal in the Port of Charleston, the International Longshoremen's Association ("ILA") sued the United States Maritime Alliance, whose members are customers of the Port, to effect a boycott by Maritime Alliance members' ships of the new terminal. This was an unfair labor practice under § 8(b) of the National Labor Relations Act ("NLRA"), as so found by the Administrative Law Judge ("ALJ"), and I would reverse the National Labor Relations Board and remand, directing it to provide relief to the Ports Authority.

After the State of South Carolina spent $1.5 billion building the new terminal to handle increased demand, the Ports Authority staffed the new terminal in accordance with the practice that it had followed at the port's two other terminals for 50 years — "a hybrid" division of labor in which the work of operating the state-owned cranes is performed by state employees and the remaining longshore work is performed by members of the ILA local union. The ILA, which represents longshoremen on the East Coast and Gulf Coast, has long wanted to displace the port's state employees with union workers, as it has also wanted to do at the Ports of Wilmington, North Carolina, and Savannah, Georgia, which likewise use the hybrid division of labor. As an ILA officer specifically stated, the ILA wanted "100 percent" of the work at the new terminal. Indeed, he stated that they "were interested in consuming all the jobs" and told the Ports Authority, "as you try to grow your business, I have to try to grow mine as well."

Consequently, before the opening of the new terminal, the ILA negotiated with the State and the Ports Authority in an attempt to displace the hybrid model and acquire new work for union workers.  When the discussions yielded no change, the ILA took further steps to achieve its goal.  After the new terminal opened and cargo ships began calling at it, the ILA sued the United States Maritime Alliance — a multi-employer association of container carriers — and two of its members whose ships had called at the new terminal, alleging that, by doing so, they were violating the collective bargaining agreement between the ILA and the Maritime Alliance.  The ILA sought $300 million in damages.  It also made clear that the same fate would befall any other Maritime Alliance carrier whose ships called at the new terminal.  In response to that suit, Maritime Alliance carriers immediately stopped calling at the new terminal, causing the Ports Authority extensive damages, which are ongoing.

In response to this ILA activity, the Ports Authority and the Maritime Alliance brought an unfair labor practice charge against the ILA, alleging that it was attempting to enforce the collective bargaining agreement in a coercive manner so as to force Maritime Alliance carriers to cease calling at the new terminal, thus effecting a boycott in violation of § 8(b) of the NLRA.  Separately, the Ports Authority brought an additional unfair labor practice charge against both the ILA and the Maritime Alliance, alleging that a provision of their collective bargaining agreement violates § 8(e) of the NLRA.

Section 8(b) prohibits unions "from engaging in secondary activities whose object is to force one employer [here, the Maritime Alliance] to cease doing business with another [here, the Ports Authority]."  *NLRB v. Int'l Longshoremen's Ass'n (ILA I)*, 447 U.S. 490,

503 (1980); *see also* 29 U.S.C. § 158(b)(4)(ii)(B).  And § 8(e) "makes unlawful those collective-bargaining agreements in which the employer [here, the Maritime Alliance] agrees to cease doing business with any other person [here, the Ports Authority]."  *ILA I*, 447 U.S. at 503–04; *see also* 29 U.S.C. § 158(e)*.*  Unions can, however, avoid liability under those provisions if they show, as an affirmative defense, that the primary objective of their activity is the *preservation* of work historically done by the bargaining unit, not the *acquisition* of union work.  *See National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 630 (1967); *see also ILA I*, 447 U.S. at 504.

The majority concludes that because ILA workers perform "the loading and unloading generally at East and Gulf ports," *ante* at 18, as described without exception in the Master Contract between the ILA and the Maritime Alliance, the ILA's efforts at the Port of Charleston were intended merely to preserve such work for union workers.  This conclusion, however, is fundamentally flawed because it fails to focus on the work performed by the relevant bargaining unit, Local 1422, as required.  S*ee ILA I*, 447 U.S. at 507 (requiring the analytical focus to be on "whether an agreement seeks no more than to preserve the work *of bargaining unit members*" (emphasis added)); *Marrowbone Dev. Co. v. Dist. 17, United Mine Workers of Am.*, 147 F.3d 296, 302–03 (4th Cir. 1998) (same).  Moreover, the majority's premise for making this argument is inaccurate.  While ILA workers do *generally* operate the cranes in East Coast and Gulf Coast ports, the undisputed facts of record show a longstanding exception to that generalization — they have *never* operated cranes in the Ports of Charleston, Wilmington, and Savannah, each of which has *always* operated with a hybrid division of labor.  Thus, the ILA's effort to bring about

change in the Port of Charleston to eliminate the hybrid model in favor of 100% ILA work was clearly an effort *to acquire* work, which, as it was attempted, was illegal, and not the lawful effort *to preserve* work. The record shows further that the ILA faced no loss or threatened loss of work in the Port of Charleston from the opening of the new terminal. Moreover, as the ALJ found, there is no record evidence that the opening of the new terminal caused or threatened to cause loss of work at any other port on the East Coast or Gulf Coast.

I agree with the ALJ in this case, as well as the dissenting member of the National Labor Relations Board ("NLRB" or the "Board"), both of whom concluded that the ILA committed an unfair labor practice in violation of § 8(b). I would therefore grant the Ports Authority's petition for review, reverse, and remand to require the Board to provide relief to the Ports Authority.

I

In the spring of 2021, the Ports Authority opened the Hugh K. Leatherman, Sr., Terminal in the Port of Charleston, operating the new terminal with the same hybrid division of labor that had been in use at the port for some 50 years. Under the hybrid model, state employees operate the state-owed cranes at the port and ILA workers perform all other longshore work. The state employees are not represented by the ILA, and the Ports Authority has no agreement with the ILA governing the terms and conditions of the Ports Authority's employment of crane operators. This hybrid model is also in use at the Ports of Wilmington and Savannah.

The vast majority of container ships that call at the Port of Charleston are owned by carriers who are members of the United States Maritime Alliance, which represents the carriers in negotiating collective bargaining agreements with the ILA. The most recent "Master Contract" between the ILA and the Maritime Alliance became effective in 2018 and will continue to 2024.

The Master Contract provides the terms and conditions for union longshore work in all the ports on the East Coast and Gulf Coast — "from Maine to Texas." It requires that all Maritime Alliance members' cargo be loaded and unloaded exclusively by ILA longshore workers. While the Master Contract contains no explicit exception for crane operators in the Ports of Charleston, Savannah, and Wilmington, the parties agree that the crane operators in those ports have never been union workers. And the Master Contract recognizes this in Article VII, § 7(a)–(b):

> (a)    [The Maritime Alliance] and the ILA shall conduct a study to determine how the *business model currently used by port authorities in the Ports of Charleston, SC, Savannah, GA, and Wilmington, NC could be altered* to permit work currently performed by state employees to be performed by Master Contract-bargaining-unit employees in a more productive, efficient, and competitive fashion. *[The Maritime Alliance] and the ILA will use this study to meet with these port authorities in an effort to convince them to employ Master Contract-bargaining-unit employees*.

> (b)    [The Maritime Alliance] agrees to formally notify any port authority contemplating the development of or intending to develop a new container handling facility that [Maritime Alliance] members may be prohibited from using that new facility if the work at that facility is not performed by Master Contract-bargaining-unit employees.

(Emphasis added).

36

The study contemplated by § 7(a) was never conducted, and no action has ever been taken before the ILA's activities in this case with respect to the Maritime Alliance members' right to call at these three ports. Even so, the representatives of the ILA and the Maritime Alliance disagree over the meaning of § 7. The ILA asserts that it precludes Maritime Alliance carriers from calling at the new terminal in the Port of Charleston unless the terminal is staffed "100 percent ILA," while the Maritime Alliance asserts that § 7 was intended merely to cabin the hybrid model to those ports using the hybrid model.

Despite the long and consistent history of the hybrid model's being used at the three ports, the ILA has been intent on changing the model and acquiring 100% of the work at those ports. Before the new terminal in the Port of Charleston opened, the ILA met with representatives of the State of South Carolina and the Ports Authority in an effort to persuade the Ports Authority to make the change at the new terminal. As the ALJ noted, the ILA representative stated that the ILA "[was] interested in consuming all the jobs at the Leatherman Terminal" and that the ILA representative "opposed the use of the hybrid operating model throughout his 24-year career as a union officer." The representative also stated that with the opening of the new terminal, the ILA decided to focus on combatting the use of the hybrid model at the Port of Charleston because "Charleston just happened to be the 'first terminal up at bat.'"

When negotiations between the ILA and the Ports Authority failed and the new terminal opened using the hybrid model, the ILA pursued a different course and filed an action against the Maritime Alliance and two member carriers who had called at the new terminal, alleging that they violated the Master Agreement between the ILA and the

Maritime Alliance.  The ILA sought $300 million in damages, intending to deter other carriers from calling at the new terminal.  That effort proved effective.  Thereafter, no Maritime Alliance carriers called at the new terminal, causing the State and the Ports Authority substantial damages, as it presently operates at only 10% capacity.

The Ports Authority filed two unfair labor practice charges against the ILA.  In the first, it alleged that by employing the ILA's interpretation of Article VII, § 7 of the Master Contract, the ILA illegally attempted to require Maritime Alliance carriers to refrain from dealing with the Ports Authority at its new terminal, in violation of § 8(e) of the NLRA.  In the second charge, the Ports Authority alleged that the ILA filed suit against the Maritime Alliance and its member carriers with the unlawful objective of forcing Maritime Alliance carriers to cease doing business with the Ports Authority and thereby to coerce the Ports Authority to assign union workers to state-owned cranes, in violation of §§ 8(b) and 8(e).

After a two-day trial in June 2021, the ALJ dismissed the first unfair practice charge because the language of § 7 did not *require* the Maritime Association to refrain from calling at the new terminal but merely required the Maritime Alliance members to *warn* the Ports Authority that they *may* not be able to use the new terminal if it used the hybrid model. With respect to the second charge, however, the ALJ found that the ILA's action in filing suit against the Maritime Alliance was an illegal effort to create a secondary boycott with the purpose of *acquiring new work*, not *preserving existing work*.  The ALJ drew on the Supreme Court's distinction in *National Woodwork* between contractual provisions employed as a "'sword' to reach out and acquire new work" and provisions employed as a "'shield' to retain work traditionally performed by Union employees." (Quoting *National*

*Woodwork*, 386 U.S. at 630).  The ALJ concluded that the ILA had used its suit to enforce the Master Contract as a "sword" to acquire new work because "a condition precedent to finding a lawful work preservation object is evidence of an actual or anticipated threat to [bargaining] unit jobs."  He found both (1) that the ILA had not adduced sufficient evidence to support its claim that the new terminal in the Port of Charleston threatened existing ILA jobs, and (2) that there was concrete evidence of the ILA's "desire to obtain all the container work at the Leatherman Terminal, as well as at any future container-handling facilities."  Both findings supported a conclusion that the purpose of the ILA's activities was to acquire work.

While the NLRB affirmed the ALJ's dismissal of the first charge, it reversed the ALJ's finding of an unfair labor practice with respect to the second charge by a 2-to-1 vote. The panel majority concluded both that the ALJ took too narrow a view "of the work preservation defense" and that the object of the ILA's lawsuit was actually work preservation.  It found that the primary object of the suit was to force the Maritime Alliance members to give longshore work to ILA members by avoiding the Leatherman Terminal in favor of facilities staffed completely by ILA workers, and that any secondary effects on the Port of Charleston were unintended — and thus permissible.  With respect to the ALJ's conclusion that there was no job loss or threat thereof, the majority said that the ILA was merely pursuing job preservation, a conclusion it took to be supported by the history of containerization and its effect on longshoremen, citing *NLRB v. Int'l Longshoremen's Ass'n (ILA II)*, 473 U.S. 61, 79 (1985).  It also concluded that the ILA's activity was not a secondary effort directed at the Ports Authority but rather was legitimately directed at the

39

Maritime Alliance and its carriers because the carriers had "the power to give the employees the work in question, and therefore, are primary employers."

From the NLRB's order of December 16, 2022, dismissing the Ports Authority's charges against the ILA, the Ports Authority filed this petition for review.

II

Section 8(b) of the NLRA forbids "forcing or requiring any person . . . to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). And § 8(e) of the NLRA forbids any employer from entering "into any contract or agreement . . . whereby such employer ceases or refrains or agrees to cease . . . doing business with any other person." *Id.* § 158(e). The general principles implemented by these provisions are not complex or even unique to labor law. While the NLRA allows union activities "having the object of pressuring the employer for agreements regulating relations between [the employer] and [its] own employees," it prohibits "'secondary' objectives" — that is, the "use of the boycott to further [a union's] aims by involving an employer in disputes not [that employer's] own." *National Woodwork*, 386 U.S. at 620. As the *National Woodwork* Court noted:

> The congressional design in enacting § 8(b)(4)(A) is therefore crucial to the determination of the scope of §§ 8(e) and 8(b)(4)(B). Senator Taft said of its purpose:
>
>> This provision makes it unlawful to resort to a *secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employees*.

* * *

40

And the Senate Committee Report carefully characterized the conduct prohibited by § 8(b)(4)(A) in the same terms:

> Thus, it would not be lawful for a union to engage in [a] strike against employer A for the purpose of forcing that employer to cease doing business with employer B; nor would it be lawful for a union to boycott employer A because employer A uses or otherwise deals in the goods of or does business with employer B (with whom the union has a dispute).

*Id.* at 624–25 (emphasis added). Thus, in enacting §§ 8(b) and 8(e), "Congress intended to reach only agreements with *secondary* objectives." *ILA I*, 447 U.S. at 504 (emphasis added). In other words, § 8(b) does not prohibit the kinds of activities described where those activities are directed toward achieving primary union objectives, and "[a]mong the primary purposes protected by the [NLRA] is 'the purpose of *preserving* for the contracting employees themselves work traditionally done by them.'" *Id.* (emphasis added) (quoting *NLRB v. Enterprise Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. & Gen. Pipefitters of N.Y.* (*Pipefitters*), 429 U.S. 507, 517 (1977)). Thus, if a union's activity is directed at preserving "work traditionally performed by [bargaining unit employees]" and if the target of the union action has the "right of control" over that work — *i.e.*, the right to decide who performs the work — then the union activity is permitted even where it would otherwise violate the letter of § 8. *Id.* Because § 8(b) facially prohibits union activities "requiring any person . . . to cease doing business with any other person," 29 U.S.C. § 158(b)(4)(ii)(B), the union carries the burden of establishing the affirmative defense that its activities are nonetheless permissible on the ground that they (1) have the purpose of *preserving* for its employees the work traditionally done by them, rather than

41

acquiring new work, and (2) are *directed at the employer with the right to control the work*, *see ILA I*, 447 U.S. at 504; *Marrowbone*, 147 F.3d at 302.

I conclude that the ILA's activities clearly fall under § 8(b) and that the ILA did not carry its burden to avoid liability. The intent of its conduct in filing suit against the Maritime Alliance was *to gain* union work, not to preserve it, as the ILA failed to show any loss or threatened loss of work caused by the opening of the new terminal in the Port of Charleston. Furthermore, its effort was not directed against the employer it was seeking to persuade — the Ports Authority — but against customers of the Ports Authority, *i.e.*, the Maritime Alliance and its members. Those entities had no control over the Ports Authority's employees, except to bring collateral pressure on the Ports Authority with a boycott, and thus the ILA's activity was secondary. In pursuing these activities, the ILA violated § 8(b) and thus committed an unfair labor practice, as charged by the Ports Authority. I address in turn the ILA's failure to demonstrate each of the two requirements of the affirmative defense.

A

With respect to the first requirement, the NLRB and the ILA contend that the ILA is entitled to the benefit of its Master Contract, which has as its purpose "to preserve traditional work and the jobs of union employees in the face of the technological advances [such as containerization] affecting the coastal units." While this assertion is true enough, it gains the ILA nothing unless it also shows that the opening of the new terminal in the Port of Charleston threatened a loss of work from technological advances and that its

42

actions were directed toward preserving that work. To fill that gap in its reasoning, the Board and the ILA argue that when more cargo — and therefore work — is directed to the Port of Charleston or the other two ports using the hybrid model, work is being pulled away from all other ports, which use only ILA workers. First, this analysis is too broad and is inconsistent with the focused analysis required for determining whether work is being preserved or acquired. As our court held in *Marrowbone*, "regardless of whether the agreement is national in scope, in determining whether it preserves or acquires work, the analysis must focus on the work of the local employees and not those elsewhere." 147 F.3d at 303 (citing *ILA I*, 447 U.S. at 507 (noting that "the Board must focus on the work of the bargaining unit employees, not on the work of other employees who may be doing the same or similar work")). The NLRB and ILA's argument focusing on all coastal units is thus legally irrelevant.

Second, even the broad argument that the NLRB and the ILA make lacks support in the record. The record lacks any evidence to show that the new terminal caused the diversion of cargo in a manner that resulted in loss of union work, and the ILA only offered the thought that "discretionary cargo work *might* migrate from ILA-controlled ports to Charleston" (emphasis added), which the ALJ characterized as "vague speculation."

Moreover, without any apparent logic, both the NLRB and the majority also describe the ILA's impetus in this case as being the loss of traditional work performed by union workers emanating from the containerization of cargo in the 1950s. But there is no factual or logical basis to conclude that the ILA's effort to obtain the crane-operating work at the new terminal in the Port of Charleston is an effort to preserve work lost by

containerization.  Both of the first two terminals in the Port of Charleston, as well as the new terminal, handle containerized cargo, and the division of labor has always been that state employees operate the state-owned cranes, and the union workers perform the other longshore work.  Simply, the issue is not whether there was a historic loss of work because of containerization — that issue is long past for this case — but whether the union can change the post-containerization settled status quo of the hybrid model's use at the Port of Charleston to obtain 100% ILA work at the new terminal.

Not only have the NLRB and the ILA not shown a loss or threatened loss of work at other ports, they have not even shown any loss or threatened loss of work by Local 1422 within the Port of Charleston, the burden that they must carry.  The cranes in the Port of Charleston were *always* operated by state employees and *never* by union workers, and the record shows that the hybrid division of work that existed before the opening of the new terminal continued thereafter without change.  The ALJ found, and no one challenges on appeal, that after the new terminal opened, the same division of work and the same proportion of workers were used at the new terminal as had been used at the other two terminals in the port.  There was no transfer of workers from the other two terminals to the new one, but rather the new terminal was staffed by new employees, in the same proportion that had always existed in the port *i.e.*, the status-quo hybrid model.  As the ALJ found, "There is no evidence that the work performed by state employees at the Leatherman Terminal differed in any way from the other Port of Charleston terminals.  The same is true regarding the work of [union] members performed there."

44

Both the NLRB and the ILA, perhaps recognizing that the undisputed facts show no loss or threatened loss of jobs anywhere, argue with some futility that the ILA need not show "a specific loss or threat of loss of jobs" because of the "unique" context of longshore work, citing *ILA I*, *ILA II*, and *American Trucking Ass'ns v. NLRB*, 734 F.2d 966 (4th Cir. 1984). But this position is conclusively refuted by the very sources that the NLRB and ILA cite, and their argument simply amounts to a concession of error. *ILA I* was, of course, a maritime shipping case — decided much closer in time to the immediate aftereffects of containerization — and yet even in that case, the Supreme Court expressly reaffirmed the requirement that a union make a precise showing of there being *an actual or imminent threat to bargaining-unit jobs*. In other words, the requirement of a rigorous showing was imposed by the Supreme Court in a case that took place within precisely the same "unique maritime context" as this dispute. Thus, the maritime context of this case in no way relieves the ILA of the requirement that its activity be directed at *preserving work traditionally performed* by the relevant bargaining unit of the union. As the Supreme Court stated:

> Identification of the work at issue in a complex case of technological displacement requires a *careful analysis of the traditional work patterns* that the parties are allegedly seeking to preserve, and of *how the agreement seeks to accomplish that result* under the changed circumstances created by the technological advance. The analysis must take into account "all the surrounding circumstances," including the nature of the work *both before and after the innovation*. . . . Whatever its scope, . . . the inquiry must be *carefully focused*: to determine whether an agreement seeks *no more than* to preserve the work of bargaining unit members, the Board must focus on the work of the bargaining unit employees . . . .

*ILA I*, 447 U.S. at 507 (emphasis added) (quoting *National Woodwork*, 386 U.S. at 644).

The Board's conclusions to the contrary are owed deference only if they are "supported by substantial evidence." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 493 (1951) (quoting 29 U.S.C. § 160(e)). Yet, there is no evidence in this case supporting the proposition that any ILA jobs were lost or threatened by the use of the hybrid model at the new terminal and were therefore in need of preservation.

This case closely resembles a course of conduct explicitly described as impermissible by the Supreme Court in *Pipefitters*. In that case, an agreement required that unionized workers perform threading and cutting of pipes themselves while on the job, rather than working with pre-threaded and pre-cut pipes. *Pipefitters*, 429 U.S. at 511–12. The Court held that the union's actions in furtherance of that contract — a boycott of a neutral subcontractor without authority to control whether the right kinds of pipes were ordered for the job site — were illegal. *Id.* at 520–21, 528–31. The Court explained that while the union's activity was *partially* premised on permissible primary objectives, it was also clearly partially premised on impermissible secondary objectives — it was enough that "*an* object" of the union's activities was an illegal secondary objective. *Id.* at 528 (emphasis added); *see also id.* at 529–30 n.16 (stating that if a union were to attempt to capture work it had previously acquiesced to non-union workers' performing, such conduct would serve "not to preserve, but to aggrandize, its own position and that of its members," concluding that "[s]uch activity is squarely within the statute" and thus prohibited).

In this case, the impermissible secondary objective motivating the ILA's suit against the Maritime Alliance was to obtain *new work* by means of a boycott of the Ports Authority's new terminal.

46

B

To satisfy the second part of the *ILA I* test for demonstrating a defense of an alleged § 8(b) violation, the ILA must show that the Maritime Alliance had the "right of control" over the work at issue. *ILA I*, 447 U.S. at 504. To meet that test, the Board and the ILA argue that the boycott effected in this case was not secondary, as prohibited by § 8(b), but primary, because the Maritime Alliance had the *right of control* over the crane-operating work in the Port of Charleston. They make this claim on the basis that the Maritime Alliance carriers have discretion as to where their ships call, and thus they can, in exercising that discretion, offload ships at ports staffed solely by ILA workers. The majority adopts the same reasoning, describing the Maritime Alliance members as having the power to "unilaterally give [the] work to union members." *Ante* at 27. But the ILA's coercing the Maritime Alliance members to exercise this power is precisely what § 8(b) prohibits as an illegal secondary boycott. *See National Woodwork*, 386 U.S. at 627 (noting Congress's concern with the "dangerous practice of unions" to widen industrial conflict by creating coercive pressures on neutral employers) (cleaned up). Rather than dealing with the Ports Authority directly with respect to the work that the Ports Authority controls, the ILA brought pressure against the Ports Authority's customers in an attempt to coerce the Ports Authority. This is secondary activity and is illegal.

It must be recalled that, as an undisputed matter, the crane operators at the Port of Charleston are employees of the Ports Authority, hired and paid by it. Neither those employees nor the Ports Authority are under any contract with the ILA with respect to

47

crane-operating work.  The crane workers are thus neither employees of the Maritime Alliance carriers nor under their control, as required for the ILA's actions to be lawful. The Maritime Alliance carriers were contractual strangers to the crane operators employed by the Ports Authority.  While it would indeed be primary conduct for the ILA to deal directly with and bring pressure on the Ports Authority about the assignment of union workers to crane operation, it was secondary conduct for them to seek to achieve that result through a coercive suit against the Maritime Alliance.  The determining fact focuses on whether there was a contractual relationship between the Maritime Alliance carriers and the port workers.  As the Supreme Court made clear:

> Whether an agreement is a lawful work preservation agreement depends on "whether, under all the surrounding circumstances, the Union's objective was preservation of work for bargaining unit employees, or whether the agreement was tactically calculated to satisfy union objectives elsewhere. . . .  The touchstone is whether the agreement or its maintenance is addressed to *the labor relations of the contracting employer vis-à-vis his own employees*."

*ILA I*, 447 U.S. at 504 (emphasis added) (cleaned up) (quoting *National Woodwork*, 386 U.S. at 644–45).  The Court explained that "if the contracting employer has *no power to assign the work*, it is reasonable to infer that the agreement has a secondary objective, that is, to influence whoever does have such power over the work."  *Id.* at 504–05 (emphasis added).  Of course, in this case, it was the Ports Authority that had the right to assign the work.

Not only does the argument that the Board and the ILA make with respect to the right of control fly in the face of controlling Supreme Court precedent, the ILA's own statements and testimony fairly concede that the Ports Authority is the relevant employer.

48

First, the complaint in the ILA's lawsuit against the Maritime Alliance states that a Maritime Alliance ship "went to the Leatherman Terminal even though it knew that the non-bargaining unit employees who were *not covered* by the Master Contract *would be hired* to unload its containers."  Moreover, in previously negotiating with and attempting to persuade the Ports Authority, the ILA by its actions acknowledged that it was the Ports Authority that would assign the employees and that it was the Ports Authority whom had to persuade to use union workers.  But then, when those negotiations failed, the ILA sought to bring secondary pressure on the Ports Authority by intimidating Maritime Alliance carriers, who otherwise would call at the new terminal, thereby forcing them not to do so and thus effecting a secondary boycott — the exact course of conduct that Congress prohibited when it enacted § 8(b).

### III

Finally, *ILA II* instructs that an absence of unlawful secondary purposes is essential to a defense against charges under § 8(b).  473 U.S. at 82.  But the record here shows clearly, by undisputed evidence, that the ILA's purpose was to acquire new work, not to preserve existing work.  An ILA representative acknowledged at trial that the very origin of Article VII in the Master Contract was the ILA's desire to "have all of the work . . . that is performed by nonbargaining workers to be brought under the ILA jurisdiction."  An ILA vice president also testified that the purpose of Article VII of the Master Contract was to establish that, with respect to new terminals, the "jobs would be bargaining unit workers . . . or else those [carriers] would be prohibited from coming into those terminals."  The ILA

representative also testified that the ILA was interested in "consuming all the jobs," and that in doing so it was trying to "grow" its business. The goal of *growing* union work through secondary pressure renders the ILA's activity illegal and an unfair labor practice under § 8(b).

*     *     *

For the reasons given, I would grant the Ports Authority's petition for review and reverse the NLRB's order and remand with instructions to grant relief to the State and the Ports Authority.